# EXHIBIT B

8/9/2024 3:20 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 90739849
By: Tianni Williams
Filed: 8/9/2024 3:20 PM

CAUSE NO. _____

| | | |
|---|---|---|
| ANKOR ENERGY LLC, | § | IN THE DISTRICT COURT |
| ANKOR E&P HOLDINGS | § | |
| CORPORATION, and | § | |
| KNOC EAGLE FORD CORPORATION | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| SANARE ENERGY PARTNERS, LLC, | § | |
| GREYHOUND ENERGY LLC, and | § | |
| GOMEX FINANCE, LLC | § | |
| | § | |
| Defendants | § | _____ JUDICIAL DISTRICT |

## ORIGINAL PETITION

Plaintiffs, ANKOR Energy LLC ("**ANKOR**"), ANKOR E&P Holdings Corporation ("**AEPH**"), and KNOC Eagle Ford Corporation ("**KNOCEF**") file this Original Petition against Defendants, Sanare Energy Partners, LLC ("**Sanare**"), Greyhound Energy LLC ("**Greyhound**"), and Gomex Finance, LLC ("**Gomex**").

## DISCOVERY CONTROL PLAN

1.      Plaintiffs request that discovery in this case be conducted under Level 3 as described in Rule 190.4 of the Texas Rules of Civil Procedure.

## STATEMENT OF RELIEF

2.      Plaintiffs bring this action against Defendants for breach of contract, specific performance, legal subrogation, declaratory relief, attorneys' fees, interest, court costs, collection costs, unjust enrichment, quantum meruit, and violations of the Texas Fraudulent Transfer Act (Texas Business and Commerce Code, Title 3, Chapter 24).  Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiffs seek monetary relief of over $1,000,000 and non-monetary

LG\388446.9

relief. Plaintiffs further seek certain declarations under the Uniform Declaratory Judgment Act, Texas Civil Practice and Remedies Code §§ 37.001 et seq.  Plaintiffs also demand a judgment for all other relief, both general and special, at law or in equity, to which they are deemed entitled.

## PARTIES

3. A.  *The Plaintiffs are:*

      i.     ANKOR Energy LLC, a limited liability company organized and existing under the laws of the state of Delaware, whose principal place of business is in Metairie, Louisiana.

      ii.     ANKOR E&P Holdings Corporation, a corporation organized and existing under the laws of the state of Delaware, whose principal place of business is in Metairie, Louisiana.

      iii.     KNOC Eagle Ford Corporation, a corporation organized and existing under the laws of the state of Delaware, whose principal place of business is in Houston, Texas.

3. B.  *The Defendants are:*

      i.     Sanare Energy Partners, LLC, a limited liability company organized and existing under the laws of the state of Delaware, whose principal place of business and home office is in Houston, Texas at 777 North Eldridge Parkway, Suite 390, Houston, TX 77079. Sanare Energy Partners, LLC may be served with process by serving in person or by registered or certified mail, return receipt requested, its registered agent, Corporation Service Company dba CSC – Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

      ii.     Greyhound Energy LLC, a limited liability company organized and existing under the laws of the state of Delaware, whose principal place of business and home office is in Houston, Texas, at 777 North Eldridge Parkway, Suite 390, Houston, TX 77079.  Greyhound Energy LLC may be served with process by serving in person or by registered or certified mail,

LG\388446.9

return receipt requested, its registered agent, Charles Rougeau at 777 North Eldridge Parkway, Suite 390, Houston, Texas 77079.

   iii. Gomex Finance, LLC, a limited liability company organized and existing under the laws of the state of Delaware and doing business in the state of Texas. Gomex has not registered as a foreign entity with the Secretary of State for the State of Texas and/or has failed to appoint or does not maintain a registered agent in the State of Texas and may be served with process through the Secretary of State for the State of Texas in accordance with TEX. BUS. ORG. CODE §§ 5.251(1)(A), 5.251(2)(B) & 5.304(a). Additionally, Gomex Finance LLC may be served with process by serving in person or by registered or certified mail, return receipt requested, its registered agent THE CORPORATION TRUST COMPANY, CORPORATION TRUST CENTER, 1209 Orange St., Wilmington, DE 19801.

## JURISDICTION AND VENUE

  4. The Court has subject matter jurisdiction over the lawsuit because the amount in controversy exceeds this Court's minimum jurisdictional requirements.

  5. The Court has personal jurisdiction over the Defendants because Sanare and Greyhound are registered to do business in the State of Texas, with their principal places of business in Houston, Harris County, Texas and because Gomex transacts business in Harris County, Texas. Additionally, the Defendants performed actions giving rise to the allegations in Texas, and such actions are a substantial part of the events giving rise to the claims asserted herein, which occurred in Harris County, Texas.

  6. Venue is proper in Harris County, Texas pursuant to Texas Civil Practice and Remedies Code Section 15.002, because Sanare Energy Partners, LLC and Greyhound Energy LLC have their principal places of business in Harris County, Texas. TEX. CIV. PRAC. & REM.

CODE § 15.002(a)(3). Venue is also proper in Harris County pursuant to § 15.002 of the Texas Civil Practice & Remedies Code because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in Harris County, Texas. TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1). Additionally, venue is proper in Harris County, Texas, because venue as to one defendant is proper as to all defendants in all claims and actions arising out of the same transaction, occurrence, or series of transactions or occurrences. TEX. CIV. PRAC. & REM. CODE § 15.005.

## NATURE OF THE CASE

7. Defendant Sanare has breached, and continues to breach, contractual obligations and has failed, and continues to fail, to pay its share of expenses required to operate and decommission certain wells, platforms, and other infrastructure located on two federal oil and gas leases in the Gulf of Mexico region of the OCS. Plaintiff ANKOR, in its capacity as operator of the relevant leases, and Plaintiffs AEPH and KNOCEF, in their capacities as co-owners with Sanare in the leases, seek money damages to compensate themselves for Sanare's failure to pay its contractual obligations.

8. Defendant Sanare further harmed Plaintiffs when Sanare, while refusing to pay amounts due to Plaintiffs, transferred substantial income-producing properties to an affiliated entity, Defendant Greyhound. Greyhound, upon information and belief, is owned and controlled by entities and individuals who also own and control Sanare, as well as the primary debt provider for Sanare. Predictably, this purposeful conduct further undermined Sanare's ability to pay its contractual obligations and, upon information and belief, rendered Sanare insolvent or further deepened Sanare's insolvency. Plaintiffs allege the right to annul the transfer and to assert other causes of action stemming from this conduct.

9.     Sanare also mortgaged and/or conveyed substantial income-producing properties to Defendant Gomex, as security for a loan in favor of Defendant Greyhound – Sanare received no benefit from this transaction. Like the assignment to Greyhound, Sanare's intentional conduct further undermined its ability to pay its contractual obligations and, upon information and belief, rendered Sanare insolvent or further deepened Sanare's insolvency.  Plaintiffs allege the right to avoid and/or annul the mortgage and to assert other causes of action stemming from this conduct.

## BACKGROUND

**I.     SANARE ENERGY PARTNERS, LLC**

10.     On August 1, 2018, Sanare, as successor and assignee of SCL Resources, LLC ("**SCL**"), acquired all rights and obligations of SCL, including its 15% ownership interest in the following two federal oil and gas leases: (a) Lease No. OCS 00577, covering the West 1/2 of Block 208 in the Eugene Island Area of the OCS (the "**EI 208 Lease**") and (b) Lease No. OCS-G 13606, covering all of Block 379 in the Vermillion Area of the OCS (the "**VR 379 Lease**").  The EI 208 Lease and VR 379 Lease are collectively referred to as the "**Leases**."

11.     During all periods relevant to this lawsuit, ownership in the EI 208 Lease has been divided as follows: (a) Sanare holds a 15% interest, (b) AEPH holds a 67% interest, and (c) GS E&R America Offshore, LLC ("**GS**") holds the remaining 18% interest.  During all periods relevant to this lawsuit, ownership in the VR 379 Lease has been divided as follows: (a) Sanare holds a 15% interest, (b) KNOCEF holds a 67% interest, and (c) GS holds the remaining 18% interest.

12.     During all relevant periods, operations on the Leases have been governed by an Offshore Operating Agreement (the "**OOA**") dated effective December 23, 2011, which is attached as <u>Exhibit 1</u>.

13.     The owners in the Leases (*i.e.*, Sanare, AEPH, KNOCEF, and GS) are parties to the OOA and serve as "Non-operators" thereunder.  Sanare became a party to the OOA effective as of August 1, 2018, when it acquired its interest in the Leases.

14.     ANKOR, a non-owner, is the remaining party to the OOA and serves as "Operator" thereunder.

15.     Pursuant to the OOA, ANKOR, as Operator, conducted all operations on the Leases on behalf of the Non-operators, and the Non-operators agreed to pay all costs associated with any operation based upon their respective ownership interests in the Leases.

16.     Pursuant to the OOA, ANKOR, as Operator, incurs the expenses associated with the operations and invoices the Non-operators for their proportionate shares thereof through monthly joint interest billing statements ("**JIBs**").

17.     Such operations conducted by ANKOR on the Leases pursuant to the OOA included operations necessary to decommission the Leases as required by applicable federal regulations.  Such operations are ongoing.

18.     The Leases produced oil and gas for a number of years; however, production on the Leases eventually ceased. As a result, the EI 208 Lease terminated on May 7, 2022, and the VR 379 Lease terminated on December 20, 2022.

19.     Following termination of an OCS lease, the federal regulations promulgated under Outer Continental Shelf Lands Act ("**OCSLA**"), namely 30 CFR § 250.1710 and 30 CFR § 250.1725, require that all wells, platforms, and other facilities located on the lease be decommissioned within 1 year of termination.

LG\388446.9

20.     The OOA, furthermore, provides that the Operator shall perform any decommissioning operations required by law with the costs to be shared by the Non-operators in proportion to their ownership interests in the Leases.

21.     Therefore, pursuant to the federal regulations and the OOA, ANKOR, as Operator, performed, and continues to perform, the necessary operations to decommission the EI 208 Lease and the VR 379 Lease.

22.     ANKOR, as Operator, has incurred (and continues to incur) expenses associated with decommissioning the Leases, and ANKOR sent JIB invoices to the Non-operators for their proportionate shares thereof.

23.     Under the express terms of the OOA, Sanare was required to pay its proportionate 15% share of the JIBs within 30 days of receipt; however, it failed and continues to fail to do so. Due to Sanare's failure to timely pay its share of the JIBs, ANKOR sent multiple letters to Sanare notifying it of its default and demanding that Sanare pay.

24.     Nevertheless, despite written notice and demand, Sanare failed – and continues to fail – to pay its share of the JIBs and remains indebted to Plaintiffs for its proportionate share.

25.     Even though Sanare has failed to pay its obligations, it has admitted that it owes the payments.

26.     At present, Sanare's share of the decommissioning costs incurred from July 2022 through June 2024, exclusive of interest, attorney's fees, and collection/court costs, totals $5,139,946.46. Below is a summary of Sanare's share of the decommissioning costs and the corresponding JIB months for those costs:

| JIB Month | Amount Due from Sanare |
|---|---|
| July 2022 | $201,025.58 |
| August 2022 | $297,970.60 |
| September 2022 | $356,400.16 |

| JIB Month | Amount Due from Sanare |
|---|---|
| October 2022 | $74,244.08 |
| November 2022 | $165,118.46 |
| December 2022 | $172,321.06 |
| January 2023 | $70,545.70 |
| February 2023 | $33,339.28 |
| March 2023 | $35,017.74 |
| April 2023 | $122,473.96 |
| May 2023 | $235,812.61 |
| June 2023 | $697,166.42 |
| July 2023 | $257,996.20 |
| August 2023 | $470,822.25 |
| September 2023 | $273,512.97 |
| October 2023 | $228,533.52 |
| November 2023 | $355,565.88 |
| December 2023 | $276,017.03 |
| January 2024 | $145,771.75 |
| February 2024 | $279,449.25 |
| March 2024 | $135,715.95 |
| April 2024 | $108,020.20 |
| May 2024 | $86,425.44 |
| June 2024 | $71,193.37 |

Copies of the JIBs reflected above are attached, *in globo,* as <u>Exhibit 2.</u>

27.     Additionally, Sanare owes $10,513.00 for its share of a surety bond fee covering the Leases (the "**Guarantee Fee**").

28.     Sanare has only paid $955,000.00 toward its share of the JIBs and the Guarantee Fee.

29.     Accordingly, Sanare owes Plaintiffs through June 2024 **$4,195,459.46** ($5,139,946.46 + $10,513.00 – $955,000.00).

30.     Plaintiffs project Sanare's share of additional decommissioning expenditures to be $2,096,728.95 for the EI 208 Lease and $2,428,654.35 for the VR 379 Lease.

31.     Upon information and belief, Sanare has approximately $630,478.26 in escrow (with interest accruing daily, as it is an interest-bearing account), relating to certain plugging and abandonment obligations with respect to the EI 208 Lease, to which Plaintiffs are entitled.

LG\388446.9

### The Trust and Escrow Agreements

32.     On August 6, 2009, Pioneer Shelf Properties Incorporated ("**Pioneer**"), Northstar Offshore Energy Partners, LLC ("**Northstar**"), and Wells Fargo Bank, National Association (the "**Trustee**"), entered into an Abandonment Trust Agreement with Escrow (the "**EI Trust**"). The EI Trust provides, *inter alia*, for Northstar to be responsible for and comply with certain duties and obligations, including plugging and abandonment obligations, with respect to the EI 208 Lease.

33.     Subsequently, Pioneer and Northstar, along with AEPH, STX Energy E&P Offshore Management, LLC, and SCL as assignees of Northstar and the Trustee, entered into an Assignment and Assumption of Abandonment Trust Agreement with Escrow, dated as of December 22, 2011 (the "**Assumption Agreement**").

34.     Sanare, as a subsequent assignee of SCL, became a party to the EI Trust and the Assumption Agreement.

35.     Pursuant to the EI Trust, Sanare is required to pay its proportionate share of all plugging and abandonment expenses related to the EI 208 Lease.  Sanare has failed to do so.

36.     As such, based on its defaults to pay its proportionate share of decommissioning expenses for the EI 208 Lease and the VR 379 Lease under the OOA and under the EI Trust, Sanare's share of the EI Trust should be paid over to Plaintiffs as a reimbursement of amounts due and owing for decommissioning expenses.

37.     Plaintiffs seek a declaration from this Court declaring that Plaintiffs are entitled to the $630,478.26 in escrow (and all interest that has accrued and continues to accrue thereto), as the expenses Plaintiffs incurred relating to the plugging and abandonment of the EI 208 Lease already significantly exceed this amount.

LG\388446.9

25

## II.	GREYHOUND ENERGY LLC

38.	Upon information and belief, David Wiley, among others, is an owner and member of three entities: Forward Path Energy, LLC ("**Forward Path**"), Sanare, and Greyhound.  All three entities are intertwined in the facts leading up to this lawsuit.

39.	On August 1, 2017, Sanare's predecessor by name change, Northstar Offshore Ventures, LLC, as mortgagor, granted a mortgage in favor of The First National Bank of Central Texas, as mortgagee ("**FNBCT**"), encumbering Lease No. OCS-G 4909, covering the Entire Block of Block 64 in the Main Pass Area of the OCS (the "**MP 64 Lease**").

40.	On November 16, 2018, Northstar Offshore Ventures, LLC changed its name to Sanare Energy Partners, LLC.

41.	On August 7, 2019, Sanare granted a mortgage to FNBCT adding Lease No. OCS-G 5692, covering the Entire Block of Block 65 in the Main Pass Area of the OCS (the "**MP 65 Lease**"), and Lease No. OCS-G 27070, covering the E1/2; E1/2W1/2 of Block 229 in the Vermilion Area of the OCS (the "**VR 229 Lease**") as encumbered properties.

42.	On April 16, 2020, FNBCT assigned its note and mortgages to Indemnity National Insurance Company ("**INIC**"), which upon information and belief, is an entity owned and controlled by David Wiley.

43.	On June 30, 2020, INIC assigned its note and mortgages to Kewa Financial Inc. ("**KEWA**"), which upon information and belief, is an entity owned and controlled by David Wiley.

44.	On December 29, 2020, KEWA assigned its note and mortgages to Forward Path, which upon information and belief, is an entity owned and controlled by David Wiley. Forward Path is also a member of Greyhound.

45.     On December 13, 2022 – after Sanare's unpaid debts to Plaintiffs began to accumulate – Sanare began to deplete itself of resources needed to pay its debts.   Sanare accomplished this by assigning 100% of its interests in various leases to Greyhound, as assignee, including the MP 64 Lease, the MP 65 Lease, and the VR 229 Lease (collectively, the "**Assignment**" or the **"Transferred Assets"**).   *See* Request of Assignment and BOEM Adjudication Approval, Received January 4, 2023, attached as Exhibit 3.   Moreover, this assignment was backdated to purportedly be effective December 31, 2021.

46.     Through these transactions, and in coordination with Sanare's refusal to pay, Sanare assigned the Transferred Assets to Greyhound, and Greyhound did not pay Sanare any funds; significantly, Greyhound gave nothing at all in exchange for the Assignment.

47.     Rather, upon information and belief, the Assignment was predicated upon a debt reduction of approximately $6 million, where Forward Path reduced Sanare's debt from $15 million to approximately $9 million.

48.     Upon information and belief, Forward Path is the 100% owner of Greyhound.   *See* BOEM qualification card for Greyhound attached as Exhibit 4.

49.     In other words, in an effort to avoid paying what will likely become a $6 to $8 million contractual obligation (upon completion of decommissioning) to Plaintiffs, Defendants worked together to render Sanare insolvent and strangle Sanare's ability to pay its ongoing and accumulating liabilities.

50.     Plaintiffs allege that appropriate value was not transferred in support of the transactions undertaken.

51.     Had Greyhound paid cash to Sanare for the Transferred Assets in lieu of debt forgiveness provided by an insider, Sanare would have the funds to pay the debts it currently owes to Plaintiffs.

52.     Instead, Greyhound received valuable assets, while Sanare simply received a cash-less reduction in debt owed to Forward Path, an entity owned and controlled by an insider of both Sanare and Greyhound (albeit debt reduction for much less than the true value of the Assignment), and Sanare received no cash consideration from the Assignment; instead, production proceeds to pay its vendors, including Plaintiffs, were severely reduced.  And by controlling each of these three entities (Greyhound, Forward Path, and Sanare), David Wiley constructed these transactions to enable Sanare to avoid paying contractual obligations it already owes to Plaintiffs by knowingly diverting these funds to entities he controls not encumbered by these decommissioning obligations.

53.     The intent and result of this scheme was for Sanare to shed its profitable assets (to its "sister entity," Greyhound) but retain its liabilities, debts, and valueless assets – leaving Sanare a worthless company against which its creditors cannot collect.

54.     To this end, Sanare has ceased operations and work in the Gulf of Mexico and has no sources of income; in contrast, Greyhound is producing the properties Sanare gave it.

55.     By no coincidence, Sanare's former vice president of corporate development and chief reservoir engineer, John Dobbs, left Sanare to become the CFO of Greyhound. Similarly, Sanare's former president and CEO, Charles Rougeau, left Sanare in January 2022 to become Greyhound's president and CEO.

## III.    GOMEX FINANCE LLC

56.     In furtherance of its scheme to defraud Plaintiffs, Sanare executed a certain Act of Mortgage, Security Agreement, Fixture Filing, Financial Statement and Assignment of Production

12

and Revenues dated September 6, 2022 ("**Gomex Mortgage**"), by which Sanare mortgaged and/or conveyed its assets to Gomex, including but not limited to the leases and wells for High Island Block A-571, Main Pass 64-65, and South Marsh Island 41 (the "**Mortgaged Assets**"). A copy of the Gomex Mortgage is attached hereto as <u>Exhibit 5</u>.

57.     Sanare received nothing in exchange for the Gomex Mortgage. Instead, the Gomex Mortgage was used to secure a loan of $30,000,000 from Gomex to Greyhound as opposed to Sanare, which actually owned the Mortgaged Assets.

58.     The Gomex Mortgage represents yet another attempt by Sanare to intentionally divest itself of assets in favor of Greyhound and to the detriment of its creditors (Plaintiffs), while receiving nothing of value (much less equal value) in return.

<u>**CAUSES OF ACTION**</u>

**I.      SANARE ENERGY PARTNERS, LLC**

     *A.      Breach of Contract*

59.     The allegations contained in Paragraphs 1 through 58 are hereby incorporated by reference.

60.     Sanare is a party to the OOA.  The OOA is a valid and enforceable contract.  Under the express terms of the OOA, Sanare agreed to pay its 15% proportionate share of all costs associated with operations on the Leases and the Guarantee Fee.  Sanare has failed to pay its share of costs and the Guarantee Fee and also failed to perform other obligations under the OOA. Plaintiffs have fully performed their respective obligations under the OOA.  Plaintiffs have satisfied any and all conditions precedent, conditions subsequent, and contract exceptions or any and all conditions precedent, conditions subsequent, and contract exceptions have occurred or been

waived or excused prior to the filing of the petition. The OOA is binding on Sanare. The contract is unambiguous.

61.     Despite written notice and demand, Sanare failed and refused to pay its share of the JIBs within 30 days of receipt.  Sanare's failure and refusal to timely pay its proportionate share of the JIBs and the Guarantee Fee constitutes a breach of its obligations under the OOA.  Sanare's defaults continue to accrue on a monthly basis.

62.     As a result of Sanare's breach of the OOA, Plaintiffs seek to recover sustained damages in the amount of $4,195,459.46 for JIBs incurred through June 2024 (and the Guarantee Fee), plus attorney's fees, interest, late fees, penalties, consequential damages, and costs incurred to collect.

63.     As the decommissioning operations for EI 208 and VR 379 Lease are not yet complete, damages continue to accrue.  Plaintiffs have incurred and will continue to incur decommissioning costs until this work is completed in accordance with applicable governmental regulations.  Based upon Sanare's non-payment of JIB statements for such costs to date, Plaintiffs anticipate that Sanare will fail and refuse to pay future JIB statements for the remaining decommissioning expenses.  This constitutes an anticipatory breach of the OOA by Sanare.  The decommissioning of the Leases should be completed during the pendency of this litigation, and Plaintiffs assert a claim for the recovery of Sanare's proportionate share of the additional decommissioning costs.  Plaintiffs will supplement their damages as the case proceeds to trial.

64.     In addition to damages (or as an alternative thereto), Plaintiffs seek an award of specific performance ordering Sanare to comply with all of its obligations under the OOA, including but not limited to its obligation to timely pay its share of the decommissioning expenses.

**B.**     *Legal Subrogation*

65.     The allegations contained in Paragraphs 1 through 64 are hereby incorporated by reference.

66.     Federal regulations promulgated under OCSLA provide that lessees are jointly and severally liable for decommissioning obligations as they accrue and until each obligation is met. *See* 30 CFR 250.1701; *see also* 30 CFR 250.146.   Federal regulations further provide that decommissioning obligations accrue when you drill a well or become a lessee of a lease on which there is a well that has not been permanently plugged.  *See* 30 CFR 250.1702.

67.     As a lessee in the Leases, therefore, Sanare is jointly and severally liable to the lessor (*i.e.*, the United States) for decommissioning the Leases.  30 CFR 250.1701.

68.     Plaintiffs, at their own cost and expense, have satisfied and continue to satisfy the decommissioning obligations required by law with respect to the EI 208 Lease and the VR 379 Lease pursuant to 30 CFR 250.1701.

69.     By performing the decommissioning on the Leases (and paying Sanare's share of the costs thereof), Plaintiffs have satisfied Sanare's portion of a joint and several obligations owed to the United States under 30 CFR 250.1701.

70.     As such, Plaintiffs are entitled to equitable and/or legal subrogation to the rights and priority of the United States for the amounts funded.

71.     Plaintiffs are therefore entitled to recover from Sanare its share of the decommissioning costs, legal interest, and all costs of these proceedings.

**C.**     *Declaratory Relief*

72.     The allegations contained in Paragraphs 1 through 71 are hereby incorporated by reference.

73.     The Plaintiffs state that a real and justifiable controversy exists between them and Sanare as to the amounts that Sanare owes to the Plaintiffs under the OOA.  The entry of a declaratory judgment would terminate the uncertainty and/or controversy giving rise to this proceeding.

74.     Pursuant to the Uniform Declaratory Judgment Act, Texas Civil Practice and Remedies Code §§ 37.001 *et seq.*, Plaintiffs request the Court construe the OOA and the various costs Sanare owes under the OOA and issue a declaratory judgment declaring the rights, status, and other legal relations between the Plaintiffs and Sanare.

75.     Based upon Sanare's non-payment of the JIB statements and the Guarantee Fee, Plaintiffs anticipate that Sanare will fail and refuse to pay future JIB statements for the remaining EI 208 Lease and the VR 379 Lease decommissioning expenses.  Plaintiffs seek declaratory relief that Sanare is and remains liable under the OOA for the payment in full of future JIB statements for the remaining costs associated with decommissioning the EI 208 Lease and the VR 379 Lease.

76.     Plaintiffs further seek a declaration that Plaintiffs are entitled to the $630,478.26 held in the EI Trust (plus all interest accrued and accruing) specifically for the plugging and abandonment obligations of the EI 208 Lease.

77.     By granting the declaratory relief sought by Plaintiffs, the Court will clarify an ongoing and continuing dispute between Plaintiffs and Defendant Sanare with regards to the OOA and EI Trust.  Plaintiffs are seeking affirmative relief itself, including but not limited to seeking an interpretation of agreements that would have the effect of defining the obligations of the Parties for the foreseeable future.

78.     Plaintiffs have incurred costs and reasonable and necessary attorneys' fees in seeking this declaratory judgment.  Accordingly, Plaintiffs also respectfully request that the Court

16

award Plaintiffs' costs and reasonable and necessary attorneys' fees as are equitable and just for any proceeding under the Uniform Declaratory Judgment Act, Texas Civil Practice and Remedies Code §§ 37.001 et seq. as provided by Section 37.009 of the Texas Civil Practice & Remedies Code.

**D.      Attorney's Fees, Interest, Court Costs, and Collection Costs**

79.     The allegations contained in Paragraphs 1 through 78 are hereby incorporated by reference.

80.     The OOA entitles Plaintiffs to recover interest upon the unpaid balance of the JIB statements set forth above, and upon JIB statements for the remaining decommissioning which is on-going at the "prime rate in effect at Chase Manhattan Bank on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws of the jurisdiction in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts."

81.     The OOA further entitles Plaintiffs to recover any "consequential damages" resulting from Sanare's default.

82.     Plaintiffs are also entitled to attorneys' fees and costs pursuant to Texas Civil Practice and Remedies Code Sections 37.009 and 38.001 and to the extent necessary pursuant to Texas Business and Commerce Code Section 24.013.  Plaintiffs also request that they be awarded its costs and expenses pursuant to Texas law, including Rules 131 and 141 of the Texas Rules of Civil Procedure.

83.     Plaintiffs seek recovery of all attorneys' fees, interest, late fees, penalties, consequential damages, and costs incurred to collect any current or future unpaid JIB statement from Sanare as allowed by the OOA, law, equity, or otherwise.

### E.     *Quantum Meruit*

84.     The allegations contained in Paragraphs 1 through 83 are hereby incorporated by reference.

85.     Plaintiffs also plead in the alternative that, to the extent they have no express or implied contract rights, then Plaintiffs are entitled to recover from Sanare under the doctrine of quantum meruit.

86.     Plaintiffs have provided valuable goods and services to Sanare, including but not limited to decommissioning work and services.  Sanare has benefitted from Plaintiffs' operations on the Leases, and Plaintiffs' decommissioning of the Leases has resulted in and/or will result in the discharge of extensive decommissioning liabilities owed by Sanare to the federal government under applicable federal law.

87.     Sanare has accepted and used and continues to accept and use these goods and services.  Sanare knew and had reasonable notice that Plaintiffs expected to be paid by Sanare for the goods and services provided to it by the Plaintiffs, and Sanare has failed to pay Plaintiffs for these goods and services.

88.     As a result of Sanare's conduct, Plaintiffs have and continue to suffer harm and damages.

### F.     *Unjust Enrichment*

89.     The allegations contained in Paragraphs 1 through 88 are hereby incorporated by reference.

90.     Plaintiffs further plead in the alternative that Plaintiffs are entitled to recover from Sanare under the doctrine of unjust enrichment for the overpayments that they have made for expenses (including decommissioning) under the OOA which Sanare should have properly paid.

91.     Sanare is required to pay its share of operations, including decommissioning, but it has failed to make such payments despite demands for payment, requiring Plaintiffs to pay Sanare's share of expenses, including decommissioning.  Sanare has retained these benefits and has been enriched by the payments the Plaintiffs have made for operations and by the discharge of Sanare's decommissioning liabilities owed to the federal government under applicable federal law.

92.     Despite Sanare's enrichment resulting from the Plaintiffs paying Sanare's share of operations and the discharge of its liability to the federal government, Sanare continues to refuse to reimburse Plaintiffs for Sanare's proportionate share of the costs and expenses incurred to perform the operational and decommissioning activities associated with the Leases.

93.     Plaintiffs have been damaged and are entitled to relief for Sanare's unjust enrichment in an amount at least to equal the benefits unjustly and unconscionably retained by Sanare.

## II.     GREYHOUND ENERGY LLC

### *Texas Fraudulent Transfer Act*

94.     The allegations contained in Paragraphs 1 through 93 are hereby incorporated by reference.

95.     Sanare initiated the Assignment to Greyhound after Sanare's debt to Plaintiffs arose.  The assignment was done with the intent to hinder, delay, or defraud Sanare's creditors, including Plaintiffs.

96.     Sanare and Greyhound are both owned, operated, and controlled by David Wiley. Wiley and Greyhound are insiders of Sanare.

97.     The Transferred Assets were among the only valuable and/or producing assets in Sanare's portfolio prior to the Assignment; thus leaving Sanare with predominately valueless and/or non-producing assets, making it unable to pay its debts to Plaintiffs.

98.     Because Sanare's only properties that remain are liabilities, the Assignment of the Transferred Assets caused, or dramatically increased Sanare's insolvency.

99.     Additionally, at the time of the Assignment, the valuation of the Transferred Assets far exceeded any purported debt reduction accompanying the transactions such that Sanare did not receive a reasonably equivalent value in exchange for the transfer.  Further at the time of the Assignment, Sanare (a) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

100.     Pursuant to Texas Business and Commerce Code, Title 3, Chapter 24, Plaintiffs are entitled to have the Court avoid or annul the Assignment.  Plaintiffs are also entitled to an award of costs and reasonable attorneys' fees as are equitable and just pursuant to Texas Business and Commerce Code Section 24.013.  To the extent necessary, this Texas Fraudulent Transfer Act claim is also asserted against Sanare.

101.     Plaintiffs also assert that Greyhound and Sanare are culpable by the Delaware Fraudulent Transfer Act (Delaware Code, Title 6, Subtitle II, Chapter 15) and/or Louisiana's Revocatory Action (La. Civil Code Art. 2036).

### III.    GOMEX FINANCE LLC

*Texas Fraudulent Transfer Act*

102.    The allegations contained in Paragraphs 1 through 101 are hereby incorporated by reference.

103.    Sanare executed the Gomex Mortgage after Sanare's debt to Plaintiffs arose. Sanare received nothing in return for the Gomex Mortgage, or alternatively, the value of the Mortgaged Assets far exceeded any purported consideration received by Sanare for the Gomex Mortgage.   Thus, Sanare did not receive a reasonably equivalent value in exchange for the mortgage.  Furthermore, the Gomex Mortgage was for the benefit of Sanare's insiders Greyhound and David Wiley.  Sanare and Greyhound are both owned, operated, and controlled by David Wiley, making Wiley and Greyhound insiders of Sanare.  The Gomex Mortgage was done with the intent to hinder, delay, or defraud Sanare's creditors, including Plaintiffs.

104.    The Mortgaged Assets were among the only valuable and/or producing assets in Sanare's portfolio prior to the Gomex Mortgage; thus leaving Sanare with predominately valueless and/or non-producing assets.

105.    Because Sanare's only properties that remain are liabilities, the Gomex Mortgage caused or dramatically increased Sanare's insolvency.

106.    Additionally, at the time of the Gomex Mortgage, Sanare (a) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

107.    Pursuant to Texas Business and Commerce Code, Title 3, Chapter 24, Plaintiffs are entitled to have the Court avoid or annul the Gomex Mortgage.  Plaintiffs are also entitled to an

award of costs and reasonable attorneys' fees as are equitable and just pursuant to Texas Business and Commerce Code Section 24.013.  To the extent necessary, this Texas Fraudulent Transfer Act claim is also asserted against Sanare.

108.    Plaintiffs also assert that Gomex and Sanare are culpable by the Delaware Fraudulent Transfer Act (Delaware Code, Title 6, Subtitle II, Chapter 15) and/or Louisiana's Revocatory Action (La. Civil Code Art. 2036).

## TEXAS RULE OF CIVIL PROCEDURE 193.7 NOTICE

109.    Plaintiffs hereby give notice of the intent to utilize items produced in discovery in any proceeding in this matter including the trial of this matter, and the authenticity of said items is self-proven under Texas Rule of Civil Procedure 193.7.

## JURY DEMAND

110.    Plaintiffs are entitled to and hereby demand a trial by jury on all triable issues.

## RESERVATION OF RIGHTS

111.    Plaintiffs hereby fully reserve all rights to pursue any additional claims against Sanare, Greyhound, Gomex, and/or its affiliates, including but not limited to KEWA and Forward Path relating to possible fraudulent property transfers.  Such causes of action include, but are not limited to, single business enterprise, piercing the corporate veil, unjust enrichment, quantum meruit, and any other cause of action stemming from the facts alleged and to be established in discovery.

## CONDITIONS PRECEDENT

112.    Any conditions precedent to bring this action have occurred or have been waived by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, ANKOR Energy LLC, ANKOR E&P Holdings Corporation, and KNOC Eagle Ford Corporation, respectfully request that Defendants Sanare Energy Partners, LLC, Greyhound Energy LLC, and Gomex Finance, LLC be cited to appear herein and that, upon final trial, the Court enter judgement against Defendants, awarding Plaintiffs:

(i) Damages, including special damages, against Sanare in an amount to be proven at trial, including the amount of $4,195,459.46 plus any additional amounts that become due under the OOA through the date of judgment, with interest accruing on all unpaid amounts at the rate dictated under the OOA from the due date until paid;

(ii) Specific performance as may be requested herein, including against Sanare for specific performance, ordering Sanare to perform all of its obligations under the OOA, including but not limited to its obligation to pay its share of all decommissioning and other operating costs associated with the EI 208 Lease and the VR 379 Lease;

(iii) All declarations that have been requested by Plaintiffs, including declarations that (i) Sanare is liable for the payment of all future JIB statements associated with the Leases, including JIBs for the decommissioning costs associated with the EI 208 Lease and the VR 379 Lease, as they become due and within 30 days of receipt, as required by the OOA; and (ii) the $630,478.26 in the EI Trust, plus all interest accrued through date of judgment, is to be paid directly to Plaintiffs, and shall not be returned to Sanare;

(iv) Contribution from Sanare by way of legal subrogation for the proportionate share of costs for which Sanare is jointly and severally liable;

(v) The Assignment to Greyhound is avoided and/or annulled;

(vi) The Gomex Mortgage is avoided and/or annulled;

(vii) Attorneys' fees as provided by law, including the common law, the Texas Civil Practice & Remedies Code Chapters 37 and 38, the Texas Business and Commerce Code Chapter 24, and the agreement among the parties;

(viii) All court costs, and any other costs incurred in connection with obtaining and collecting judgment; and

(ix) All other and further relief, both general and special, at law or in equity, to which Plaintiffs may be entitled.

LG\388446.9

Respectfully submitted,

**LOOPER GOODWINE, P.C.**

By: /s/ *Taylor P. Mouledoux*
Taylor P. Mouledoux; Texas Bar No. 24135787
Paul J. Goodwine (*pro hac vice forthcoming*)
Seth E. Bagwell (*pro hac vice forthcoming*)
650 Poydras Street, Suite 2400
New Orleans, Louisiana 70130
Telephone: (504) 503-1500
Telecopier: (504) 503-1501
tmouledoux@loopergoodwine.com
pgoodwine@loopergoodwine.com
sbagwell@loopergoodwine.com

-and-

David A. Pluchinsky; Texas Bar No. 16074400
1300 Post Oak Blvd., Suite 750
Houston, Texas 77056
Telephone: (713) 335-8600
Telecopier: (713) 335-8601
dpluchinsky@loopergoodwine.com

*Attorneys for ANKOR Energy LLC,*
*ANKOR E&P Holdings Corporation, and*
*KNOC Eagle Ford Corporation*

LG\388446.9

# Offshore Operating Agreement

## ANKOR Energy LLC

and

## ANKOR E&P Holdings Corporation

and

## STX Energy E&P Offshore Management, LLC

and

## SCL Resources, LLC

## GULF OF MEXICO PROPERTIES

## EFFECTIVE

## DECEMBER 23, 2011

Unofficial Copy Office of Marilyn Burgess District Clerk

**EXHIBIT 1**

Unofficial Copy Office of Marilyn Burgess District Clerk

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................... i

WITNESSETH: .............................................................................................................................. 1

ARTICLE 1  APPLICATION ......................................................................................................... 1
    1.1    APPLICATION TO EACH LEASE ............................................................................................. 1

ARTICLE 2  DEFINITIONS ........................................................................................................... 1
    2.1    ADDITIONAL TESTING ......................................................................................................... 1
    2.2    AFFILIATE ........................................................................................................................... 1
    2.3    AUTHORIZATION FOR EXPENDITURE (AFE) ....................................................................... 2
    2.4    BOEM ................................................................................................................................ 2
    2.5    BSEE ................................................................................................................................. 2
    2.6    COMPLETE, COMPLETING, COMPLETION ............................................................................. 2
    2.7    COMPLETION EQUIPMENT .................................................................................................. 2
    2.8    CONFIDENTIAL DATA .......................................................................................................... 2
    2.9    DEEPEN, DEEPENING .......................................................................................................... 2
    2.10   DEVELOPMENT OPERATION ................................................................................................ 2
    2.11   DEVELOPMENT WELL ......................................................................................................... 2
    2.12   EXPLORATORY OPERATION ................................................................................................. 3
    2.13   EXPLORATORY WELL .......................................................................................................... 3
    2.14   EXPORT PIPELINES ............................................................................................................. 3
    2.15   FORCE MAJEURE ................................................................................................................ 3
    2.16   HYDROCARBONS ................................................................................................................ 3
    2.17   JOINT ACCOUNT ................................................................................................................ 3
    2.18   LEASE ................................................................................................................................ 3
    2.19   NON-CONSENT OPERATION ................................................................................................ 4
    2.20   NON-CONSENT PLATFORM ................................................................................................. 4
    2.21   NON-CONSENT WELL ......................................................................................................... 4
    2.22   NON-OPERATOR ................................................................................................................. 4
    2.23   NON-PARTICIPATING PARTY .............................................................................................. 4
    2.24   NON-PARTICIPATING PARTY'S SHARE ................................................................................ 4
    2.25   OBJECTIVE DEPTH ............................................................................................................. 4
    2.26   OBJECTIVE HORIZON ......................................................................................................... 4
    2.27   OFFSITE HOST FACILITIES .................................................................................................. 4
    2.28   OPERATOR ......................................................................................................................... 4
    2.29   PARTICIPATING INTEREST ................................................................................................... 4
    2.30   PARTICIPATING PARTY ....................................................................................................... 4
    2.31   PLATFORM ......................................................................................................................... 4
    2.32   PROCESSING FACILITIES ..................................................................................................... 5
    2.33   PRODUCIBLE RESERVOIR ................................................................................................... 5
    2.34   PRODUCIBLE WELL ........................................................................................................... 5
    2.35   PRODUCTION INTERVAL .................................................................................................... 5
    2.36   RECOMPLETE, RECOMPLETING, RECOMPLETION ............................................................... 5
    2.37   REWORK, REWORKING ...................................................................................................... 5
    2.38   SIDETRACK, SIDETRACKING ............................................................................................... 6
    2.39   TAKE-IN-KIND FACILITIES ................................................................................................. 6
    2.40   TRANSFER OF INTEREST ..................................................................................................... 6
    2.41   WORKING INTEREST .......................................................................................................... 6

**ARTICLE 3  EXHIBITS** ................................................................................................................. 6

3.1   EXHIBITS .............................................................................................................................. 6
 3.1.1   Exhibit "A" ................................................................................................................ 6
 3.1.2   Exhibit "B" ................................................................................................................ 6
 3.1.3   Exhibit "C" ................................................................................................................ 6
 3.1.4   Exhibit "D" ................................................................................................................ 6
 3.1.5   Exhibit "E" ................................................................................................................ 6
 3.1.6   Exhibit "F" ................................................................................................................ 6
 3.1.8   Exhibit "G" ............................................................................................................... 7
 3.1.9   Exhibit "H" ............................................................................................................... 7
3.2   CONFLICTS ........................................................................................................................... 7

**ARTICLE 4  OPERATOR** ................................................................................................................ 7

4.1   OPERATOR ............................................................................................................................ 7
4.2   SUBSTITUTE OPERATOR ....................................................................................................... 7
 4.2.1   Circumstances Under Which the Operator Must Conduct a Non-Consent Operation ......... 8
 4.2.2   Operator's Conduct of a Non-Consent Operation in which ANKOR E&P Holdings Corporation is a
 Non-participating Party ................................................................................................ 8
 4.2.3   Appointment of a Substitute Operator ........................................................................ 8
 4.2.4   Redesignation of Operator ......................................................................................... 9
4.3   RESIGNATION OF OPERATOR ................................................................................................ 9
4.4   REMOVAL OF OPERATOR ...................................................................................................... 9
4.5   SELECTION OF SUCCESSOR .................................................................................................. 9
4.6   EFFECTIVE DATE OF RESIGNATION OR REMOVAL .............................................................. 10
4.7   DELIVERY OF PROPERTY ..................................................................................................... 10

**ARTICLE 5  AUTHORITY AND DUTIES OF OPERATOR** ........................................................ 11

5.1   EXCLUSIVE RIGHT TO OPERATE .......................................................................................... 11
5.2   WORKMANLIKE CONDUCT ................................................................................................... 11
5.3   LIENS AND ENCUMBRANCES ............................................................................................... 11
5.4   EMPLOYEES AND CONTRACTORS ......................................................................................... 11
5.5   RECORDS ............................................................................................................................ 11
5.6   COMPLIANCE ...................................................................................................................... 11
5.7   CONTRACTORS .................................................................................................................... 12
5.8   GOVERNMENTAL REPORTS .................................................................................................. 12
5.9   INFORMATION TO PARTICIPATING PARTIES ......................................................................... 12
5.10   INFORMATION TO NON-PARTICIPATING PARTIES .............................................................. 13

**ARTICLE 6  VOTING AND VOTING PROCEDURES** .............................................................. 13

6.1   VOTING PROCEDURES ......................................................................................................... 13
 6.1.1   Voting Interest ....................................................................................................... 13
 6.1.2   Vote Required ......................................................................................................... 13
 6.1.3   Votes ..................................................................................................................... 14
 6.1.4   Meetings ................................................................................................................ 14

**ARTICLE 7  ACCESS** .................................................................................................................... 14

7.1   ACCESS TO LEASE ............................................................................................................... 14
7.2   REPORTS ............................................................................................................................ 14
7.3   CONFIDENTIALITY ............................................................................................................... 15
7.4   LIMITED DISCLOSURE ......................................................................................................... 15
7.5   MEDIA RELEASES ................................................................................................................ 15

**ARTICLE 8  EXPENDITURES** ...................................................................................................... 16

8.1   BASIS OF CHARGE TO THE PARTIES ..................................................................................... 16

Uncertified Copy Office of Marilyn Burgess District Clerk

i



8.2     AFEs ........................................................................................ 16
8.3     EMERGENCY AND REQUIRED EXPENDITURES ................................ 16
8.4     ADVANCE BILLINGS .................................................................. 16
8.5     COMMINGLING OF FUNDS .......................................................... 16
8.6     SECURITY RIGHTS .................................................................... 16
     8.6.1    *Mortgage and Security Interest in Favor of Operator* ........ 16
     8.6.2    *Mortgage and Security Interest in Favor of the Non-operators* ... 18
     8.6.3    *Recordation* ........................................................ 19
     8.6.4    *Default* ............................................................... 19
     8.6.5    *Unpaid Charges* ................................................... 20
     8.6.6    *Carved-out Interests* ............................................ 20
8.7     OVEREXPENDITURES ................................................................. 21

**ARTICLE 9 NOTICES** ...................................................................... 23

9.1     GIVING AND RECEIVING NOTICES .............................................. 23
9.2     CONTENT OF NOTICE ................................................................ 23
9.3     RESPONSE TO NOTICES ............................................................. 24
     9.3.1    *Platform and/or Processing Facilities Proposals* ............ 24
     9.3.2    *Well Proposals* ..................................................... 24
     9.3.3    *Proposal for Multiple Operations* ............................ 24
     9.3.4    *Other Matters* ...................................................... 24
9.4     FAILURE TO RESPOND ............................................................... 24
9.5     RESPONSE TO COUNTERPROPOSALS ........................................... 24
9.6     TIMELY WELL OPERATIONS ...................................................... 25
9.7     TIMELY PLATFORM/PROCESSING FACILITIES OPERATIONS ............ 25

**ARTICLE 10 EXPLORATORY OPERATIONS** ....................................... 25

10.1    PROPOSING OPERATIONS ........................................................... 25
10.2    COUNTERPROPOSALS ................................................................ 25
10.3    OPERATIONS BY ALL PARTIES ................................................... 26
10.4    SECOND OPPORTUNITY TO PARTICIPATE ..................................... 26
10.5    OPERATIONS BY FEWER THAN ALL PARTIES ................................ 26
10.6    EXPENDITURES APPROVED ......................................................... 27
10.7    CONDUCT OF OPERATIONS ........................................................ 27
10.8    COURSE OF ACTION AFTER REACHING OBJECTIVE DEPTH ............. 27
     10.8.1   *Election by Participating Parties* .............................. 27
     10.8.2   *Priority of Operations* ............................................ 27
     10.8.3   *Second Opportunity to Participate* ........................... 28
     10.8.4   *Operations by Fewer Than All Parties* ...................... 28
     10.8.5   *Subsequent Operations* .......................................... 29
     10.8.6   *Restoration of Damaged Well* .................................. 29
10.9    WELLS PROPOSED BELOW DEEPEST PRODUCIBLE RESERVOIR ....... 30

**ARTICLE 11 DEVELOPMENT OPERATIONS** ..................................... 31

11.1    PROPOSING OPERATIONS ........................................................... 31
11.2    COUNTERPROPOSALS ................................................................ 31
11.3    OPERATIONS BY ALL PARTIES ................................................... 31
11.4    SECOND OPPORTUNITY TO PARTICIPATE ..................................... 31
11.5    OPERATIONS BY FEWER THAN ALL PARTIES ................................ 31
11.6    EXPENDITURES APPROVED ......................................................... 32
11.7    CONDUCT OF OPERATIONS ........................................................ 32
11.8    COURSE OF ACTION AFTER REACHING OBJECTIVE DEPTH ............. 32
     11.8.1   *Election by Fewer Than All Parties* .......................... 32
     11.8.2   *Priority of Operations* ............................................ 33
     11.8.3   *Second Opportunity to Participate* ........................... 33




11.8.4    Operations by Fewer Than All Parties .......................................................... 33
11.8.5    Subsequent Operations ................................................................................. 34
11.8.6    Restoration of Damaged Well ....................................................................... 35

ARTICLE 12  PLATFORM AND PROCESSING FACILITIES ........................................ 35

12.1    PROPOSAL .................................................................................................................... 35
12.2    COUNTERPROPOSALS ................................................................................................... 36
    12.2.1    Operations by All Parties .............................................................................. 36
    12.2.2    [Intentionally left blank] ............................................................................... 36
    12.2.3    Operations by Fewer Than All Parties .......................................................... 36
12.3    OWNERSHIP AND USE OF THE PLATFORM AND PROCESSING FACILITIES .................. 36
12.4    RIGHTS TO TAKE IN KIND ............................................................................................ 37
12.5    EXPANSION OR MODIFICATION OF A PLATFORM AND/OR PROCESSING FACILITIES ... 37

ARTICLE 13  NON-CONSENT OPERATIONS ...................................................................... 38

13.1    NON-CONSENT OPERATIONS ........................................................................................ 38
    13.1.1    Non-interference ........................................................................................... 38
    13.1.2    Multiple Completion Limitation ................................................................... 38
    13.1.3    Metering ........................................................................................................ 38
    13.1.4    Non-consent Well .......................................................................................... 38
    13.1.5    Cost Information ........................................................................................... 38
    13.1.6    Completions ................................................................................................... 39
13.2    RELINQUISHMENT OF INTEREST ................................................................................. 39
    13.2.1    Production Reversion Recoupment ............................................................... 39
    13.2.2    Non-production Reversion ............................................................................. 40
13.3    DEEPENING OR SIDETRACKING OF NON-CONSENT WELL ........................................... 41
13.4    DEEPENING OR SIDETRACKING COST ADJUSTMENTS .................................................. 41
13.5    SUBSEQUENT OPERATIONS IN NON-CONSENT WELL .................................................... 42
13.6    OPERATIONS IN A PRODUCTION INTERVAL ................................................................. 42
13.7    OPERATIONS UTILIZING A NON-CONSENT PLATFORM AND/OR PROCESSING FACILITIES ... 42
13.8    DISCOVERY OR EXTENSION FROM NON-CONSENT DRILLING ....................................... 43
13.9    ALLOCATION OF PLATFORM/PROCESSING FACILITIES COSTS TO NON-CONSENT OPERATIONS ... 43
    13.9.1    Charges ......................................................................................................... 43
    13.9.2    Operating and Maintenance Charges ............................................................ 44
13.10    ALLOCATION OF COSTS BETWEEN ZONES ................................................................. 44
13.11    LEASE MAINTENANCE OPERATIONS ........................................................................... 45
    13.11.1    Participation in Lease Maintenance Operations .......................................... 45
    13.11.2    Accounting for Non-participation ................................................................ 46
13.12    RETENTION OF LEASE BY NON-CONSENT WELL .......................................................... 46

ARTICLE 14  ABANDONMENT, SALVAGE, AND SURPLUS .......................................... 47

14.1    PLATFORM SALVAGE AND REMOVAL COSTS ............................................................... 47
14.2    ABANDONMENT OF PLATFORMS, PROCESSING FACILITIES OR WELLS ........................ 47
14.3    ASSIGNMENT OF INTEREST ......................................................................................... 47
14.4    ABANDONMENT OPERATIONS REQUIRED BY GOVERNMENTAL AUTHORITY .............. 47
14.5    DISPOSAL OF SURPLUS MATERIAL ............................................................................. 47

ARTICLE 15  WITHDRAWAL ................................................................................................. 48

15.1    RIGHT TO WITHDRAW ................................................................................................. 48
15.2    RESPONSE TO WITHDRAWAL NOTICE .......................................................................... 48
    15.2.1    Unanimous Withdrawal ................................................................................. 48
    15.2.2    No Additional Withdrawing Parties ............................................................. 49
    15.2.3    Acceptance of the Withdrawing Parties' Interests ....................................... 49
    15.2.4    Effects of Withdrawal .................................................................................... 49
15.3    LIMITATION UPON AND CONDITIONS OF WITHDRAWAL ............................................. 50

Unofficial Copy Office of Marilyn Burgess District Clerk





15.3.1   Prior Expenses ........................................................................................ 50
15.3.2   Confidentiality ......................................................................................... 50
15.3.3   Emergencies and Force Majeure ............................................................. 51

ARTICLE 16  RENTALS, ROYALTIES, AND OTHER PAYMENTS ................................... 51

16.1   Overriding Royalty and Other Burdens ................................................. 51
16.2   Subsequently Created Interest ................................................................ 51
16.3   Payment of Rentals and Minimum Royalties ........................................ 52
16.4   Non-participation in Payments ............................................................... 52
16.5   Royalty Payments .................................................................................... 52

ARTICLE 17  TAXES ............................................................................................... 53

17.1   Property Taxes ......................................................................................... 53
17.2   Contest of Property Tax Valuation ........................................................ 53
17.3   Production and Severance Taxes ............................................................ 53
17.4   Other Taxes and Assessments ................................................................ 53

ARTICLE 18  INSURANCE ....................................................................................... 53

18.1   Insurance ................................................................................................. 53
18.2   Bonds ....................................................................................................... 53

ARTICLE 19  LIABILITY, CLAIMS, AND LAWSUITS .................................................. 54

19.1   Individual Obligations ............................................................................ 54
19.2   Notice of Claim or Lawsuit .................................................................... 54
19.3   Settlements .............................................................................................. 54
19.4   Defense of Claims and Lawsuits ............................................................ 54
19.5   Liability for Damages ............................................................................. 55
19.6   Indemnification for Non-Consent Operations ....................................... 55
19.7   Damage to Reservoir, Loss of Reserves and Profit ............................... 55
19.8   Non-Essential Personnel ......................................................................... 56
19.9   Dispute Resolution .................................................................................. 56

ARTICLE 20  INTERNAL REVENUE PROVISION ........................................................ 56

20.1   Internal Revenue Provision .................................................................... 56

ARTICLE 21  CONTRIBUTIONS ................................................................................ 57

21.1   Notice of Contributions Other Than Advances for Sale of Production ... 57
21.2   Cash Contributions ................................................................................. 57
21.3   Acreage Contributions ............................................................................ 57

ARTICLE 22  DISPOSITION OF PRODUCTION ........................................................... 57

22.1   Take-in-Kind Facilities ........................................................................... 57
22.2   Duty to Take in Kind .............................................................................. 57
22.3   Failure to Take in Kind ........................................................................... 58
22.4   Expenses of Delivery in Kind ................................................................ 58

ARTICLE 23  APPLICABLE LAW .............................................................................. 59

23.1   Applicable Law ....................................................................................... 59

ARTICLE 24  LAWS, REGULATIONS, AND NONDISCRIMINATION .............................. 59

24.1   Laws and Regulations ............................................................................. 59
24.2   Nondiscrimination ................................................................................... 59

ARTICLE 25  FORCE MAJEURE ............................................................................... 59

25.1   Force Majeure ......................................................................................... 59

Unofficial Copy Office of Marilyn Burgess District Clerk

v



ARTICLE 26  SUCCESSORS, ASSIGNS, AND PREFERENTIAL RIGHTS ...................................... 60

26.1    TRANSFER OF INTEREST ................................................................................................. 60
26.1.1    Exceptions to Transfer Notice ........................................................................ 60
26.1.2    Effective Date of Transfer of Interest ........................................................... 60
26.1.3    Form of Transfer of Interest ........................................................................... 60
26.1.4    Warranty .......................................................................................................... 61
26.1.5    Completion of Transfer of Interest ................................................................ 61
26.2    PREFERENTIAL RIGHT TO PURCHASE .......................................................................... 61
26.2.1    Notice of Proposed Transfer of Interest ........................................................ 61
26.2.2    Exercise of Preferential Right to Purchase ................................................... 61
26.2.3    Transfer of Interest Not Affected by the Preferential Right to Purchase ...... 62
26.2.4    Completion of Transfer of Interest ................................................................ 62

ARTICLE 27  ADMINISTRATIVE PROVISIONS ................................................................................ 62

27.1    TERM ............................................................................................................................... 62
27.2    WAIVER ........................................................................................................................... 63
27.3    WAIVER OF RIGHT TO PARTITION ................................................................................ 63
27.4    COMPLIANCE WITH LAWS AND REGULATIONS ............................................................ 63
27.4.1    Severance of Invalid Provisions .................................................................... 63
27.4.2    Fair and Equal Employment ........................................................................... 63
27.5    CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT .................................. 64
27.5.1    Headings for Convenience ............................................................................. 64
27.5.2    Article References .......................................................................................... 64
27.5.3    Gender and Number ....................................................................................... 64
27.5.4    Joint Preparation ........................................................................................... 64
27.5.5    Integrated Agreement ..................................................................................... 64
27.5.6    Binding Effect ................................................................................................ 64
27.5.7    Further Assurances ........................................................................................ 65
27.5.8    Counterpart Execution ................................................................................... 65
27.5.9    Other Agreement ............................................................................................ 65

Unofficial Copy Office of Marilyn Burgess District Clerk

## OFFSHORE OPERATING AGREEMENT

## GULF OF MEXICO PROPERTIES

ANKOR Energy LLC - Operator
ANKOR E&P Holdings Corporation, STX Energy E&P Offshore Management LLC, and SCL Resources, LLC
- Non-Operators

THIS OFFSHORE OPERATING AGREEMENT (this "Agreement"), made effective the 23rd day of December, 2011, by the signers hereof, their respective heirs, successors, legal representatives, and assigns, herein referred to collectively as the "Parties" and individually as a "Party."

## WITNESSETH:

WHEREAS, the Parties own and have rights to one or more oil and gas Leases identified in Exhibit "A" and desire to explore, develop, produce, and operate those Leases pursuant to this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants in this Agreement, the Parties agree as follows:

## ARTICLE 1

## APPLICATION

1.1     Application to Each Lease

If there is more than one Lease identified in Exhibit "A," this Agreement shall be applicable to all Leases collectively for the purposes herein, and all Leases shall be considered as being covered collectively by this Agreement.

## ARTICLE 2

## DEFINITIONS

2.1     Additional Testing

An operation not previously approved in the AFE and proposed for the specific purpose of obtaining additional subsurface data.

2.2     Affiliate

For a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) "control" means the possession by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the

equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

2.3   **Authorization For Expenditure (AFE)**

An authority to expend funds prepared by a Party to estimate the costs to be incurred in conducting an operation under this Agreement.

2.4   **BOEM**

The Bureau of Ocean Energy Management, United States Department of Interior, or its successor agency.  Where appropriate, the reference to BOEM shall include the appropriate state agency.

2.5   **BSEE**

The Bureau of Safety and Environmental Enforcement, United States Department of Interior, or its successor agency.  Where appropriate, the reference to BSEE shall include the appropriate state agency.

2.6   **Complete, Completing, Completion**

An operation to complete a well for initial Hydrocarbon production in one or more Producible Reservoirs, including, but not limited to, setting production casing, perforating the casing, stimulating the well, installing Completion Equipment, and/or conducting production tests.

2.7   **Completion Equipment**

That certain equipment on an Exploratory Well or a Development Well required to be installed prior to the movement of a well-completion rig off that well

(a)      under 30 CFR  250.502, or any succeeding order or regulation issued by the BOEM or BSEE, up to and including the tree, and

(b)      by any other regulatory agency having jurisdiction, including, but not limited to, a caisson and navigational aids.

2.8   **Confidential Data**

The information and data obtained under this Agreement, including, but not limited to, geological, geophysical, and reservoir information; originals and copies of logs, and other information about the progress, tests, or results of a well drilled or an operation conducted under this Agreement, except data or information that becomes public other than by breach of this Agreement.

2.9   **Deepen, Deepening**

A drilling operation conducted in an existing wellbore below the Objective Depth to which the well was previously drilled.

2.10   **Development Operation**

An operation on the Lease other than an Exploratory Operation.

2.11   **Development Well**

A well or portion of a well proposed as a Development Operation.

2

2.12    **Exploratory Operation**

An operation that is conducted on the Lease and that is any of the following:

(a)     proposed to Complete an Exploratory Well;

(b)     proposed for an Objective Horizon that is not a Producible Reservoir;

(c)     proposed for an Objective Horizon that has a Producible Well, but that will be penetrated at a location where the distance between the midpoint of the Objective Horizon to be penetrated by the proposed operation and the midpoint of the same Objective Horizon where it is actually penetrated by a Producible Well will be at least three thousand (3,000) feet for a gas Completion and at least two thousand (2,000) feet for an oil Completion;

(d)     proposed for an Objective Horizon that is unanimously agreed by the Parties not to be in an existing Producible Reservoir; or

(e)     proposed as deeper drilling operating below the base of the deepest Producible Reservoir.

2.13    **Exploratory Well**

A well or portion of a well proposed as an Exploratory Operation.

2.14    **Export Pipelines**

Pipelines to which a gathering line or lateral line downstream of the Platform and/or Processing Facilities or, if there is no Platform, the Completion Equipment, is connected and which are used to transport Hydrocarbons or produced water to shore.

2.15    **Force Majeure**

An event or cause that is reasonably beyond the control of the Party claiming the existence of such event or cause, which includes, but is not limited to, a flood, storm, hurricane, loop current/eddy, or other act of God, a fire, loss of well control, oil spill, or other environmental catastrophe, a war, a civil disturbance, a labor dispute, a strike, a lockout, compliance with a law, order, rule, or regulation, governmental action or delay in granting necessary permits or permit approvals, and the inability to secure materials or a rig.

2.16    **Hydrocarbons**

Oil and/or gas and associated liquid and gaseous by-products (except helium) which may be produced from a wellbore located on the Lease.

2.17    **Joint Account**

This term has the same definition as the defined term "Joint Account" in Exhibit "C" (Accounting Procedure).

2.18    **Lease**

The portion or portions of the oil and gas lease(s) identified in Exhibit "A," limited to the lands covered thereby.

Unofficial Copy Office of Marilyn Burgess District Clerk

3

**2.19 Non-consent Operation**

An operation conducted on the Lease by fewer than all Parties, which subjects the Non-participating Party to Article 13 (Non-Consent Operations).

**2.20 Non-consent Platform**

A Platform owned by fewer than all Parties.

**2.21 Non-consent Well**

An Exploratory Well or a Development Well owned by fewer than all Parties.

**2.22 Non-operator**

A Party other than the Operator.

**2.23 Non-participating Party**

A Party other than a Participating Party.

**2.24 Non-participating Party's Share**

The Participating Interest that a Non-participating Party would have had if all Parties had participated in the operation.

**2.25 Objective Depth**

A depth sufficient to test the lesser of the Objective Horizon or the specific footage depth stated in the AFE.

**2.26 Objective Horizon**

The interval consisting of the deepest zone, formation, or horizon to be tested in an Exploratory Well, Development Well, Deepening operation, or Sidetracking operation, as stated in the AFE.

**2.27 Offsite Host Facilities**

Processing and handling facilities that (a) are located off the Lease and (b) are either owned by one or more third parties or by one or more Participating Parties in a well, whose interests in the processing and handling facilities differ from their respective Working Interest shares in the well.

**2.28 Operator**

The Party designated in Article 4.1 (Designation of the Operator), a successor Operator selected under Article 4.5 (Selection of Successor Operator), and, if applicable, a substitute Operator selected under Article 4.2 (Substitute Operator).

**2.29 Participating Interest**

The percentage of the costs and risks of conducting an operation under this Agreement that a Participating Party agrees, or is otherwise obligated, to pay and bear.

**2.30 Participating Party**

A Party that executes an AFE for a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under this Agreement.

**2.31 Platform**

An offshore structure that supports Wells, Completion Equipment, or Processing Facilities, whether fixed, compliant, or floating, and the components of that structure, including, but not

limited to, caissons or well protectors, rising above the water line and used for the exploration, development, or production of Hydrocarbons from the Lease. The term "Platform" shall also mean an offshore subsea structure or template (excluding templates used for drilling operations) and any component thereof (including, but not limited to, flow lines and control systems), other than those installed in connection with Completion of a well that is attached to the sea floor and used to obtain production of Hydrocarbons from the Lease.

2.32   **Processing Facilities**

Production equipment other than Completion Equipment that is installed on or outside the Lease in order to handle or process Hydrocarbon production.  Processing Facilities include, but are not limited to,

(a)   compression, separation, dehydration, and metering equipment,

(b)   the flowlines, gathering lines or lateral lines that deliver Hydrocarbons and water

1   from the Completion Equipment to the Platform and/or Processing Facilities or to Offsite Host Facilities, or

2   from the Platform to Export Pipelines; and

(c)   injection and disposal wells.

Processing Facilities exclude (1) Platforms, (2) Export Pipelines, and (3) Take-in-Kind Facilities.

2.33   **Producible Reservoir**

An underground accumulation of Hydrocarbons (a) in a single and separate natural pool characterized by a distinct pressure system, (b) not in Hydrocarbon communication with another accumulation of Hydrocarbons, and (c) into which a Producible Well has been drilled.

2.34   **Producible Well**

A well that is drilled under this Agreement and that (a) is producing Hydrocarbons; or (b) is determined to be, or meets the criteria for being determined to be, capable of producing Hydrocarbons in paying quantities under an applicable order or regulation issued by the governmental authority having jurisdiction.

2.35   **Production Interval**

A zone or interval producing or capable of producing Hydrocarbons from a well without Reworking operations.

2.36   **Recomplete, Recompleting, Recompletion**

An operation whereby a Completion in one Producible Reservoir is abandoned in order to attempt a Completion in a different Producible Reservoir within the existing wellbore.

2.37   **Rework, Reworking**

An operation conducted in a well, after it has been Completed in one or more Producible Reservoirs, to restore, maintain, or improve Hydrocarbon production from one or more of those Producible Reservoirs, but specifically excluding drilling, Sidetracking, Deepening, Completing, or Recompleting the well.



5





2.38   Sidetrack, Sidetracking

The directional control and intentional deviation of a well to change the bottom-hole location, whether it be to the original Objective Depth or formation or another bottom-hole location not deeper than the stratigraphic equivalent of the initial Objective Depth, unless the intentional deviation is done to straighten the hole or to drill around junk in the hole or to overcome other mechanical difficulties.

2.39   Take-in-Kind Facilities

Facilities which (i) are not paid for by the Joint Account and (ii) are installed for the benefit and use of a particular Party or Parties to take its or their share of Hydrocarbon production in kind.

2.40   Transfer of Interest

A conveyance, assignment, transfer, farmout, exchange, or other disposition of all or part of a Party's Working Interest.

2.41   Working Interest

The ownership of each Party in and to the Lease and all wells, equipment, Platforms, and Processing Facilities, located on the Lease, as well as all Hydrocarbon production from the Lease, in the percentage set forth in Exhibit "A" except as otherwise provided by this Agreement.

# ARTICLE 3
# EXHIBITS

3.1   Exhibits

The following exhibits are attached to this Agreement and incorporated into this Agreement by reference:

3.1.1   Exhibit "A"

Operator, Description of Leases, Division of Interests, and Notification Addresses

3.1.2   Exhibit "B"

Insurance Provisions.

3.1.3   Exhibit "C"

Accounting Procedure.

3.1.4   Exhibit "D"

Non-discrimination Provisions.

3.1.5   Exhibit "E"

Gas Balancing Agreement.

3.1.6   Exhibit "F"

Memorandum of Operating Agreement and Financing Statement.

8

3.1.8   Exhibit "G"

Contribution and Reimbursement Agreement.

3.1.9   Exhibit "H"

Declaration of Operating Agreement

3.2   **Conflicts**

If a provision of an exhibit, except Exhibit "D" or "E," is inconsistent with a provision in the body of this Agreement, the provision in the body of this Agreement shall prevail.  If a provision of Exhibit "D" or "E" is inconsistent with a provision in the body of this Agreement, however, the provision of the exhibit shall prevail.

# ARTICLE 4

# OPERATOR

4.1   **Operator**

ANKOR Energy LLC is designated as the Operator of the Lease.  The Parties shall promptly execute and provide Operator with all documents required by the BOEM in connection with the designation of ANKOR Energy LLC as Operator or with the designation of any other Party as a substitute or successor Operator.  Unless agreed to the contrary by all Parties hereto, ANKOR E&P Holdings Corporation shall be classified as the designated applicant for oil spill financial responsibility purposes and each Non-operating Party shall promptly execute the appropriate documentation reflecting this designation and promptly provide same to Operator for filing with BOEM. Notwithstanding any other provision in this Agreement, ANKOR Energy LLC's only rights, benefits, liabilities and obligations under this Agreement and the Lease shall be as Operator. ANKOR Energy LLC shall have no right to vote or make an election under this Agreement and has zero percent (0.0%) record title interest, operating rights interest and/or Working Interest in the Lease. In no event shall ANKOR Energy LLC have a Working Interest in relation to any operation carried out under this Agreement nor be deemed to have acquired a Working Interest directly or indirectly as a result of being the Operator under this Agreement. ANKOR Energy LLC's sole function is to be Operator under this Agreement and to conduct all operations as ANKOR E&P Holdings Corporation's operating entity. For the purpose of this Agreement, ANKOR Energy LLC shall be excluded from the phrases "the Parties" and "all Parties".

4.2   **Substitute Operator**

Except as otherwise provided in Article 4.2.1 (Circumstances Under Which the Operator Must Conduct a Non-Consent Operation), if ANKOR E&P Holdings Corporation becomes a Non-participating Party in a Non-consent Operation, the Participating Parties may approve the

designation of any Participating Party as the substitute Operator by the vote of two (2) or more of the Participating Parties having a combined fifty one percent (51%) or more of the Participating Interests. The substitute Operator shall serve only (a) for the Non-consent Operation, (b) on the Lease, or that portion of the Lease, affected by the Non-consent Operation, and, subject to these limitations, and (c) with the same authority, rights, obligations, and duties as the Operator.  If a Non-operator is the only Participating Party in a Non-consent Operation, then the Non-operator shall be designated as the substitute Operator for that Non-consent Operation, with no vote required, unless the Non-operator elects not to accept the designation.  No Non-operator shall ever be designated as a substitute Operator against its will.  If a substitute Operator is not designated under the foregoing procedures, the Operator shall, upon the unanimous agreement of the Participating Parties and the Operator, conduct the Non-consent Operation on behalf of the Participating Parties and at the Participating Parties' sole cost and risk under Article 13 (Non-Consent Operations).

4.2.1   **Circumstances Under Which the Operator Must Conduct a Non-Consent Operation**

If:

    (a)    a drilling rig is on location and ANKOR E&P Holdings Corporation becomes a Non-participating Party in a supplemental AFE for an Exploratory Operation, or Development Operation, or

    (b)    ANKOR E&P Holdings Corporation becomes a Non-participating Party in an operation to be conducted from a Platform operated by the Operator,

the Operator shall conduct the Non-consent Operation on behalf of the Participating Parties and at the Participating Parties' sole cost and risk under Article 13 (Non-Consent Operations).

4.2.2   **Operator's Conduct of a Non-Consent Operation in which ANKOR E&P Holdings Corporation is a Non-participating Party**

When, under Article 4.2 (Substitute Operator) or Article 4.2.1 (Circumstances Under Which the Operator Must Conduct a Non-Consent Operation), the Operator conducts a Non-consent Operation in which ANKOR E&P Holdings Corporation is a Non-participating Party, it shall follow the practices and standards in Article 5 (Exclusive Right to Operate). The Operator shall not be required to proceed with the Non-consent Operation until the Participating Parties have advanced the costs of the Non-consent Operation to the Operator.  The Operator and ANKOR E&P Holdings Corporation shall never be obligated to expend any of their own funds for the Non-consent Operation in which ANKOR E&P Holdings Corporation is a Non-participating Party.

4.2.3   **Appointment of a Substitute Operator**

After expiration of all applicable response periods for the Non-consent Operation and selection of a substitute Operator, each Party shall promptly provide the substitute

Operator with the appropriate BOEM designation of operator forms and designation of oil spill responsibility forms.  The Operator and the substitute Operator shall coordinate the change of operatorship to avoid interfering with ongoing activities and operations, if any, including but not limited to, lease maintenance activities and operations.

### 4.2.4   Redesignation of Operator

Within thirty (30) days after conclusion of the Non-consent Operation, all Parties shall execute and provide the Operator with the appropriate BOEM designation of operator forms and designation of oil spill responsibility forms to return operatorship to the Operator, thereby superseding the Parties' designation of the substitute Operator under Article 4.2.3 (Appointment of a Substitute Operator).

### 4.3   Resignation of Operator

Subject to Article 4.5 (Selection of Successor), the Operator may resign at any time by giving written notice to the other Parties, except that the Operator may not resign during a Force Majeure or an emergency that poses a threat to life, safety, property, or the environment.

### 4.4   Removal of Operator

Operator may be removed by an affirmative vote of the Parties owning a combined Working Interest of fifty one percent (51%) or more of the remaining Working Interest after excluding the ANKOR E&P Holdings Corporation's Working Interest if:

(a)      Operator becomes insolvent or unable to pay its debts as they mature, makes an assignment for the benefit of creditors, commits an act of bankruptcy, or seeks relief under laws providing for the relief of debtors;

(b)      a receiver is appointed for Operator or for substantially all of its property or affairs;

(c)      a Transfer of Interest by ANKOR E&P Holdings Corporation (excluding an interest assigned to an Affiliate) reduces ANKOR E&P Holdings Corporation's Working Interest to less than the Working Interest of a Non-operator, whether accomplished by one or more Transfer of Interest.

### 4.5   Selection of Successor

Upon resignation or removal of Operator, a successor Operator shall be selected from among the Parties by an affirmative vote of two (2) or more Parties having a combined Working Interest of fifty one percent (51%) or more.  If ANKOR E&P Holdings Corporation is not entitled to vote, fails to vote, or votes only to succeed ANKOR Energy LLC, then the successor Operator shall be selected by the affirmative vote of the Parties owning a combined Working Interest of fifty one percent (51%) or more of the remaining Working Interest after excluding the Working Interest of ANKOR E&P Holdings Corporation.  If ANKOR E&P Holdings Corporation assigns all or a part of its Working Interest, then under Article 4.3 (Resignation of Operator) or Article 4.4.(c), the Party who acquired all or a part of ANKOR E&P Holdings Corporation's Working Interest shall not be excluded from voting for a successor Operator.  If there are only two Parties to this Agreement

8

when the Operator resigns or is removed, then the Non-operator (other than ANKOR E&P Holdings Corporation) automatically has the right, but not the obligation, to become the Operator. If no Party is willing to become the Operator, this Agreement shall terminate under Article 27.1 (Term).

### 4.6    Effective Date of Resignation or Removal

The resignation or removal of the Operator shall become effective as soon as practical but no later than 7:00 a.m. on the first day of the month following a period of ninety (90) days after the date of resignation or removal, unless a longer period is required for the Parties to obtain approval of the designation of the successor Operator, and designated applicant for oil spill financial responsibility purposes, by the BOEM; however, in no event shall the resignation or removal of Operator become effective unless and until a successor Operator has assumed the duties of Operator.   The resignation or removal of the outgoing Operator shall not prejudice any rights, obligations, or liabilities resulting from its operatorship.  The successor Operator may charge the Joint Account for reasonable costs incurred in connection with the change of operatorship.

### 4.7    Delivery of Property

On the effective date of resignation or removal of the Operator, the outgoing Operator shall deliver to the successor Operator (i) possession of all items purchased for the Joint Account under this Agreement, (ii) all Hydrocarbons that are not the separate property of a Party, (iii) all equipment, materials, and appurtenances purchased for the Joint Account under this Agreement, and (iv) all books, records, and inventories relating to the Joint Account (other than those books, records, and inventories maintained by the outgoing Operator as the owner of a Working Interest).   The outgoing Operator shall further use its reasonable efforts to transfer to the successor Operator, as of the effective date of the resignation or removal, its rights as Operator under all contracts exclusively relating to the activities or operations conducted under this Agreement, and the successor Operator shall assume all obligations of the Operator that are assignable under the contracts.  The Parties may audit the Joint Account and conduct an inventory of all property and all Hydrocarbons that are not the separate property of a Party, and the inventory shall be used in the return of, and the accounting by the outgoing Operator of, the property and the Hydrocarbons that are not the separate property of a Party.  The inventory and audit shall be conducted under Exhibit "C".

# ARTICLE 5

## AUTHORITY AND DUTIES OF OPERATOR

5.1 **Exclusive Right to Operate**

Unless otherwise provided in this Agreement, Operator shall have the exclusive right and duty to conduct operations (or cause them to be conducted) under this Agreement. In performing services under this Agreement for the Non-operators, Operator shall be an independent contractor, not subject to the control or direction of Non-operators, except for the type of operation to be undertaken in accordance with the voting and election procedures of this Agreement. Operator shall not be deemed to be, or hold itself out as, the agent or fiduciary of Non-operators.

5.2 **Workmanlike Conduct**

Operator shall timely commence and conduct all operations in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances. Operator shall not be liable to Non-operators for losses sustained or liabilities incurred, except as may result from Operator's gross negligence or willful misconduct. Operator shall never be required under this Agreement to conduct an operation that it believes would be unsafe or would endanger persons or property. Unless otherwise provided in this Agreement, Operator shall consult with Non-operators and keep them informed of all important matters.

5.3 **Liens and Encumbrances**

Operator shall endeavor to keep the Lease, wells, Platforms, Processing Facilities, and other equipment free from all liens and other encumbrances occasioned by operations hereunder, except those provided in Article 8.6 (Security Rights).

5.4 **Employees and Contractors**

Operator shall select employees and contractors and determine their number, hours of labor, and compensation. The employees shall be employees of Operator.

5.5 **Records**

The Operator shall keep accurate books, accounts, and records of activities or operations under this Agreement in compliance with the Accounting Procedure in Exhibit "C". Unless otherwise provided in this Agreement, all records of the Joint Account shall be available to a Non-operator as provided in Exhibit "C". The Operator shall use good-faith efforts to ensure the settlements, billings, and reports rendered to each Party under this Agreement are complete and accurate. The Operator shall notify the other Parties promptly upon the discovery of any error or omission pertaining to the settlements, billings, and reports rendered to each Party. This provision does not affect a Party's audit rights under this Agreement.

5.6 **Compliance**

Operator shall comply, and shall require all agents and contractors to comply, with all applicable laws, rules, regulations, and orders of governmental authorities having jurisdiction.

11



5.7   Contractors

Operator may enter into contracts with independent contractors for the design, construction, installation, or operation of wells, Platforms and Processing Facilities.  Insofar as possible, Operator shall procure goods and services for the benefit of the Parties at prices and under contracts customary and competitive at or near prevailing market rates and within the industry when let and entered.  All drilling operations conducted under this Agreement shall be conducted by properly qualified and responsible drilling contractors under current competitive contracts.  A drilling contract will be deemed to be a current competitive contract if it (a) was made within one (1) year before the commencement of the well and (b) contains terms, rates, and provisions that, when the contract was made, did not exceed those generally prevailing in the area for operations involving substantially equivalent rigs that are capable of drilling the proposed well.  At its election, Operator may use its own or an Affiliate's drilling equipment, derrick barge, tools, or machinery to conduct drilling operations, but the work shall be (i) performed by Operator acting as an independent contractor, (ii) approved by written agreement with the Participating Parties before commencement of operations, and (iii) conducted under the same terms and conditions and at the same rates as are customary and prevailing in competitive contracts of third parties doing work of similar nature.  Before awarding a drilling contractor performing work with its own or an Affiliate's drilling equipment, derrick barge, tools, or machinery, Operator shall attempt to obtain competitive bids for the work from independent contractors.

5.8   Governmental Reports

Operator shall make reports to governmental authorities it has a duty to make as Operator and shall furnish copies of the reports to the Participating Parties.

5.9   Information to Participating Parties

Operator shall furnish each Participating Party the following information, if applicable, for each well operation conducted by Operator:

5.9.1   A copy of the application for permit to drill and all amendments thereto.

5.9.2   A daily drilling report, giving the depth, corresponding lithological information, data on drilling fluid characteristics, information about drilling or operational difficulties or delays, if any, and other pertinent information, by facsimile transmission within twenty four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) for well operations conducted in the preceding twenty four (24) hour period.

5.9.3   A complete report of each core analysis.

5.9.4   A copy of each electrical survey, currently as it is run; all data for each radioactivity log, temperature survey, deviation or directional survey, caliper log, and other log or survey obtained during the drilling of the well; and, upon completion of the well, a composite of all electrical-type logs, insofar as is reasonable and customary.

5.9.5   A copy of all well test results, bottom-hole pressure surveys, and fluid analyses.

12



5.9.6 Upon written request received by Operator before commencement of drilling, samples of cuttings and cores taken from the well (if sufficient cores are retrieved), packaged in containers furnished by Operator at the expense of the requesting Party, marked as to the depths from which they were taken, and shipped collect by express courier to the address designated by the requesting Party.

5.9.7 To the extent possible, twenty four (24) hours' advance notice of, and access to, logging, coring, and testing operations.

5.9.8 A daily report on the volume of Hydrocarbons and water produced from each well.

5.9.9 A copy of each report made to a governmental authority having jurisdiction.

5.9.10 A copy of reserve report purchased for the Joint Account under this Agreement.

5.9.11 Upon written request by any Participating Party, other pertinent information available to Operator including, but not limited to, those portions of the contracts to be used for the benefit of the Joint Account and which pertain to the Lease, but excluding the Operator's proprietary or secret information and its subsurface interpretations.

5.10 **Information to Non-participating Parties**

Operator shall furnish each Non-participating Party a copy of each Operator's governmental report that is available to the public and associated with the applicable Non-consent Operation. Until the applicable recoupment under Article 13 (Non-consent Operations) is complete, a Non-participating Party shall not receive or review any other information specified by Article 5.9 (Information to Participating Parties), except as may be necessary for a payout audit of the Non-consent Operation.

# ARTICLE 6

## VOTING AND VOTING PROCEDURES

6.1 **Voting Procedures**

Unless otherwise provided in this Agreement, each matter requiring approval of the Parties shall be determined as follows:

6.1.1 **Voting Interest**

Subject to Article 6.6.4 (Default), each Party shall have a voting interest equal to its Working Interest or its Participating Interest, as applicable.

6.1.2 **Vote Required**

Unless expressly stated to the contrary herein, a matter requiring approval of the Parties shall be decided by the affirmative vote of two (2) or more Parties having a combined voting interest of fifty one percent (51%) or more. If there are two (2) Parties to this Agreement, the matter shall be determined by the Party having a majority interest or, if the interests are equal, the matter shall require unanimous consent.



6.1.3   Votes

The Parties may vote at a meeting; by telephone, promptly confirmed in writing to Operator; or by letter or facsimile transmission.  Operator shall give each Party prompt notice of the results of the voting.

6.1.4   Meetings

Meetings of the Parties may be called by Operator upon its own motion or at the request of a Party having a voting interest of not less than five percent (5%).  Except in an emergency, no meeting shall be called on less than five (5) days' advance written notice, and the notice of meeting shall include the proposed meeting agenda.  The representative of Operator shall be chairman of each meeting.  Only matters included in the agenda may be discussed at a meeting, but the agenda and items included in the agenda may be amended by unanimous agreement of all Parties.

# ARTICLE 7

# ACCESS

7.1   Access to Lease

Each Party shall have access, at its sole risk and expense and at all reasonable times, to the Lease to inspect operations and wells in which it participates, and to pertinent records and data. A Non-operator shall give Operator at least twenty-four (24) hours' notice of the Non-operator's intention to visit the Lease.  To protect Operator and the Non-operators from unnecessary lawsuits, claims, and legal liability, if it is necessary for a person who is not performing services for Operator directly related to the joint operations, but is performing services solely for a Non-operator or pertaining to the business or operations of a Non-operator, to visit, use, or board a rig, Platform, or Processing Facility on a Lease subject to this Agreement, the Non-operator shall give Operator advance notice of the visit, use, or boarding, and shall secure from that person an agreement, in a form satisfactory to Operator, indemnifying and holding Operator and Non-operators harmless, or shall itself provide the same hold harmless and indemnification in favor of Operator and other Non-operators before the visit, use, or boarding.

7.2   Reports

On written request, Operator shall furnish a requesting Party any information not otherwise furnished under Article 5 (Authority and Duties of Operator) to which that Party is entitled under this Agreement within reasonable limits determined by Operator.  The costs of gathering and furnishing information not furnished under Article 5 shall be charged to the requesting Party. Operator is not obligated to furnish interpretative data that was generated by Operator at its sole cost.

7.3     Confidentiality

Except as otherwise provided in Article 7.4 (Limited Disclosure), Article 7.5 (Media Releases), and Article 21.1 (Notice of Contributions Other Than Advances for Sale of Production), and except for necessary disclosures to governmental authorities having jurisdiction, or except as agreed in writing by all Participating Parties, no Party or Affiliate shall disclose Confidential Data to a third party. This Article 7.3 shall be in force and effect for a term of one (1) year after termination of this Agreement.

7.4     Limited Disclosure

A Party may make Confidential Data to which it is entitled under this Agreement available to:

(a)     outside professional consultants and reputable engineering firms, for the purpose of evaluations;

(b)     gas transmission companies for Hydrocarbon reserve or other technical evaluations;

(c)     reputable financial institutions for study before commitment of funds;

(d)     governmental authorities having jurisdiction or the public, to the extent required by applicable laws or by those governmental authorities;

(e)     the public, to the extent required by the regulations of a recognized stock exchange;

(f)     third parties with whom a Party is engaged in a bona fide effort to effect a merger or consolidation, sell all or a controlling part of that Party's stock, or sell all or substantially all assets of that Party or an Affiliate of that Party;

(g)     an Affiliate of a Party; or

(h)     third parties with whom a Party is engaged in a bona fide effort to sell, farm out, or trade all or a portion of its interest in the Lease.

Confidential Data made available under Articles 7.4(f) and 7.4(h) shall not be removed from the custody or premises of the Party making the Confidential Data available to third parties described in those Articles.  A third party permitted access under Articles 7.4(a), (b), (c), (f), and (h) shall first agree in writing neither to disclose the Confidential Data to others nor to use the Confidential Data, except for the purpose for which it was disclosed.  The disclosing Party shall give prior notice to the other Parties that it intends to make the Confidential Data available.

7.5     Media Releases

Except as agreed by all Parties or otherwise permitted by this Article, no Party shall issue a news or media release about operations on the Lease.  In an emergency involving extensive property damage, operations failure, loss of human life, or other clear emergency, and for which there is insufficient time to obtain the prior approval of the Parties, Operator may furnish the minimum, strictly factual, information necessary to satisfy the legitimate public interest of the media and governmental authorities having jurisdiction.  Operator shall then promptly advise the other Parties of the information furnished in response to the emergency.

## ARTICLE 8

## EXPENDITURES

8.1    Basis of Charge to the Parties

Subject to the other provisions of this Agreement, Operator shall pay all costs incurred under this Agreement, and each Party shall reimburse Operator in proportion to its Participating Interest. All charges, credits, and accounting for expenditures shall be made and done pursuant to Exhibit "C".

8.2    AFEs

Before undertaking an operation or making a single expenditure to be in excess of one hundred fifty thousand Dollars ($150,000), and before conducting an activity or operation to drill, Sidetrack, Deepen, Complete or Recomplete a well (regardless of the estimated cost), Operator shall submit an AFE for the operation or expenditure to the Parties for approval. Operator shall also furnish an informational AFE to all Parties for an operation or single expenditure estimated to cost one hundred fifty thousand Dollars ($150,000) or less, but in excess of fifty thousand Dollars ($50,000) if Operator prepares for its own use.

8.3    Emergency and Required Expenditures

Notwithstanding anything in this Agreement to the contrary, Operator is hereby authorized to conduct operations and incur expenses that in its opinion are reasonably necessary to safeguard life, property, and the environment in case of an actual or imminently threatened blowout, explosion, accident, fire, flood, storm, hurricane, catastrophe, or other emergency, and the expenses shall be borne by the Participating Parties in the affected operation. Operator shall report to the Participating Parties, as promptly as possible, the nature of the emergency and the action taken. Operator is also authorized to conduct operations and incur expenses reasonably required by statute, regulation, order, or permit condition or by a governmental authority having jurisdiction, which expenses shall be borne by the Participating Parties in the affected operation.

8.4    Advance Billings

Operator may require each Party to advance its respective share of estimated expenditures pursuant to Exhibit "C".

8.5    Commingling of Funds

Funds received by Operator under this Agreement may be commingled with its own funds.

8.6    Security Rights

In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, for and in consideration of the covenants and mutual undertakings of the Operator and the Non-operators herein, the Parties shall have the following security rights:

8.6.1    Mortgage and Security Interest in Favor of Operator

Each Non-operator hereby grants to the Operator a mortgage, lien, an assignment of leases and rents, an assignment of production affecting all of its right, title and interest in and to the Lease, and a pledge of and continuing security interest in its share of Hydrocarbons when extracted and in all other as-extracted collateral produced from the Lease and its interest in all equipment and property, including fixtures, whether movable or immovable, corporeal or incorporeal, located upon and/or useful in the production of Hydrocarbons and other (as-extracted collateral from such Lease (all such property being more fully described in Exhibit "F"). This mortgage and continuing security interests is given to secure the complete and timely performance of and payment by each Non-operator of all obligations and indebtedness of every kind and nature, whether now owed by such Non-operator or hereafter arising, pursuant to this Agreement. To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of the Operator herein shall secure the payment of all costs and other expenses properly charged to such Party, together with (A) interest on such indebtedness, costs, and other expenses at the rate set forth in Exhibit "C" attached hereto (the "Accounting Procedure") or the maximum rate allowed by law, whichever is the lesser, (B) reasonable attorneys' fees, (C) court costs, and (D) other directly related collection costs. If any Non-operator does not pay such costs and other expenses or perform its obligations under this Agreement when due, the Operator shall have the additional right to notify the purchaser or purchasers of the defaulting Non-operator's Hydrocarbon production and collect such costs and other expenses out of the proceeds from the sale of the defaulting Non-operator's share of Hydrocarbon production until the amount owed has been paid. The Operator shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Non-operator's share of Hydrocarbon production. Any purchaser of such production shall be entitled to rely on the Operator's statement concerning the amount of costs and other expenses owed by the defaulting Non-operator and payment made to the Operator by any purchaser shall be binding and conclusive as between such purchaser and such defaulting Non-operator. Should any Non-Operator default under its obligations to the Operator under this Agreement, the Operator may, subject to the terms of this Agreement, be entitled to exercise any and all rights and remedies of a mortgagee under Texas law or , as the case may be, Louisiana law and as a secured party under applicable provisions of the Uniform Commercial Code (including, without limitation, the terms in effect in the State of Texas or , as the case may be, State of Louisiana at La. R.S. 10:9-101, et seq.).

To the extent applicable state law requires liquidation of the same for the mortgage to be enforceable, the maximum amount for which the mortgage herein granted by each Non-operator shall be deemed to secure the obligations and indebtedness of such Non-operator to the Operator as stipulated herein is hereby fixed in an amount equal to $100,000,000.00 (the "Limit of the Mortgage of each Non-operator"), otherwise, the maximum amount of the obligations of each Non-Operator to the Operator to be so secured shall be unlimited.

Notwithstanding the foregoing Limit of the Mortgage of each Non-operator, the liability of each Non-operator under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Operator shall not be entitled to enforce the same against such Non-operator for an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the Memorandum of Operating Agreement and Financing Statement (Louisiana), as such term is defined in Article 8.6.3 (Recordation) hereof) outstanding and unpaid and that are attributable to or charged against the interest of such Non-operator pursuant to this Agreement.

### 8.6.2   Mortgage and Security Interest in Favor of the Non-operators

To secure the complete and timely performance of and payment by the Operator of all obligations and indebtedness of every kind and nature, whether now owed by the Operator or hereafter arising, pursuant to this Agreement, ANKOR E&P Holdings Corporation, as the Operator's Affiliate, hereby grants to each of the other Non-operators a mortgage, lien, an assignment of leases and rents, an assignment of production affecting all of its right, title, and interest in and to the Lease, and a pledge of and continuing security interest in its share of Hydrocarbons when extracted and in all other as-extracted collateral produced from the Lease and its interest in all equipment and property, including fixtures, whether movable or immovable, corporeal or incorporeal, located upon and/or useful in the production of Hydrocarbons and other as-extracted collateral from such Lease (all such property being more fully described in Exhibit "F"). To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of the Non-operators herein shall secure the payment of all costs and other expenses properly charged to the Operator, together with (A) interest on such indebtedness, costs, and other expenses at the rate set forth in Exhibit "C" attached hereto (the "Accounting Procedure") or the maximum rate allowed by law, whichever is the lesser, (B) reasonable attorneys' fees, (C) court costs, and  (D) other directly related collection costs. Should the Operator default under its obligations to the Non-operators under this Agreement, each Non-operator (excluding ANKOR E&P Holdings Corporation) may, subject to the terms of this Agreement, be entitled to exercise any and all rights and remedies of a mortgagee under Texas law or, as the case may be, Louisiana law and as a secured party under applicable provisions of the Uniform Commercial Code (including, without limitation, the version in effect in the State of Louisiana at La. R.S. 10:9-101, et seq.).

To the extent applicable state law requires liquidation of the same for the mortgage to be enforceable, the maximum amount for which the mortgage herein granted by ANKOR E&P Holdings Corporation, as Operator's Affiliate, in favor of each Non-operator shall be deemed to secure the obligations and indebtedness of the Operator as stipulated herein is hereby fixed in an amount equal to $100,000,000.00 (the "Limit of the Mortgage of Operator"); otherwise, the maximum amount of the obligations of the Operator to the Non-operators (excluding ANKOR E&P Holdings Corporation) to be so secured shall be unlimited.  Notwithstanding the foregoing

Limit of the Mortgage of Operator, in favor of each Non-operator (excluding ANKOR E&P Holdings Corporation), the liability of Operator under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Non-operators (excluding ANKOR E&P Holdings Corporation) shall not be entitled to enforce the same against ANKOR E&P Holdings Corporation as Operator's Affiliate for an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges, provided for in this Agreement or in the Memorandum of Operating Agreement and Financing Statement (Louisiana), as such term is defined in Article 8.6.3 (Recordation) hereof) outstanding and unpaid and that are attributable to or charged against the Operator pursuant to this Agreement.

### 8.6.3   Recordation

To provide evidence of, and to further perfect the Parties' security rights created hereunder, upon request, each Party shall execute and acknowledge the Memorandum of Operating Agreement and Financing Statement attached as Exhibit "F" (the "Memorandum of Operating Agreement and Financing Statement) in multiple counterparts as appropriate. Each Party is authorized to file the Memorandum of Operating Agreement and Financing Statement in any and all jurisdictions which it may deem reasonably necessary to perfect and to continue the effect of perfection of the mortgage and security interests granted hereby.  The Parties further authorize the Operator to file the Declaration of Operating Agreement attached as Exhibit "H" in the public records to serve as notice of the existence of this Agreement as a burden on the title of the Non-operators to their interests in the Lease.  Upon the acquisition of a leasehold interest in the Lease, the Parties shall, within five (5) business days following request by one of the Parties hereto, execute and furnish to the requesting Party for recordation such a Memorandum of Operating Agreement and Financing Statement and Declaration of Agreement describing such leasehold interest. Such Memorandum of Operating Agreement and Financing Statement and Declaration of Agreement shall be amended from time to time upon acquisition of additional leasehold interests in the Lease, and the Parties shall, within five (5) business days following request by one of the Parties hereto, execute and furnish to the requesting Party for recordation any such amendment.

### 8.6.4   Default

If any Party does not pay its share of the charges authorized under this Agreement when due, the Operator may give the defaulting Party notice that unless payment is made within thirty (30) days from delivery of the notice, the non-paying Party shall be in default. A Party in default shall have no further access to the rig, Platform or Processing Facilities, any Confidential Data or other maps, records, data, interpretations, or other information obtained in connection with activities or operations hereunder or be allowed to participate in meetings. A Party in default shall not be entitled to Vote or to make an Election until such time as the defaulting Party is no longer in default. The voting interest of each non-defaulting Party shall be counted in the

Unofficial Copy Office of Harris County District Clerk

proportion its Working Interest bears to the total non-defaulting Working Interests. As to any operation approved during the time a Party is in default, such defaulting Party shall be deemed to be a Non-participating Party, except where such approval is binding on all Parties or Participating Parties, as applicable. In the event a Party believes that such statement of charges is incorrect, the Party shall nevertheless pay the amounts due as provided herein, and the Operator shall attempt to resolve the issue as soon as practicable, but said attempt shall be made no later than sixty (60) days after receiving notice from the Party of such disputed charges.

### 8.6.5   Unpaid Charges

If any Participating Party fails to pay its share of the costs and other expenses authorized under this Agreement within thirty (30) days after receipt of an invoice therefor or to otherwise perform any of its obligations under this Agreement when due, the Party to whom such payment is due, in order to take advantage of the provisions of this Article 8.6, shall notify the other Party by certified or registered U.S. Mail that it is in default and has thirty (30) days from the receipt of such notice to pay. If such payment is not made timely by the non-paying Party after the issuance of such notice to pay, the Party requesting such payment may take immediate steps to diligently pursue collection of the unpaid costs and other expenses owed by such Participating Party, to collect consequential damages as a result of the default, and to exercise the mortgage and security rights granted by this Agreement. The bringing of a suit and the obtaining of a judgment by any Party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the security rights granted herein. In addition to any other remedy afforded by law, each Party shall have, and is hereby given and vested with, the power and authority to foreclose the lien, mortgage, pledge, and security interest established hereby in its favor in the manner provided by law, to exercise the Power of Sale provided for herein, if applicable, and to exercise all rights of a secured party under the Uniform Commercial Code as adopted by the state in which the Lease is located or such other states as such Party may deem appropriate. The Operator shall keep an accurate account of amounts owed by the nonperforming Party (plus interest and collection costs) and any amounts collected with respect to amounts owed by the nonperforming Party. In the event there become three or more Parties to this Agreement, then if any nonperforming Party's share of costs remains delinquent for a period of sixty (60) days, each other Participating Party shall, upon the Operator's request, pay the unpaid amount of costs in the proportion that its Working Interest bears to the total non-defaulting Working Interests. Each Participating Party paying its share of the unpaid amounts of a nonperforming Party shall be subrogated to the Operator's mortgage and security rights to the extent of the payment made by such Participating Party.

### 8.6.6   Carved-out Interests

Any subsequent agreements creating any overriding royalty, production payment, net proceeds interest, net profits interest, carried interest or any other interest carved out of a Working

Unofficial Copy Office of Marilyn Burgess District Clerk

20

Interest in the Lease shall specifically make such interests inferior to the rights of the Parties to this Agreement. If any Party whose Working Interest is so encumbered does not pay its share of costs and other expenses authorized under this Agreement, and the proceeds from the sale of its Hydrocarbon production pursuant to this Article 8.6 are insufficient to pay such costs and expenses, the security rights provided for in this Article 8.6 may be applied against the carved-out interests with which the defaulting or non-performing Party's interest in the Lease is burdened. In such event, the rights of the owner of such carved-out interest shall be subordinated to the security rights granted by this Article 8.6.

**8.7     Overexpenditures**

Operator shall notify the Participating Parties when it appears that actual expenditures for an approved operation in an Exploratory or Development Well or for the design, construction, and installation of a Platform (other than a Platform that solely supports Processing Facilities) will exceed the AFE estimate (the excess being an "Overexpenditure"). If it appears that the Overexpenditure will be no more than twenty percent (20%) (hereinafter referred to as the "Allowable Variance," Operator's notice shall be forwarded for information only. If Operator determines that the Overexpenditure will exceed the Allowable Variance, Operator shall submit a new AFE for the current operation ("Supplemental AFE") for approval of the Participating Parties. The Participating Parties may then elect whether to continue to participate within ten (10) days or twenty four (24) hours if a rig is on location, exclusive of Saturdays, Sundays, and federal holidays, after receipt of the Supplemental AFE. If fewer than all, but one (1) or more Participating Parties elect to continue to participate in the current operation and agree to pay and bear one hundred percent (100%) of the costs and risks of conducting it, Operator shall continue to conduct the current operation. Otherwise, the operation shall cease. A Participating Party that elects not to continue to participate in the current operation shall become a Non-participating Party in the operation, from and after the date when the current operation began, and Article 13.2 (Relinquishment of Interest) shall apply to the Party as if the Party had originally elected to be a Non-participating Party to the current operation, except that such Party shall be liable for all obligations incurred, including without limitation drilling costs, until the date of its election not to continue to participate in the current operation. Unless otherwise agreed by the Participating Parties, each Participating Party electing to continue to participate in the current operation may, but is not obligated to, pay and bear that portion of the costs and risks attributable to the interests of the Non-participating Parties in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties electing to continue participating in the current operation. If it appears to Operator that actual expenditures for an approved operation will exceed the Supplemental AFE estimate, Operator shall again repeat the procedure of this Article 8.7, using the estimate in the most recently approved Supplemental AFE as the basis for determining the Overexpenditure and Allowable Variance. An initial Participating Party in an operation shall remain responsible for its share of all costs and risks for plugging, replugging, capping, burying,

disposing, abandoning, removing, and restoring associated with the operation, subject to Article 14 (Abandonment, Salvage, and Surplus), regardless of its subsequent election on a Supplemental AFE; provided, however, that the foregoing shall not apply in the case of a Platform and/or Processing Facilities if an election not to continue to participate in its construction and installation is made on a Supplemental AFE before the Platform and/or Processing Facilities loadout. Notwithstanding anything in this Article to the contrary, if expenditures exceed the Allowable Variance for an emergency, as provided in Article 8.3 (Emergency and Required Expenditures), Operator shall not be required to secure the approval of the Participating Parties, as the expenditures will be borne by all Participating Parties.  However, once stabilization takes place and emergency expenditures are no longer being incurred, Operator shall promptly furnish a Supplemental AFE to the Participating Parties for their review and election, as provided above.

# ARTICLE 9

# NOTICES

9.1   Giving and Receiving Notices

Except as otherwise provided in this Agreement, all AFEs and notices required or permitted by this Agreement shall be in writing and shall be delivered in person or by mail, overnight courier service, email or facsimile transmission, with postage and charges prepaid, addressed to the Parties at the addresses in Exhibit "A". When a drilling rig is on location and standby charges are accumulating, however, notices pertaining to the rig shall be given orally or by telephone. All telephone or oral notices permitted by this Agreement shall be confirmed immediately thereafter by written notice. An originating AFE or notice shall be deemed to have been delivered only when received by the Party to whom it was directed, and the period for a Party to deliver an AFE or notice in response thereto shall begin on the date the originating AFE or notice is received. "Receipt", for (i) oral or telephone notice and (ii) proposals and responses thereto, means actual and immediate communication to the Party to be notified, and for written notice, means actual delivery of the notice to the address of the Party to be notified, as specified in this Agreement, or to the facsimile machine of that Party. A responsive notice shall be deemed to have been delivered when the Party to be notified is in receipt of same. When a response is required in forty-eight (48) hours or less, however, the response shall be given orally or by telephone or facsimile transmission within that period. If a Party is unavailable to receive a notice required to be given orally or by telephone, the notice may be delivered by any other method specified in this Article 9.1 and shall be deemed to have been delivered in the same manner provided in this Article 9.1 for a responsive notice. A message left on an answering machine or with an answering service or other third person shall not be deemed to be adequate telephonic or oral notice.

9.2   Content of Notice

An AFE or notice requiring a response shall indicate the maximum response time specified in Article 9.3 (Response to Notices). If an AFE or proposal does not contain sufficient contents specified in Article 9.2 (Content of Notice), the maximum response time shall, on request, be reasonably requested. A proposal for a Platform and/or Processing Facilities shall include an AFE, containing a description of the Platform and/or Processing Facilities, including, but not limited to, location, and the estimated costs of design, fabrication, transportation, and installation. A proposal for a well operation shall include an AFE, describing the estimated commencement date, the proposed depth, the objective formation or formations to be penetrated or tested, the Objective Horizon, the surface and bottomhole locations, proposed directional drilling operations, the type of equipment to be used, the estimated production volume, reserve information from each well, the estimated ultimate recovery, the economic evaluation report, and the estimated costs of the operation, including, but not limited to, the estimated costs of drilling, testing, and

23



Completing or abandoning the well.  If a proposed operation is subject to Article 13.11 (Lease Maintenance Operations), the notice shall specify that the proposal is a Lease Maintenance Operation.  A proposal for multiple operations on more than one well location by the same rig shall contain separate AFEs or notices for each operation and shall specify in writing which operation will take precedence. Each Party shall respond to each proposed multiple operation in the manner provided in Article 9.3.3 (Proposal for Multiple Operations).

9.3   **Response to Notices**

Each Party's response to a proposal shall be in writing to the proposing Party.  Unless otherwise provided in this Agreement, the response time shall be as follows:

9.3.1   **Platform and/or Processing Facilities Proposals**

Each Party shall respond within thirty (30) days after its receipt of the AFE or notice for a Platform and/or Processing Facilities.

9.3.2   **Well Proposals**

Except as provided in Article 9.3.3 (Proposal for Multiple Operations), each Party shall respond within thirty (30) days after receipt of the well proposal, but if (a) a drilling rig is on location, (b) the proposal relates to the same well or its substitute, and (c) standby charges are accumulating, a response shall be made within forty eight (48) hours after receipt of the proposal, inclusive of Saturdays, Sundays, and federal holidays.

9.3.3   **Proposal for Multiple Operations**

When a proposal is made to conduct multiple Exploratory or Development Operations at separate well locations using the same rig, each Party shall respond (a) to the well operation taking precedence, within thirty (30) days after receipt of the proposal; and (b) to each subsequent well location, within forty eight (48) hours, exclusive of Saturdays, Sundays, and federal holidays, after completion of approved operations at the prior location and notification thereof by Operator if a drilling rig is on location and standby charges are accumulating and if each Party has been provided with proper notice for the proposed operation as provided in Article 9.2 (Content of Notice) at least thirty (30) days prior to receipt of notification by Operator.

9.3.4   **Other Matters**

For all other matters requiring notice, each Party shall respond within thirty (30) days after receipt of notice.

9.4   **Failure to Respond**

Failure of a Party to respond to a proposal or notice, to vote, or to elect to participate within the period required by this Agreement shall be deemed to be a negative response, vote, or election.

9.5   **Response to Counterproposals**

Responses must be made within the response period for the original proposal.

9.6    Timely Well Operations

Unless otherwise provided, an approved well shall be commenced within one hundred twenty (120) days after the date when the last applicable election on that well may be made. Wells shall be deemed to have commenced on the day charges commence under the drilling contract for that well. If the Operator does not commence actual drilling operations on an approved well within one hundred twenty (120) days from the last applicable election on the approved well, the proposal of the well and its approval will be deemed to have been withdrawn. Regardless of whether or not the well is commenced, all costs incurred by Operator attributable to an approved operation shall be paid by the Participating Parties.

9.7    Timely Platform/Processing Facilities Operations

Unless otherwise provided, Operator shall commence, or cause to commence, the construction, fabrication, acquisition, or refurbishment of an approved Platform and/or Processing Facilities within one hundred eighty (180) days after the date when the last applicable election on that Platform and/or Processing Facilities may be made. The construction, fabrication, acquisition, or refurbishment of an approved Platform and/or Processing Facilities shall be deemed to have commenced on the date the contract is awarded for the design, fabrication, or refurbishment of the Platform and/or Processing Facilities. If the Operator does not commence the construction, acquisition, or refurbishment of an approved Platform and/or Processing Facilities within one hundred eighty (180) days from the last applicable election on the approved Platform and/or Processing Facilities, the proposal of the Platform and/or Processing Facilities and their approval will be deemed to have been withdrawn. Regardless of whether or not the construction, acquisition, or refurbishment of a Platform and/or Processing Facilities is commenced, all costs incurred by Operator, attributable to that activity, shall be paid by the Participating Parties.

# ARTICLE 10

# EXPLORATORY OPERATIONS

10.1    Proposing Operations

A Party may propose an Exploratory Operation by sending an AFE or notice to the other Parties in accordance with Article 9 (Notice).

10.2    Counterproposals

When an Exploratory Operation is proposed, a Party may, within thirty (30) days after receipt of the AFE or notice for the original proposal, make a counterproposal to conduct an alternative Exploratory Operation by sending an AFE or notice to the other Parties in accordance with Article 9 (Notices). The AFE or notice shall indicate that the proposal is a counterproposal to the original proposal. If one or more counterproposals are made, each Party shall elect to participate in the

25





original proposal, or one counterproposal, or neither the original proposal nor a counterproposal. Except for the response period provided in this Article 10.2, a counterproposal shall be subject to the same terms and conditions as the original proposal.

10.3   **Operations by All Parties**

If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

10.4   **Second Opportunity to Participate**

If there are more than two (2) Parties to this Agreement and if fewer than all but two (2) or more Parties having a combined Working Interest of fifty one percent (51%) or more elect to participate, then the proposing Party shall notify the Parties of the elections made, whereupon a Party originally electing not to participate may then elect to participate by notifying the proposing Party within twenty-four (24) hours, exclusive of Saturdays, Sundays, and federal holidays, after receipt of such notice. If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk. If there are only three (3) Parties to this Agreement and two (2) of the Parties having fifty-one percent (51%) or more elect to participate and agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, then there shall not be a second opportunity to elect to participate, and the Operator, subject to Article 4.2 (Substitute Operator), shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.

10.5   **Operations by Fewer Than All Parties**

If, after the election (if applicable) made under Article 10.4 (Second Opportunity to Participate), fewer than all but two (2) or more Parties having a combined Working Interest of fifty one percent (51%) or more elect to participate in the proposed operation, the proposing Party shall notify the Participating Parties, and each Participating Party shall have twenty-four (24) hours, exclusive of Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear. Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of the costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties who elect to pay and bear a portion of costs and risks attributable to the total Non-participating Parties' interests. Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks. If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator, subject to Article 4.2 (Substitute Operator), shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply. If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.

10.6   Expenditures Approved

Approval of an Exploratory Operation shall cover all necessary expenditures associated with the operation proposed in the AFE or notice that are incurred by Operator in connection with (a) preparations for drilling; (b) the actual drilling; (c) evaluations, such as testing, coring, and logging; and (d) plugging and abandonment.

10.7   Conduct of Operations

Upon commencement of drilling an Exploratory Well, Operator shall diligently conduct the operation without unreasonable delay until the well reaches the Objective Depth, unless the well encounters, at a lesser depth, impenetrable conditions or mechanical difficulties that cannot be overcome by reasonable and prudent operations and that render further operations impracticable. If a well does not reach its Objective Depth as a result of the conditions mentioned in this Article 10.7, the operation shall be deemed to have been completed and Article 13 (Non-Consent Operations) shall apply to each Non-participating Party for the portion of the well drilled.

10.8   Course of Action After Reaching Objective Depth

When an Exploratory Well has been drilled to its Objective Depth and reasonable testing, coring, and logging have been completed and the results have been furnished to the Participating Parties, Operator shall notify the Participating Parties of Operator's recommendation for further operations in the well, and the following provisions shall apply.

10.8.1   Election by Participating Parties

The Participating Parties shall notify Operator within forty-eight (48) hours, inclusive of Saturdays, Sundays, and federal holidays, of receipt of the notice whether the Participating Parties elect to (a) participate in the recommended operation, (b) propose another operation, or (c) not participate in the recommended operation. Failure to respond shall be deemed to be an election not to participate in the recommended operation. To propose another operation, a Party shall submit notice of the operation to the Participating Parties within forty eight (48) hours, inclusive of Saturdays, Sundays, and federal holidays, after receipt of the notice of proposal by Operator.

10.8.2   Priority of Operations

If all Participating Parties elect to participate in the same proposed operation, Operator shall conduct the operation at their cost and risk. If more than one (1) operation is approved by two (2) or more Participating Parties having a combined Working Interest of fifty one percent (51%) or more, then the approved operation with the lowest number as indicated below shall take precedence:

(Indicate the order of preferences.)

1.   Additional Testing, coring, or logging.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take

27

precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

2.   Deepen.   (If conflicting proposals are approved, the operation proposed to the deepest depth shall take precedence.)

3.   Sidetrack. (If conflicting proposals are approved, the proposal receiving the largest percentage Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

4.   Complete at the deepest Objective Horizon.

5.   Complete above the deepest Objective Horizon.   (If conflicting proposals are approved, the operation proposed at the deepest depth shall take precedence.)

6.   Other operations. (If conflicting proposals are approved, the proposal receiving the largest percentage Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

7.   Temporarily abandon.

8.   Plug and abandon.

### 10.8.3   Second Opportunity to Participate

If fewer than all but two (2) or more Participating Parties having a combined Working Interest of fifty one percent (51%) or more elect to participate in an operation, the proposing Party shall notify the Participating Parties of the elections made, whereupon a Party originally electing not to participate in the proposed operation may then elect to participate by notifying the proposing Party within twenty four (24) hours, inclusive of Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

### 10.8.4   Operations by Fewer Than All Parties

If, after the election (if applicable) made under Article 10.8.3 (Second Opportunity to Participate), fewer than all but two (2) or more Parties having a combined Working Interest of fifty one percent (51%) or more elect to participate in the proposed operation that takes precedence, the proposing Party shall notify the Participating Parties and each Participating Party shall have twenty four (24) hours, inclusive of Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of the costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties who elect to pay and



38                    

bear a portion of costs and risks attributable to the nonparticipating interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks. If the Participating Parties agree to bear one hundred percent (100%) of the costs and risks of the operation, Operator, subject to Article 4.2 (Substitute Operator), shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.  If a Participating Party in a well elects not to participate in the Deepening or Sidetracking operation in the well, such non-consenting Party shall become a Non-participating Party in all operations conducted, after that election, through the Completing and equipping of the Deepened or Sidetracked portion of the well. If the Non-consent Operation is an Additional Testing, coring, or logging operation, Article 13 (Non-consent Operations) shall not apply, however, a Party electing not to participate in the Additional Testing, coring, or logging shall not be entitled to information resulting from the operation.

### 10.8.5  Subsequent Operations

Upon completion of an operation conducted under Article 10.8 (Course of Action After Reaching Objective Depth), if the well is not either (a) Completed as a Producible Well, or (b) temporarily abandoned or permanently plugged and abandoned, Operator shall notify the Participating Parties of Operator's recommendation for further operations in the well under Articles 10.8.1 through 10.8.4, which again shall apply.  If sufficient approval is not obtained to conduct a subsequent operation in a well or if all Participating Parties elect to plug and abandon the well, subject to Article 14 (Abandonment and Salvage), Operator shall permanently plug and abandon the well at the cost and risk of all Participating Parties.  Each Participating Party shall be responsible for its proportionate share of the plugging and abandonment costs associated with the operation in which it participated.

### 10.8.6  Restoration of Damaged Well

If, during Additional Testing, coring, or logging operation or during a Deepening or Sidetracking operation that does not result in the well being Completed as a Producible Well, the well is damaged to the extent that the well is rendered incapable of having a lower-priority operation conducted and a Party (a) who participated in the well, but not in the operation being conducted when the well was damaged, (b) who has a sufficient percentage of the Working Interest to approve an operation, and (c) who elected to conduct a lower-priority operation still desires to conduct the lower-priority operation after the well has been damaged may conduct the lower-priority operation, which would include operations to either restore the well to a condition that will allow the lower-priority operation to be conducted or to drill a new well to a sufficient depth to allow the lower-priority operation to be conducted.  Upon conclusion of the lower-priority operation, the

Participating Parties in the operation being conducted when the well was damaged shall reimburse the Participating Parties conducting the lower-priority operation all their costs associated with restoration of the well to the point at which the lower-priority operation was conducted. In no event, however, shall the Participating Parties in the operation being conducted when the well was damaged be required to reimburse the Participating Parties conducting the lower-priority operations an amount greater than what was actually incurred in the damaged well.

10.9   **Wells Proposed Below Deepest Producible Reservoir**

If a proposal is made to conduct an Exploratory Operation involving the drilling of a well to an Objective Horizon below the base of the deepest Producible Reservoir, a Party may elect within the applicable period to limit its participation in the operation down to the base of the deepest Producible Reservoir. For purposes of this Article 10.9, a Party who elects to limit its participation in the operation down to the base of the deepest Producible Reservoir shall be referred to as "Shallow Participant" and a Party who elects to participate in the entire operation shall be referred to as "Deep Participant". If a Party elects to limit its participation to the base of the deepest Producible Reservoir, Operator shall prepare and submit to the Shallow Participant, for informational purposes, a separate AFE covering operations down to the deepest Producible Reservoir. The Shallow Participant shall be a Participating Party in, and shall pay and bear the costs and risks of, each operation to the base of the deepest Producible Reservoir, according to its Participating Interest. The Shallow Participant shall be a Non-participating Party in each operation below the deepest Producible Reservoir, and the operation shall be considered a Non-consent Operation, and the provisions of Article 13 (Non-consent Operations) shall apply. If the well is Completed and produces Hydrocarbons from a horizon below the deepest Producible Reservoir, the Deep Participant shall reimburse the Shallow Participant for its share of the actual well costs to the base of the deepest Producible Reservoir. If the well is Completed and produces Hydrocarbons from a horizon below the deepest Producible Reservoir, the Shallow Participant shall reimburse the Deep Participant for its Working Interest share of the actual well costs to the base of the deepest Producible Reservoir in accordance with Article 13.4 (Deepening or Sidetracking Cost Adjustments), upon the earlier of the time that (a) the well is plugged back to a horizon above the base of the deepest Producible Reservoir, as determined when the original well was proposed, (b) the well is plugged and abandoned, or (c) the amount to be recouped by the Deep Participant under Article 13 (Non-consent Operations) is recovered.

# ARTICLE 11

# DEVELOPMENT OPERATIONS

11.1   **Proposing Operations**

A Party may propose a Development Operation by sending an AFE or notice to the other Parties in accordance with Article 9 (Notices).

11.2   **Counterproposals**

When a Development Operation is proposed, a Party may, within thirty (30) days after receipt of the AFE or notice for the original proposal, make a counterproposal to conduct an alternative Development Operation by sending an AFE or notice to the other Parties in accordance with Article 9 (Notices). The AFE or notice shall indicate that the proposal is a counterproposal to the original proposal. If one or more counterproposals are made, each Party shall elect to participate in the original proposal, one counterproposal, or neither the original proposal nor a counterproposal. Except for the response period provided in this Article 11.2, a counterproposal shall be subject to the same terms and conditions as the original proposal.

11.3   **Operations by All Parties**

If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

11.4   **Second Opportunity to Participate**

If there are more than two (2) Parties to this Agreement and if fewer than all but two (2) or more Parties having a combined Working Interest of fifty-one percent (51%) or more elect to participate, then the proposing Party shall notify the Parties of the elections made, whereupon a Party originally electing not to participate may then elect to participate by notifying the proposing Party within twenty-four (24) hours, exclusive of Saturdays, Sundays, and federal holidays, after receipt of such notice. If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk. If there are only three (3) Parties to this Agreement and two (2) of the Parties having fifty-one (51%) or more elect to participate and agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, then there shall not be a second opportunity to elect to participate, and the Operator, subject to Article 12.13, shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.

11.5   **Operations by Fewer Than All Parties**

If, after the election (if applicable) made under Article 11.4 (Second Opportunity to Participate), fewer than all but two (2) or more Parties having a combined Working Interest of fifty-one percent (51%) or more elect to participate in the proposed operation, the proposing Party shall notify the Participating Parties, and each Participating Party shall have twenty-four (24) hours, exclusive of Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.

31

Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of costs and risks attributable to the total Non participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties who elect to pay and bear a portion of the costs and risks attributable to the total Non participating Parties' interests. Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks. If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator, subject to Article 4.2 (Substitute Operator) shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply. If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.

11.6    **Expenditures Approved**

Approval of a Development Operation shall cover all necessary expenditures associated with the operation proposed in the AFE or notice that are incurred by Operator in connection with (a) preparations for drilling; (b) the actual drilling; (c) evaluations, such as testing, coring, and logging; and (d) plugging and abandonment, subject to any limitation that may exist as provided under Article 8 above.

11.7    **Conduct of Operations**

Upon commencement of a Development Well, Operator shall diligently conduct the operation without unreasonable delay until the well reaches the Objective Depth, unless the well encounters, at a lesser depth, impenetrable conditions or mechanical difficulties that cannot be overcome by reasonable and prudent operations and render further operations impracticable. If a well does not reach its Objective Depth as a result of the conditions mentioned in this Article 11.7, the operation shall be deemed to have been completed and Article 13 (Non-consent Operations) shall apply to each Non-participating Party for the portion of the well drilled.

11.8    **Course of Action After Reaching Objective Depth**

When a Development Well has been drilled to its Objective Depth and reasonable testing, coring, and logging have been completed and the results have been furnished to the Participating Parties, Operator shall notify the Participating Parties of Operator's recommendation for further operations on the well and the following provisions shall apply:

11.8.1    **Election by Fewer Than All Parties**

The Participating Parties shall notify Operator within forty-eight (48) hours, inclusive of Saturdays, Sundays, and federal holidays, of receipt of the notice whether the Participating Parties elect to (a) participate in the recommended operation, (b) propose another operation, or (c) not participate in the recommended operation. Failure to respond shall be deemed to be an election not to participate in the recommended operation. To propose another operation, a Party shall submit notice of the operation to the Participating Parties

within forty eight (48) hours, inclusive of Saturdays, Sundays, and federal holidays, after receipt of notice of the proposal by Operator.

**§1.8.2   Priority of Operations**

If all Participating Parties elect to participate in the same proposed operation, Operator shall conduct the operation at their cost and risk. If more than one (1) operation is approved by two (2) or more Participating Parties having a combined Working Interest of fifty-one percent (51%) or more, then the approved operation with the lowest number as indicated below shall take precedence:

1.   Additional Testing, coring, or logging. (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

2.   Complete at the deepest Objective Horizon.

3.   Complete above the deepest Objective Horizon. (If conflicting proposals are approved, the operation proposed to the deepest depth shall take precedence.)

4.   Deepen.  (If conflicting proposals are approved, the operation proposed to the deepest depth shall take precedence.)

5.   Sidetrack.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

6.   Other operations.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

7.   Temporarily abandon.

8.   Plug and abandon.

**11.8.3   Second Opportunity to Participate**

If fewer than all but two (2) or more Participating Parties having a combined Working Interest of fifty one percent (51%) or more elect to participate in an operation, the proposing Party shall notify the Participating Parties of the elections made, whereupon a Party originally electing not to participate in the proposed operation may then elect to participate by notifying the proposing Party within twenty-four (24) hours, inclusive of Saturdays, Sundays, and federal holidays, after receipt of such notice. If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

**11.8.4   Operations by Fewer Than All Parties**

33

If, after the election (if applicable) made under Article 11.8.3 (Second Opportunity to Participate), fewer than all but two (2) or more Parties having a combined Working Interest of fifty one percent (51%) or more elect to participate in the proposed operation that takes precedence, the proposing Party shall notify the Participating Parties and each Participating Party shall have twenty four (24) hours, inclusive of Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear. Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of the costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties who elect to pay and bear a portion of costs and risks attributable to the non-participating interests. Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks. If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator, subject to Article 4.2 (Substitute Operator), shall conduct the operation as a Non-consent for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply. If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made. If a Participating Party in a well elects not to participate in the Deepening or Sidetracking operation in the well, such non-consenting Party shall become a Non-participating Party in all operations conducted after the election, through the Completing and equipping of the Deepened or Sidetracked portion of the well. If the Non-consent Operation is an Additional Testing, coring, or logging operation, Article 13 (Non-consent Operations) shall not apply, however, a Party electing not to participate in the Additional Testing, coring, or logging shall not be entitled to information resulting from the operation.

### 11.8.5  Subsequent Operations

Upon the completion of an operation conducted under Article 11.8 (Course of Action After Reaching Objective Depth), if the well is not either (a) Completed as a well capable of producing Hydrocarbons in paying quantities, or (b) temporarily abandoned or permanently plugged and abandoned, Operator shall notify the Participating Parties of Operator's recommendation for operations in the well under Articles 11.8.1 through 11.8.4, which again shall apply. If sufficient approval is not obtained to conduct a subsequent operation in a well, or if all Participating Parties elect to plug and abandon the well, subject to Article 14 (Abandonment, Salvage, and Surplus), Operator shall permanently plug and abandon the well at the expense of all Participating Parties. Each Participating Party shall be responsible for its proportionate share of the plugging and abandonment costs associated with the operation in which it participated if

11.8.6  Restoration of Damaged Well

If, during an Additional Testing, coring, or logging operation or during a Deepening or Sidetracking operation that does not result in the well being Completed as a Producible Well, the well is damaged to the extent that the well is rendered incapable of having a lower-priority operation conducted and a Party (a) who participated in the well, but not in the operation being conducted when the well was damaged, (b) who has a sufficient percentage of the Working Interest to approve an operation, and (c) who elected to conduct a lower-priority operation, still desires to conduct the lower-priority operation after the well has been damaged, may conduct the lower priority operation, which would include operations to either restore the well to a condition that will allow the lower-priority operation to be conducted or to drill a new well to a sufficient depth to allow the lower-priority operation to be conducted. Upon conclusion of the lower-priority operation, the Participating Parties in the operation being conducted when the well was damaged shall reimburse the Participating Parties conducting the lower-priority operation all their costs associated with restoration of the well to the point at which the lower-priority operation was conducted. In no event, however, shall Participating Parties in the operation being conducted when the well was damaged be required to reimburse the Participating Parties conducting the lower-priority operations an amount greater than what was actually incurred in the damaged well.

# ARTICLE 12

# PLATFORM AND PROCESSING FACILITIES

12.1  Proposal

A Party may propose the fabrication and installation of a Platform and/or Processing Facilities, with information adequate to describe the proposed Platform and/or Processing Facilities and their estimated costs. Any proposal for a Platform to be installed hereunder shall include an AFE or AFEs for the attendant Processing Facilities necessary to appropriately achieve (whether alone or by a tie-in to another Platform and/or Processing Facilities or to any other platform, facilities and/or pipeline) Hydrocarbon production to sales arising from the wells (i) drilled at the Platform's proposed location and/or (ii) proposed to be drilled from, tied back to, or tied into connections upon such Platform (the "Associated Wells"); and the Parties shall only be entitled to elect as provided herein whether to participate in all or none of said Platform and Processing Facilities proposals as packaged together.

**12.2    Counterproposals**

When a Platform and/or Processing Facilities is proposed under Article 12.1, a Party may, within thirty (30) days after receipt of the AFE or notice for the original proposal, make a proposal, hereinafter referred to as "Counterproposal," to fabricate and install said Platform and/or Processing Facilities by sending an AFE or notice to the other Parties in accordance with Article 9 (Notices). The AFE or notice shall indicate that the proposal is a Counterproposal to the original proposal.  If one or more Counterproposals are made, each Party shall elect to participate in the original proposal, one Counterproposal, or neither the original proposal nor a Counterproposal.

**12.2.1   Operations by All Parties**

If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

**12.2.2   [Intentionally left blank]**

**12.2.3   Operations by Fewer Than All Parties**

If, after the election made under Article 12.4 (Second Opportunity to Participate), fewer than all but two (2) or more Parties having a combined Working Interest of fifty-one percent (51%) or more elect to participate in the Platform and/or Processing Facilities, the proposing Party shall notify the Participating Parties, and each Participating Party shall have forty-eight (48) hours, exclusive of Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear. Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties who elect to pay and bear a portion of the costs and risks attributable to the total Non-participating Parties' interests. Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks. If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, the Operator, subject to Article 4.2 (Substitute Operator), shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and except as provided in Article 12.4 (Rights to Take in Kind), the provisions of Article 13.2.1 (b) shall apply. If such agreement is not obtained, however, the fabrication and installation of the Platform and/or Processing Facilities shall not be commenced, and the effect shall be as if the proposal had not been made.

**12.3    Ownership and Use of the Platform and Processing Facilities**

The Participating Parties in the Processing Facilities own all of the excess capacity of the Processing Facilities and the excess weight, space and buoyancy of the Platform, and each Participating Party in the Processing Facilities does not have the right to use its Working Interest share of the excess capacity, weight, space and buoyancy for hydrocarbon production from

Unofficial Copy Office of Marilyn Burgess District Clerk

outside the Lease at its sole discretion and for its sole account. Each Participating Party in the Processing Facilities or Platform must obtain the unanimous approval of the other Participating Parties in the Processing Facilities or Platform in order to utilize any portion of the excess capacity, weight, space and buoyancy. It must negotiate the payment of a fee with the Participating Parties in the Processing Facilities or Platform in order to utilize any portion of the excess capacity, weight, space and buoyancy. Each of the Participating Parties in the Processing Facilities or Platform shall receive its Working Interest share of all fees derived from the utilization of the excess capacity, weight, space and buoyancy. All hydrocarbon production from outside the Lease shall be processed under a "Facilities Use and Production Handling Agreement" unanimously agreed to by the Participating Parties in the Processing Facilities.

**12.4    Rights to Take in Kind**

Nothing in this Article 12 shall act to limit a Party's rights under Article 22 (Disposition of Production), or to otherwise separately dispose of its share of Hydrocarbon production. If a Party elects (a) not to participate in an approved Processing Facilities proposal and (b) to separately dispose of its share of Hydrocarbon production (the "Separately Disposing Party"), the Separately Disposing Party must provide proof to the Participating Parties in the approved Processing Facilities proposal, within one hundred and eighty (180) days from the last applicable response date to the Processing Facilities proposal that it has begun disposing (i.e. the actual "flowing") its own share of Hydrocarbon production. If a Separately Disposing Party fails to provide such proof by that deadline, it must immediately (i) utilize the Processing Facilities for its share of Hydrocarbon production, (ii) pay to the Participating Parties in the approved Processing Facilities proposal, in proportion to their ownership percentages in the Processing Facilities, a sum equal to one hundred and twenty-five percent (125%) of the Separately Disposing Party's share of the costs and expense of the Processing Facilities, and (iii) assume its share of the risks and liabilities associated with the construction and ownership of the Processing Facilities as of the date of commencement of the operations to construct same.

**12.5    Expansion or Modification of a Platform and/or Processing Facilities**

After installation of a Platform and/or Processing Facilities, any Participating Party in that Platform and/or Processing Facilities may propose the expansion or modification of that Platform and/or Processing Facilities by written notice (along with its associated AFE) to the other Participating Parties in that Platform and/or Processing Facilities. That proposal requires approval by two (2) or more of the Participating Parties in the Platform and/or Processing Facilities with more than fifty percent (50%) of the Participating Interest in the Platform and/or Processing Facilities. If approved, that proposal will be binding on all Participating Parties in that Platform and/or Processing Facilities, and the Operator shall commence that expansion or modification at the sole cost and risk of all of the Participating Parties in that Platform and/or Processing Facilities unless otherwise agreed.

37





ADB 2K

# ARTICLE 13

## NON-CONSENT OPERATIONS

13.1 **Non-consent Operations**

Operator or substitute Operator under Article 4.2 (Substitute Operator) shall conduct Non-consent Operations at the sole cost and risk of the Participating Parties in accordance with the following provisions:

13.1.1 **Non-interference**

Non-consent Operations shall not interfere unreasonably with operations being conducted by all Parties.

13.1.2 **Multiple Completion Limitation**

A Non-consent Operation shall not be conducted in a well having multiple Completions unless (a) each Completion is owned by the same Parties in the same proportions; (b) the well is incapable of producing from any Completion; or (c) all Participating Parties in the well consent to the operation.

13.1.3 **Metering**

In Non-consent Operations, Hydrocarbon production shall be determined upon the basis of appropriate well tests, unless separate metering devices are required by a governmental authority having jurisdiction.

13.1.4 **Non-consent Well**

Operations on a Non-consent Well shall not be conducted in a Producible Reservoir without approval of all Parties unless (a) the Producible Reservoir is designated in the notice as a Completion objective; (b) Completion of the well in the Producible Reservoir will not increase the rates of Hydrocarbon production that are prescribed and approved for the Producible Reservoir by the governmental authority having jurisdiction; and (c) the horizontal distance between the vertical projections of the midpoint of the Producible Reservoir in the well and an existing well currently completed in and producing from the same Producible Reservoir will be at least two thousand (2,000) feet for an oil-well Completion or three thousand (3,000) feet for a gas-well Completion.

13.1.5 **Cost Information**

Operator shall, within one hundred twenty (120) days after completion of a Non-consent Operation, furnish the Parties either (a) an inventory and an itemized statement of the cost of the well and equipment pertaining thereto, or (b) a detailed statement of the monthly billings. Each quarter thereafter, while the Participating Parties are being reimbursed under Article 13.2.1 (Production Reversion Recoupment), Operator shall furnish the Non-participating Parties a quarterly statement of all costs and liabilities

incurred in the operation of the well, together with a statement of the quantities of Hydrocarbons produced from it and the amount of the proceeds from the sale of the Non-participating Parties' relinquished Hydrocarbon production from the well for the preceding quarter. Operator shall prepare the monthly statement of the quantities of Hydrocarbons produced and the amounts of the proceeds from the sale of Non-participating Parties' relinquished Hydrocarbon production based on the proceeds received for the Operator's share of Hydrocarbon production. When Operator's payout calculation indicates that payout has occurred, Operator shall promptly notify all Parties. The Participating Parties who carried a portion of the Non-participating Parties' relinquished interest shall then provide Operator all information pertaining to the cumulative proceeds received from the sale of the Non-participating Parties' relinquished Hydrocarbon production. Operator shall revise the payout date using the actual proceeds from the sale of the Non-participating Parties' relinquished Hydrocarbon production and administer any subsequent adjustments between the Parties.

13.1.6  Completions

For determinations under Article 13.1 (Non-consent Operations), each Completion shall be considered a separate well.

13.2  Relinquishment of Interest

Upon commencement of Non-consent Operations, other than Non-consent Operations governed by the Acreage Out Option under Article 10.5 (Operations by Fewer Than All Parties) or Article 13.7 (Operations Utilizing a Non-consent Platform and/or Processing Facilities), each Non-participating Party's interest and leasehold operating rights in the Non-consent Operation and title to Hydrocarbon production resulting therefrom; and if Article 13.8 (Discovery or Extension from Non-consent Drilling) is effective, one-half (1/2) of each Non-participating Party's interest and leasehold operating rights and title to Hydrocarbon production from wells mentioned in Article 13.8 (Discovery or Extension from Non-consent Drilling); shall be owned by and vested in each Participating Party in proportion to its Participating Interest, or in the proportions otherwise agreed by the Participating Parties, for as long as the operations originally proposed are being conducted or Hydrocarbon production is obtained, subject to the following:

13.2.1  Production Reversion Recoupment

The interest, right, and title described in Article 13.2 (Relinquishment of Interest) shall revert to each Non-participating Party when the Participating Parties have recouped out of Hydrocarbon production from the Non-consent Operations attributable to the Non-participating Party's interest an amount, which when added to amounts received under Article 13.3 (Deepening or Sidetracking of Non-consent Well), equals the sum of the following:

(a) Eight hundred percent (800%) of the Non-participating Party's share of the costs of the following Non-consent Exploratory Operations, or four hundred percent (400%) of the Non-participating Party's share of the costs of the following Non-consent Development Operations: drilling, testing, Completing, Recompleting, Deepening, Sidetracking, Reworking, plugging back, and temporarily abandoning a well, reduced by the Non-participating Party's Share of a cash contribution received under Article 21.2 (Cash Contributions);

(b) If applicable, three hundred percent (300%) of Non-participating Party's Share of the cost of Platform and/or Processing Facilities; such recoupment is limited to the Non-participating Party's Share of the Hydrocarbon production that utilize such Platform and/or Processing Facilities;

(c) three hundred percent (300%) of the Non-participating Party's Share of the cost charged in accordance with Article 13.9 (Allocation of Platform/Processing Facilities Costs to Non-consent Operations) of using an existing Platform/Processing Facilities; and

(d) the Non-participating Party's Share of the costs of operation, maintenance, treating, processing, gathering, and transportation, as well as lessor's royalties and severance, Hydrocarbon production, and excise taxes.

When the Participating Parties have recovered from a Non-participating Party's relinquished interests the specified sum, the relinquished interests of the Non-participating Party shall automatically revert to the Non-participating Party as of 7:00 a.m. of the day after the recoupment occurs. Thereafter, the Non-participating Party shall own the same interest in the Non-consent Well, equipment pertaining thereto, including, but not limited to, any applicable Non-consent Wells, Platform or Processing Facilities, and the Hydrocarbon production therefrom as the Non-participating Party would have owned or been entitled to if it had participated in the Non-consent Operation. Upon reversion, the Non-participating Party shall become a Participating Party and, as such, shall become liable for its proportionate share of the further costs of the operation under this Agreement and Exhibit "C".

**13.2.2 Non-production Reversion**

If the Non-consent Operations fail to obtain Hydrocarbon production or if the operations result in Hydrocarbon production that ceases before complete recoupment by the Participating Parties under Article 13.2.1 (Production Reversion Recoupment), such leasehold operating rights shall revert to each Non-participating Party, except that all Non-consent Wells, Platforms, and Processing Facilities shall remain vested in the Participating Parties (but the salvage value in excess of the sum remaining under Article 13.2.1 shall be credited to all Parties).

48

13.3    **Deepening or Sidetracking of Non-consent Well**

Operator shall notify Non-operators of each proposal by a Participating Party to Deepen or Sidetrack a Non-consent Well. A Non-participating Party may then elect to participate in the Deepening or Sidetracking operation by notifying Operator within thirty (30) days, or within forty-eight (48) hours, exclusive of Saturdays, Sundays, and federal holidays, if a rig is on location and standby charges are being incurred, after receiving notice of the proposal.  A Non-participating Party that elects to participate in Deepening or Sidetracking the well, as proposed, shall immediately pay the Participating Parties, in accordance with Article 13.4 (Deepening or Sidetracking Cost Adjustments), its Working Interest share of actual well costs (excluding logging, coring, testing, and Completion costs), less all amounts recovered by the Participating Parties from the proceeds of Hydrocarbon production from the well, as if the Non-participating Party had originally participated to the initial Objective Depth or formation, in the case of a Deepening operation, or the depth at which the Sidetracking operation is initiated.  Thereafter, the Non-participating Party shall be deemed to be a Participating Party for the Deepening or Sidetracking operations, and Article 13.2.1(a) shall not apply to that Party for the Deepened or Sidetracked portion of the well. The initial Participating Parties, however, shall continue to recoup out of the proceeds of Hydrocarbon production from the non-consent portion of the well any balance for the Non-consent Well remaining to be recovered under Article 13.2.1 (Production Reversion Recoupment), less the amounts paid by the Non-participating Party under this Article 13.3.

13.4    **Deepening or Sidetracking Cost Adjustments**

If a proposal is made to Deepen or Sidetrack a Non-consent Well, a well cost adjustment will be performed as follows:

(a)    Intangible drilling will be valued at the actual cost incurred by the Participating Parties.

(b)    Tangible materials will be valued as transfers of new material in accordance with the provisions of Exhibit "C".

(c)    For Sidetracking operations, the values determined in Articles 13.4(a) and 13.4(b) shall be reduced by the amount allocated to that portion of the well one hundred (100) feet below the point of Sidetrack. Such allocations shall be accomplished consistent with the guidelines recommended by the Council of Petroleum Accountants Societies ("COPAS") in COPAS Bulletin No. 2, *Determination of Values for Well Cost Adjustments Joint Operations*, September 1985, as amended from time to time.

(d)    Amortization/depreciation shall be applied to both intangible and tangible values at the rate of ten percent (10%) per annum from the date the well commenced Hydrocarbon production to the date operations commence to Deepen or Sidetrack the well, provided, however, the value of tangible materials after applying depreciation shall never be less than fifty percent (50%) of the value determined in Article 13.4(b).

13.5    Subsequent Operations in Non-consent Well

Except as provided in Article 13.3 (Deepening or Sidetracking of Non-consent Well), an election not to participate in the drilling, Sidetracking, or Deepening of a well shall be deemed to be an election not to participate in any subsequent operations in the well before full recovery by the Participating Parties of the Non-participating Party's recoupment amount. A subsequent operation conducted during the recoupment period by the Parties entitled to participate shall be subject to the recoupment provided in Article 13.2.1 (Production Reversion Recoupment).

13.6    Operations in a Production Interval

An owner in the Production Interval may propose Rework or Sidetrack operations within a Production Interval, or to permanently plug and abandon a Production Interval in a well; however, no Production Interval in a well shall be plugged and abandoned without the unanimous approval of the Participating Parties in the Production Interval. If a proposal, estimated to exceed the amount specified in Article 8.2 (Authorization), is made to Rework or Sidetrack a Production Interval, the unanimous approval of the Parties owning an interest in the Production Interval shall be required to conduct the operation. A proposal to Rework an Interval, other than a Production Interval, shall be made and approved in accordance with Article 11.5 (Operations by Fewer Than All Parties).

13.7    Operations Utilizing a Non-consent Platform and/or Processing Facilities

Except as otherwise provided in Article 12.4 (Rights to Take in Kind) and this Article 13.7, if applicable, a Party that did not originally participate in a Platform and/or Processing Facilities shall be a Non-participating Party for all operations utilizing the Platform and/or Processing Facilities and shall be subject to Article 13.2 (Relinquishment of Interest). Notice, in accordance with Article 9 (Notices), shall be given to the Non-participating Party for all wells proposed to be drilled from or tied-back to the Non-consent Platform and/or handled by non-consent Processing Facilities. If a Non-participating Party in a Non-consent Platform and/or Processing Facilities desires to participate in the drilling of any such well proposed by the Participating Parties in the Platform and/or Processing Facilities, the Non-participating Party desiring to join in the proposed well shall first pay the Participating Parties in the Platform and/or Processing Facilities its proportionate share of the cost of the Platform and/or Processing Facilities, including, but not limited to, costs of material, fabrication, transportation, and installation plus any remaining amounts to be recouped under Article 13.2.1(b). The Non-participating Party shall remit payment to Operator and Operator shall (a) reimburse the Participating Parties in the Platform and/or Processing Facilities in the same proportions they are sharing in the Platforms and/or Processing Facilities recoupment account, and (b) credit the applicable payout account. Upon payment of that amount, the original Non-participating Party shall become an owner and a Participating Party in the Platform and/or Processing Facilities in the same manner as if recoupment had occurred under Article 13.2.1 (Production Reversion Recoupment), and may participate in all future wells drilled from or tied

42




back to the Platform.  As to well operations conducted from the Platform and/or Processing Facilities prior to payment under this Article 13.7, the original Non-participating Party shall remain a Non-participating Party in such Non-consent Operations until such time as the entire recoupment balance applicable to all such Non-consent Operations in the aggregate has occurred, as provided for in Articles 13.2.1(a) and 13.2.1(d).

13.8    **Discovery or Extension from Non-consent Drilling**

If a Non-consent Well (a) discovers a new Producible Reservoir or (b) extends an existing Producible Reservoir beyond its recognized boundaries, as unanimously agreed by the Parties before commencement of drilling operations, the recoupment of costs for that well shall be governed by Article 13.2 (Relinquishment of Interest) and shall be recovered by the Participating Parties in one of the following ways:

(a)      If the Non-consent Well is not completed and produced, recoupment shall be out of one-half (1/2) of each Non-participating Party's interest in Hydrocarbon production from all subsequently drilled and completed wells on the Lease that are completed in the Producible Reservoir discovered, or in that portion extended, by the Non-consent Well and in which the Non-participating Party has a Participating Interest; or

(b)      If the Non-consent Well is completed and produced, recoupment shall be out of the Non-participating Party's Share of all Hydrocarbon production from the Non-consent Well and one-half (1/2) of the Non-participating Party's interest in Hydrocarbon production from all subsequently drilled and completed wells on the Lease that are completed in the Producible Reservoir discovered, or in that portion extended, by the Non-consent Well and in which the Non-participating Party has a Participating Interest.

13.9    **Allocation of Platform/Processing Facilities Costs to Non-consent Operations**

Non-consent Operations shall be subject to further conditions as follows:

13.9.1    **Charges**

In the event a well is drilled or produced from a Platform or is produced through Processing Facilities whose Participating Parties are different from the Participating Parties in that well or if the Participating Parties' Participating Interest shares in that Platform or Processing Facilities are different from their Participating Interest shares in that well, the rights of the Participating Parties in that well and the costs to use the Platform or Processing Facilities for that well shall be determined as follows:

(a)      The Participating Parties in that well shall pay to the Operator a one-time slot usage fee for the use of a slot on the Platform equal to that portion of the total costs of the Platform, which one Platform slot bears to the total number of Platform slots then being utilized. Within thirty (30) days of its receipt of that fee, the Operator shall distribute to the Participating Parties in the Platform their Participating Interest share of that payment.  If that well is abandoned, having

43

never produced Hydrocarbons, the right of the Participating Parties in that well to use the Platform slot through which the well was drilled shall terminate unless those Parties commence drilling a substitute well for the abandoned well through the same slot within one hundred eighty (180) days of the abandonment. If that substitute well is abandoned, having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Platform slot through which the well was drilled shall terminate.

The slot usage fee shall not apply to a slot deemed to be "surplus." A slot may be deemed surplus only by the unanimous agreement of the owners of the Platform.

(b)    The Participating Parties in that well shall pay to the owners of the Processing Facilities a lump sum equal to that portion of the total cost of those Processing Facilities that the throughput volume of the Non-consent Operation bears to the total design throughput volume of the Processing Facilities.  Throughput volume shall be estimated by the Operator in barrels produced per day (with 1 barrel of oil equaling 5.6 mcf of gas), using an average daily volume of the first three months of Hydrocarbon production from the Non-consent Operation.

Payment of sums under this Article 13.9.1 is not a purchase of an additional interest in the Platform or the Processing Facilities. Such payment shall be included in the total amount that the Participating Parties are entitled to recoup out of Hydrocarbon production from the Non-consent Well.

### 13.9.2  Operating and Maintenance Charges

The Participating Parties shall pay all costs necessary to connect a Non-consent Well to the Processing Facilities and that proportionate part of the costs of operating and maintaining the Platform and Processing Facilities applicable to the Non-consent Well. Platform operating and maintenance costs that are costs not directly attributable to a wellbore shall be allocated equally to all actively producing Completions. Operating and maintenance costs for the Processing Facilities shall be allocated on a volume throughput basis, that is, in the proportion that the volume throughput of the well bears to the total volume throughput of all wells connected to the Processing Facilities. Volume throughput, as used in this Article 13.9.2, shall be determined by considering all Hydrocarbons and water volumes.

### 13.10  Allocation of Costs Between Zones

Except as provided in Article 10.9 (Wells Proposed Below Deepest Producible Reservoir), if for any reason the Participating Interests of the Parties in a well are not the same for the entire depth or the Completion thereof, the costs of drilling, Completing, and equipping the well shall be allocated in an equitable manner, as agreed by the Parties, based on the value and allocation guidelines recommended by the Council of Petroleum Accountants Societies (COPAS) in COPAS

*Bulletin No. 2, Determination of Values for Well Costs Adjustments Joint Operations, September 1965, as amended from time to time.*

13.11   **Lease Maintenance Operations**

An operation proposed within the last one (1) year of the primary term or, subsequent thereto, an operation proposed to perpetuate the Lease or portion thereof at its expiration date or otherwise, including, but not limited to, well operations, regulatory relief (for example, course of action necessary to satisfy the statutory or regulatory requirements of the governmental authority having jurisdiction), and other Lease operations, shall be deemed to be a "Lease Maintenance Operation." To invoke this Article 13.11, a notice or AFE that proposes an operation must state that the proposed operation is a Lease Maintenance Operation.

13.11.1 **Participation in Lease Maintenance Operations**

A Party may propose a Lease Maintenance Operation by giving notice to the other Parties.  If fewer than all Parties elect to participate in the proposed Lease Maintenance Operation, the proposing Party shall notify the Parties of the elections made.  Each Party electing not to participate shall then have a second opportunity to participate in the proposed operation by notifying the other Parties of its election within forty-eight (48) hours after receipt of the notice.  A Lease Maintenance Operation shall not require minimum approval, either of the number of Parties or the percentage of the voting interests of the Parties otherwise required in Article 6.1.2 (Vote Required).  For a Lease Maintenance Operation to be conducted, the Participating Parties must agree to pay and bear one hundred percent (100%) of the costs and risks of the operation.  If more than one Lease Maintenance Operation is proposed, the operation with the greatest percentage approval shall be conducted.  Notwithstanding the recoupment provisions of this Agreement, a Party electing not to participate in a well operation proposed as a Lease Maintenance Operation shall promptly assign, effective as of the date the operation commences, to the Participating Parties all of its right, title, and interest in and to that portion of the Lease that would otherwise expire and the property and equipment attributable thereto, in accordance with Article 26 (Successors, Assigns, and Preferential Rights).  If more than one Lease Maintenance Operation is proposed and there is a tie between two proposed operations, both operations shall be conducted and the costs and risks of conducting both operations shall be paid and borne by the Participating Parties.  If the drilling of a well is undertaken as a Lease Maintenance Operation, further operations conducted by the Participating Parties in the well shall be governed by Article 10.9 (Course of Action After Reaching Objective Depth) or Article 11.9 (Course of Action After Reaching Objective Depth), whichever applies.  If more than one well operation is conducted, any of which would perpetuate the Lease or such portion thereof, an assignment shall not be required from a Party participating in any such well operation.

**13.11.2 Accounting for Non-participation**

> If after one (1) year from completion of a well operation conducted as a Lease Maintenance Operation, the Lease or portion thereof is being perpetuated by a Lease Maintenance Operation, as provided in Article 13.11.1 (Participation in Lease Maintenance Operations), Operator shall render a final statement, if applicable, to the assigning Party for its share of all expenses attributed to the assigned interest before the effective date of the assignment, plus any credit or deficiency in salvage value calculated under Article 15.3.1 (Prior Expenses). The assigning Party shall settle any deficiency owed the non-assigning Parties within thirty (30) days after receipt of Operator's statement.

**13.12   Retention of Lease by Non-consent Well**

If, at the expiration of the primary term of the Lease, one or more Non-consent Wells, except wells drilled under the Acreage Out Option under Article 10.5 (Operations by Fewer Than All Parties), if selected, are the only wells perpetuating the Lease, Operator shall give written notice to each Non-participating Party that the Non-consent Wells are serving to perpetuate the Lease. Each Non-participating Party shall, within thirty (30) days after receipt of Operator's written notice, elect one of the following:

(a)      to assign its entire interest in the Lease to the Participating Parties in the proportions in which the Non-consent Wells are owned; or

(b)      to pay the Participating Parties, within sixty (60) days after its election, the lesser of its proportionate share of the actual well costs of the wells, as if the Non-participating Party had originally participated, or the balance of the recoupment account. The payment shall be made to Operator and credited to the account of each Participating Party. The Non-participating Party shall remain as a Non-participating Party until full recoupment is obtained, but the payment shall be credited against the total amount to be recouped by the Participating Parties.

A Non-participating Party that fails to make the required election shall be deemed to have elected under Article 13.12(a) to relinquish its entire interest in the Lease. If a Non-participating Party elects to make payment under Article 13.12(b) but fails to make the required payment within sixty (60) days after its election, the Non-participating Party shall either remain liable on the obligation to pay or, by unanimous vote of the Participating Parties, be deemed to have elected under Article 13.12(a) to relinquish its entire interest in the Lease. Each relinquishing Non-participating Party shall promptly execute and deliver an assignment of its interest to the Participating Parties, in accordance with Article 26 (Successors, Assigns, and Preferential Rights).

48

## ARTICLE 14

## ABANDONMENT, SALVAGE, AND SURPLUS

14.1   Platform Salvage and Removal Costs

When the Parties owning wells, Platforms and/or Processing Facilities unanimously agree to dispose of the wells, Platforms and/or Processing Facilities, it shall be disposed of by Operator in the time and manner approved by the Parties.  The costs, risks, and net proceeds, if any, for the disposal shall be shared by the Parties in proportion to their Participating Interests therein.

14.2   Abandonment of Platforms, Processing Facilities or Wells

Except as provided in Article 10 (Exploratory Operations) and Article 11 (Development Operations), a Party may propose the abandonment of a Platform and Processing Facilities or wells by notifying the other Participating Parties.   No Platform and Processing Facilities or wellbore shall be abandoned without the unanimous approval of the Participating Parties.   If all Parties do not approve abandoning the Platform and Processing Facilities or wells, the Party desiring to abandon it shall pay the Operator, on behalf of the Participating Parties for that Party's share of the estimated costs of abandonment, removal and site clearance of the Platform and Processing Facilities or plugging and abandonment of the wells, less estimated salvage value, as determined under Exhibit "C." If an abandoning Party's respective share of the estimated salvage value is greater than its share of the estimated costs, Operator, on behalf of the Participating Parties, shall pay a sum equal to the deficiency to the abandoning Party.

14.3   Assignment of Interest.

Each Participating Party desiring to abandon a Platform and Processing Facilities or wells under Article 14.2 (Abandonment of Platforms, Processing Facilities or Wells) shall assign, effective as of the last applicable election date, to the non-abandoning Parties, in proportion to their Participating Interests, its interest in the Platform and Processing Facilities or wells and the equipment therein and its ownership in the Hydrocarbon production from the wells.  A Party so assigning shall be relieved from further liability for the Platform and Processing Facilities or wells, except liability for payments under Article 14.2 (Abandonment of Platforms, Processing Facilities or Wells).

14.4   Abandonment Operations Required by Governmental Authority

A well abandonment or Platform and Processing Facilities removal required by a governmental authority having jurisdiction shall be accomplished by Operator with the costs, risks, and net proceeds, if any, to be shared by the Parties owning the well or Platform and Processing Facilities in proportion to their Participating Interests therein.

14.5   Disposal of Surplus Material

Material and equipment acquired hereunder may be classified as surplus by Operator when deemed no longer needed in present or foreseeable operations.  Operator shall determine the

value and cost of disposing of the materials in accordance with Exhibit "C". If the material is classified as junk or if the value, less cost of disposal, is less than or equal to seventy five thousand Dollars ($75,000), Operator shall dispose of the surplus materials in any manner it deems appropriate. If the value, less the cost of disposal of the surplus material, is greater than seventy five thousand Dollars ($75,000), Operator shall give written notice thereof to the Parties owning the material. Unless purchased by Operator, the surplus material shall be disposed of in accordance with the method of disposal approved by the Parties owning the material. Proceeds from the sale or transfer of surplus material shall be promptly credited to each Party in proportion to its ownership of the material at the time of retirement or disposition.

# ARTICLE 15

# WITHDRAWAL

15.1   **Right to Withdraw**

Subject to this Article 15.1, any Party may withdraw from this Agreement as to one or more Leases (the "Withdrawing Party") by giving prior written notice to all other Parties stating its decision to withdraw ("the withdrawal notice"). The withdrawal notice shall specify an effective date of withdrawal that is at least sixty (60) days, but not more than one hundred twenty (120) days, after the date of the withdrawal notice. Within thirty (30) days of receipt of the withdrawal notice, the other Parties may join in the withdrawal by giving written notice of that fact to the Operator ("written notice to join in the withdrawal") and upon giving written notice to join in the withdrawal are "Other Withdrawing Parties". The withdrawal notice and the written notice to join in the withdrawal are unconditional and irrevocable offers by the Withdrawing Party and the Other Withdrawing Parties to convey to the Parties who do not join in the withdrawal ("the Remaining Parties") the Withdrawing Party's and the Other Withdrawing Parties' entire Working Interest in all of the Lease or Leases, Hydrocarbon production, and other property and equipment owned under this Agreement.

15.2   **Response to Withdrawal Notice**

Failure to respond to a withdrawal notice is deemed a decision not to join in the withdrawal.

15.2.1   **Unanimous Withdrawal**

If all the other Parties join in the withdrawal,

(a)     no assignment of Working Interests shall take place;

(b)     no further operations may be conducted under this Agreement unless agreed to by all Parties;

(c)   the Parties shall abandon all activities and operations within the Lease and relinquish all of their Working Interests to the BOEM within ninety (90) days of the conclusion of the thirty (30) day joining period; and

(d)   notwithstanding anything to the contrary in Article 14 (Abandonment, Salvage and Surplus), the Operator shall:

1)   furnish all Parties a detailed abandonment plan, if applicable, and a detailed cost estimate for the abandonment within sixty (60) days after the conclusion of the thirty (30) day joining period; and

2)   cease operations and begin to permanently plug and abandon all wells and remove all Facilities in accordance with the abandonment plan.

### 15.2.2   No Additional Withdrawing Parties

If none of the other Parties join in the withdrawal, then the Remaining Parties must accept an assignment of their Participating Interest share of the Withdrawing Party's Working Interest.

### 15.2.3   Acceptance of the Withdrawing Parties' Interests

If one or more but not all of the other Parties join in the withdrawal and become Other Withdrawing Parties, then within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of the conclusion of the thirty (30) day joining period, each of the Remaining Parties shall submit to the Operator a written rejection or acceptance of its Participating Interest share of the Withdrawing Party's and Other Withdrawing Parties' Working Interest. Failure to make that written rejection or acceptance shall be deemed a written acceptance. If the Remaining Parties are unable to select a successor Operator, if applicable, or if a Remaining Party submits a written rejection and the other Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party's and Other Withdrawing Parties' Working Interest within ten (10) days of the conclusion of the forty-eight (48) hour period to submit a written rejection or acceptance, the Remaining Parties will be deemed to have joined in the withdrawal, and Article 15.2.1 (Unanimous Withdrawal) will apply.

### 15.2.4   Effects of Withdrawal

Except as otherwise provided in this Agreement, after giving a withdrawal notice or a written notice to join in the withdrawal, the Withdrawing Party and Other Withdrawing Parties are not entitled to approve or participate in any activity or operation in the Lease, other than those activities or operations for which they retain a financial responsibility. The Withdrawing Party and Other Withdrawing Parties shall take all necessary steps to accomplish their withdrawal by the effective date referred to in Article 15.1 (Right to Withdraw) and shall execute and deliver to the Remaining Parties all necessary

instruments to assign their Working Interest to the Remaining Parties. A Withdrawing Party and Other Withdrawing Parties shall bear all expenses associated with their withdrawal and the transfer of their Working Interest.

### 15.3   Limitation Upon and Conditions of Withdrawal

#### 15.3.1   Prior Expenses

The Withdrawing Party and Other Withdrawing Parties remain liable for their Participating Interest share of the costs of all activities, operations, rentals, royalties, taxes, damages, or other liability or expense accruing or relating to (i) obligations existing as of the effective date of the withdrawal, (ii) operations conducted before the effective date of the withdrawal, (iii) operations approved by the Withdrawing Party and Other Withdrawing Parties before the effective date of the withdrawal, or (iv) operations commenced by the Operator under one of its discretionary powers under this Agreement before the effective date of the withdrawal. Before the effective date of the withdrawal, the Operator shall render a statement to the Withdrawing Party and Other Withdrawing Parties for (1) their respective shares of all identifiable costs under this Article 15.3.1 and (2) their respective Participating Interest shares of the estimated current costs of plugging and abandoning all wells and removing all Platforms, Processing Facilities, and other material and equipment serving the Lease, less their respective Participating Interest Shares of the estimated salvage value of the assets at the time of abandonment, as approved by vote. This statement of expenses, costs, and salvage value shall be prepared by the Operator under Exhibit "C". Before withdrawing, the Withdrawing Party and Other Withdrawing Parties shall either pay the Operator, for the benefit of the Remaining Parties, the amounts allocated to them in the statement, or provide security satisfactory to the Remaining Parties for all obligations and liabilities they have incurred and all obligations and liabilities attributable to them before the effective date of the withdrawal. All liens, charges, and other encumbrances which the Withdrawing Party and Other Withdrawing Parties placed (or caused to be placed) on their Working Interest shall be fully satisfied or released prior to the effective date of its withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to those liens, charges, and other encumbrances).

#### 15.3.2   Confidentiality

The Withdrawing Party and Other Withdrawing Parties will continue to be bound by the confidentiality provisions of Article 7.3 (Confidentiality) after the effective date of the withdrawal but will have no further access to technical information relating to activities or operations under this Agreement. The Withdrawing Party and Other Withdrawing Parties are not required to return to the Remaining Parties Confidential Data acquired prior to the effective date of the withdrawal.

### 15.3.3  Emergencies and Force Majeure

No Party may withdraw during a Force Majeure or emergency that poses a threat to life, safety, property or the environment but may withdraw from this Agreement after termination of the Force Majeure or emergency.  The Withdrawing Party and Other Withdrawing Parties remain liable for their share of all costs and liabilities arising from the Force Majeure or emergency, including but not limited to the drilling of relief wells, containment and cleanup of oil spills and pollution, and all costs of debris removal made necessary by the Force Majeure or emergency.

# ARTICLE 16

# RENTALS, ROYALTIES, AND OTHER PAYMENTS

### 16.1  Overriding Royalty and Other Burdens

If the Working Interest or Participating Interest of a Party is subject to an overriding royalty, production payment, net profits interest, mortgage, lien, security interest, or other burden or encumbrance, other than lessor's royalty, the Party so burdened shall pay and bear all liabilities and obligations created or secured by the burden or encumbrance and shall indemnify and hold the other Parties harmless from all claims and demands for payment asserted by the owners of the burdens or encumbrances.  If a Party becomes entitled to an assignment under this Agreement, or as a result of Non-consent Operations hereunder becomes entitled to receive a relinquished interest, as provided in Article 13.2 (Relinquishment of Interest), otherwise belonging to a Non-participating Party whose Working Interest in the operations is so burdened or encumbered, the Party entitled to receive the assignment from the Non-participating Party or the relinquished interest of the Non-participating Party's Hydrocarbon production shall receive same free and clear of all such burdens and encumbrances, and the Non-participating Party whose interest is subject to the burdens and encumbrances shall hold the Participating Parties harmless for the burdens and encumbrances, and will bear same at its own expense.

### 16.2  Subsequently Created Interest

Notwithstanding anything in this Agreement to the contrary, if a Party, after execution of this Agreement, creates an overriding royalty, Hydrocarbon production payment, net profits interest, carried interest, or any other interest out of its Working Interest (hereinafter called "Subsequently Created Interest"), the Subsequently Created Interest shall be made specifically subject to this Agreement.  If the Party owning the interest from which the Subsequently Created Interest was established fails to pay, when due, its share of costs, and if the proceeds from the sale of Hydrocarbon production under Exhibit "F" and Article 8.6 (Security Rights) are insufficient for that purpose, or elects to abandon a well, or elects to relinquish its interest in the Lease, the Subsequently Created Interest shall be chargeable with a pro rata portion of all costs in the same

manner as if the Subsequently Created Interest were a Working Interest, and Operator may enforce against the Subsequently Created Interest the lien and other rights granted or recognized under this Agreement to secure and enforce collection of costs chargeable to the Subsequently Created Interest.  The rights of the owner of the Subsequently Created Interest shall be, and hereby are, subordinated to the rights granted or recognized by Exhibit "F" and Article 8.6 (Security Rights).

16.3   **Payment of Rentals and Minimum Royalties**

Operator shall pay in a timely manner, for the joint account of the Parties, all rentals, minimum royalties, and other similar payments accruing under the Lease and shall, on request, submit evidence of each such payment to the Parties.  Operator shall not be held liable to the other Parties in damages for loss of the Lease or interest therein if, through mistake or oversight, a rental, minimum royalty, or other payment is not paid or is erroneously paid.  The loss of a Lease or interest therein resulting from the failure to pay, or erroneous payment of rental or minimum royalty shall be a joint loss, and there shall be no readjustment of interests.  For Hydrocarbon production delivered in kind by Operator to a Non-operator or to another for the account of a Non-operator, the Non-operator shall provide Operator with information about the proceeds or value of the Hydrocarbon production in order that Operator may make payments of minimum royalties due.

16.4   **Non-participation in Payments**

A Party that desires not to pay its share of a rental, minimum royalty, or similar payment shall notify the other Parties in writing at least sixty (60) days before the payment is due. Operator shall then make the payment for the benefit of the Parties that do desire to maintain the Lease. In such event, the Non-participating Party shall assign to the Participating Parties, upon their request, the portions of its interest in the Lease maintained by the payment. The assigned interest shall be owned by each Participating Party in proportion to its Participating Interest. The assignment shall be made in accordance with Article 27 (Successors, Assigns, and Preferential Rights).

16.5   **Royalty Payments**

Each Party shall be responsible for and shall separately bear and properly pay or cause to be paid all royalty and other amounts due on Hydrocarbon production in accordance with state or federal regulations, as may be amended from time-to-time.   Adjustments shall be made among the Parties in accordance with Exhibit "E" (Gas Balancing Agreement).   During a period when Participating Parties in a Non-consent Operation are receiving a Non-participating Party's share of Hydrocarbon production, the Participating Parties shall bear and properly pay, or cause to be paid, the Lease royalty on the Hydrocarbon production, and shall hold the Non-participating Parties harmless from liability for the payment.

# ARTICLE 17

# TAXES

### 17.1   Property Taxes

Operator shall render property covered by this Agreement for ad valorem taxation, if applicable, and shall pay the property taxes for the benefit of each Party. Operator shall charge each Party its share of the tax payments. If the ad valorem taxes are based in whole or in part upon separate valuations of each Party's Working Interest, then notwithstanding anything in this Agreement to the contrary, each Party's share of property taxes shall be in proportion to the tax value generated by that Party's Working Interest.

### 17.2   Contest of Property Tax Valuation

Operator shall timely and diligently protest to a final determination each tax valuation it deems unreasonable.  Pending such determination, Operator may elect to pay under protest.  Upon final determination, Operator shall pay the taxes and the interest, penalties, and costs accrued as a result of the protest.  In either event, Operator shall charge each Party its share.

### 17.3   Production and Severance Taxes

Each Party shall pay, or cause to be paid, all production and severance taxes due on Hydrocarbon production that it receives under this Agreement.

### 17.4   Other Taxes and Assessments

Operator shall pay other applicable taxes (other than income taxes, excise taxes, or other similar types of taxes) or assessments and charge each Party its share.

# ARTICLE 18

# INSURANCE

### 18.1   Insurance

Operator or its Affiliate shall provide and maintain the insurance prescribed in Exhibit "B" and charge those costs to the Joint Account.  No other insurance shall be carried for the benefit of the Parties under this Agreement, except as provided in Exhibit "B".

### 18.2   Bonds

Operator or its Affiliate shall obtain and maintain all bonds or financial guarantees required by an applicable law, regulation or rule.  The costs of those bonds or financial guarantees acquired exclusively for the conduct of activities and operations under this Agreement shall be charged to the Joint Account, including an amount equivalent to the reasonable cost of that bond or financial guarantee if Operator provides that bond or guarantee itself and does not engage a third party to

do so.  Operator shall require all contractors to obtain and maintain all bonds required by an applicable law, regulation or rule.

# ARTICLE 19

# LIABILITY, CLAIMS, AND LAWSUITS

### 19.1   Individual Obligations

The obligations, duties, and liabilities of the Parties under this Agreement are several, not joint or collective.  Nothing in this Agreement shall ever be construed as creating a partnership of any kind, joint venture, agency relationship, association, or other character of business entity recognizable in law for any purpose.  In their relations with each other under this Agreement, the Parties shall not be considered to be fiduciaries or to have established a confidential relationship, except as specifically provided in Article 7.3 (Confidentiality) and Article 7.4 (Limited Disclosure), but rather shall be free to act at arm's length in accordance with their own respective self-interests.  Each Party shall hold all other Parties harmless from liens and encumbrances on the Lease arising as a result of its acts.

### 19.2   Notice of Claim or Lawsuit

If, on account of a matter involving activities or operations under this Agreement, or affecting the Lease, a claim is made against a Party, or if a party outside of this Agreement files a lawsuit against a Party, or if a Party files a lawsuit, or if a Party receives notice of a material administrative or judicial hearing or other proceeding, that Party shall give written notice of the claim, lawsuit, hearing, or proceeding ("Claim") to the other Parties as soon as reasonably practicable.

### 19.3   Settlements

The Operator may settle a Claim, or multiple Claims arising out of the same incident, involving activities or operations under this Agreement or affecting the Lease, if the aggregate expenditure does not exceed fifty thousand ($50,000) and if the payment is in complete settlement of these Claims.  If the amount required for settlement exceeds this amount, the Parties shall determine the further handling of the Claims under Article 19.4 (Defense of Claims and Lawsuits).

### 19.4   Defense of Claims and Lawsuits

The Operator shall supervise the handling, conduct, and prosecution of all Claims involving activities or operations under this Agreement or affecting the Lease.  Claims may be settled in excess of the amount specified in Article 19.3 (Settlements) if the settlement is approved by vote in accordance with Article 6.1.2 of the Participating Parties in the activity or operation out of which the Claim arose, but a Party may independently settle a Claim or the portion of a Claim which is attributable to its Participating Interest share alone as long as that settlement does not directly adversely affect the interest or rights of the other Participating Parties.  No charge shall be made

Unofficial Copy Office of Marilyn Burgess District Clerk



for services performed by the staff attorneys of a Party, but all other expenses incurred by the Operator in the prosecution or defense of Claims for the Parties, together with the amount paid to discharge a final judgment, are costs and shall be paid by the Parties in proportion to their Participating Interest share in the activity or operation out of which the Claim arose. The employment of outside counsel, but not the selection of that counsel, requires approval by vote of the Participating Parties in the activity or operation out of which the Claim arose. If the use of outside counsel is approved, the fees and expenses incurred as a result thereof shall be charged to the Parties in proportion to their Participating Interest share in the activity or operation out of which that Claim arose. Each Party has the right to hire its own outside counsel at its sole cost with respect to its own defense.

19.5    Liability for Damages

Unless specifically provided otherwise in this Agreement, liability for losses, damages, costs, expenses or Claims involving activities or operations under this Agreement or affecting the Lease which are not covered by or in excess of the insurance carried for the Joint Account shall be borne by each Party in proportion to its Participating Interest share in the activity or operation out of which that liability arises, except that when liability results from the gross negligence or willful misconduct of a Party, that Party shall be solely responsible for liability resulting from its gross negligence or willful misconduct.

19.6    Indemnification for Non-Consent Operations

To the extent allowed by law, the Participating Parties will hold the Non-participating Parties (and their Affiliates, agents, insurers, directors, officers, and employees) harmless and release, defend, and indemnify them against all claims, demands, liabilities, regulatory decrees, and liens for environmental pollution and property damage or personal injury, including sickness and death, caused by or otherwise arising out of Nonconsent Operations, and any loss and cost suffered by a Nonparticipating Party as an incident thereof, except where that loss or cost results from the sole, concurrent, or joint negligence, fault or strict liability of that Non-participating Party, in which case each Party shall pay or contribute to the settlement or satisfaction of judgment in the proportion that its negligence, fault or strict liability caused or contributed to the incident. If an indemnity in this Agreement is determined to violate law or public policy, that indemnity shall then be enforceable only to the maximum extent allowed by law.

19.7    Damage to Reservoir, Loss of Reserves and Profit

Notwithstanding any contrary provision of this Agreement, no Party is liable to any other Party for damage to a reservoir, loss of Hydrocarbons, loss of profits, or other consequential damages, damages for business interruption, or punitive damages, except if that damage or loss arises from a Party's gross negligence or willful misconduct, nor does a Party indemnify any other Party for that damage or loss.



55    DK

19.8   Non-Essential Personnel

A Non-operator that requests transportation or access to a drilling rig, Platform, vessel, or other facility used for activities or operations under this Agreement shall hold the other Parties harmless and shall release, defend, and indemnify them against (i) all claims, demands, and liabilities for property damage and (ii) all claims, demands, and liabilities for any loss or cost suffered by a Party as an incident thereof, including, but not limited to, sickness and death, caused by or otherwise arising out of that transportation or access, or both, except if that loss or cost results from the gross negligence or willful misconduct of the Party so indemnified and protected.

19.9   Dispute Resolution

The Parties will encourage the prompt and equitable settlement of all controversies or claims between the Parties.  The Parties agree to negotiate their differences directly and in good faith for a period of no less than thirty (30) days after receiving written notification of the existence of a dispute.  If the dispute is not resolved within thirty (30) days after written notification of the existence of a dispute, the Parties agree to submit their dispute to a licensed attorney that is an experienced mediator and is located in Harris County, Texas, to work with them to resolve their differences utilizing non-binding mediation. This mediation is a compromise negotiation for purposes of Rule 408 of the Federal Rules of Evidence and Texas Rules of Evidence and is an alternative dispute resolution procedure subject to Section 154.073 of the Texas Civil Practice & Remedies Code. If after non-binding mediation occurs, the dispute is not resolved, the Parties are free to exercise all other legal and equitable right.

## ARTICLE 20

## INTERNAL REVENUE PROVISION

20.1   Internal Revenue Provision

Notwithstanding any provision in this Agreement to the effect that the rights and liabilities of the Parties are several, not joint or collective, and that this Agreement and the activities and operations under this Agreement do not constitute a partnership under state law, each Party elects to be excluded from the application of all or any part of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended, or similar provisions of applicable state laws regardless of whether for federal income tax purposes this Agreement and the activities and operations under this Agreement are regarded as a partnership.

88



## ARTICLE 21

## CONTRIBUTIONS

21.1   **Notice of Contributions Other Than Advances for Sale of Production**

Each Party shall promptly notify the other Parties of all offers of contributions that it may obtain, or contributions it is attempting to obtain, for drilling a well on the Lease.   Payments received as consideration for entering into a contract for the sale of Hydrocarbon production from the Lease, loans, and other financial arrangements shall not be considered contributions for the purpose of this Article 21.   No Party shall release or obligate itself to release Confidential Data in return for a contribution from a third party for drilling a well without prior written consent of the Participating Parties or Parties having the right to participate in the well.

21.2   **Cash Contributions**

If a Party receives a cash contribution for drilling a well on the Lease, the cash contribution shall be paid to Operator, and Operator shall credit the amount thereof to the Parties in proportion to their Participating Interests in the well.   If the well is a Non-consent Well, the amount of the contribution shall be deducted from the cost specified in Article 13.2.1(a) before computation of the amount to be recouped out of Hydrocarbon production.

21.3   **Acreage Contributions**

If a Party receives an acreage contribution for the drilling of a well on the Lease, the acreage contribution shall be shared by each Participating Party that accepts it in proportion to its Participating Interest in the well. As between the Participating Parties, this Agreement shall apply separately to the acreage.

## ARTICLE 22

## DISPOSITION OF PRODUCTION

22.1   **Take-in-Kind Facilities**

Subject to Article 22.2, a Party may, at its sole cost and risk, construct Take-in-Kind Facilities to take its share of Hydrocarbon production in kind.

22.2   **Duty to Take in Kind**

Each Party shall own and, at its own cost and risk, shall take in kind or separately dispose of its share of the oil, gas, and condensate produced and saved from the Lease, exclusive of Hydrocarbon production used by Operator in developing and producing operations, subject to this Article 22.   In order to avoid interference with operations on or regarding the Platform, the Processing Facilities, and the Lease, a Party exercising its right to construct Take-in-Kind Facilities (the "Take in Kind Party") shall provide the Operator with a list of equipment it deems

necessary for its Take in Kind Facilities (the "Components") along with its notice informing the Operator of its election to take in kind.  The Operator shall purchase the Components and install it on behalf of the Take in Kind Party at the Take in Kind Party's sole risk and cost, including, but not limited to, any fees, penalties or other costs incurred as a result of any cancellation of placed orders as may be requested by the Take in Kind Party.  The Take in Kind Party shall have the right, upon providing the Operator with two (2) week written notice prior to a scheduled order of the Components, to stop or postpone the Operator's placing of the scheduled order.  The cancellation provisions contained in any Component order shall be similar in all material respects to the cancellation provisions used by the Operator for similar project equipment orders. The Operator shall provide the Take in Kind Party with monthly updates on the progress of the ordering and installation of the Take in Kind Facilities.  The Operator, based on the instructions of Take in Kind Party, shall install and operate all of the Components.  The Operator shall not be responsible for any losses or damages to the Components or the Take in Kind Party's Hydrocarbon production metered, treated, processed or transported by the Components unless such losses or damages are the result of the Operator's gross negligence or willful misconduct.

**22.3   Failure to Take in Kind**

Notwithstanding Article 22.2 (Duty to Take in Kind), if a Party fails to take in kind or dispose of its share of the Hydrocarbons, Operator shall have the right, but not the obligation, subject to revocation at will by the Party owning the Hydrocarbons production, to purchase for its own account, sell to others, or otherwise dispose of all or part of the Hydrocarbons production at the same price at which Operator calculates and pays lessor's royalty on its own portion of the Hydrocarbons production.  Operator shall notify the non-taking Party when the option is exercised. A purchase or sale by Operator of any other Party's share of the Hydrocarbons production shall be for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall a contract be for a period in excess of one (1) year. Proceeds of the Hydrocarbons purchased, sold, or otherwise disposed of by Operator under this Article 22.3 shall be paid to the Party that had, but did not exercise, the right to take in kind and separately dispose of the Hydrocarbons. Operator, in disposing of another Party's Hydrocarbons, shall not be responsible for making any filing with regulatory agencies not required by law to be made by it in respect to another Party's share of Hydrocarbons.  Unless required by governmental authority having jurisdiction or by judicial process, no Party shall be forced to share an available market with a non-taking Party. If for any reason a Party fails to take or market its full share of gas as produced, that Party may later take, market, or receive a cash accounting for its full share in accordance with Exhibit "E".

**22.4   Expenses of Delivery in Kind**

A cost that is incurred by Operator in making delivery of a Party's share of Hydrocarbons or disposing of same shall be paid by the Party.

## ARTICLE 23

## APPLICABLE LAW

23.1   Applicable Law

This Agreement shall be governed by and construed, interpreted, and applied under the laws of Texas, excluding choice of law rules that would refer the matter to the laws of another jurisdiction.

## ARTICLE 24

## LAWS, REGULATIONS, AND NONDISCRIMINATION

24.1   Laws and Regulations

This Agreement and operations under this Agreement are subject to all applicable laws, rules, regulations, and orders. A provision of this Agreement found to be contrary to or inconsistent with any such law, rule, regulation, or order shall be deemed to have been modified accordingly.

24.2   Nondiscrimination

In performing work under this Agreement, the Parties shall comply and Operator shall require each independent contractor to comply with the governmental requirements in Exhibit "D" and with Articles 202(1) to (7), inclusive of Executive Order 11246, as amended.

## ARTICLE 25

## FORCE MAJEURE

25.1   Force Majeure

If a Party is unable, wholly or in part because of a Force Majeure, to carry out its obligations under this Agreement, other than the obligation to make money payments, such Party shall give the other Parties prompt written notice of the Force Majeure with full particulars about it.   Effective upon the date notice is given, the obligations of the Party, so far as they are affected by the Force Majeure, shall be suspended during, but no longer than, the continuance of the Force Majeure. Time is of the essence in the performance of this Agreement, and every reasonable effort will be made by the Party to avoid delay or suspension of any work or acts to be performed under this Agreement.   The requirement that the Force Majeure be remedied with all reasonable dispatch shall not require a Party to settle strikes or other labor difficulties.

# ARTICLE 26

## SUCCESSORS, ASSIGNS, AND PREFERENTIAL RIGHTS

### 26.1   Transfer of Interest

Except as provided in 26.1.1 (Exceptions to Transfer Notice), a Transfer of Interest shall be preceded by written notice to the Operator and the other Parties ("the transfer notice"). Any Transfer of Interest shall be made to a party financially capable of assuming the corresponding obligations under this Agreement. No Transfer of Interest shall release a Party from its obligations and liabilities under this Agreement, and the security rights under Exhibit "F" and Article 8.6 (Security Rights) shall continue to burden the Working Interest transferred and to secure the payment of those obligations and liabilities.

### 26.1.1   Exceptions to Transfer Notice

Notwithstanding any contrary provision of this Agreement, the transfer notice is not required when a Party proposes to mortgage, pledge, hypothecate or grant a security interest in all or a portion of its Working Interest (including Assignments of Hydrocarbon production executed as further security for the debt secured by that security device), any wells, Platforms, Processing Facilities or other equipment. However, an encumbrance arising from the financing transaction shall be expressly made subject and subordinated to this Agreement.

### 26.1.2   Effective Date of Transfer of Interest

The effective date of a Transfer of Interest shall be at least sixty (60) days, but not more than one hundred eighty (180) days, after the date of the transfer notice. No Transfer of Interest, other than those provided in Article 15.1 (Right to Withdraw) and Article 26.1.1 (Exceptions to Prior Written Notice), is binding upon the Parties unless and until (i) the assignor or assignee provides all remaining Parties with a photocopy of a fully executed Transfer of Interest, an executed BOEM Form 1123 "Designation of Operator" and a designation of oil spill responsibility form and (ii) evidence of receipt of all necessary approvals by the BOEM. The Parties shall promptly undertake all reasonable actions necessary to secure those approvals and shall execute and deliver all documents necessary to effectuate that Transfer of Interest. All costs attributable to a Transfer of Interest are the sole obligation of the assigning Party.

### 26.1.3   Form of Transfer of Interest

Any Transfer of Interest shall incorporate provisions that the Transfer of Interest is subordinate to and made expressly subject to this Agreement and provide for the assumption by the assignee of the performance of all of the assigning Party's obligations

under this Agreement.  Any Transfer of Interest not in compliance with this provision is voidable by the non-assigning Parties.

### 26.1.4  Warranty

Any Transfer of Interest, vesting or relinquishment of Working Interest between the Parties under this Agreement shall be made without warranty of title.

### 26.1.5  Completion of Transfer of Interest

If the proposed Transfer of Interest is not executed and filed of record with the BOEM within six (6) months after receipt of the transfer notice by the non-assigning Parties, or if the terms of the proposed Transfer of Interest conveyance are materially altered, the proposed Transfer of Interest shall be deemed withdrawn.

## 26.2  Preferential Right to Purchase

Any Transfer of Interest shall be subject to the following provisions:

### 26.2.1  Notice of Proposed Transfer of Interest

This transfer notice shall provide full information about the proposed Transfer of Interest, including, but not limited to, the name and address of the prospective assignee (who must be ready, willing, and able to acquire the interest and deliver the stated consideration therefor), the full consideration for the Transfer of Interest, and all other terms of the offer. In the case of a package sale of oil and gas interests that includes all or part of the assigning Party's Working Interest, or if the proposed Transfer of Interest is structured as a like-kind exchange, the Working Interest that is subject to the Transfer of Interest shall be separately valued and the transfer notice shall state the monetary value attributed to the Working Interest by that prospective assignee. Article 26.2 (Preferential Right to Purchase) shall apply only to the Working Interest that is subject to the Transfer of Interest.

### 26.2.2  Exercise of Preferential Right to Purchase

Within thirty (30) days from receipt of the transfer notice, each non-assigning Party may exercise its preferential right to purchase its Participating Interest share of the Working Interest offered (on the same terms and conditions, or on equivalent terms for a non-cash transaction as stated in the notice) without reservations or conditions by written notice of that fact to all of the Parties.  If a non-assigning Party does not exercise its preferential right to purchase its Participating Interest share of the Working Interest offered and the non-assigning Parties, who wish to exercise their preferential right to purchase, do not agree to pay the full consideration for the Transfer of Interest and accept all of the other terms of the third party offer within twenty (20) days of the thirty (30) period in which the non-assigning Parties may exercise their preferential right to purchase, the assigning Party shall be free to complete the proposed conveyance on the terms disclosed in the notice.  If the other non-assigning Parties agree to pay the full consideration for the

Unofficial Copy Office of Marilyn Burgess District Clerk

61

Transfer of Interest and accept all of the other terms of the third party offer, the assigning Party shall transfer the Working Interest to the non-assigning Parties who exercised their preferential right to purchase under this Article 26 (Successors, Assigns, and Preferential Rights). The Transfer of Interest shall be concluded within a reasonable time, but no later than sixty (60) days after the applicable period in which the non-assigning Parties may exercise their preferential right to purchase.

26.2.3   Transfer of Interest Not Affected by the Preferential Right to Purchase

Article 26.2 (Preferential Right to Purchase) shall not apply when a Party proposes to:

(a)   mortgage, pledge, hypothecate or grant a security interest in all or a portion of its Working Interest (including assignments of Hydrocarbon production executed as further security for the debt secured by that security device);

(b)   grant an overriding royalty, a net profits interest, or a production payment;

(c)   dispose of its Working Interest by:

(1) a merger, reorganization, or consolidation;

(2) a Transfer of Interest of substantially all of a Party's exploration and production properties in the Gulf of Mexico; or

(3) a Transfer of Interest to an Affiliate, provided that there is included in the Transfer of Interest a provision that, if for any reason the assignee ceases to be an Affiliate of the Transferring Party within three (3) years after Transfer of Interest, those rights shall be immediately reassigned to the original Party before the assignee ceases to be an Affiliate, and that all rights of the assignee in the Lease shall terminate if the re-assignment does not take place.

26.2.4   Completion of Transfer of Interest

If the proposed Transfer of Interest is not executed and filed of record with the BOEM within three (3) months after receipt of the transfer notice by the non-assigning Parties, or if the terms of the proposed Transfer of Interest conveyance are materially altered, the proposed Transfer of Interest shall be deemed withdrawn, and the Working Interest included in the proposed Transfer of Interest shall again be governed by this Article 26.2 (Preferential Right to Purchase).


# ARTICLE 27

## ADMINISTRATIVE PROVISIONS

27.1   Term

This Agreement shall remain in effect so long as a Lease remains in effect and thereafter until (a) all wells have been abandoned and plugged or turned over to the Parties owning an interest in the

Unofficial Copy Office of Marilyn Burgess District Clerk

Lease on which the wells are located; (b) all Platforms, Processing Facilities, and equipment have been disposed by the Operator in accordance with Article 14 (Abandonment, Salvage, and Surplus); (c) all Claims as defined in Article 19 (Liability, Claims, and Lawsuits) have been settled or otherwise disposed of; and (d) there has been a final accounting and settlement by all Parties. In accordance with Article 4.5 (Selection of Successor Operator), this Agreement will also terminate if no Party is willing to become Operator, effective after all conditions in clauses (a) through (d) above have been completed. Termination of this Agreement shall not relieve a Party of a liability or obligation accrued or incurred before termination and is without prejudice to all continuing confidentiality obligations or other obligations in this Agreement.

27.2   Waiver

A term, provision, covenant, representation, warranty, or condition of this Agreement may be waived only by written instrument executed by the Party waiving compliance. The failure or delay of a Party in the enforcement or exercise of the rights granted under this Agreement shall not constitute a waiver of said rights nor shall it be considered as a basis for estoppel. Time is of the essence in the performance of this Agreement and all time limits shall be strictly construed and enforced.

27.3   Waiver of Right to Partition

Each Party waives the right to bring an action for partition of its interest in the Lease, wells, Platform, Processing Facilities, and other equipment held under this Agreement, and covenants that during the existence of this Agreement it shall not resort at any time to an action at law or in equity to partition any or all of the Leases and lands or personal property subject to this Agreement.

27.4   Compliance With Laws and Regulations

This Agreement, and all activities or operations conducted by the Parties under this Agreement, are expressly subject to, and shall comply with, all laws, orders, rules, and regulations of all federal, state, and local governmental authorities having jurisdiction over the Lease.

27.4.1   Severance of Invalid Provisions

If, for any reason and for so long as, a clause or provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, unenforceable or unconscionable under a present or future law (or interpretation thereof), the remainder of this Agreement will not be affected by that illegality or invalidity. An illegal or invalid provision will be deemed severed from this Agreement, as if this Agreement had been executed without the illegal or invalid provision. The surviving provisions of this Agreement will remain in full force and effect unless the removal of the illegal or invalid provision destroys the legitimate purposes of this Agreement, in which event this Agreement shall be null and void.

27.4.2   Fair and Equal Employment

Each of the Parties is an Equal Opportunity Employer, and the equal opportunity provisions of 30 CFR 270 and 41 CFR 60-1, as amended or modified, are incorporated in this Agreement by reference.   The affirmative action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative action clauses concerning employment of the handicapped (41 CFR 60-741) are also incorporated in this Agreement by reference.  In performing work under this Agreement, the Parties shall comply with (and the Operator shall require each independent contractor to comply with) the governmental requirements in Exhibit "D" that pertain to non-segregated facilities.

27.5   Construction and Interpretation of this Agreement

27.5.1   Headings for Convenience

Except for the definition headings in Article 2 (Definitions), all the table of contents, captions, numbering sequences, and paragraph headings in this Agreement are inserted for convenience only and do not define, expand or limit the scope, meaning, or intent of this Agreement.

27.5.2   Article References

Except as otherwise provided in this Agreement, each reference to an article of this Agreement includes all of the referenced article and its sub-articles.

27.5.3   Gender and Number

The use of pronouns in whatever gender or number is a proper reference to the Parties to this Agreement though the Parties may be individuals, business entities, or groups thereof.  Reference in this Agreement to the singular of a noun or pronoun includes the plural and vice versa.

27.5.4   Joint Preparation

This Agreement shall be deemed for all purposes to have been prepared through the joint efforts of the Parties and shall not be construed for or against one Party or the other as a result of the preparation, submittal, drafting, execution or other event of negotiation hereof.

27.5.5   Integrated Agreement

This Agreement contains the final and entire agreement of the Parties for the matters covered by this Agreement and, as such, supersedes all prior written or oral communications and agreements.  This Agreement may not be modified or changed except by written amendment signed by the Parties.

27.5.6   Binding Effect

To the extent it is assignable, this Agreement shall bind and inure to the benefit of the Parties and their respective successors and assigns, and shall constitute a covenant

running with the land comprising the Lease. This Agreement does not benefit or create any rights in a person or entity that is not a Party to this Agreement.

### 27.5.7  Further Assurances

Each Party will take all actions necessary and will sign all documents necessary to implement this Agreement. Except as otherwise provided in this Agreement, within (30) days after their receipt of a valid written request for those documents from a Party, all other Parties shall prepare and execute the documents.

### 27.5.8  Counterpart Execution

This Agreement may be executed by signing the original or a counterpart. If this Agreement is executed in counterparts, all counterparts taken together shall have the same effect as if all Parties had signed the same agreement. No Party shall be bound to this Agreement until all Parties have executed a counterpart or the original of this Agreement. This Agreement may also be ratified by a separate instrument that refers to this Agreement and adopts by reference all provisions of this Agreement. Ratification shall have the same effect as an execution of this Agreement.

### 27.5.9  Other Agreement

This Agreement is subject to the terms and conditions of that certain Contribution and Reimbursement Agreement dated November 30, 2011 ("Contribution and Reimbursement Agreement"), by and between the Parties. In the event of conflict between this Agreement and the Contribution and Reimbursement Agreement, the provisions of this Agreement shall prevail.

IN WITNESS WHEREOF, this Agreement has been executed by the Parties as of the day and year first written above.

WITNESSES:                                OPERATOR

                                          ANKOR Energy LLC

Printed Name: Deborah Cunningham          By: _____
                                          Name:  W. Denton Copeland
Printed Name: Deborah K. Downing          Title:   President


WITNESSES:                                NON-OPERATORS

                                          ANKOR E&P Holdings Corporation

Printed Name: Deborah Cunningham          By: _____
                                          Name:  Ithaca  Cho
Printed Name: Deborah K. Downing          Title:   Vice President


                                          STX Energy E&P Offshore Management, LLC

Printed Name: Deborah Cunningham          By: _____
                                          Name:  Dong Won  Kim
Printed Name: Deborah K. Downing          Title:   Manager


                                          SCL Resources, LLC

Printed Name: Deborah Cunningham          By: _____
                                          Name:  SUSANNA RIVERA
Printed Name: Deborah K. Downing          Title:   MANAGER

H:\MISCL\OOA_130331-4-5-13.doc

66                    DK

JPB  ILC

Unofficial copy from office of Marilyn Burgess District Clerk

EXHIBIT "A"

Attached to and made a part of that certain Operating Agreement dated effective
December 23, 2011 between ANKOR Energy LLC, as Operator,
and ANKOR E&P Holdings Corporation, STX Energy E&P Offshore Management, LLC, and
SCL Resources, LLC, as Non-Operators.

(1) Identification of lands subject to this agreement:
    Leases listed below on Exhibit "A" to this Operating Agreement.

(2) Restrictions, if any, as to depths, formations, or substances:
    None except as may be contained in the various leases and agreements listed
    below.

(3) Percentages or fractional interest of parties to this agreement as to the
    Prospect:

|  | W.I. |
|---|---|
| ANKOR E&P Holdings Corporation | 0.67 |
| STX Energy E&P Offshore Management, LLC | 0.18 |
| SCL Resources, LLC | 0.15 |
|  | 1.00 |

Exceptions to the above ownership:

| Mobile Area, Block 87B, OCS-G 5868 | W.I. |
|---|---|
| ANKOR E&P Holdings Corporation | 0.7391 |
| STX Energy E&P Offshore Management, LLC | 0.1959 |
| SCL Resources, LLC | 0.0750 |
|  | 1.0000 |

Addresses and telephone numbers of parties for notice purposes

ANKOR E&P Holdings Corporation
1615 Poydras Street, Suite 2000
New Orleans, LA 70112
Attn: Mr. Ilkwon Cho
Phone: 504-587-6503
Fax: 504-587-6510
Email: ikcho@knoc.co.kr

ANKOR Energy LLC
1615 Poydras Street, Suite 1100
New Orleans, LA 70112
Attn: Mr. Frank D. Barber, III
Phone: 504-596-3736
Fax: 504-596-3762
Email: fbarber@ankorenergy.com

STX Energy E&P Offshore Management, LLC
1853 Poydras Street, Suite 1720
New Orleans, LA 70112
Attn: Mr. Dongwon Kim, Ph.D.
Phone: 504-529-3335
Fax: 504-529-3338
Email: kdong5236@jamestx.com
Email: kdong5236@gmail.com

SCL Resources, LLC
840 Roosevelt 2 Fl.
Irvine, CA 92620
Attn: Ms. Susanna Rivera
Phone: 949-812-1074
Fax: 949-390-5752
Email: susanna@samchully.co.kr



(4) Oil and gas leases and/or oil and gas interests subject to this agreement:

Lease No.:                OCS-G 26032
Area/Block:               Eugene Island Block 208 (E/2)
Lease Date:               7/1/04
Lessor:                   United States of America
Original Lessee:          Pioneer Natural Resources USA, Inc.
Lease/Aliquot Description: **Record Title** being the E/2 of Block 208, Eugene Island Area.
Ownership Rights:         Record Title

Lease No.:                OCS- 0377
Area/Block:               Eugene Island Block 208 (W/2)
Lease Date:               9/1/55
Lessor:                   United States of America
Original Lessee:          Continental Oil Company, et al
Lease/Aliquot Description: **Record Title** in the W/2 of Block 208, Eugene Island Area,
LESS AND EXCEPT the Operating Rights in the N/2 from 11,232' TVD and below.
Ownership Rights:         Record Title

Lease No.:                OCS-G 5068
Area/Block:               Mobile Area Block 870
Lease Date:               4/1/82
Lessor:                   United States of America
Original Lessee:          Placid Oil Company
Lease/Aliquot Description: **Operating Rights** in that portion of Block 870, Mobile Area,
INSOFAR AND ONLY INSOFAR as to those depths above the stratigraphic equivalent of
100' below the depths of 2,358 feet subsea as encountered in the Santa Fe International
Corporation OCS-G 5068, Well No. 1.
Ownership Rights:         Operating Rights

Lease No.:                OCS-G 33663
Area/Block:               South Pelto 12
Lease Date:               7/1/10
Lessor:                   United States of America
Original Lessee:          Northstar Offshore Energy Partners, LLC
Lease/Aliquot Description: **Record Title** in the E/2 of Block 12, South Pelto Area.
Ownership Rights:         Record Title

Lease No.:                OCS-G 13606
Area/Block:               Vermilion Block 379
Lease Date:               9/1/92
Lessor:                   United States of America
Original Lessee:          Sun Operating Limited Partnership, et al
Lease/Aliquot Description: **Record Title** in all of Block 379, Vermilion Area, South
Addition.
Ownership Rights:         Record Title

2

Lease No.:  OCS-G 10584
Area/Block:  West Cameron 431
Lease Date:  5/1/89
Lessor:  United States of America
Original Lessee:  Pelto Oil Company
Lease/Aliquot Description: **Operating Rights** as to the N/2 SE/4 NE/4 of Block 431, West Cameron Area, West Addition, INSOFAR AND ONLY INSOFAR as to those depths from 6,000' down to 12,500' TVD.
Ownership Rights:  Operating Rights
Lease/Aliquot Description: **Contractual Rights** as to the N/2 N/2 from 100' below the stratigraphic equivalent of 6,500' Sand  as seen in the log for the Hall-Houston Oil Company OCS-G 10584 Well No. A-3 between the depths of 6,475' and 6,483' TVD; down to 6,800' TVD; and further, 6,800' TVD to 20,000' TVD.
Ownership Rights:  Contractual Rights
Lease/Aliquot Description: **Overriding Royalty Interest** reserved only as to the N/2 N/2 from the surface to 100' below the stratigraphic equivalent of 6,500' TVD.
Ownership Rights:  Overriding Royalty Interest


Lease No.:  OCS-G 15277
Area/Block:  Ship Shoal 79
Lease Date:  8/1/95
Lessor:  United States of America
Original Lessee:  Enron Oil & Gas Company
Lease/Aliquot Description: **Record Title** in all of Block 79, Ship Shoal Area, LESS AND EXCEPT the Operating Rights from the surface to one hundred feet below the stratigraphic equivalent of 11,318' TVD.
Ownership Rights:  Record Title
Lease/Aliquot Description: **Overriding Royalty Interest** reserved as to those depths from the surface to 100' below the stratigraphic equivalent of 11,318'TVD.
Ownership Rights:  Overriding Royalty Interest

Unofficial Copy Office of Marilyn Burgess District Clerk

3

**EXHIBIT "B"**

Attached to and made a part of that certain Operating Agreement dated effective
December 23, 2011, between ANKOR Energy LLC, as Operator,
and ANKOR E&P Holdings Corporation, STX Energy E&P Offshore Management, LLC,
and SCL Resources, LLC, as Non-Operators.

## INSURANCE PROVISIONS

1.  Operator shall carry the following insurance for the joint account:

    a.  Workmen's Compensation and Employer's Liability Insurance covering employees of Operator engaged in operations hereunder in compliance with all applicable State and Federal Laws. The Workmen's Compensation policy shall have attached the "Longshoreman's Harbor Worker's Compensation Act (Federal) Endorsement" and "Outer Continental Shelf Lands Endorsement".

    b.  Contingent Maritime Employer's Liability Insurance shall provide for a limit of liability of not less than $1,000,000 per accident.

2.  Each PARTY shall self-insure or carry the insurance noted below with the minimum limits as set out:

    a.  General Liability Insurance covering operations conducted hereunder with a combined single limit each occurrence of $1,000,000 for bodily injury and property damage, including:

         i.   Premises and Operations coverages.

         ii.  Independent Contractor's Contingent coverage.

         iii. Contractual Liability covering liabilities assumed under this Operating Agreement.

         iv.  Products and Completed Operations coverage.

         v.   Coverage for explosion, collapse and underground resources and property damage under both Premises/Operations and Contractual Liability coverage parts, where applicable.

         vi.  Broad Form Property Damage Liability endorsement.

         vii. Personal Injury Liability.

         viii. *In Rem* endorsement.

         ix.  Territorial extension shall cover all work areas.

         x.   Where applicable, coverage for liability resulting from the consumption of food prepared or served by contractor or subcontractor.

         xi.  Watercraft exclusion deleted or Protection & Indemnity provided.

         xii. Coverage is provided for "Action Over" suits.

         xiii. Coverage is silent as respects Punitive Damages.

         xiv. Sudden and Accidental Pollution Liability Coverage.

Unofficial Copy Office of Marilyn Burgess District Clerk

xv.   Coverage for Offshore/Marine Operations.

b.   Commercial Automobile Liability Insurance covering owned, non-owned and hired automobiles with a combined single limit of $1,000,000 per occurrence and Property Damage Insurance covering operations conducted hereunder with a combined single limit each occurrence of $500,000 for bodily injury and property damage.

c.   Excess Liability Insurance, including sudden and accidental pollution liability, with a limit of $25,000,000.00.

d.   Non-Owned Aircraft Liability Insurance with a limit of $5,000,000 each occurrence.

e.   Insurance for Control of Well, Redrilling and Restoration due to blowout and/or cratering above or below surface, and Seepage and Pollution Liability coverage including cleanup and containment with a minimum limit of $25,000,000 per occurrence. Coverage shall also include Care Custody and Control Insurance with a minimum limit of $500,000 per occurrence.

3.   Any PARTY hereto may acquire such additional insurance as it deems proper to protect itself against any claims, losses, damages or destruction arising out of operations hereunder.

4.   Operator shall use reasonable efforts to require all contractors and subcontractors working or performing services hereunder to comply with the Workmen's Compensation and Employer's Liability Laws, both State and Federal, and to carry Comprehensive General Liability and such other insurance as Operator deems necessary.

5.   In the event that construction operations are performed, Operator shall determine the amount(s) of Builder's Risks Insurance appropriate for the project and shall: (i) cause the pertinent contractor(s) and, as applicable, subcontractor(s) to carry at the aggregate and as Operator deems appropriate, such coverage and/or (ii) carry for the joint account (and charge it accordingly) for such portion of, or all, the coverage as operator deems appropriate. In any such event, Operator shall cause certificates of insurance reflective of such coverage to be forwarded to the Non-Operator(s).

6.   Once offshore properties are installed, each Party must carry its own Physical Damage Insurance for its own insurable interest to be effective at the expiration date of the Builder's Risk Policy.

End of Exhibit "B"

EXHIBIT "C"

Attached to and made a part of that certain Operating Agreement dated effective
December 23, 2011, between ANKOR Energy LLC, as Operator,
and ANKOR E&P Holdings Corporation, STX Energy E&P Offshore Management, LLC, and SСL Resources, LLC, and
as Non-Operators.

# ACCOUNTING PROCEDURE

# OFFSHORE JOINT OPERATIONS

## I. GENERAL PROVISIONS

### 1. Definitions

"Joint Property" shall mean the real and personal property subject to the Agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties of this Agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity. The First Level Supervisor shall not be required to be located on the Joint Property, but shall be located at a field location near the Joint Property.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material, which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

"Shore Base Facilities" shall mean onshore support facilities that during drilling, development, maintenance and producing operations provide such services to the Joint Property as receiving and transshipment point for supplies, materials and equipment; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; other associated functions benefiting the Joint Property.

"Offshore Facilities" shall mean platforms and support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, helipad, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations.

### 2. Statements and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

1

3.   **Advances and Payments by Non-Operators**

   A.   Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

   B.   Each Non-Operator shall pay its proportion of all bills within thirty (30) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at Chase Manhattan Bank on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws of the jurisdiction in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4.   **Adjustments**

   Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof, provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustments. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

5.   **Audits**

   A.   A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year, provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

   B.   The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.   **Approval by Non-Operators**

   Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

# II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.   **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

2.   **Labor**

   (1)   Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

   (2)   Salaries and wages of Operator's employees directly employed on Shore Base Facilities or other Offshore Facilities serving the Joint Property if such costs are not charged under Paragraph 7 of this Section II.

   (3)   Salaries of First Level Supervisors in the field.

   (4)   Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

2

(3)   Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B.   Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

D.   Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

3.   **Employee Benefits**

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

4.   **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided. However, all surplus material purchased for the Joint Account will remain charged to the Joint Account until disposition of such surplus materials by Operator. Operator shall use its best efforts to dispose of such surplus materials on a reasonable and timely basis, however Operator shall consult with and obtain a Non-Operator's current permitted Non-Operator's consent as provided within five (5) days after receipt of notice from Operator of its intent to dispose of such surplus material. Failure by Non-Operator to provide Operator with its consent within said five (5) days shall be an indication that Non-Operator consents or approves of the disposal of said surplus material.

5.   **Transportation**

Transportation of employees and Material necessary for the Joint Operation but subject to the following limitations:

A.   If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available including all railway receiving point nearest the Joint Property unless agreed to by the Parties.

B.   If surplus Material is moved to Operator's warehouse or other storage points, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C.   In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

6.   **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraphs i and ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel directly engaged in the operation of the Joint Property shall be charged to the Joint Account if such charges are excluded from the overhead rates.

7.   **Equipment and Facilities Furnished by Operator**

A.   Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including Shore Base and/or Offshore Facilities, at rates commensurate with costs of ownership and operation. Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation and interest on gross investment less accumulated depreciation not to exceed twelve percent (12%) per annum. In addition,

for platforms only, the rate may include an element of the estimated cost of platform dismantlement. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

8. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less twenty percent (20%). For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

8. **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other causes, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

9. **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payments of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the Agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

10. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

11. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted at offshore locations in which Operator may act as self-insurer for Workers' Compensation and Employers' Liability, Operator may include the risk under its self-insurance program in providing coverage under State and Federal laws and charge the Joint Account at Operator's cost not to exceed manual rates.

12. **Communications**

Costs of acquiring, leasing, installing, operating, repairing and maintaining communication systems including radio and microwave facilities between the Joint Property and the Operator's nearest Shore Base Facility. In the event communication facilities systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Paragraph 7 of this Section II.

13. **Ecological and Environmental**

Costs incurred on the Joint Property as a result of statutory regulations for archaeological and geophysical surveys relative to identification and protection of cultural resources and/or other environmental or ecological surveys as may be required by the Minerals Management Service or other regulatory authority. Also, costs to provide or have available pollution containment and removal equipment plus costs of actual control and cleanup and resulting responsibilities of oil spills as required by applicable laws and regulations.

14. **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

15. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.


# III. OVERHEAD

As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge the Joint Account in accordance with this Section III.

4

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies, except as herein described, shall be considered as included in the overhead rates provided for in this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

i.   Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

( ) shall be covered by the overhead rates.
( x ) shall not be covered by the overhead rates.

ii.   Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

( x ) shall be covered by the overhead rates.
( ) shall not be covered by the overhead rates.

**1.   Overhead - Drilling and Producing Operations**

As compensation for overhead incurred in connection with drilling and producing operations, Operator shall charge on either:

( x ) Fixed Rate Basis, Paragraph 1A, or
( ) Percentage Basis, Paragraph 1B

A. Overhead - Fixed Rate Basis

(1)  Operator shall charge the Joint Account at the following rates per well per month:
Drilling Well Rate $48,800.00 (Prorated for less than a full month) Producing
Well Rate $4,880.00

(2) Application of Overhead - Fixed Rate Basis for Drilling Well Rate shall be as follows:

(a)  Charges for drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the day the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive calendar days.

(b)  Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3)  Application of Overhead - Fixed Rate Basis for Producing Well Rate shall be as follows:

(a)  An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(b)  Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(c)  An inactive gas well shut-in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(d)  A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(e)  All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(4)  The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year

5

preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. Overhead - Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

Percent (_____%) of cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

(b) Operating

Percent (_____%) of the cost of Operating the Joint

Property exclusive of costs provided under Paragraphs 3 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any project with a primary purpose to extend or expand a wellbore in order to recover new reserves not previously recoverable by the wellbore; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating except that catastrophe costs shall be assessed overhead as provided in Section III, Paragraph 3.

2. Overhead - Major Construction

A.    If the Operator absorbs the engineering, design and drafting costs related to the project:

(1)    _____5_____ % of total costs if such costs are more than $50,000 but less than $100,000; plus

(2)    _____3_____ % of total costs in excess of $100,000 but less than $1,000,000; plus

(3)    _____2_____ % of total costs in excess of $1,000,000.

B.    If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1)    _____4_____ % of total costs if such costs are more than $50,000 but less than $100,000; plus

(2)    _____2_____ % of total costs in excess of $100,000 but less than 1,000,000; plus

(3)    _____2_____ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

On any project, Operator shall advise Non-Operator(s) in advance which of the above options shall apply. In the event of any conflict between the provisions of this paragraph and those provisions under Section II, Paragraph 2 or Paragraph 6, the provisions of this paragraph shall govern.

3. Overhead - Catastrophe

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

6

(1)    $    % of total costs through $100,000; plus

(2)    $    % of total costs in excess of $100,000 but less than $1,000,000; plus

(3)    $    % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.    **Amendment of Rates**

The Overhead Parties hereto if, in practice, the rates are found to be insufficient or excessive rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties.

IV.    **PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS**

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.    **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.    **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts.

A. New Material (Condition A)

(1) Tubular Goods Other than Line Pipe

(a) Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

(b) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

(c) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d) Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2) Line Pipe

(a) Line pipe movements (except size 24 inch OD and larger with walls 3/8 inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.2.1(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(b) Line pipe movements (except size 24 inch OD and larger with walls 3/4 inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as

of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

    (c)    Line pipe 24 inch OD and over and 3/4 inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

    (d)    Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

  (3)  Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

  (4)  Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraphs A (1) and (2).

B. Good Used Material (Condition B)

  Material in sound and serviceable condition and suitable for reuse without reconditioning:

  (1)  Material moved to the Joint Property
    At seventy-five percent (75%) of current new price, as determined by Paragraph A.

  (2)  Material used on and moved from the Joint Property

    (a)    At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material; or

    (b)    At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material.

  (3)  Material not used on and moved from the Joint Property

    At seventy-five percent (75%) of current new price as determined by Paragraph A.
    The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

  (1) Condition C

    Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

  (2) Condition D

    Material, including junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

    (a)    Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

    (b)    Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis.

  (3) Condition E

    Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

Unofficial Copy Office of Marilyn Burgess District Clerk

8

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents ($0.25) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. Warranty of Material Furnished By Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

# V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. Reconciliation and Adjustment of Inventories

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. Special Inventories

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4. Expense of Conducting Inventories

A. The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B. The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

<center>End of Exhibit "C"</center>

9



EXHIBIT "D"

Attached to and made a part of that certain Operating Agreement dated effective
December 23, 2011, between ANKOR Energy LLC, as Operator,
and ANKOR E&P Holdings Corporation, STX Energy E&P Offshore Management, LLC, and SCL
Resources, LLC, as Non-Operators.

## CERTIFICATION OF NONSEGREGATED FACILITIES

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. Contractor certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause in any Government contract between Contractor and Corporation. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local customs or otherwise. Contractor further agrees that (except where it has obtain identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES. A Certification of Non-segregated Facilities, as required by the May 9, 1967, order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed. Reg. 7439, May 19, 1967), must be submitted prior to the award of a subcontract exceeding $10,000, which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semi-annually, or annually). (1968 MAR.) (Note: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.)

Whenever used in the foregoing Section, the term "contractor" refers to each party to this Agreement.

End of Exhibit "D"

Unofficial Copy Office of Marilyn Burgess District Clerk

EXHIBIT "E"

Attached to and made a part of that certain Operating Agreement dated effective
December 23, 2011, between ANKOR Energy LLC, as Operator,
and ANKOR E&P Holdings Corporation, STX Energy E&P Offshore Management, LLC, and SCL Resources LLC, as
Non-Operators.

## GAS BALANCING AGREEMENT

I.   **Definitions**

    A.   "Agreement" shall mean this Gas Balancing Agreement.

    B.   "Balanced" is that condition which occurs when a party hereto has taken the same percentage of the cumulative volume of Gas production it is entitled to take pursuant to the terms of the Operating Agreement.

    C.   "Gas" includes natural gas produced from a Well that produces Natural Gas, including all constituent parts of such natural gas except liquid hydrocarbons and condensate recovered by primary separation equipment.

    D.   "Overproduced" is the status of a party when the percentage of the cumulative volume of Gas taken by that party exceeds that party's percentage interest of the volume of cumulative Gas production of all parties to the Operating Agreement under and pursuant to the terms of the Operating Agreement.

    E.   "Underproduced" is the status of a party when the percentage of cumulative volume of Gas taken by that party is less than that party's percentage interest of the volume of cumulative Gas production of all parties to the Operating Agreement under and pursuant to the terms of such Operating Agreement.

    F.   "Well" is defined as each well subject to the Operating Agreement that produces Gas. If a single Well is completed in two or more reservoirs, such Well shall be considered a separate Well with respect to, but only with respect to, each reservoir from which the Gas produced is not commingled in the well bore.

II.  **Application of this Agreement**

    The parties to the Operating Agreement own the working or operating interests in the Gas underlying the LEASE covered by the Operating Agreement and are entitled to share in the percentages therein stated in the Operating Agreement.

    In accordance with the terms of the Operating Agreement, each day each party is responsible for marketing its share and shall take its full share of Gas produced from the LEASE and market or otherwise dispose of same. In the event a party hereto elects in writing not to take in kind or market its full share of Gas or has contracted to sell its share of Gas produced from the LEASE to a purchaser which, at any time while this Agreement is in effect, fails to take that share of Gas attributable to the interest of such party, the terms of this Agreement shall automatically become effective, provided, however, that within any given calendar month should one or more parties fail to take its daily entitlement(s) of Gas then in order to allow the party(s) to get back into balance within that month before implementation of this provision Operator will first notify the underproduced party(s) and it will fully utilize all pipeline operational flexibility afforded it, to specifically include that allowed under a governing pipeline Operational Balancing Agreement.

    The Operator is responsible for administering the provisions of this Agreement and as such shall have the sole option of administering all reporting of the same for the parties or retaining the services of third party professionals for this specific purpose. The costs of such third party services by Operator shall be considered as included in the overhead rates. The Operator shall cause deliveries to be made to the Gas purchasers at such rates as may be required to give effect to the extent practicable, to be or become Balanced.

    The provisions of this Agreement shall be applied to the LEASE, regardless of the number of wells.

III. **Storing and Making Up Gas Production**

    A.   Right to Take and Market Gas

        During any periods or periods when any party hereto does not take, has no market for, or the market of a party is not sufficient to take, that party's full share of the Gas produced from any Well located on the LEASE, or such party's purchaser otherwise fails to take such party's share of Gas produced from any such Well located on the LEASE, resulting in such party becoming Underproduced (each party being herein referred to as an "Underproduced Party"), the other party or parties shall be entitled, but not required, to produce from said Well on the LEASE (and take or deliver to their respective purchaser(s)), each month all or a part of that portion of the allowable

Gas production assigned to such Well by the regulatory body having jurisdiction. Any party so taking or delivering Gas which results in such party becoming Overproduced is herein referred to as an "Overproduced Party".

Those parties which are capable of taking and/or marketing quantities of Gas allocable to an Underproduced Party, in the absence of any other agreement between them, shall each take a share of the Gas attributed to the Underproduced Party or Parties in the direct proportion that their respective interests bear to the total interest of all parties taking Gas which are also considered Overproduced.

All parties hereto shall share in and own the liquid hydrocarbons recovered from such Gas by primary separation equipment in accordance with their respective interests and subject to the terms of the above-described Operating Agreement, whether or not such parties are actually taking and/or marketing Gas at such time.

B.    Making Up Underproduction

Any Underproduced Party shall endeavor to bring its taking of Gas into a Balanced condition. Upon thirty (30) days prior written notice to the Operator, any Underproduced Party may thereafter begin taking or delivering to its purchaser its full share of the Gas produced from a Well (less any used in operations, vented or lost). To balance the Gas account of the parties in accordance with their respective interests, Underproduced Party shall be entitled to take or deliver to a purchaser its full share of Gas produced from such Well (less any used in operations, vented or lost) plus, (i) for the months of March, April, May, June, July, August, September and October only of any calendar year during which this Agreement may be in place, an amount up to an additional fifty percent (50%) of the monthly quantity of Gas attributable to the Overproduced Party or Parties, or (ii) for the months of November, December, January and February only of any calendar year or years during which this Agreement may be in place, an amount up to an additional twenty-five percent (25%) of the monthly quantity of Gas attributable to the Overproduced Party or Parties. If more than one Underproduced Party is entitled to take additional Gas, they shall divide the additional Gas in proportion to their respective Underproduced accounts. The first Gas made up shall be assumed to be the first Gas Underproduced.

C.    Gas Balance Reporting

Each party taking will promptly provide to the Operator any data required by the Operator for preparation of the statements required hereunder. The Operator will maintain appropriate accounting on a monthly and cumulative basis of the quantities of Gas each party is entitled to take and/or market and the quantities of Gas taken and/or marketed by each of the parties at their respective Gas purchasers. Within ninety (90) days after the end of each producing calendar month, the Operator shall furnish each party a statement showing the status of the Overproduced and Underproduced accounts of all parties.

To determine respective volumes of Gas taken by separate gas pipelines connected to the Well, measurement of Gas for overproduction and underproduction shall be accomplished by use of sales meters and lease measurement equipment, which shall be in accordance with AGA requirements.

Each party to this Agreement agrees that it will not utilize any information obtained hereunder for any purpose other than implementing or administering the terms of this Agreement.

D.    Royalty and Production Tax

At all times while Gas is produced from the LEASE, unless otherwise required by any State or Federal law or regulations, each party shall pay or cause to be paid all royalty due and payable on the actual volumes of gas taken for its account. Each party agrees to hold each other party harmless from any and all claims for royalty payments asserted by its royalty owners. The term "royalty owner" shall include owners of royalty, overriding royalties, production payments and similar interests payable out of production.

Each party producing or taking or delivering Gas to its Gas purchaser shall pay, or cause to be paid, all production and severance taxes due on all volumes of Gas actually taken or sold by such party.

IV.    Cash Settlement

A.    Volume/Value

The Parties agree to a monthly cash settlement of imbalances between them, beginning the first quarter after initial production commences and continuing every quarter until production permanently ceases. The cash settlement will be based on the one hundred percent (100%) Inside FERC's Gas Marketing Report index price published by Platts for the jurisdictional pipeline to which Gas produced from the Prospect Area flows for the applicable production month, less any applicable transportation deducts. Should this publication cease to exist, the Parties shall mutually agree to an alternative pricing bulletin. Operator will submit a monthly settlement worksheet and invoices to the Parties setting forth the monthly account balance. The Overproduced Party will make a cash payment to Operator for such amount due. Conversely, Operator will make a cash

payment to the Underproduced Party for such amount due. The cash payments required will be made within fifteen (15) days of receipt of settlement invoices. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at Chase Manhattan Bank on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws of the jurisdiction in which the Balancing Area is located, whichever is the lesser, plus attorney's fees, court costs and other costs in connection with the collection of unpaid amounts.

B.   Interest compounded at the rate as specified in Section A, or the maximum lawful rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section A, beginning the first day following the date payment is past due. Such interest shall be borne by any Overproduced Party in the proportion that their respective payments are beyond the deadlines set out in Section A.

C.   Collection and Distribution

Operator shall provide to all parties herein within sixty (60) days of permanent determination of Gas production a final accounting of the Gas balance. Overproduced Parties, within thirty (30) days of receipt of the final accounting of the Gas balance, shall pay their respective shares of the above described cash settlement to the Underproduced Parties in that proportion that each such Underproduced Party's volume of gas in storage bears to the total of all Underproduced Parties' volumes of gas in storage.

V.   Miscellaneous

A.   Term

This Agreement shall remain in force and effect as long as the Operating Agreement to which it is attached remains in force and effect, and thereafter until the Gas balance accounts between the parties are settled in full, and shall inure to the benefit of and be binding upon the parties hereto, their heirs, successors, legal representatives and assigns.

B.   Expenses

Nothing herein shall change or affect each party's obligations to pay its proportionate share of all costs and liabilities incurred in operations on the LEASE, as its share thereof is set forth in the Operating Agreement to which this Agreement is attached.

C.   Well Tests

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to its Gas purchaser up to one hundred percent (100%) of the entire Well stream to meet the deliverability test required by its Gas purchaser, provided that such tests are reasonable in light of overall industry standards.

D.   Monitoring of Takes of Production

Each party shall, at all times, use its best efforts to regulate its takes and deliveries from each Well on the LEASE so that no Well will be shut-in for overproducing the allowable assigned thereto by the regulatory body having jurisdiction. Additionally, each party shall communicate, as necessary, the contents of this Agreement to its respective Gas purchaser(s) or transporter(s) and shall monitor its deliveries to the respective Gas purchaser(s) or transporter(s) so as to ensure to the greatest extent practicable that its Gas purchaser(s) or transporter(s) does not take Gas in excess of the quantities provided for herein.

E.   Liquefiable Hydrocarbons Not Covered Under Agreement

The parties shall share proportionately in and own all liquid hydrocarbons recovered with the Gas by lease equipment in accordance with their respective interests.

End of Exhibit "E"

3

EXHIBIT "F"

Attached to and made a part of that certain Operating Agreement dated effective
December 23, 2011, between ANKOR Energy LLC, as Operator,
and ANKOR E&P Holdings Corporation, STX Energy E&P Offshore Management, LLC, and SCL Resources LLC, as
Non-Operators.

MEMORANDUM OF OPERATING AGREEMENT
AND FINANCING STATEMENT
(Louisiana)

1.0    This Memorandum of Operating Agreement and Financing Statement (this "Memorandum") is effective as of the effective date of the Operating Agreement referred to in Paragraph 2.0 below and is executed by ANKOR Energy LLC, (the "Operator"), whose mailing address is 1615 Poydras Street, Suite 1100, New Orleans, LA 70112 and ANKOR E&P Holdings Corporation, whose address is 1615 Poydras Street, Suite 2060, New Orleans, LA 70112 (the "Non-Operator") and STX Energy E&P Offshore Management, LLC whose mailing address is 1555 Poydras Street, Suite 1720, New Orleans, LA 70112 (the "Non-Operator") and SCL Resources, LLC, whose address is 840 Roosevelt 2 Fl, Irvine, California 92620 (the "Non-Operator").

2.0    The Operator and the Non-Operator are parties to that certain Operating Agreement dated effective the 23rd day of December, 2011 (the "Operating Agreement") providing for the development and production of crude oil, natural gas and associated substances from the lands and oil and gas leases described in Exhibit "A" of the Operating Agreement (therein and herein called the "Contract Area"), and described more particularly on Attachment "1" to this Memorandum, and designating ANKOR Energy LLC as the Operator, to conduct such operations for itself and the Non-Operator. Reference is made hereby to the Operating Agreement for all purposes, and its terms and provisions are incorporated herein by this reference to the same extent as if the Operating Agreement were reproduced herein. Capitalized terms not otherwise defined herein are defined and shall have the same meaning herein as set forth in the Operating Agreement.

3.0    The Operator hereby certifies that a true and correct copy of the Operating Agreement is on file and is available for inspection by third parties at the offices of the Operator at the address set forth in this Memorandum.

4.0    Among other provisions, the Operating Agreement (i) provides for certain liens and security interests to secure payment by the Parties of their respective share of costs and performance of other obligations under the Operating Agreement and contains a power of sale, (ii) contains an Accounting Procedure, and (iii) includes non-consent clauses which establish that Parties who elect not to participate in certain operations shall be deemed to have relinquished their interest in production until the carrying consenting Parties recover their costs of such operations plus a specified amount, or in some cases to permanently forfeit their interest in all or part of the Lease. Certain provisions of Section 8.6 of the Operating Agreement are set forth as follows:

     Mortgage in Favor of the Operator. Non-Operator hereby grants to the Operator a mortgage, hypothecate and pledge of and over all of its rights, titles and interests in and to the (a) the Lease, (b) the oil and gas in, on under and that may be produced from the lands within the Lease and (c) all other immovable property susceptible of mortgage situated within the Lease.

     This mortgage is given to secure the complete and timely performance of and payment by Non-Operator of all obligations and indebtedness of every kind and nature, whether now owned by Non-Operator or hereafter arising pursuant to this Agreement. To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of the Operator herein shall secure the payment of all costs and other expenses properly charged to such Party, together with (A) interest on such indebtedness, costs and other expenses at the rate set forth in Exhibit "C" attached hereto (the "Accounting Procedure") or the maximum rate allowed by law, whichever is the lesser, (B) reasonable attorneys' fees, (C) court costs and (D) other directly related collection costs. If Non-Operator does not pay

1

such costs and other expenses or perform its obligations under this Agreement when due, the Operator shall have the additional right to notify the purchaser or purchasers of the defaulting Non-Operator's Hydrocarbon production and collect such costs and other expenses out of the proceeds from the sale of the defaulting Non-Operator's Hydrocarbon production until the amount owed has been paid. The Operator shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Non-Operator's share of Hydrocarbon production. Any purchaser of such production shall be entitled to rely on the Operator's statement concerning the amount of costs and other expenses owed by the defaulting Non-Operator and payment shall be made to the Operator by any purchaser shall be binding and conclusive as between such purchaser and such defaulting Non-Operator.

The maximum amount for which the mortgage herein granted by Non-Operator shall be deemed to secure the obligations and indebtedness of Non-Operator to the Operator as stipulated herein is hereby fixed in an amount equal to $100,000,000.00 (the "Limit of the Mortgage of each Non-Operator"). Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of Non-Operator to the Operator is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of Non-Operator, the liability of Non-Operator under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Operator shall not be entitled to enforce the same against Non-Operator for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the Memorandum of Operating Agreement and Financing Statement (Louisiana), as such term is defined in Article 8.6.1.4 (Recordation) hereof] outstanding and unpaid and that are attributable to or charged against the interest of Non-Operator pursuant to this Agreement.

Security Interest in Favor of the Operator. To secure the complete and timely performance of and payment by Non-Operator of all obligations and indebtedness of every kind and nature, whether now owed by Non-Operator or hereafter arising, pursuant to this Agreement, Non-Operator hereby grants to the Operator a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Lease or attributable to the Lease when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Platforms and Processing Facilities, wells, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the lands or offshore blocks covered by the Lease or maintained or used in connection with the ownership, use or exploitation of the Lease, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof. The interest of Non-Operator in and to the oil and gas produced from or attributable to the Lease when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease. To the extent susceptible under applicable law, the security interest granted by Non-Operator hereunder covers: (A) all substitutions, replacements, and accessions to the property of Non-Operator described herein and is intended to cover all of the rights, titles and interests of Non-Operator is all movable property now or hereafter located upon or used in connection with the Lease, whether corporeal or incorporeal; (B) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of Non-Operator in connection with the Lease, or the oil and gas produced from or attributable to the Lease, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of Non-Operator in any partnership, tax partnership, limited partnership, association, joint

Unofficial Copy from Bureau of Land Management Network

2

OK

venture, or other entity or enterprise that holds, owns, or controls any interest in the Lease; and (C) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of Non-Operator in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease, including the following:

(1)     all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A-1", to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Lease;

(2)     all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A-1", to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Lease; and

(3)     all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease.

Mortgage in Favor of the Non-Operator. The Operator hereby grants to Non-Operator a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Lease; (b) the oil and gas in, on, under, and that may be produced from the lands within the Lease; and (c) all other immovable property or other property susceptible of mortgage situated within the Lease.

This mortgage is given to secure the complete and timely performance of and payment by the Operator of all obligations and indebtedness of every kind and nature, whether now owed by the Operator or hereafter arising, pursuant to this Agreement. To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of Non-Operator herein shall secure the payment of all costs and other expenses properly charged to the Operator, together with (A) interest on such indebtedness, costs, and other expenses at the rate set forth in the Accounting Procedure or the maximum rate allowed by law, whichever is the lesser, (B) reasonable attorneys' fees, (C) court costs, and (D) other directly related collection costs. If the Operator does not pay such costs and other expenses or perform its obligations under this Agreement when due, the Non-Operator shall have the additional right to notify the purchaser or purchasers of the Operator's Hydrocarbon production and collect such costs and other expenses out of the proceeds from the sale of the Operator's share of Hydrocarbon production until the amount owed has been paid. The Non-Operator shall have the right to offset the amount owed against the proceeds from the sale of the Operator's share of Hydrocarbon production. Any purchaser of such production shall be entitled to rely on the Non-Operator's statement concerning the amount of costs and other expenses owed by the Operator and payment made to the Non-Operator by any purchaser shall be binding and conclusive as between such purchaser and the Operator.

The maximum amount for which the mortgage herein granted by the Operator shall be deemed to secure the obligations and indebtedness of the Operator to

Non-Operator as stipulated herein is hereby fixed in an amount equal to $100,000,000.00 in the aggregate (the "Limit of the Mortgage of the Operator"). Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Operator to the Non-Operator is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of the Operator, the liability of the Operator under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Non-Operator shall not be entitled to enforce the same against the Operator for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the Memorandum of Operating Agreement and Financing Statement, as such term is defined in Article 8.6.1.4 hereof) outstanding and unpaid and that are attributable to or charged against the interest of the Operator pursuant to this Agreement.

Security Interest in Favor of the Non-Operators. To secure the complete and timely performance of and payment by the Operator of all obligations and indebtedness of every kind and nature, whether now owed by the Operator or hereafter arising, pursuant to this Agreement, the Operator hereby grants to Non-Operator a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Lease or included within the Lease or attributable to the Lease when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Platforms and Processing Facilities, wells, fixtures, other corporeal property whether movable or immovable, whether now or hereafter placed on the offshore blocks covered by the Lease or maintained or used in connection with the ownership, use or exploitation of the Lease, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof. The interest of the Operator in and to the oil and gas produced from or attributable to the Lease when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease. To the extent susceptible under applicable law, the security interest granted by the Operator hereunder covers: (A) all substitutions, replacements, and accessions to the property of the Operator described herein and is intended to cover all of the rights, titles and interests of the Operator in all movable property now or hereafter located upon or used in connection with the Lease, whether corporeal or incorporeal; (B) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Operator in connection with the Lease, the oil and gas produced from or attributable to the Lease, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of the Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Lease; and (C) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of the Operator in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease, including the following:

(A)   all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to and under or derived from any present or future operating, farm out bidding, pooling, unitization and communitization agreements, assignments and subleases, whether or not described in Exhibit "A-1", to the extent, and only to the extent, that such agreements, assignments and subleases cover or include any of its rights, titles and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease, and all units created by any such pooling, unitization and communitization agreements and all units formed under orders, regulations, rules or other official acts of any

governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Lease.

(B) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A," to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Lease; and

(C) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Lease.

5.0 To provide evidence of, and to further perfect the Parties' security rights created hereunder, upon request, each Party shall execute and acknowledge the Memorandum of Operating Agreement and Financing Statement attached as Exhibit "F" (the "Memorandum of Operating Agreement and Financing Statement) in multiple counterparts as appropriate. The Parties authorize the Operator to file the Memorandum of Operating Agreement and Financing Statement in the public records set forth below to serve as notice of the existence of this Agreement as a burden on the title of the Operator and the Non-Operator to their interests in the Lease and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law and to attach an original of the Memorandum of Operating Agreement and Financing Statement to a standard UCC-1 for filing in the UCC records set forth below to perfect the security interests created by the Parties in this Agreement. Upon the acquisition of a leasehold interest in the Lease, the Parties shall, within five business days following request by one of the Parties hereto, execute and furnish to the requesting Party for recordation such a Memorandum of Operating Agreement and Financing Statement describing such leasehold interest. Such Memorandum of Operating Agreement and Financing Statement shall be amended from time to time upon acquisition of additional leasehold interests in the Lease, and the Parties shall, within five business days following request by one of the Parties hereto, execute and furnish to the requesting Party for recordation any such amendment.

The Memorandum of Operating Agreement and Financing Statement is to be filed or recorded, as the case may be, in (a) the conveyance records of the county or counties, parish or parishes adjacent to the lands or offshore blocks covered by the Lease or contained within the Lease, (b) the mortgage records of such county or counties, parish or parishes, and (c) the appropriate Uniform Commercial Code records.

6.0 If payment of any indebtedness created under the Operating Agreement is not made when due under the Operating Agreement, in addition to any other remedy afforded by law, each Party to the Operating Agreement and any successor to such Party by assignment, operation of law, or otherwise, shall have, and is hereby given and vested with, the power and authority to foreclose the lien and security interest established in its favor in the Operating Agreement in the manner provided by law or therein and to exercise all rights of a secured party under the Uniform Commercial Code.

7.0 Upon expiration of the Operating Agreement and the satisfaction of all obligations and indebtedness established thereunder, on behalf of all Parties to the Operating Agreement, the Operator and the Non-Operator, as appropriate, shall file of record an appropriate release and termination of all security and other rights created under the Operating Agreement and this Memorandum. Upon the filing of such release and termination instrument, all benefits and obligations under this Memorandum shall terminate as to all Parties who have executed or ratified this Memorandum. In addition, at any time prior to the filing of such release and termination instrument, the Operator and the Non-Operator shall have the right to file a continuation statement pursuant to the Uniform Commercial Code with respect to any financing statement filed in their favor under the terms of this Memorandum.

3

8.0    It is understood and agreed by the Parties hereto that if any part, term, or provision of this Memorandum is held by the courts to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Memorandum did not contain the particular part, term or provision held to be invalid.

9.0    This Memorandum shall be binding upon and shall inure to the benefit of the Parties hereto and to their respective legal representatives, successors and permitted assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who execute this Memorandum.

10.0   A Party having an interest in the Contract Area may ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and such ratification shall have the same effect as if the ratifying Party had executed this Memorandum or a counterpart thereof. By execution or ratification of this Memorandum, each Party hereby consents to its ratification and adoption by any Party who acquires or may acquire any interest in the Contract Area.

11.0   The Operator and the Non-Operator hereby agree to execute, acknowledge and deliver or cause to be executed, acknowledged and delivered any instrument or take any action necessary or appropriate to effectuate the terms of the Operating Agreement or any Exhibit, instrument, certificate or other document pursuant thereto.

12.0    Whenever the context requires, reference herein made to the single number shall be understood to include the plural, and the plural shall likewise be understood to include the singular, and specific enumeration shall not exclude the general, but shall be construed as cumulative.

EXECUTED on the dates set forth below each signature but effective as of the 23rd day of December, 2011.

OPERATOR:

WITNESSES:                          ANKOR Energy LLC

_____                 By: _____
Printed: _____                 Name:
                                    Title:
_____
Printed: _____


NON-OPERATORS:

WITNESSES:                          ANKOR E&P Holdings Corporation

_____                 By: _____
Printed: _____                 Name:
                                    Title:
_____
Printed: _____


WITNESSES:                          STX Energy E&P Offshore Management, LLC

_____                 By: _____
Printed: _____                 Name:
                                    Title:
_____
Printed: _____

Unofficial Copy Office of Marilyn Burgess District Clerk

6

NON-OPERATORS:

WITNESSES:                                    SCL Resources, LLC

_____          By: _____
Printed: _____       Name: _____
                                        Title: _____
Printed: _____

ACKNOWLEDGMENT
OPERATOR:

STATE OF LOUISIANA §
PARISH OF ORLEANS §

On this _____ day of _____, 20__, before me appeared _____, to me personally known, who, being by me duly sworn, did say that he is the _____ of ANKOR ENERGY LLC and that said instrument was signed on behalf of said company by authority of its Board of Directors and said appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal of the day and year first above written.

_____
Notary Public

ACKNOWLEDGMENT
NON-OPERATORS:

STATE OF LOUISIANA        §
PARISH OF ORLEANS        §

BEFORE ME, the undersigned authority, on this _____ day of _____, 2012, personally appeared _____, to me personally known, who, being by me duly sworn, did say that he is the _____ of ANKOR E&P HOLDINGS CORPORATION and that said instrument was signed on behalf of said company by authority of its Board of Directors and said appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal of the day and year first above written.

_____
Notary Public

## ACKNOWLEDGMENT
## NON-OPERATORS

STATE OF _____ §
_____ OF _____ §


BEFORE ME, the undersigned authority, on this _____ day of _____ 2012, personally appeared _____, to me personally known, who, being by me duly sworn, did say that he is the _____ of STX Energy E&P Offshore Management, LLC and that said instrument was signed on behalf of said company by authority of its Board of Directors and said appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal of the day and year first above written.


_____
Notary Public


STATE OF _____ §
_____ OF _____ §


BEFORE ME, the undersigned authority, on this _____ day of _____ 2012, personally appeared _____, to me personally known, who, being by me duly sworn, did say that he is the _____ of SCL Resources, LLC and that said instrument was signed on behalf of said company by authority of its Board of Directors and said appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal of the day and year first above written.


_____
Notary Public

Unofficial Copy Official of Marilyn Burgess District Clerk

8

ATTACHMENT "I"

Attached to and made a part of the Memorandum of Operating Agreement and Financing
Statement (Louisiana) dated effective December 23, 2011, by and between ANKOR Energy LLC, as
Operator and ANKOR E&P Holdings Corporation, STX Energy E&P Offshore Management, LLC,
and SCL Resources, LLC, as Non-Operator

I.    DESCRIPTION OF LANDS AND LEASES WITHIN THE CONTRACT AREA

SEE ATTACHMENT "I-A" ATTACHED.

II.    INTERESTS OF THE PARTIES IN THE CONTRACT AREA:

|  | W.I. |
|---|---|
| ANKOR E&P Holdings Corporation | 67.00% |
| STX Energy E&P Offshore Management, LLC | 18.00% |
| SCL Resources, LLC | 15.00% |
|  | 100.00% |

**Exceptions to the above ownership:**

| Mobile Area, Block 870, OCS-G 5068 | W.I. |
|---|---|
| ANKOR E&P Holdings Corporation | 72.91% |
| STX Energy E&P Offshore Management LLC | 19.59% |
| SCL Resources, LLC | 7.50% |
|  | 100.00% |

III.    THE OPERATOR FOR THE LEASE SHALL BE:

ANKOR Energy LLC

IV.    NOTIFICATION AND ADDRESSES OF THE DESIGNATED REPRESENTATIVES
    ARE AS FOLLOWS:

**ANKOR Energy LLC**
1615 Poydras Street, Suite 1100
New Orleans, Louisiana  70112
Attention:  Mr. Frank D. Barber, III
Telephone:  504-595-3739
Fax:  504-595-3762
Email:  fbarber@ankorenergy.com

**STX Energy E&P Offshore Management, LLC**
1555 Poydras Street, Suite 1720
New Orleans, LA  70112
Attention:  Dongwon Kim, Ph.D.
Telephone:  504-529-3335
Fax:  504-529-3339
Email:  kdong5230@onestx.com
Email:  kdong5230@gmail.com

**ANKOR E&P Holdings Corporation**
1615 Poydras Street, Suite 2000
New Orleans, Louisiana  70112
Attention:  Mr. Ilkwon Cho
Telephone:  504-587-6503
Fax:  504-587-6510
Email:  ikcho@knoc.co.kr

**SCL Resources, LLC**
840 Roosevelt 2FI
Irvine, CA  92620
Attention:  Ms. Susana Rivera
Telephone:  949-812-1074
Fax:  949-390-5752
Email:  susanar@samchully.co.kr

ATTACHMENT "1-A"

Attached to and made a part of the Memorandum of Operating Agreement and Financing
Statement (Louisiana) dated effective December 23, 2011, by and between ANKOR Energy LLC, as
Operator and ANKOR E&P Holdings Corporation, STX Energy E&P Offshore Management, LLC,
and SCL Resources, LLC, as Non-Operator

**(1) Oil and gas leases and/or oil and gas interests subject to this agreement:**

Lease No.:          OCS-G 26032
Area/Block:         Eugene Island Block 208 (E/2)
Lease Date:         7/1/04
Lessor:             United States of America
Original Lessee:    Pioneer Natural Resources USA, Inc.
Lease/Aliquot Description:   **Record Title** being the E/2 of Block 208, Eugene Island Area.
Ownership Rights:   Record Title

Lease No.:          OCS- 0577
Area/Block:         Eugene Island Block 208 (W/2)
Lease Date:         9/1/55
Lessor:             United States of America
Original Lessee:    Continental Oil Company, et al
Lease/Aliquot Description:   **Record Title** in the W/2 of Block 208, Eugene Island Area, LESS AND
EXCEPT the Operating Rights in the N/2 from 11,732'TVD and below.
Ownership Rights:   Record Title

Lease No.:          OCS-G 5068
Area/Block:         Mobile Area Block 870
Lease Date:         4/1/82
Lessor:             United States of America
Original Lessee:    Placid Oil Company
Lease/Aliquot Description:   **Operating Rights** in that portion of Block 870, Mobile Area,
INSOFAR AND ONLY INSOFAR as to those depths above the stratigraphic equivalent of 100'
below the depths of 2,358 feet subsea as encountered in the Santa Fe International Corporation
OCS-G 5068, Well No. 1.
Ownership Rights:   Operating Rights

Lease No.:          OCS-G 33663
Area/Block:         South Pelto 12
Lease Date:         7/1/10
Lessor:             United States of America
Original Lessee:    Northstar Offshore Energy Partners, LLC
Lease/Aliquot Description:   **Record Title** in the E/2 of Block 12, South Pelto Area.
Ownership Rights:   Record Title

Lease No.:          OCS-G 13686
Area/Block:         Vermilion Block 379
Lease Date:         8/1/92
Lessor:             United States of America
Original Lessee:    Sun Operating Limited Partnership, et al
Lease/Aliquot Description:   **Record Title** in all of Block 379, Vermilion Area, South Addition.
Ownership Rights:   Record Title

10

Lease No.: OCS-G 10584
Area/Block: West Cameron 431
Lease Date: 5/1/89
Lessor: United States of America
Original Lessee: Pelto Oil Company
Lease/Aliquot Description: **Operating Rights** as to the N/2 SE/4 NE/4 of Block 431, West Cameron Area, West Addition, INSOFAR AND ONLY INSOFAR as to those depths from 6,000' down to 12,500' TVD.
Ownership Rights: Operating Rights
Lease/Aliquot Description: **Contractual Rights** as to the N/2 N/2 from 100' below the stratigraphic equivalent of 6,500' Sand  as seen in the log for the Hall-Houston Oil Company OCS-G 10584 Well No. A-3 between the depths of 6,478' and 6,483' TVD, down to 6,809' TVD; and further, 6,809' TVD to 20,000' TVD.
Ownership Rights: Contractual Rights
Lease/Aliquot Description: **Overriding Royalty Interest** reserved only as to the N/2 N/2 from the surface to 100' below the stratigraphic equivalent of 6,500' TVD.
Ownership Rights: Overriding Royalty Interest


Lease No.: OCS-G 15277
Area/Block: Ship Shoal 79
Lease Date: 8/1/93
Lessor: United States of America
Original Lessee: Enron Oil & Gas Company
Lease/Aliquot Description: **Record Title** in all of Block 79, Ship Shoal Area, LESS AND EXCEPT the Operating Rights from the surface to one hundred feet below the stratigraphic equivalent of 11,318' TVD.
Ownership Rights: Record Title
Lease/Aliquot Description: **Overriding Royalty Interest** reserved as to those depths from the surface to 100' below the stratigraphic equivalent of 11,318' TVD.
Ownership Rights: Overriding Royalty Interest

EXHIBIT "G"

Attached to and made a part of that certain Operating Agreement dated effective
December 23, 2011, between ANKOR Energy LLC, as Operator,
and ANKOR E&P Holdings Corporation, STX Energy E&P Offshore Management, LLC, and SCL Resources LLC,
as Non-Operators.

## CONTRIBUTION AND REIMBURSEMENT AGREEMENT

THIS CONTRIBUTION AND REIMBURSEMENT AGREEMENT
("Agreement") is entered into as of November 30, 2011 by and among ANKOR E&P Holdings
Corporation, a Delaware corporation ("ANKOR"), STX ENERGY E&P OFFSHORE
MANAGEMENT, LLC, a Texas limited liability company ("STX"), and SCL RESOURCES,
LLC, a Texas limited liability company ("SCL", and together with ANKOR and STX,
collectively, "Contributors") for the purpose of establishing rights and obligations of contribution
among the Contributors.

## RECITALS

WHEREAS, Contributors have, concurrently herewith, entered into that certain
Purchase and Sale Agreement with Northstar Offshore Energy Partners, LLC, a Delaware limited
liability company ("Seller") dated as of November 30, 2011 (the "Purchase Agreement"), it being
the intention of the Contributors to benefit by collectively entering into the Purchase Agreement
and agreeing to purchase different undivided Proportionate Shares of the Assets of the Seller
described therein on a basis under which they share joint and several liability to the Seller for
certain obligations thereunder, including certain Assumed Obligations which will remain
outstanding and continue to arise after the Closing Date, in order to obtain and procure terms and
conditions which are more beneficial to each Contributor than would be available to each
Contributor if it had entered into a similar transaction alone;

WHEREAS, the Contributors will each be liable for the full performance and
payment of certain obligations due under the Purchase and Sale Agreement Note (the "Joint and
Several Obligations"), but will be only severally liable to the Seller for the payment of their
respective Proportionate Shares of the Purchase Price and the Deposit more fully described
therein (the "Several Obligations");

WHEREAS, since Contributors will each benefit from the transactions
contemplated by the Purchase Agreement and in consideration thereof desire to enter into this
Agreement to provide a fair and equitable arrangement to make contributions in the event
payments to Seller or any third party of the Joint and Several Obligations are made by any one or
more Contributor or in the event that one or more of them is forced to make payment of any Sole
Obligations of any Defaulting Contributor as such terms are herein defined; and

NOW, THEREFORE, in consideration of the foregoing premises and for other
good and valuable consideration, the receipt of which is hereby acknowledged, Contributors
hereby agree as follows:

SECTION 1. **Defined Terms.** All capitalized terms used in this Agreement and
not otherwise defined in this Agreement shall have the meanings ascribed to them in the
Purchase Agreement.

SECTION 2. **Contribution.** In order to provide for just and equitable contribution
among Contributors if any payment is made by a Contributor in satisfaction of any Joint and

Several Obligation under the Purchase Agreement, the Contributor paying any such amount (the "Payor") shall be entitled to a contribution from the other Contributors for all payments, damages and expenses incurred by that Payor in discharging that Joint and Several Obligation, in the manner and to the extent set forth in this Agreement. Any amount payable as contribution under this Agreement shall be determined as of the date on which the related payment is made by a Payor and shall not include any consequential and indirect damages.

SECTION 3. **Contribution Obligation.** Each Contributor who is not a Payor shall be liable to the Payor in an aggregate amount equal to its Proportionate Share of the total amount of Joint and Several Obligations paid for by the Payor, plus interest thereon at the Prime Rate per annum, adjusted daily, plus two percent (2%) until paid in full, plus all costs of collection including reasonable attorney's fees. For purposes hereof, "Prime Rate" shall mean the Prime Rate published or announced from time to time by JPMorgan Chase Bank, N.A, or any successor bank as its base lending rate to corporate customers, or if same cannot be determined, the Prime Rate published in the *Wall Street Journal* as the base lending rate for the largest banks in the United States.

SECTION 4. **Payment of Indemnity** Claims. Any Payor paying a claim against Buyers under Section 13.3 of the Purchase Agreement (an "Indemnity Claim") shall have a right of contribution hereunder against the other Contributors unless (i) the other Contributors have been given the right to participate in the settlement and defense of such claim under the procedures set forth in Section 13.7 of the Purchase Agreement, or (ii) the payment is made with the written consent of the other Contributors, unless the payment was made by the Payor in response to a final, non-appealable judgment against the Payor in a court of competent jurisdiction.

SECTION 5. **Payment of a Sole Obligation of a Defaulting Contributor.** In the event that any Indemnity Claim relates to a matter which arises out of the sole act, omission, default or breach of representation of any one or more Contributor (a "Defaulting Contributor"), or in the event of the loss of a non-defaulting Contributor's Proportionate Share of the Deposit or other loss resulting from the termination of the Purchase Agreement for such reason (a "Sole Obligation"), any Payor forced to pay such other one or more Defaulting Contributor's Sole Obligation shall be entitled to full reimbursement from the Defaulting Contributor(s) whose acts, omissions, defaults or breach of representation created such Sole Obligation, and each Defaulting Contributor(s) shall be jointly and severally liable for full reimbursement to the non-defaulting Contributor(s) suffering such loss of its Proportionate Share of the Deposit or forced to pay a Sole Obligation. Any Payor of a Sole Obligation shall be entitled to full reimbursement from the Defaulting Contributor(s) for the amounts of the Sole Obligation paid plus interest thereon at the Prime Rate per annum, adjusted daily, plus two percent (2%) until paid in full, plus all costs of collection including reasonable attorney's fees.

SECTION 6. **Allocation.** If at any time there exists more than one Payor with respect to any Joint and Several Obligation or with respect to any Sole Obligation of another Contributor, then payment from other Contributor(s) pursuant to this Agreement shall be allocated among such Payors in proportion to the total amount of money paid for or on account of the Contributors by each such Payor.

SECTION 7. **Payment of Working Expenses.** This Agreement shall not apply to any Assumed Obligation which consists of an obligation to pay working expenses associated

with the Assets which are owned in common with other working interest owners, and which may be governed by separate joint operating agreements assumed as a result of the Purchase Agreement. As to any Assets acquired which prior to Closing were solely owned by Seller, this Agreement shall apply to the sharing of working expenses in their Proportionate Share unless the Parties will enter into a mutually agreeable joint operating agreement. Contributors, each a purchaser of an undivided interest in Seller's right, title and interest in and to the Assets, acknowledge that the liability of the parties in the development and operation of the Assets as among themselves, shall be several, and not joint or collective. It is not the intention of the parties to this letter agreement to create, nor shall the joint ownership of undivided interests in the Assets be construed as creating a mining or other partnership or association, or to render the parties liable as partners. Notwithstanding any provision herein that the rights and liabilities as among themselves are several, and not joint or collective, or that the development and operation of the Assets by the parties shall not constitute a partnership, if, for federal income tax purposes, the development and operation of the Assets are regarded as a partnership, then each party to this letter agreement elects to be excluded from the application of all of the provisions of subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended (the "Code"), as permitted by section 761 of the Code and the regulations promulgated thereunder. Each party hereto agrees that it will not give any notices or take any other action inconsistent with this election and will execute such documents and furnish such other evidence as may be required by the U.S. Internal Revenue Service or as may be necessary to evidence this election. In making this election, each party agrees that the income derived by such party from the development and operation of the Assets can be adequately determined with the computation of partnership taxable income.

SECTION 8. **Co-Ownership of BOEM Rights-of-Way**. The parties acknowledge that certain of the Assets acquired from Seller consist of rights of way in which only one record owner may be filed of record with the BOEM at any time. Accordingly, those rights of way will be conveyed at Closing solely to ANKOR, and ANKOR shall be designated as the operator of those rights of way. ANKOR agrees that it will hold title to such rights of way for the benefit of itself and the other Contributors with each to have a beneficial interest in and to their Proportionate Share thereof. ANKOR agrees that it shall not convey or encumber any such rights of way to which it holds title for the benefit of the Contributors without making any such conveyance or encumbrance expressly subject to the prior beneficial interests of the other Contributors. Otherwise, ANKOR shall have no liability to any of the other Contributors for any acts or omissions in any way related to its holding title to the BOEM rights of way pursuant to this Agreement except by reason of acts or omissions constituting gross negligence or fraud. Each Contributor agrees to bear its Proportionate Share of any and all expenses associated with the ownership and operation of such rights of way and that all such costs and expenses shall be a Joint and Several Obligations.

SECTION 9. **No Joint Venture or Fiduciary Duties**. Each of the Contributors has made its own decision, after obtaining independent advice of its own counsel, to enter into the Purchase Agreement and to acquire the Assets in common with the other Contributors, and understand that it shall be fully responsible for all incidents of ownership of its Proportionate Share of the Assets and all risks of loss associated therewith. Nothing contained herein shall be construed to make the Contributors joint venturers or partners. Nothing contained herein shall be construed to create any fiduciary duty on the part of any Contributor to any other Contributor, nor shall anything contained herein be deemed to create any contractual obligations owed by any Contributor to the others except as expressly set forth herein.

SECTION 10. **Preservation of Rights.** This Agreement shall not limit any right which any Contributor may have against any other Person which is not a party hereto.

SECTION 11. **No Third Party Beneficiaries.** The parties intend that this Agreement shall be for the sole and exclusive benefit of the Contributors stated herein (and for the benefit of the successors and assigns, if any, specified in Section 13 below) and for no other party. There are no third party beneficiaries of this Agreement.

SECTION 12. **Successor and Assigns.** Except as expressly otherwise provided in this Section 12, this Agreement shall be binding upon each party hereto and its respective successors and assigns and shall inure to the benefit of the parties hereto and their respective successors and assigns.

SECTION 13. **Termination and Amendment.** This Agreement, as it may be modified or amended from time to time, shall remain in effect, and terminate two years after Closing unless the Seller has a pending claim for indemnity or a Contributor has a claim in which case the Agreement will terminate when such claims are resolved by a final nonappealable judgment. No amendment of this Agreement shall be effective without the express written consent of each Contributor (or its successor in interest) and any purported amendment entered into without the written consent of each Contributor (or its successor in interest) shall be null, void and of no force or effect. Provided, however, that Section 8 Co-Ownership of BOEM Rights-of-Way will survive and will be considered a covenant running with the land.

SECTION 14. **CHOICE OF LAW.** THIS AGREEMENT, AND ANY INSTRUMENT OR AGREEMENT REQUIRED HEREUNDER, SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

SECTION 15. **Counterparts.** This Agreement, and any modifications or amendments hereto may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original for all purposes, but all such counterparts shall constitute but one and the same instrument.

SECTION 16. **Headings.** Headings contained in this Agreement are for referenced purposes only and shall not effect in any way the meaning or interpretation of this Agreement.

SECTION 17. **Severability.** If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated. It is hereby stipulated and declared to be the intention of the parties that they will have executed the remaining terms, provisions, covenants and restrictions contained in this Agreement without including any of those which may be hereafter declared invalid, void or unenforceable.

SECTION 18. **Effectiveness.** This Agreement shall become effective as to all parties upon execution hereof by each such party and delivery of executed counterparts hereof by them to any one or more of Contributors.

IN WITNESS WHEREOF, the undersigned parties have caused this Agreement to be duly executed as of the day and year first written above.

ANKOR E&P HOLDINGS CORPORATION

By: _____
Name:
Title:

STX ENERGY E&P OFFSHORE MANAGEMENT, LLC

By: _____
Name:
Title:

SCL RESOURCES, LLC

By: _____
Name:
Title:



Unofficial Copy Office of Marilyn Burgess District Clerk

**EXHIBIT 2**



## Settlement Statement

ANKOR Energy LLC
1615 Poydras, Suite 1100,
New Orleans, LA 70112
(504)596-3700

SANARE ENERGY PARTNERS, LLC
ATTN: MR. AVERY ALCORN
777 N. ELDRIDGE PARKWAY, STE 300
HOUSTON, TX,77079

| | |
|---|---|
| Account : | 80000040 |
| Date : | 9/9/2022 |
| Period : | Aug-22 |

**Prepaid Balance by Project:**

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pre-Pavts | Pre-Prata Applied | Balance Remain |
|---|---|---|---|---|---|---|---|
| AN1616 | CPX | | Eugene Island 57, PLTF (Platform) | 0.00 | 595,870.26 | 0.00 | 595,870.26 |
| | | | Total | 0.00 | 595,870.26 | 0.00 | 595,870.26 |

**Summary by Lease:**

| Property No. | Equity Type | Description | Net Income | Expense | Pre-Prats Applied | You Owe | Overdue | To You | Payout |
|---|---|---|---|---|---|---|---|---|---|
| AN1001 | CPX | Eugene Island 208 (Platf) | 0.00 | 127,731.32 | 0.00 | 127,731.32 | 0.00 | 0.00 | 0.00 |
| AN1002 | CPX | Eugene Island 208,PLTF-E (Platform) | 0.00 | 150,006.38 | 0.00 | 150,006.38 | 0.00 | 0.00 | 0.00 |
| AN1003 | LOE | Eugene Island 208,E-8(Well) | 0.00 | 811.31 | 0.00 | 811.31 | 0.00 | 0.00 | 0.00 |
| AN1008 | CPX | Eugene Island 208,PLTF-J(Platform) | 0.00 | 12,403.81 | 0.00 | 12,403.81 | 0.00 | 0.00 | 0.00 |
| AN1010 | LOE | Eugene Island 208,J-1DST-1 (Well) | 0.00 | -2,777.34 | 0.00 | -2,777.34 | 0.00 | 0.00 | 0.00 |
| AN1012 | LOE | Eugene Island 208,J-3(Well) | 0.00 | -142.50 | 0.00 | -142.50 | 0.00 | 0.00 | 0.00 |
| AN1019 | LOE | Eugene Island 208,J-5ST-1 (Well) | 0.00 | -187.50 | 0.00 | -187.50 | 0.00 | 0.00 | 0.00 |
| AN1022 | CPX | Eugene Island 208,PLTF-K (Platform) | 0.00 | 9,116.33 | 0.00 | 9,116.33 | 0.00 | 0.00 | 0.00 |
| AN1052 | CPX | Vermilion 379,PLTF-A(Platform) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AN1054 | LOE | Vermilion 379,A-2BT-1(Well) | 0.00 | 3,103.99 | 0.00 | 3,103.99 | 0.00 | 0.00 | 0.00 |
| AN1056 | LOE | Vermilion 379,A-4BT-1(Well) | 0.00 | 52.50 | 0.00 | 52.50 | 0.00 | 0.00 | 0.00 |
| AN1057 | LOE | Vermilion 379,A-5BT-1(Well) | 0.00 | 52.50 | 0.00 | 52.50 | 0.00 | 0.00 | 0.00 |
| | | Total | 0.00 | 297,870.65 | 0.00 | 297,870.65 | 0.00 | 0.00 | 0.00 |

| Owner No. | Check No./Date | Gross Revenue | Working | Royalty | Deductions | Withholding | Pmt Amount |
|---|---|---|---|---|---|---|---|
| SANARE ENE | 00/00/0000 | Check Totals: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | YTD Totals: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Unofficial Copy Office of Marilyn Burgess District Clerk

# Settlement Statement



Unofficial Copy Office of Laura Burgess District Clerk



Unofficial Copy Office of Marilyn Burgess District Clerk



## Settlement Statement

ANKOR Energy LLC
1615 Poydras, Suite 1100,
New Orleans,LA 70112
(504)599-3700

SANARE ENERGY PARTNERS, LLC
ATTN: MR. AVERY ALCORN
777 N. ELDRIDGE PARKWAY, STE 300
HOUSTON, TX 77079

| | | |
|---|---|---|
| Account : | | 80000240 |
| Date : | | 12/14/2022 |
| Period : | | Nov-22 |

**Prepaid Balance by Project:**

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pre-Pmts | Pre-Pmts Applied | Balance Remain. |
|---|---|---|---|---|---|---|---|
| | | | Total | 0.00 | 0.00 | 0.00 | 0.00 |

**Summary by Lease:**

| Property No. | Equity Type | Description | Net Income | Expense | Pre-Pmts Applied | You Owe | Overdue | To You | Pay out |
|---|---|---|---|---|---|---|---|---|---|
| AN1001 | CPX | Eugene Island 208-'Unit' | 0.00 | 189,827.36 | 0.00 | 189,827.36 | 565,940.70 | 0.00 | 0.00 |
| AN1002 | CPX | Eugene Island 208,PLTF-E-Platform | 0.00 | 0.00 | 0.00 | 0.00 | 238,794.29 | 0.00 | 0.00 |
| AN1003 | LOE | Eugene Island 208,E-8 (Well) | 0.00 | 1,489.66 | 0.00 | 1,489.66 | 5,280.98 | 0.00 | 0.00 |
| AN1008 | CPX | Eugene Island 208,PLTF-J-Platform | 0.00 | 0.00 | 0.00 | 0.00 | 76,281.59 | 0.00 | 0.00 |
| AN1010 | LOE | Eugene Island 208-J-1OST-1(Well) | 0.00 | 421.85 | 0.00 | 421.85 | 5,847.39 | 0.00 | 0.00 |
| AN1022 | CPX | Eugene Island 208,PLTF-K-Platform | 0.00 | 0.00 | 0.00 | 0.00 | 39,139.51 | 0.00 | 0.00 |
| AN1027 | CPX | Eugene Island 208-K-4(Well) | 0.00 | 0.00 | 0.00 | 0.00 | 896.76 | 0.00 | 0.00 |
| AN1051 | CPX | Vermilion 379,Field | 0.00 | 817.20 | 0.00 | 817.20 | 987.60 | 0.00 | 0.00 |
| AN1054 | LOE | Vermilion 379,A-2SS1-1 (Well) | 0.00 | 3,495.00 | 0.00 | 3,495.00 | 16,400.93 | 0.00 | 0.00 |
| AN1056 | LOE | Vermilion 379,A-4ST-1(Well) | 0.00 | 0.00 | 0.00 | 0.00 | 7,832.84 | 0.00 | 0.00 |
| AN1057 | LOE | Vermilion 379,A-5ST-1(Well) | 0.00 | 0.00 | 0.00 | 0.00 | 7,852.88 | 0.00 | 0.00 |
| | | Parent Guarantee Fee | | | | | 16,513.00 | | |
| | | **Total** | **0.00** | **196,118.46** | **0.00** | **196,118.46** | **929,646.42** | **0.00** | **0.00** |

| Owner No. | Check No./Date | Gross Revenue | Working | Royalty | Deductions | Withholding | Pmt Amount |
|---|---|---|---|---|---|---|---|
| SANARE ENR | | Check Totals: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 00/00/0000 | YTD Totals: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Unofficial Copy Office of Marilyn Burgess District Clerk

## Settlement Statement

ArkKOR Energy LLC
1615 Poydras, Suite 1100,
New Orleans,LA 70112
(504)596-3705

SANARE ENERGY PARTNERS, LLC
ATTN: MR. AVERY ALCORN
777 N. ELDRIDGE PARKWAY, STE.300
HOUSTON, TX.77079

| | |
|---|---|
| Account : | 600000240 |
| Date : | 1/6/2023 |
| Period : | Dec-22 |

**Prepaid Balance by Project:**

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pre-Pmts | Pre-Pmts Applied | Balance Remain. |
|---|---|---|---|---|---|---|---|
| | | | Total | 0.00 | 0.00 | 0.00 | 0.00 |

**Summary by Lease:**

| Property No. | Equity Type | Description | Net Income | Expense | Pre-Pmts Applied | You Owe | Overdue | To You | Pay out |
|---|---|---|---|---|---|---|---|---|---|
| AN1001 | OPX | Eugene Island 208 Field | 0.00 | 148,315.39 | 0.00 | 148,315.39 | 724,966.90 | 0.00 | 0.00 |
| AN1002 | OPX | Eugene Island 208,PLTF-E(Platform) | 0.00 | 911.25 | 0.00 | 911.25 | 236,704.29 | 0.00 | 0.00 |
| AN1003 | LOE | Eugene Island 208 E-8(Well) | 0.00 | 1,842.14 | 0.00 | 1,842.14 | 10,737.89 | 0.00 | 0.00 |
| AN1008 | OPX | Eugene Island 208,PLTF-J(Platform) | 0.00 | 0.00 | 0.00 | 0.00 | 96,281.68 | 0.00 | 0.00 |
| AN1010 | LOE | Eugene Island 208,J-1(3ST-1 Well) | 0.00 | 1,842.14 | 0.00 | 1,842.14 | 6,298.34 | 0.00 | 0.00 |
| AN1022 | OPX | Eugene Island 208,PLTF-K(Platform) | 0.00 | 0.00 | 0.00 | 0.00 | 29,129.61 | 0.00 | 0.00 |
| AN1028 | LOE | Eugene Island 208,K-1(Well) | 0.00 | 820.67 | 0.00 | 820.67 | 996.78 | 0.00 | 0.00 |
| AN1029 | LOE | Eugene Island 208,K-7D(Well) | 0.00 | 96.51 | 0.00 | 96.51 | 786.00 | 0.00 | 0.00 |
| AN1051 | OPX | Vermilion 379 (Field) | 0.00 | 0.00 | 0.00 | 0.00 | 786.00 | 0.00 | 0.00 |
| AN1054 | LOE | Vermilion 379,A-2ST-1 Well) | 0.00 | 18,497.66 | 0.00 | 18,497.66 | 19,896.91 | 0.00 | 0.00 |
| AN1056 | LOE | Vermilion 379,A-4ST-1(Well) | 0.00 | 0.00 | 0.00 | 0.00 | 7,832.66 | 0.00 | 0.00 |
| AN1087 | LOE | Vermilion 379,A-5ST-1(Well) | 0.00 | 0.00 | 0.00 | 0.00 | 7,832.86 | 0.00 | 0.00 |
| | | Parent Guarantee Fee | | | | | 16,613.80 | | |
| | | **Total** | 0.00 | 172,321.86 | 0.00 | 172,321.86 | 1,664,796.86 | 0.00 | 0.00 |

| Owner No. | Check No./Date | Gross Revenue | Working | Royalty | Deductions | Withholding | Pmt Amount |
|---|---|---|---|---|---|---|---|
| SANARE ENE | 01/06/2023 | Check Totals: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | YTD Totals: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Unofficial Copy Office of Marilyn Burgess District Clerk



# Settlement Statement

ANKOR Energy LLC
1615 Poydras, Suite 1100
New Orleans LA 70112
(504)596-3700

SANARE ENERGY PARTNERS, LLC
ATTN: MR. AVERY ALCORN
777 N. ELDRIDGE PARKWAY, STE 300
HOUSTON, TX 77079

Account : 50000040
Date : 2/14/2023
Period : Jan-23

**Prepaid Balance by Project:**

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pre-Pmts | Pre-Pmts Applied | Balance Remain. |
|---|---|---|---|---|---|---|---|
| | | Total | | 0.00 | 0.00 | 0.00 | 0.00 |

**Summary by Lease:**

| Property No. | Equity Type | Description | Net Income | Expense | Pre-Pmts Applied | You Owe | Overdue | To You | Pay out |
|---|---|---|---|---|---|---|---|---|---|
| AN1001 | CPX | Eugene Island 208-Field | 0.00 | 63,264.25 | 0.00 | 63,264.25 | 873,195.05 | 0.00 | 0.00 |
| AN1002 | CPX | Eugene Island 208,PLTF-E Platform | 0.00 | 335.00 | 0.00 | 335.00 | 236,515.54 | 0.00 | 0.00 |
| AN1008 | LOE | Eugene Island 208,E-8 Well | 0.00 | 1,123.82 | 0.00 | 1,123.82 | 12,573.73 | 0.00 | 0.00 |
| AN1018 | CPX | Eugene Island 208,PLTF-J Platform | 0.00 | 0.00 | 0.00 | 0.00 | 38,281.58 | 0.00 | 0.00 |
| AN1010 | LOE | Eugene Island 208,J-1DST-1 Well | 0.00 | 1,825.62 | 0.00 | 1,825.62 | 6,111.95 | 0.00 | 0.00 |
| AN1022 | CPX | Eugene Island 208,PLTF-K Platform | 0.00 | 0.00 | 0.00 | 0.00 | 28,189.61 | 0.00 | 0.00 |
| AN1023 | LOE | Eugene Island 208,K-1 Well | 0.00 | 531.23 | 0.00 | 531.23 | 1,719.60 | 0.00 | 0.00 |
| AN1023 | LOE | Eugene Island 208,K-7D Well | 0.00 | 0.00 | 0.00 | 0.00 | 95.61 | 0.00 | 0.00 |
| AN1051 | CPX | Vermilion 379-Field | 0.00 | 0.00 | 0.00 | 0.00 | 784.80 | 0.00 | 0.00 |
| AN1084 | LOE | Vermilion 379,A-23T-1 Well | 0.00 | 3,465.16 | 0.00 | 3,465.16 | 38,363.58 | 0.00 | 0.00 |
| AN1085 | LOE | Vermilion 379,A-45T-1 Well | 0.00 | 5.41 | 0.00 | 5.41 | 7,633.84 | 0.00 | 0.00 |
| AN1087 | LOE | Vermilion 379,A-45T-1 Well | 0.00 | 5.41 | 0.00 | 5.41 | 7,633.88 | 0.00 | 0.00 |
| | | Percent Guarantee Fee | | | | | 16,913.89 | | |
| | | Total | 0.00 | 70,845.76 | 0.00 | 70,845.79 | 1,287,075.84 | 0.00 | 0.00 |

| Owner No. | Check No./Date | Gross Revenue | Working | Royalty | Deductions | Withholding | Pmt Amount |
|---|---|---|---|---|---|---|---|
| SANARE ENP | | Check Totals: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 00/00/0000 | YTD Totals: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Unofficial Copy Office of Marilyn Burgess District Clerk

## Settlement Statement

ANKOR Energy LLC
3900 North Causeway Blvd. Suite 500
Metairie, LA 70002
(504)596-3700

SAMARE ENERGY PARTNERS, LLC
ATTN: MR. AVERY ALCORN
777 N. ELDRIDGE PARKWAY, STE 300
HOUSTON, TX 77079

| | |
|---|---|
| Account : | 80000260 |
| Date : | 3/30/2023 |
| Period : | Feb-23 |

**Prepaid Balance by Project:**

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pre-Pmts | Pre-Pmts Applied | Balance Remain |
|---|---|---|---|---|---|---|---|
| | | | **Total** | 0.00 | 0.00 | 0.00 | 0.00 |

**Summary by Lease:**

| Property No. | Equity Type | Description | Net Income | Expense | Pre-Pmts Applied | You Owe | Overdue | To You | Pay out |
|---|---|---|---|---|---|---|---|---|---|
| AN1601 | CPX | Eugene Island 208-Field | 0.00 | 10,591.35 | 0.00 | 10,591.35 | 936,449.30 | 0.00 | 0.00 |
| AN1602 | CPX | Eugene Island 208-PLTF-E-Platform | 0.00 | 5,437.00 | 0.00 | 5,437.00 | 209,849.54 | 0.00 | 0.00 |
| AN1603 | LOE | Eugene Island 208-E-6-Well | 0.00 | 1,878.49 | 0.00 | 1,878.49 | 13,753.38 | 0.00 | 0.00 |
| AN1608 | CPX | Eugene Island 208-PLTF-J-Platform | 0.00 | 2,420.67 | 0.00 | 2,420.67 | 36,281.58 | 0.00 | 0.00 |
| AN1619 | LOE | Eugene Island 208-J-DST-1-Well | 0.00 | 4,372.35 | 0.00 | 4,372.35 | 8,936.76 | 0.00 | 0.00 |
| AN1622 | CPX | Eugene Island 208-PLTF-K-Platform | 0.00 | 2,420.67 | 0.00 | 2,420.67 | 29,139.61 | 0.00 | 0.00 |
| AN1623 | LOE | Eugene Island 208-K-1-Well | 0.00 | 724.57 | 0.00 | 724.57 | 2,360.88 | 0.00 | 0.00 |
| AN1623N | LOE | Eugene Island 208-K-7D-Well | 0.00 | 0.00 | 0.00 | 0.00 | 80.61 | 0.00 | 0.00 |
| AN1651 | CPX | Vermilion 375-Field | 0.00 | 0.00 | 0.00 | 0.00 | 1,784.90 | 0.00 | 0.00 |
| AN1654 | LOE | Vermilion 375 A-2ST-1-Well | 0.00 | 6,696.14 | 0.00 | 6,696.14 | 41,858.75 | 0.00 | 0.00 |
| AN1656 | LOE | Vermilion 375 A-4ST-1-Well | 0.00 | 0.00 | 0.00 | 0.00 | 7,839.20 | 0.00 | 0.00 |
| AN1657 | LOE | Vermilion 375 A-5ST-1-Well | 0.00 | 0.00 | 0.00 | 0.00 | 7,838.27 | 0.00 | 0.00 |
| | | Parent Guarantee Fee | | | | | 10,813.60 | | |
| | | **Total** | 0.00 | 33,339.28 | 0.00 | 33,339.28 | 1,337,625.64 | 0.00 | 0.00 |

| Owner No. | Check No./Date | Gross Revenue | Working | Royalty | Deductions | Withholding | Pmt Amount |
|---|---|---|---|---|---|---|---|
| SAMARE ENE | | **Check Totals:** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 00/00/0000 | **YTD Totals:** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Unofficial Copy Office of Marilyn Burgess District Clerk


## Settlement Statement

ANKOR Energy LLC
3500 North Causeway Blvd. Suite 500
Metairie, LA 70002
(504)566-3706

SANARE ENERGY PARTNERS, LLC
ATTN: MR. AVERY ALCORN
777 N. ELDRIDGE PARKWAY, STE 30C
HOUSTON, TX 77079

Account : 90000240
Date : 4/10/2023
Period : Mar-23

**Prepaid Balance by Project:**

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pre-Pmts | Pre-Pmts Applied | Balance Remain. |
|---|---|---|---|---|---|---|---|
| | | | Total | 0.00 | 0.00 | 0.00 | 0.00 |

**Summary by Lease:**

| Property No. | Equity Type | Description | Net Income | Expense | Pre-Pmts Applied | You Owe | Overdue | To You | Pay out |
|---|---|---|---|---|---|---|---|---|---|
| AN1001 | CPX | Eugene Island 208 Field | 0.00 | 6,057.70 | 0.00 | 6,057.70 | 947,440.65 | 0.00 | 0.00 |
| AN1002 | CPX | Eugene Island 208,PLTF-E Platform | 0.00 | 144.41 | 0.00 | 144.41 | 246,277.54 | 0.00 | 0.00 |
| AN1003 | LOE | Eugene Island 208,E-8 Well | 0.00 | 5,942.38 | 0.00 | 5,942.38 | 15,879.84 | 0.00 | 0.00 |
| AN1018 | CPX | Eugene Island 208,PLTF-J Platform | 0.00 | 0.00 | 0.00 | 0.00 | 38,702.26 | 0.00 | 0.00 |
| AN1019 | LOE | Eugene Island 208 J-10ST-1 Well | 0.00 | 7,406.74 | 0.00 | 7,406.74 | 14,359.09 | 0.00 | 0.00 |
| AN1022 | CPX | Eugene Island 208,PLTF-K Platform | 0.00 | 0.00 | 0.00 | 0.00 | 31,550.28 | 0.00 | 0.00 |
| AN1023 | LOE | Eugene Island 208,K-1 Well | 0.00 | 3,274.10 | 0.00 | 3,274.10 | 3,979.45 | 0.00 | 0.00 |
| AN1028 | LOE | Eugene Island 208,K-7G Well | 0.00 | 0.00 | 0.00 | 0.00 | 96.61 | 0.00 | 0.00 |
| AN1051 | CPX | Vermilion 379 Field | 0.00 | 0.00 | 0.00 | 0.00 | 1,784.60 | 0.00 | 0.00 |
| AN1052 | CPX | Vermilion 379,PLTF-A Platform | 0.00 | 3,832.36 | 0.00 | 3,832.36 | 0.00 | 0.00 | 0.00 |
| AN1054 | LOE | Vermilion 379 A-2ST-1 Well | 0.00 | 8,560.07 | 0.00 | 8,560.07 | 46,354.89 | 0.00 | 0.00 |
| AN1056 | LOE | Vermilion 379 A-4ST-1 Well | 0.00 | 0.00 | 0.00 | 0.00 | 7,839.26 | 0.00 | 0.00 |
| AN1057 | LOE | Vermilion 379 A-6ST-1 Well | 0.00 | 0.00 | 0.00 | 0.00 | 2,839.27 | 0.00 | 0.00 |
| | | Patent Guarantee Fee | | | | | 16,513.88 | | |
| | | Total | 0.00 | 35,017.74 | 0.00 | 35,017.74 | 1,375,664.92 | 0.00 | 0.00 |

| Owner No. | Check No./Date | Gross Revenue | Working | Royalty | Deductions | Withholding | Pmt Amount |
|---|---|---|---|---|---|---|---|
| SANARE ENE | 06/26/0000 | Check Totals: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | YTD Totals: | 0.00 | 0.00 | 0.00 | | 0.00 |



## Settlement Statement

ANKOR Energy LLC
3900 North Causeway Blvd, Suite 500
Metairie, LA 70002
(504)596-3700

SANARE ENERGY PARTNERS, LLC
ATTN: MR. AVERY ALCORN
777 N. ELDRIDGE PARKWAY, STE 360
HOUSTON, TX 77079

| | |
|---|---|
| Account : | 50000240 |
| Date : | 9/8/2023 |
| Period : | Apr-23 |

**Prepaid Balance by Project:**

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pre-Pmts | Pre-Pmts Applied | Balance Remain. |
|---|---|---|---|---|---|---|---|
| | | | **Total** | 0.00 | 0.00 | 0.00 | 0.00 |

**Summary by Lease:**

| Property No. | Equity Type | Description | Net Income | Expense | Pre-Pmts Applied | You Owe | Overdue | To You | Pay out |
|---|---|---|---|---|---|---|---|---|---|
| AN1001 | CPX | Eugene Island 208-Field | 0.00 | 115,844.94 | 0.00 | 115,844.94 | 953,476.35 | 0.00 | 0.00 |
| AN1002 | CPX | Eugene Island 208-J-LTF-1(Platform) | 0.00 | 231.75 | 0.00 | 231.75 | 245,421.95 | 0.00 | 0.00 |
| AN1008 | LOE | Eugene Island 208-E-6-Well | 0.00 | 1,917.29 | 0.00 | 1,917.29 | 21,892.20 | 0.00 | 0.00 |
| AN1019 | CPX | Eugene Island 208-PLTF-1(Platform) | 0.00 | 0.00 | 0.00 | 0.00 | 36,700.25 | 0.00 | 0.00 |
| AN1010 | LOE | Eugene Island 208-J-10ST-1(Well) | 0.00 | 1,995.78 | 0.00 | 1,995.78 | 21,715.83 | 0.00 | 0.00 |
| AN1222 | CPX | Eugene Island 208-PLTF-1(Platform) | 0.00 | 0.00 | 0.00 | 0.00 | 31,580.28 | 0.00 | 0.00 |
| AN1023 | LOE | Eugene Island 208-K-1(Well) | 0.00 | 300.00 | 0.00 | 300.00 | 6,349.55 | 0.00 | 0.00 |
| AN1026 | LOE | Eugene Island 208-K-7D(Well) | 0.00 | 0.00 | 0.00 | 0.00 | 60.81 | 0.00 | 0.00 |
| AN1051 | CPX | Vermilion 378-Field | 0.00 | 0.00 | 0.00 | 0.00 | 1,784.80 | 0.00 | 0.00 |
| AN1052 | CPX | Vermilion 378-PLTF-A(Platform) | 0.00 | 712.56 | 0.00 | 712.56 | 3,632.36 | 0.00 | 0.00 |
| AN1054 | LOE | Vermilion 378-A-2ST-1(Well) | 0.00 | 1,388.16 | 0.00 | 1,388.16 | 55,934.96 | 0.00 | 0.00 |
| AN1056 | LOE | Vermilion 378-A-4ST-1(Well) | 0.00 | 123.75 | 0.00 | 123.75 | 7,636.25 | 0.00 | 0.00 |
| AN1057 | LOE | Vermilion 378-A-5ST-1(Well) | 0.00 | 123.75 | 0.00 | 123.75 | 7,638.27 | 0.00 | 0.00 |
| | | Parent Guarantee Fee | | | | | 16,913.68 | | |
| | | **Total** | 0.00 | 122,473.36 | 0.00 | 122,473.36 | 1,405,882.68 | 0.00 | 0.00 |

| Owner No. | Check No./Date | Gross Revenue | Working | Royalty | Deductions | Withholding | Pmt Amount |
|---|---|---|---|---|---|---|---|
| SANARE ENE | | **Check Totals:** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 00/00/0000 | **YTD Totals:** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Unofficial Copy Office of Marilyn Burgess District Clerk

## Settlement Statement

ARMOR Energy LLC
3990 North Causeway Blvd. Suite 300
Metairie, LA 70002
(504)596-3700

SANARE ENERGY PARTNERS, LLC
ATTN: MR. AVERY ALCORN
777 N. ELDRIDGE PARKWAY, STE 300
HOUSTON, TX 77079

| | |
|---|---|
| Account : | 00080240 |
| Date : | 6/9/2023 |
| Period : | May-23 |



**Prepaid Balance by Project:**

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pre-Pmts | Pre-Pmts Applied | Balance Remain. |
|---|---|---|---|---|---|---|---|
| | | | Total | 0.00 | 0.00 | 0.00 | 0.00 |

**Summary by Lease:**

| Property No. | Equity Type | Description | Net Income | Expense | Pre-Pmts Applied | You Owe | Overdue | To You | Pay out |
|---|---|---|---|---|---|---|---|---|---|
| AN1001 | CPX | Eugene Island 208 Field | 0.00 | 68,272.42 | 0.00 | 68,272.42 | 1,068,323.28 | 0.00 | 0.00 |
| AN1002 | CPX | Eugene Island 208 PLTF-E Platform | 0.00 | 56.25 | 0.00 | 56.25 | 945,653.70 | 0.00 | 0.00 |
| AN1009 | LOE | Eugene Island 208 E-6 Well | 0.00 | 1,084.25 | 0.00 | 1,084.25 | 23,434.49 | 0.00 | 0.00 |
| AN1018 | CPX | Eugene Island 208 PLTF-J Platform | 0.00 | 134,683.96 | 0.00 | 134,683.96 | 38,762.28 | 0.00 | 0.00 |
| AN1019 | LOE | Eugene Island 208 J-10-ST-1 Well | 0.00 | 8,742.81 | 0.00 | 8,742.81 | 25,671.82 | 0.00 | 0.00 |
| AN1022 | CPX | Eugene Island 208 PLTF-K Platform | 0.00 | 0.00 | 0.00 | 0.00 | 31,980.20 | 0.00 | 0.00 |
| AN1023 | LOE | Eugene Island 208 K-1 Well | 0.00 | 16.00 | 0.00 | 16.00 | 5,649.55 | 0.00 | 0.00 |
| AN1028 | LOE | Eugene Island 208 K-7D Well | 0.00 | 0.00 | 0.00 | 0.00 | 90.81 | 0.00 | 0.00 |
| AN1051 | CPX | Vermilion 379 Field | 0.00 | 0.00 | 0.00 | 0.00 | 784.90 | 0.00 | 0.00 |
| AN1052 | CPX | Vermilion 379 PLTF-A Platform | 0.00 | 750.00 | 0.00 | 750.00 | 4,344.66 | 0.00 | 0.00 |
| AN1054 | LOE | Vermilion 379 A-2ST-1 Well | 0.00 | 3,206.86 | 0.00 | 3,206.86 | 56,804.15 | 0.00 | 0.00 |
| AN1068 | LOE | Vermilion 379 A-4ST-1 Well | 0.00 | 0.00 | 0.00 | 0.00 | 7,982.00 | 0.00 | 0.00 |
| AN1097 | LOE | Vermilion 379 A-5ST-1 Well | 0.00 | 0.00 | 0.00 | 0.00 | 7,982.92 | 0.00 | 0.00 |
| | | Parent Guarantee Fee | | | | | 10,513.00 | | |
| | | Total | 0.00 | 235,812.61 | 0.00 | 235,812.61 | 1,528,456.61 | 0.00 | 0.00 |

| Owner No. | Check No./Date | Gross Revenue | Working | Royalty | Deductions | Withholding | Pmt Amount |
|---|---|---|---|---|---|---|---|
| SANARE ENE | | Check Totals: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 6/9/00/0000 | YTD Taxes: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Unofficial Copy Office of Marilyn Burgess District Clerk



## Settlement Statement

ANKOR Energy LLC
3500 North Causeway Blvd  Suite 800
Metairie, LA 70002
(504)596-3700

SANARE ENERGY PARTNERS, LLC.
ATTN: MR. AVERY ALCORN
777 N. ELDRIDGE PARKWAY, STE 300
HOUSTON, TX 77079

| | |
|---|---|
| Account : | 80000240 |
| Date : | 7/14/2023 |
| Period : | Jun-23 |

**Prepaid Balance by Project:**

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pre-Pmts | Pre-Pmts Applied | Balance Remain. |
|---|---|---|---|---|---|---|---|
| | | | **Total** | 0.00 | 0.00 | 0.00 | 0.00 |

**Summary by Lease:**

| Property No. | Equity Type | Description | Net Income | Expense | Pre-Pmts Applied | You Owe | Overdue | To You | Pay Out |
|---|---|---|---|---|---|---|---|---|---|
| AN1001 | CPX | Eugene Island 208 Field | 0.00 | 82,516.07 | 0.00 | 82,516.07 | 1,188,585.70 | 0.00 | 0.00 |
| AN1002 | CPX | Eugene Island 208 PLTF-E Platform | 0.00 | 5,598.73 | 0.00 | 5,598.73 | 245,708.95 | 0.00 | 0.00 |
| AN1003 | LOE | Eugene Island 208 E-8 Well | 0.00 | 3,128.81 | 0.00 | 3,128.81 | 24,518.74 | 0.00 | 0.00 |
| AN1018 | CPX | Eugene Island 208 PLTF-J Platform | 0.00 | 585,658.29 | 0.00 | 585,658.29 | 173,386.21 | 0.00 | 0.00 |
| AN1019 | LOE | Eugene Island 208 J-10ST-1 Well | 0.00 | 3,135.91 | 0.00 | 3,135.91 | 36,414.43 | 0.00 | 0.00 |
| AN1022 | CPX | Eugene Island 208 PLTF-K Platform | 0.00 | 2,746.90 | 0.00 | 2,746.90 | 31,560.29 | 0.00 | 0.00 |
| AN1028 | LOE | Eugene Island 208 K-10 Well | 0.00 | 1,171.94 | 0.00 | 1,171.94 | 8,565.81 | 0.00 | 0.00 |
| AN1029 | LOE | Eugene Island 208 K-7D Well | 0.00 | 0.00 | 0.00 | 0.00 | 86.61 | 0.00 | 0.00 |
| AN1051 | CPX | Vermilion 379 Field | 0.00 | 0.00 | 0.00 | 0.00 | 1,784.54 | 0.00 | 0.00 |
| AN1052 | CPX | Vermilion 379 PLTF-A Platform | 0.00 | 8,995.94 | 0.00 | 8,995.94 | 5,094.96 | 0.00 | 0.00 |
| AN1054 | LOE | Vermilion 379 A-3ST-1 Well | 0.00 | 2,915.85 | 0.00 | 2,915.85 | 60,011.01 | 0.00 | 0.00 |
| AN1056 | LOE | Vermilion 379 A-4ST-1 Well | 0.00 | 82.94 | 0.00 | 82.94 | 7,662.00 | 0.00 | 0.00 |
| AN1057 | LOE | Vermilion 379 A-5ST-1 Well | 0.00 | 82.94 | 0.00 | 82.94 | 7,662.00 | 0.00 | 0.00 |
| | | Parent Guarantee Fee | | | | | 16,913.00 | | |
| | | **Total** | 0.00 | 697,196.42 | 0.00 | 697,196.42 | 1,764,289.22 | 0.00 | 0.00 |

| Owner No. | Check No./Date | Gross Revenue | Working | Royalty | Deductions | Withholding | Pmt Amount |
|---|---|---|---|---|---|---|---|
| SANARE ENE | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 80000/0000 | **Check Totals:** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | **YTD Totals:** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Unofficial Copy Office of Marilyn Burgess District Clerk

# Settlement Statement

KNOC Eagle Ford Corp.(JV)
5850 San Felipe Suite 725
Houston,Texas, 77056
(713)552-0904

SANARE ENERGY PARTNERS, LLC
ATTN: MR. AVERY ALDORIN
777 N. ELDRIDGE PARKWAY, STE 500
HOUSTON, TX 77079

Account : 800/00249
Date : 8/12/2023
Period : Jul-23



**Prepaid Balance by Project:**

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pre-Pmts | Pre-Pmts Applied | Balance Remain |
|---|---|---|---|---|---|---|---|
| | | | Total | 0.00 | 0.00 | 0.00 | 0.00 |

**Summary by Lease:**

| Property No. | Equity Type | Description | Net Income | Expense | Pre-Pmts Applied | You Owe | Overdue | To You | Pay out |
|---|---|---|---|---|---|---|---|---|---|
| AN1051 | OPX | Eugene Island 208(Platform) | 0.00 | 2,354.60 | 0.00 | 2,354.05 | 1,241,513.77 | 0.00 | 0.00 |
| AN1052 | OPX | Eugene Island 208,PLTF-E,Platform | 0.00 | 22.50 | 0.00 | 22.50 | 231,408.68 | 0.00 | 0.00 |
| AN1053 | LOE | Eugene Island 208,E-3,Well | 0.00 | 1,149.66 | 0.00 | 1,149.66 | 27,624.56 | 0.00 | 0.00 |
| AN1058 | CPX | Eugene Island 208,PLTF-J,Platform | 0.00 | 236,388.94 | 0.00 | 236,388.94 | 758,045.50 | 0.00 | 0.00 |
| AN1050 | LOE | Eugene Island 208,D-13,Well | 0.00 | 135.00 | 0.00 | 135.00 | 0.00 | 0.00 | 0.00 |
| AN1019 | LOE | Eugene Island 208,I-10ST-1(Well | 0.00 | 1,149.66 | 0.00 | 1,149.66 | 33,860.24 | 0.00 | 0.00 |
| AN1017 | OPX | Eugene Island 208,I-85/-4(Well) | 0.00 | 90.00 | 0.00 | 90.00 | 0.00 | 0.00 | 0.00 |
| AN1025 | OPX | Eugene Island 208,PLTF-K,Platform | 0.00 | 214.20 | 0.00 | 214.20 | 34,360.29 | 0.00 | 0.00 |
| AN1023 | LOE | Eugene Island 208,K-1,Well | 0.00 | 150.00 | 0.00 | 150.00 | 0.00 | 0.00 | 0.00 |
| AN1027 | LOE | Eugene Island 208,OCS-F,Well | 0.00 | 394.74 | 0.00 | 394.74 | 7,836.83 | 0.00 | 0.00 |
| AN1028 | LOE | Eugene Island 208,K-2BF-3(Well) | 0.00 | 150.00 | 0.00 | 150.00 | 0.00 | 0.00 | 0.00 |
| AN1038 | LOE | Eugene Island 208,K-4BS-1(Well) | 0.00 | 2,328.75 | 0.00 | 2,328.75 | 0.00 | 0.00 | 0.00 |
| AN1019 | LOE | Eugene Island 208,J-2D(Well) | 0.00 | 0.00 | 0.00 | 0.00 | 90.61 | 0.00 | 0.00 |
| AN1051 | OPX | Vermilion 379(Field) | 0.00 | 0.00 | 0.00 | 0.00 | 1,754.40 | 0.00 | 0.00 |
| AN1053 | CPX | Vermilion 379,PLTF-A,Platform | 0.00 | 13,616.81 | 0.00 | 13,616.81 | 19,066.80 | 0.00 | 0.00 |
| AN1054 | LOE | Vermilion 379,A-1(Well) | 0.00 | 840.41 | 0.00 | 840.41 | 62,026.65 | 0.00 | 0.00 |
| AN1056 | LOE | Vermilion 379,A-2(Well) | 0.00 | 5.20 | 0.00 | 5.20 | 6,026.04 | 0.00 | 0.00 |
| AN1057 | LOE | Vermilion 379,A-6ST-1(Well) | 0.00 | 5.20 | 0.00 | 5.20 | 9,024.96 | 0.00 | 0.00 |
| | | Parent Guarantee Fee | | | | | 16,913.00 | | |
| | | **Total** | 0.00 | 257,996.20 | 0.00 | 257,996.20 | 2,481,635.64 | 0.00 | 0.00 |

| Owner No. | Check No./Date | Gross Revenue | Working | Royalty | Deductions | Withholding | Net Amount |
|---|---|---|---|---|---|---|---|
| SANARE ENE | | Check Totals | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 00/00/0000 | YTD Totals | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Unofficial Copy - Office of Marilyn Burgess District Clerk



Unofficial Copy Office of Marilyn Burgess District Clerk

## Settlement Statement



Unofficial Copy Office of Marilyn Burgess District Clerk



# Settlement Statement

ANKOR Energy LLC
3500 North Causeway Blvd. Suite 300
Metairie, LA 70002
(504)596-3700

SANARE ENERGY PARTNERS, LLC

Account : 80000240
Date : 12/19/2023
Period : Nov-23

Project Balance by Project:

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pre-Posts | Pre-Posts Applied | Balance Remain. |
|---|---|---|---|---|---|---|---|
| | | Total | | 0.00 | 0.00 | 0.00 | 0.00 |

Summary by Lease:

| Property No. | Equity Type | Description | Net Income | Expense | Pre-Posts Applied | You Owe | Overage | To You | Payout |
|---|---|---|---|---|---|---|---|---|---|
| AN1001 | OPX | Eugene Island 208 (Platform) | 0.00 | 12,779.79 | 0.00 | 12,779.79 | 254,987.22 | 0.00 | 0.00 |
| | | | | | | | | | |

_(Remaining rows illegible due to document quality)_

| | | 2022 Parent Guarantee Fee | | | | | 50,000.00 | | |
| | | Total | | 255,563.98 | 0.00 | 255,563.98 | 3,092,206.58 | 0.00 | 0.00 |

| Account | Check No./Date | Gross Revenue Check Totals | Severity | Royalty | Deductions | Withholdings | Net Amount |
|---|---|---|---|---|---|---|---|
| 80000240 | | YTD Totals | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Unofficial Copy Office of Marilyn Burgess District Clerk

# Settlement Statement

ANKOR Energy LLC
3500 North Causeway Blvd. Suite 600
Metairie, LA 70002
(504)596-3700

SANARE ENERGY PARTNERS, LLC
ATTN: MR. AVERY ALCORN
777 N. ELDRIDGE PARKWAY, STE 300
HOUSTON, TX 77079

Amount : [illegible]
Date : 1/5/2024
Period : Dec-23

Prepaid Balance by Project:

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pre-Pmts | Pre-Pmts Applied | Balance Remain. |
|---|---|---|---|---|---|---|---|
| | | | Total | 0.00 | 0.00 | 0.00 | 0.00 |

Summary by Lease:

| Property No. | Equity Type | Description | Net Income | Expense | Pre-Pmts Applied | You Owe | Overdue | To You | Pay out |
|---|---|---|---|---|---|---|---|---|---|
| AN1001 | CPX | Eugene Island 208 Field | 0.00 | 5,495.84 | 0.00 | 5,495.84 | 1,163,272.93 | 0.00 | 0.00 |
| AN1002 | CPX | Eugene Island 208 PLTF-E Platform | 0.00 | 24,773.58 | 0.00 | 24,773.58 | 309,790.08 | 0.00 | 0.00 |
| AN1005 | LOE | Eugene Island 208 E-6 Well | 0.00 | 1,075.20 | 0.00 | 1,075.20 | 28,925.55 | 0.00 | 0.00 |
| AN1007 | CPX | Eugene Island 208 E-12 Well | 0.00 | 354.81 | 0.00 | 354.81 | 60,634.39 | 0.00 | 0.00 |
| AN1008 | CPX | Eugene Island 208 PLTF-J Platform | 0.00 | 7,416.86 | 0.00 | 7,416.86 | 1,593,098.00 | 0.00 | 0.00 |
| AN1009 | CPX | Eugene Island 208 J-1ST-1 Well | 0.00 | 0.00 | 0.00 | 0.00 | [illegible] | 0.00 | 0.00 |
| AN1010 | LOE | Eugene Island 208 J-1CST-1 Well | 0.00 | 974.32 | 0.00 | 974.32 | [illegible] | 0.00 | 0.00 |
| AN1011 | CPX | Eugene Island 208 J-2ST-1 Well | 0.00 | 0.00 | 0.00 | 0.00 | [illegible] | 0.00 | 0.00 |
| AN1012 | CPX | Eugene Island 208 J-3 Well | 0.00 | 271.80 | 0.00 | 271.80 | 19,6[illegible].47 | 0.00 | 0.00 |
| AN1013 | LOE | Eugene Island 208 J-3 Well | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AN1014 | CPX | Eugene Island 208 J-5ST-1 Well | 0.00 | 0.00 | 0.00 | 0.00 | [illegible]0,682.78 | 0.00 | 0.00 |
| AN1015 | CPX | Eugene Island 208 J-6 Well | 0.00 | 0.00 | 0.00 | 0.00 | 31.75 | 0.00 | 0.00 |
| AN1016 | CPX | Eugene Island 208 J-7 Well | 0.00 | 0.00 | 0.00 | 0.00 | 8,426.21 | 0.00 | 0.00 |
| AN1017 | CPX | Eugene Island 208 J-8ST-1 Well | 0.00 | 0.00 | 0.00 | 0.00 | 26,562.07 | 0.00 | 0.00 |
| AN1018 | CPX | Eugene Island 208 J-8DST-1 Well | 0.00 | 0.00 | 0.00 | 0.00 | 5,797.02 | 0.00 | 0.00 |
| AN1019 | CPX | Eugene Island 208 J-9ST-1 Well | 0.00 | 126.00 | 0.00 | 126.00 | 2,220.68 | 0.00 | 0.00 |
| AN1019 | LOE | Eugene Island 208 J-9ST-1 Well | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AN1020 | CPX | Eugene Island 208 J-10BP-1 Well | 0.00 | 0.00 | 0.00 | 0.00 | 15,263.24 | 0.00 | 0.00 |
| AN1021 | CPX | Eugene Island 208 J-11 Well | 0.00 | 0.00 | 0.00 | 0.00 | 2,794.76 | 0.00 | 0.00 |
| AN1022 | CPX | Eugene Island 208 PLTF-K Platform | 0.00 | 96,207.11 | 0.00 | 96,207.11 | 94,029.64 | 0.00 | 0.00 |
| AN1023 | CPX | Eugene Island 208 K-1 Well | 0.00 | 38,249.13 | 0.00 | 38,249.13 | 7,802.26 | 0.00 | 0.00 |
| AN1023 | LOE | Eugene Island 208 K-1 Well | 0.00 | 974.32 | 0.00 | 974.32 | 14,410.55 | 0.00 | 0.00 |
| AN1024 | CPX | Eugene Island 208 K-2BP-1 Well | 0.00 | 34,332.67 | 0.00 | 34,332.67 | 6,161.00 | 0.00 | 0.00 |
| AN1026 | CPX | Eugene Island 208 K-4BP-1 Well | 0.00 | 42,159.76 | 0.00 | 42,159.76 | 16,279.40 | 0.00 | 0.00 |
| AN1028 | CPX | Eugene Island 208 K-7 Well | 0.00 | 0.00 | 0.00 | 0.00 | 171.75 | 0.00 | 0.00 |
| AN1029 | LOE | Eugene Island 208 K-7D Well | 0.00 | 0.00 | 0.00 | 0.00 | 90.81 | 0.00 | 0.00 |
| AN1051 | CPX | Vermilion 379 Field | 0.00 | 767.17 | 0.00 | 767.17 | 5,284.82 | 0.00 | 0.00 |
| AN1052 | CPX | Vermilion 379 PLTF-A Platform | 0.00 | 19,012.21 | 0.00 | 19,012.21 | 160,799.22 | 0.00 | 0.00 |
| AN1053 | CPX | Vermilion 379 A-1 Well | 0.00 | 420.00 | 0.00 | 420.00 | 0.00 | 0.00 | 0.00 |
| AN1054 | CPX | Vermilion 379 A-2ST-1 Well | 0.00 | 240.00 | 0.00 | 240.00 | 0.00 | 0.00 | 0.00 |
| AN1054 | LOE | Vermilion 379 A-3ST-1 Well | 0.00 | 1,645.22 | 0.00 | 1,645.22 | 73,534.89 | 0.00 | 0.00 |
| AN1056 | LOE | Vermilion 379 A-4ST-1 Well | 0.00 | 311.40 | 0.00 | 311.40 | 18,121.97 | 0.00 | 0.00 |
| AN1057 | LOE | Vermilion 379 A-5ST-1 Well | 0.00 | 311.40 | 0.00 | 311.40 | 10,101.28 | 0.00 | 0.00 |
| AN1072 | CPX | Vermilion 379 A-7ST-1 Well | 0.00 | 380.00 | 0.00 | 380.00 | 0.00 | 0.00 | 0.00 |
| AN1087 | CPX | Eugene Island 208 J-7ST-1 Well | 0.00 | 0.00 | 0.00 | 0.00 | 11,755.26 | 0.00 | 0.00 |
| AN1088 | CPX | Eugene Island 208 J-12 Well | 0.00 | 0.00 | 0.00 | 0.00 | 34,580.21 | 0.00 | 0.00 |
| | | 2023 Parent Guarantee Fee | | | | | 10,613.00 | | |
| | | Total | 0.00 | 276,017.02 | 0.00 | 276,017.02 | 3,847,889.46 | 0.00 | 0.00 |

| Owner No. | Check No./Date | Gross Revenue | Taxes | Royalty | Deductions | Withholding | Pmt Amount |
|---|---|---|---|---|---|---|---|
| SANARE ENE | | Check Totals: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 00/00/0000 | YTD Totals: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Unofficial Copy Office of Marilyn Burgess District Clerk

## Settlement Statement

ARENA Energy LLC
7000 North Causeway Blvd, Suite 600
Metairie, LA 70002
(504) 889-6700

SANARE ENERGY PARTNERS, LLC

Account:   0000264
Date:   2/15/2024
Period:   Jan-24

Unofficial Copy Office of Cheryl E. Johnson Burgess District Clerk

## Settlement Statement

ANKOR Energy LLC
1300 North Causeway Blvd. Suite 300
Metairie, LA 70001
(504) 896-1710

MANARA ENERGY PARTNERS, LLC
ATTN: MR. AVERY SELDON
777 N. ELDRIDGE PARKWAY, STE. 300
HOUSTON, TX 77079

Account: 060073340
Date: 3/05/2024
Period: Feb-24

### Prepaid Balances by Project:

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pre Pints | Pre-Pints Applied | Ending Balance |
|---|---|---|---|---|---|---|---|
| | | | Total | 0.00 | 0.00 | 0.00 | 0.00 |

### Summary by Lease:

Unofficial Copy Office of Marilyn Burgess District Clerk

| Property No. | Equity Type | Description | Net Income | Expense | Pre-Pints Applied | You Owe | Overdue | Tax With | Pay out |
|---|---|---|---|---|---|---|---|---|---|

| | | Total | 279,449.38 | 0.00 | 279,449.38 | 4,079,182.22 | 0.00 | | 0.00 |

| Lease No. | Lease Purchase | Gross Revenue Check Totals | Working | Royalty | Deductions | Withholding | Net Amount |
|---|---|---|---|---|---|---|---|
| | Settlement | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Settlement Statement**

ANKOR Energy LLC
9450 North Townsend Blvd., Suite 3000
Metairie, LA 70002
(504)846-1700

    RANGER ENERGY PARTNERS, LLC
    ATTN: MR. AVERY MCGINN
    777 N. ELDRIDGE PARKWAY, STE 300
    HOUSTON, TX 77079

Account: 800000KO
Date: XTM2024
Period: Jan-24

Prepaid Balance by Project

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pre Press | Pre-Press Applied | Balance Remain |
|---|---|---|---|---|---|---|---|
| | | | Total | 0.00 | 0.00 | | 0.00 |

Summary by Lease

| Property No. | Equity Type | Description | Net Revenue | Expense | Pre-Paid Applied | Your Owe | Overdue | To You | Pay out |
|---|---|---|---|---|---|---|---|---|---|
| AN1001 | DPX | Eugene Island 208 Lease | 0.00 | 0.00 | 0.00 | 0.00 | 1,688,976.74 | 0.00 | |
| AN1001 | DPX | Eugene Island 208 #4 "A-2" Platform | 0.00 | 175.00 | 0.00 | 175.00 | 584,718.54 | 0.00 | |
| AN1001 | LOX | Eugene Island 208 A-15 Well | 0.00 | 1,512.00 | 0.00 | 1,512.00 | 92,438.00 | 0.00 | |
| AN1001 | DPX | Eugene Island 208 D-12 Well | 0.00 | 594.00 | 0.00 | 594.00 | 0.00 | 0.00 | |
| AN1001 | DPX | Eugene Island 208 PLAT Structure | 0.00 | 48.00 | 0.00 | 48.00 | 1,658,715.00 | 0.00 | |
| AN1010 | DPX | Eugene Island 208 J-10/1 Well | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| AN1010 | LTIP | Eugene Island 208 J-10/1 Well | 0.00 | 1,512.00 | 0.00 | 178.00 | 0.00 | 0.00 | |
| AN1011 | DPX | Eugene Island 208 A-5/A-11 Well | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| AN1011 | DPX | Eugene Island 208 A-4 Well | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| AN1012 | DPX | Eugene Island 208 A-7 Well | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| AN1013 | DPX | Eugene Island 208 A-9 Well | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| AN1014 | DPX | Eugene Island 208 A-6 Well | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| AN1015 | DPX | Eugene Island 208 A-8 Well | 0.00 | 0.00 | 0.00 | 0.00 | 9,985.21 | 0.00 | |
| AN1016 | DPX | Eugene Island 208 A-38 Well | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| AN1017 | DPX | Eugene Island 208 A-35 Well | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| AN1020 | DPX | Eugene Island 208 #2 Well | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| AN1060 | DPX | Eugene Island 208 Lease | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| AN1060 | DPX | Eugene Island 208 A-15 Well | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| AN1001 | DPX | Eugene Island 208 #1 "A" Platform | 0.00 | 411.00 | 0.00 | 641.00 | 134,336.00 | 0.00 | |
| AN1003 | DPX | Eugene Island 208 A-15 Well | 0.00 | 0.00 | 0.00 | 0.00 | 82,050.04 | 0.00 | |
| AN1005 | DPX | Eugene Island 208 A-11 Well | 0.00 | 0.00 | 0.00 | 0.00 | 23,959.00 | 0.00 | |
| AN1006 | DPX | Eugene Island 208 A-38 Well | 0.00 | 0.00 | 0.00 | 0.00 | 14,714.00 | 0.00 | |
| AN1305 | DPX | Vermilion 378 Lease | 0.00 | 321,319.00 | 0.00 | 321,919.49 | 471,389.38 | 0.00 | |
| AN1305 | DPX | Vermilion 378 A-5/1 Well | 0.00 | 0.00 | 0.00 | 0.00 | 6,704.78 | 0.00 | |
| AN1305 | DPX | Vermilion 378 A-15/1 Well | 0.00 | 0.00 | 0.00 | 6,531.44 | 791,821.46 | 0.00 | |
| AN1305 | DPX | Vermilion 378 A-18/1 Well | 0.00 | 0.00 | 0.00 | 0.00 | 54,819.00 | 0.00 | |
| AN1305 | DPX | Vermilion 378 A-38/1 Well | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| AN1305 | DPX | Vermilion 378 A-7 Well | 0.00 | 0.00 | 0.00 | 5,845.90 | 0.00 | 0.00 | |
| AN1305 | DPX | Eugene Island 208 #1 Well | 0.00 | 0.00 | 0.00 | 0.00 | 14,780.00 | 0.00 | |
| AN1305 | DPX | Eugene Island 208 A-7 Well | 0.00 | 0.00 | 0.00 | 0.00 | 58,815.00 | 0.00 | |
| | | 2023 Annual Operation Fee | | | | | | | |
| | | Total | 0.00 | 334,716.00 | 0.00 | 339,196.95 | 4,389,964.90 | | 0.00 |

| Owner No. | Check Number | Gross Revenue | Withholding | Royalty | Deductions | Withholding | Net Amount |
|---|---|---|---|---|---|---|---|
| RANGER ENER | 800000OKO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | YTD Totals | 0.00 | | | 0.00 | 0.00 |

## Settlement Statement

ANADER Energy LLC
3000 North Causeway Blvd. Suite 600
Metairie, LA 70002

| | |
|---|---|
| Account: | 000003460 |
| Date: | 05/2024 |
| Period: | Apr-24 |

HARVEST ENERGY PARTNERS, LLC

Unofficial Copy Office of Marilyn Burgess District Clerk

**Prepaid Balances by Project**

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pro. Posts | Pre-Posts Posted | Balance Remain. |
|---|---|---|---|---|---|---|---|
| | | | Total | 0.00 | 0.00 | | 0.00 |

**Summary by Lease**

| Property No. | Equity Type | Description | Net Income | Expense | Deductions Applied | You Owe | Overdue | To You | Pay out |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | Total | 588,639.26 | 0.00 | 588,639.26 | 4,385,539.48 | 0.00 | 0.00 |

| Owner No. | Check No./Date | Gross Payments | Warning | Non-Deductions | Withholding | Net Amount |
|---|---|---|---|---|---|---|
| | | (To Owner) | 0.00 | 0.00 | 0.00 | 0.00 |

## Settlement Statement

ANKOR Energy LLC
28870 North Causeway Blvd, Suite 500
Mandeville, LA 70448
(985)844-3700

SANARE ENERGY PARTNERS, LLC

| | |
|---|---|
| Account : | 80000000 |
| Date : | 6/00/24 |
| Period : | May-24 |

**Prepaid Balance by Project:**

| Property No. | Equity Type | AFE No. | Description | Beginning Balance | Current Pro-Rata | Pre-Rata Accrued | Balance Forward |
|---|---|---|---|---|---|---|---|
| | | | Total | 0.00 | 0.00 | 0.00 | |

**Summary by Lease:**

Unofficial Copy Office of Marilyn Burgess District Clerk

| Property No. | Equity Type | Description | Net Income | Expense | Pre-Rata Applied | Tax Deck | Overages | To You | Pay Out |
|---|---|---|---|---|---|---|---|---|---|
| | | | Total | 36,435.44 | 0.00 | 96,436.44 | 4,663,527.44 | 0.00 | 0.00 |

| Account No. | Equity Type | Direct No. Dest | Gross Income | Tax Gathering | Net Income | Overages | Withholding | Pay Down |
|---|---|---|---|---|---|---|---|---|
| | | Credit Balance | 0.00 | 0.00 | 0.00 | 0.00 | | |

## Settlement Statement

Unofficial Copy Office of Marilyn Burgess District Clerk

ADJUDICATION SECTION

JAN 04 2023

# LISKOW&LEWIS

A Professional Law Corporation

Liskow.com

701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Main 504.581.7979
Fax 504.556.4108

Joan G. Seelman    Direct: (504) 299-6421
jseelman@liskow.com

January 3, 2023

**VIA EMAIL  (boemadjudication@boem.gov)**

Bureau of Ocean Energy Management
Adjudication Unit
1201 Elmwood Park Boulevard, MS 5421
New Orleans, Louisiana  70123-2390

Re:  **OCS-G 4909** - Assignment of Record Title Interest in Federal OCS Oil and Gas Lease (Affecting Portions of Main Pass Area, Block 64) – APPROVE FIRST

Dear Sir or Madam:

As the authorized consultant for Greyhound Energy LLC (3650), enclosed please find regulatory documents that we are submitting for approval relating to the assignment of record title interest in the referenced lease pursuant to the Assignment of Record Title Interest in Federal OCS Oil and Gas Lease by Sanare Energy Partners, LLC (3520), as Assignor, and Greyhound Energy LLC (3650), as Assignee.  To evidence the transfer of such interest, we submit the following for filing and approval:

1.  Two (2) originals of the Assignment of Record Title Interest in Federal OCS Oil and Gas Lease dated effective December 31, 2021, for the above referenced Lease;

2.  Paygov receipt in the amount of $234.00 for filing fees associated with the approval of the assignment;

3.  Two (2) originals of the Designation of Operator form wherein Greyhound Energy LLC (3650) designates itself as operator;

4.  Paygov receipt in the amount of $207.00 for filing fees associated with the change of operator from Sanare Energy Partners, LLC to Greyhound Energy LLC;

5.  OSFR 1017 form wherein Greyhound Energy LLC designates itself as the designated applicant for portions of the Lease it has acquired interest in. (Original OSFR 1017 sent under separate cover letter to Tatiana Williams with the Oil Spill Financial Responsibility Section);

6.  Bonding: An Outer Continental Shelf (OCS) Mineral Lessee's or Operator's Supplemental Bond by Indemnity National Insurance Company, as Surety and Greyhound Energy, LLC, as Principal, bond number N-032022-OCS-G 4909, in

5424786v2

NEW ORLEANS | LAFAYETTE | HOUSTON | BATON ROUGE

**EXHIBIT 3**

Bureau of Ocean Energy Management
Adjudication Unit
January 3, 2023
Page - 2 -

the amount of $7,150,000.00 was submitted to the Financial Assurance Section under separate cover letter; and

Please refer to your GOM Company No. (3520) for Sanare Energy Partners, LLC, as Assignor and GOM Company No. (3650) for Greyhound Energy LLC, as Assignee, for documents qualifying said entities to hold leases/rights-of-way on the Outer Continental Shelf in the Gulf of Mexico.

I hereby request that the above Assignment be approved effective December 31, 2021. Please return via email, an approved assignment and designation of operator form to the attention of Joan G. Seelman at jseelman@liskow.com and Brian H. Macmillan at bmac@sanarepartners.com.

If you have any questions, or need additional information, please contact me at 504-299-6121 or by email at jseelman@liskow.com.

Very truly yours,

Joan G. Seelman
Regulatory Paralegal

Enclosures

RECEIVED

ADJUDICATION SECTION

JAN 04 2023

U.S. Department of the Interior
Bureau of Ocean Energy Management

OMB Control No.: 1010-0006
Expiration Date: 01/31/2023

OCS-G 4909
Lease No.

December 1, 1981
Lease Effective Date

## ASSIGNMENT OF RECORD TITLE INTEREST IN FEDERAL OCS OIL AND GAS LEASE

New Lease No. (BOEM Use Only)

| Part A: Assignment |

Legal description of the OCS oil and gas lease or the officially designated subdivision of the lease being assigned:

That portion of Block 64, Main Pass Area, Louisiana Map No. 10, which is more than three geographical miles seaward from the line described in the supplemental decree of the U.S. Supreme Court, June 16, 1975 (United States vs. Louisiana, 422 U.S. 13)

Assignor(s) does (do) hereby sell, assign, transfer, and convey unto Assignee(s) the following undivided right, title and interest (insert name and qualification number of each Assignor and Assignee below):

| Assignor(s): | Percentage Interest Conveyed |
|---|---|
| Sanare Energy Partners, LLC (3520) | 100.00000% |

| Assignee(s): | Percentage Interest Received |
|---|---|
| Greyhound Energy LLC (3650) | 100.00000% |

The approval of this assignment is restricted to record title interest only.

[X] Exhibit "A," which sets forth other provisions between Assignor(s) and Assignee(s), is attached to and made a part of this assignment.

| For BOEM use only |

This Assignment of Record Title Interest has been filed as of the date stamped on this document and is hereby approved by the Bureau of Ocean Energy Management on the date shown below.

By _Yolanda M. Winslow_      Supervisor Adjudication Section      FEB 02 2023

Authorized Official for BOEM      Title      BOEM Approval Date

Paperwork Reduction Act of 1995 (PRA) Statement: The PRA (44 U.S.C. 3501 et seq.) requires us to inform you that we collect this information to use in the adjudication process involved in leasing and lease operations. BOEM uses the information to track ownership of leases in the Federal OCS. Responses are required to obtain or retain a benefit. Proprietary data are covered under section 26 of the OCSLA, 30 CFR 556.19, and in accordance with regulations in 30 CFR parts 550, 551, and 552. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB Control Number. Public reporting burden of this form is estimated to average 30 minutes per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form. Comments on the burden estimate or any other aspect of this form should be directed to the Information Collection Clearance Office, Bureau of Ocean Energy Management, 45600 Woodland Road, Sterling, VA 20166.

==================================================

**Part B: Certification and Acceptance**

==================================================

1. Each Assignee certifies it is the owner of the record title interest in the above-described lease that is hereby assigned to the Assignee(s) specified above.

2. **DEBARMENT COMPLIANCE**: Each Assignor and Assignee certifies its compliance with the Department of the Interior's nonprocurement debarment and suspension regulations at 2 CFR Subtitle B, Part 1400, and agree to communicate the requirement to comply with these regulations to persons with whom it does business related to this record title interest assignment by including the terms of the regulations in its contracts and transactions.

3. **EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION COMPLIANCE CERTIFICATION**: Each Assignor and Assignee certifies that it is in full compliance with Equal Opportunity Executive Order 11246, as amended, and the implementing regulations at 41 CFR 60-1 – Obligations of Contractors and Subcontractors; and 41 CFR 60-2 – Affirmative Action Programs

4. **QUALIFICATIONS of ASSIGNOR(S) and ASSIGNEE(S)**: Each Assignor and Assignee certifies that it. is established and officially recognized by the Bureau of Ocean Energy Management as qualified and authorized to bid on, acquire interests in, and hold OCS oil and gas leases; is exercising and meeting due diligence requirements on any other OCS lease in accordance with section 8 of the OCSLA, as amended (43 U.S.C. 1337(d)); is in good standing with acceptable operating performance as required by 30 CFR §§ 550 and 556; is not disqualified by BOEM from acquiring any new OCS leases or assigned interest in existing leases because of unacceptable operating performance on any other OCS lease; is not failing to meet or exercise due diligence (as determined by BOEM after notice and opportunity for a hearing under 30 CFR part 590, subpart A); and is not restricted from bidding or acquiring interests in the lease or officially designated subdivision, thereof, or grouped with any other entities on the restricted joint bidders list.

5. Assignee's execution of this assignment constitutes acceptance of all applicable terms, conditions, stipulation and restrictions pertaining to the lease described herein. Applicable terms and conditions include, but are not limited to, an obligation to conduct all operations on the leasehold in accordance with the terms and conditions of the lease, to condition all wells for proper abandonment, to restore the leased lands upon completion of any operations as described in the lease, and to furnish and maintain bond(s) pursuant to regulations at 30 CFR §§ 550 and 556. This assignment is subject to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (the "Act"), and Assignee(s) is (are) subject to, and shall fully comply with, all applicable regulations now or to be issued under the Act. Notwithstanding any agreement between the Assignor(s) and Assignee(s), the parties' liability to the Bureau of Ocean Energy Management is governed by 30 CFR §§ 550 through 556.

==================================================

This Assignment of Record Title Interest will be made effective between the parties hereto as of _____December 31, 2021_____, upon approval by the Bureau of Ocean Energy Management, United States Department of the Interior.

This instrument may be executed in any number of counterparts, each of which will be deemed an original instrument, but all of which together shall constitute but one and the same instrument provided, however, this instrument and any other counterpart hereof, will not be binding unless and until executed by all of the parties, and will not be accepted by the Bureau of Ocean Energy Management unless all counterparts are filed simultaneously.

By signing this document, you certify that your statements made herein are true, complete and correct to the best of your knowledge and belief and are made in good faith.

Title 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

| | |
|---|---|
| Assignor Name: Sanare Energy Partners, LLC | Assignor Name: _____ |
| Assignor Qualification No. 3520 | Assignor Qualification No. _____ |
| By: _____ | By: _____ |
| Signatory Name: Brian H. Macmillan | Signatory Name: _____ |
| Signatory Title: Sr. Vice President - Land | Signatory Title: _____ |
| Execution Date: 12/13/2022 | Execution Date: _____ |
| Assignee Name: Greyhound Energy LLC | Assignee Name: _____ |
| Assignee Qualification No. 3650 | Assignee Qualification No. _____ |
| By: _____ | By: _____ |
| Signatory Name: David Wiley | Signatory Name: _____ |
| Signatory Title: Vice President and Secretary | Signatory Title: _____ |
| Execution Date: 12/13/2022 | Execution Date: _____ |

This document prepared by, and when recorded return to:

Greyhound Energy LLC
777 N Eldridge Pkwy, Suite 390
Houston, Texas 77079
Attn:        Charles Rougeau
Phone:       281-794-4615
Email:       crougeau@greyhoundenergyllc.com

## ASSIGNMENT, BILL OF SALE AND CONVEYANCE

THIS ASSIGNMENT, BILL OF SALE AND CONVEYANCE (this "Assignment") is dated as of the dates set forth in the notary certifications below but effective as of December 31, 2021 (the "Effective Time") from Sanare Energy Partners, LLC, a Delaware limited liability company ("Assignor"), to Greyhound Energy LLC, a Delaware limited liability company ("Assignee" and, together with Assignor, the "Parties").

### RECITALS

WHEREAS, pursuant to the terms of that certain Assignment Agreement dated January 31, 2022 by and among Assignor, Assignee and Forward Path Energy LLC, a Delaware limited liability company (the "Assignment Agreement"), Assignor has agreed to assign to Assignee, and Assignee has agreed to receive from Assignor, all of its right, title and interest in and to the Assets (as defined below); and

WHEREAS, each of the Parties will derive substantial benefit from the transactions contemplated under the Assignment Agreement and this Assignment.

### AGREEMENT

Section 1.    Assignment of Interests.   NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby SELLS, ASSIGNS, TRANSFERS, GRANTS, BARGAINS AND CONVEYS to Assignee all of Assignor's right, title and interest, whether real or personal, recorded or unrecorded, tangible or intangible, vested, contingent or reversionary, and whether now owned or hereafter acquired, in and to the following (collectively, the "Transferred Assets"):

(a)     the oil, gas, and mineral leases, subleases and other interests described on Exhibit A-1 (collectively, the "Leases"), together with (i) all rights, privileges, benefits and powers conferred upon the holder of the Leases with respect to the use and occupation of the lands covered thereby and (ii) all record title rights, operating rights, and other rights, options, titles and interests of Assignor, including rights to obtain or otherwise earn any interest in the Leases or within the lands covered by the Leases or any acreage pooled or unitized therewith and;

(b)    all unitized acreage which includes all or a part of any Lease, and all rights and interests in, under or derived from all unitization agreements in effect with respect to any of the Leases or Wells and the units created thereby (the "Units");

(c)    all oil and gas wells or injection wells, whether producing, shut-in or abandoned located on the Leases or the Units, including the interests in the wells shown on Exhibit A-2 (the "Wells", and together with the Leases and the Units, the "Properties");

(d)    all easements, permits, licenses, servitudes, rights-of-way, surface or seabed leases, field office leases, or other surface or seabed rights or interests that directly relate to or are otherwise applicable to any of the Transferred Assets, to the extent transferrable, including the easements, permits, licenses, servitudes, rights-of-way, surface or seabed leases, and other surface or seabed rights and interests described on Exhibit A-3 (the "Surface Rights");

(e)    all Contracts;

(f)    all Equipment;

(g)    copies of any files, records and data, whether written or electronically stored, relating solely to the Transferred Assets, including: (i) land and title records (including abstracts of title, title opinions, and title curative documents); (ii) Contract files relating to the Properties; (iii) correspondence with Governmental Bodies; (iv) operations, environmental, production, tax and accounting records; and (v) production, facility and well records and data; and

(h)    all geophysical data, geological data, engineering data and other technical data to the extent, and only to the extent, relating to the Properties.

TO HAVE AND TO HOLD the Assets unto Assignee, its successors and assigns, forever, subject, however, to the terms of this Assignment and the Assignment Agreement

Section 2.    Special Warranty; Disclaimer.    Assignor warrants title to the Transferred Assets, subject to the terms and conditions of the Assignment Agreement, unto Assignee, its successors and assigns, against all persons claiming or to claim the same or any part thereof by, through or under Assignor, but not otherwise (the "Special Warranty"). EXCEPT AS PROVIDED IN THE SPECIAL WARRANTY, ASSIGNOR MAKES NO, AND EXPRESSLY DISCLAIMS AND NEGATES ANY, REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO TITLE TO ANY OF THE TRANSFERRED ASSETS. Assignor hereby assigns to Assignee all rights, claims, and causes of action on title warranties given or made by Assignor's predecessors (other than Affiliates of Assignor), and Assignee is specifically subrogated to all rights which Assignor may have against its predecessors (other than Affiliates of Assignor), to the extent that Assignor may legally transfer such rights and grant such subrogation.

Section 3.    Disclaimers.    EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THE ASSIGNMENT AGREEMENT OR THIS ASSIGNMENT, ASSIGNOR (I) MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER,

2

AND (II) EXCEPT FOR INTENTIONAL FRAUD, DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT, OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO ASSIGNEE (INCLUDING ANY OPINION, INFORMATION, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ASSIGNEE BY ANY RESPECTIVE AFFILIATE OR REPRESENTATIVE OF ASSIGNOR OR BY ANY INVESTMENT BANK OR INVESTMENT BANKING FIRM, ANY PETROLEUM ENGINEER OR ENGINEERING FIRM, ASSIGNOR'S COUNSEL, OR ANY OTHER AGENT, CONSULTANT, OR REPRESENTATIVE). EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS ASSIGNMENT OR THE ASSIGNMENT AGREEMENT, AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ASSIGNOR EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, RELATING TO (A) THE TITLE TO ANY OF THE TRANSFERRED ASSETS, (B) THE CONDITION OF THE TRANSFERRED ASSETS (INCLUDING ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS), IT BEING DISTINCTLY UNDERSTOOD THAT THE TRANSFERRED ASSETS ARE BEING SOLD "AS IS," "WHERE IS," AND "WITH ALL FAULTS AS TO ALL MATTERS," (C) ANY INFRINGEMENT BY ASSIGNOR OF ANY PATENT OR PROPRIETARY RIGHT OF ANY THIRD PARTY, (D) ANY INFORMATION, DATA, EXHIBITS, SCHEDULES, OR OTHER MATERIALS (WRITTEN OR ORAL) FURNISHED TO ASSIGNEE BY OR ON BEHALF OF ASSIGNOR (INCLUDING THE EXISTENCE OR EXTENT OF OIL, GAS, OR OTHER MINERAL RESERVES, THE RECOVERABILITY OF SUCH RESERVES, ANY PRODUCT PRICING ASSUMPTIONS, THE ABILITY TO SELL OIL OR GAS PRODUCTION AFTER CLOSING, AND THE INFORMATION REFLECTED ON ANY EXHIBITS OR SCHEDULES TO THE ASSIGNMENT AGREEMENT), AND (E) THE ENVIRONMENTAL CONDITION AND OTHER CONDITION OF THE ASSETS AND ANY POTENTIAL LIABILITY ARISING FROM OR RELATED TO THE TRANSFERRED ASSETS.

Section 4.    **Assumed Obligations**.  Without limiting Assignee's rights to indemnity under Section 10.2 of the Assignment Agreement, from and after Closing, Assignee assumes and hereby agrees to fulfill, perform, pay and discharge (or cause to be timely fulfilled, performed, paid or discharged) all of the Assumed Obligations.

Section 5.    **Subject to Contracts**.  Except as set forth to the contrary in the Assignment Agreement, Assignee is taking the Assets subject to the terms of the Contracts, and Assignee hereby assumes and agrees to fulfill, perform, pay, and discharge Assignor's obligations under such Contracts from and after the Effective Date.

Section 6.    **Further Assurances**.  Assignor and Assignee agree to take such further actions and to execute, acknowledge and deliver all such further documents as are reasonably requested by the other Party for carrying out the purposes of this Assignment or of any document delivered pursuant to this Assignment.

Section 7. **Assignment Subject to Assignment Agreement**. This Assignment shall at all times be subject to and governed by the Assignment Agreement. In the event of a conflict between the terms and provisions of this Assignment and those set forth in the Assignment Agreement, the terms and provisions set forth in the Assignment Agreement shall control. Capitalized terms used and not otherwise defined herein shall have their respective meanings assigned to such terms in the Assignment Agreement.

Section 8. **Successors and Assigns**. This Assignment shall inure to the benefit of, and shall be binding upon, the successors and assigns of Assignor and Assignee.

Section 9. **Titles and Captions**. All Section titles and captions in this Assignment are for convenience only, shall not be deemed part of this Assignment, and shall not define, limit, extend, or describe the scope or intent of any provision hereof.

Section 10. **Governing Law**. This Assignment and the rights of the Parties hereunder shall be governed by, and construed in accordance with, the laws of the State of Texas, without reference to principles of conflicts of law.

Section 11. **Counterparts**. This Assignment may be executed in counterparts, each of which shall be deemed an original instrument, but all such counterparts together shall constitute but one agreement. No Party shall be bound until such time as all of the Parties have executed counterparts of this Assignment.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

4

IN WITNESS WHEREOF, this Assignment is executed by Assignor and Assignee on the dates set forth in the respective notary certifications below but effective as of the Effective Time.

WITNESSES:

Print Name: _____

Print Name: _____

ASSIGNOR

SANARE ENERGY PARTNERS, LLC

By: _____
Name: Richard Coleman
Title: Sr. Vice President-COO

Unofficial Copy Office of Marilyn Burgess District Clerk

IN WITNESS WHEREOF, this Assignment is executed by Assignor and Assignee on the dates set forth in the respective notary certifications below but effective as of the Effective Time.

WITNESSES:

Print Name: Gary H. Macmillan

Print Name: Ralph Todd

ASSIGNEE

GREYHOUND ENERGY LLC

By:

Name:  Charles Rougeau

Title:  President and CEO

Unofficial Copy Office of Marilyn Burgess District Clerk

STATE OF TEXAS                §

COUNTY OF HARRIS        §

BE IT REMEMBERED, that I, Marisela Chapa, the undersigned authority, a Notary Public duly qualified, commissioned, sworn, and acting in and for the County and State aforesaid, hereby certify that on this 11th day of February, 2022 there appeared before me Richard Coleman, Sr. Vice President-COO of Sanare Energy Partners, LLC, a Delaware limited liability company.

(Louisiana)          On such date, before me personally came and appeared Richard Coleman, to me personally known, who, duly sworn did say that he is the Sr. Vice President-COO of said limited liability company, and the foregoing instrument was signed on behalf of said limited liability company and executed for the uses, purposes, and considerations therein stated, with full authority to execute said instrument, and acknowledged said instrument to be free act and deed of said limited liability company.

Notary Public in and for the State of   TEXAS

Name as it appears on notarial commission: Marisela Chapa

MARISELA CHAPA
Notary ID #126843305
My Commission Expires
July 22, 2024

[Assignor Notary Block to Assignment and Bill of Sale]

STATE OF TEXAS          §

COUNTY OF HARRIS        §

BE IT REMEMBERED, that I, _Marisela Chapa_, the undersigned authority, a Notary Public duly qualified, commissioned, sworn, and acting in and for the County and State aforesaid, hereby certify that on this 11ᵗʰ day of February, 2022 there appeared before me Charles Rougeau, President and CEO of Greyhound Energy LLC, a Delaware limited liability company.

(Louisiana)         On such date, before me personally came and appeared Charles Rougeau, to me personally known, who, duly sworn did say that he is the President and CEO of said limited liability company, and the foregoing instrument was signed on behalf of said limited liability company, and executed for the uses, purposes, and considerations therein stated, with full authority to execute said instrument, and acknowledged said instrument to be free act and deed of said limited liability company.

_____
Notary Public in and for the State of _TEXAS_

Name as it appears on notarial commission: _Marisela Chapa_

MARISELA CHAPA
Notary ID #126989305
My Commission Expires
July 22, 2024

[Assignee Notary Block to Assignment and Bill of Sale]

**Exhibit A-1**

**Leases**

| Area | Block | Lease No. | Lease Date | Lessor | Original Lessee | Lease/Aliquot Description | | Ownership Rights |
|------|-------|-----------|------------|--------|-----------------|---------------------------|---|------------------|
| Main Pass | 64 | OCS-G 4909 | 12-1-1981 | United States | Howell Petroleum Corporation | Entire Block | | Record Title |
| | | | | | | Portion of Block 64, Main Pass Area, INSOFAR AND ONLY INSOFAR AS the lease covers the South Half (S/2) of the block, below the stratigraphic equivalent of 11,500 feet subsea as seen on the electric log on the OCS-G 4904 Well #20 | | Operating Rights |
| Main Pass | 65 | OCS-G 5692 | 7-1-1983 | United States | Total Petroleum | Entire Block | | Record Title |
| Vermilion | 229 | OCS-G 27979 | 5-1-2005 | United States | Hunt Oil Company | E1/2; E1/2W1/2 of Block 229, Vermilion Area | | Record Title |

[Exhibit A-1 to Assignment and Bill of Sale]

Unofficial Copy Office of Marilyn Burgess District Clerk

Exhibit A-2

Wells

| Field | Well | Name | API |
|---|---|---|---|
| Main Pass 64 | 4909 | B022 ST1 | 17-725-40818-01 |
| Main Pass 64 | 4909 | 011 | 17-725-40829-00 |
| Main Pass 64 | 4909 | 005 ST2 | 17-725-40817-02 |
| Main Pass 64 | 4909 | 0015 | 17-725-40846-00 |
| Main Pass 64 | 4909 | 010 ST1 | 17-725-40828-01 |
| Main Pass 64 | 4909 | 007 | 17-725-40822-00 |
| Main Pass 64 | 4909 | 003 | 17-725-40805-00 |
| Main Pass 64 | 4909 | 004 | 17-725-40807-00 |
| Main Pass 64 | 4909 | 006 | 17-725-40820-00 |
| Main Pass 64 | 4909 | 008 | 17-725-40826-00 |
| Main Pass 64 | 4909 | 013 | 17-725-40850-00 |
| Main Pass 64 | 4909 | 001 ST1 | 17-725-40834-01 |
| Main Pass 64 | 4909 | 017 ST1 | 17-725-40463-01 |
| Main Pass 64 | 4909 | 009 Dual | 17-725-40827-00 |
| Main Pass 64 | 4909 | 0014 | 17-725-40870-00 |
| Main Pass 64 | 4909 | 012 | 17-725-40833-00 |
| Main Pass 64 | 4909 | 018 | 17-725-40555-00 |
| Main Pass 64 | 4909 | 020 | 17-725-40584-00 |
| Main Pass 64 | 4909 | B021 Dual | 17-725-40812-00 |
| Main Pass 64 | 4909 | 002 | 17-725-40803-00 |
| Main Pass 64 | 4909 | 0019 | 17-725-40565-00 |
| Main Pass 65 | 5692 | A002 | 17-725-40855-00 |
| Main Pass 65 | 5692 | A005 | 17-725-40854-00 |
| Main Pass 65 | 5692 | A003 | 17-725-40856-00 |
| Main Pass 65 | 5692 | A005 ST1 | 17-725-40406-01 |
| Main Pass 65 | 5692 | A004 | 17-725-40852-00 |
| Vermilion 229 | 27070 | A-1 | 17-705-41271-00 |

Exhibit A-3

Surface Rights

PIPELINE:

A 12-3/4 inch pipeline, 0.39 miles in length, transporting oil from a Sub Sea Tie-In (SSTI) in Block 55, to the Federal/State Boundary in Block 55, all located in Main Pass Area, and all related pipelines, valves, cathodic protection equipment, pig launchers and receivers, metering facilities, equipment, other fixtures and personal property (Segment No. 4892).

A 4 1/2-inch pipeline, 3.60 miles in length, transporting oil from Platform A in Block 65, through Block 56, to Platform PIG-TRAP in Block 55, all located in Main Pass Area and all related pipelines, valves, cathodic protection equipment, pig launchers and receivers, metering facilities, equipment, other fixtures and personal property (Segment No. 7294).

A 4 1/2-inch pipeline, 0.012 miles in length, transporting oil from Platform PIG-TRAP in Block 55 to a subsea tie-in in Block 55, all located in Main Pass Area and all related pipelines, valves, cathodic protection equipment, pig launchers and receivers, metering facilities, equipment, other fixtures and personal property (Segment No. 11963).

A 4 1/2-inch pipeline, 3.60 miles in length, transporting oil from Platform A in Block 65, through Block 56, to Platform PIG-TRAP in Block 55, all located in Main Pass Area, and all related pipelines, valves, cathodic protection equipment, pig launchers and receivers, metering facilities, equipment, other fixtures and personal property (Segment No. 18181, formerly Segment No. 7306).

A 3 1/2-inch pipeline, 1.08 miles in length, transporting gas supply from the Federal/State boundary in Block 68 to Platform A in Block 64, all located in Main Pass Area, and all related pipelines, valves, cathodic protection equipment, pig launchers and receivers, metering facilities, equipment, other fixtures and personal property (Segment No. 16199).

A 3 1/2-inch pipeline located in Plaquemines Parish, Louisiana, transporting natural gas from Main Pass Area Block 68, Platform "I" to Block 64 SSTI, and all related pipelines, valves, cathodic protection equipment, pig launchers and receivers, metering facilities, equipment, other fixtures and personal property.

**Greyhound Energy LLC**

777 N. Eldridge Parkway
Suite 390

Houston, Texas 77079

GOM COMPANY#:  **3650**

Delaware Limited Liability Company
Modified:      25-May-22
Approved:     03-Dec-20

| **AUTHORIZED TO CONDUCT THE FOLLOWING BUSINESS:** | **BANKRUPTCY INFORMATION:** | **DESIGNATED OPERATOR STATUS:** |
|---|---|---|
| OIL & GAS: Yes | BANKRUPTCY:  No | REVOKED:   No |
| RIGHTS-OF-WAY: Yes | BANKRUPTCY START DATE: | REVOKED START DATE: |
| ALTERNATIVE ENERGY: No | BANKRUPTCY END DATE: | REVOKED END DATE: |
| | | DEBARMENT: No |
| | EEO Plan: No | DEBARMENT START DATE: |
| | | DEBARMENT END DATE: |

Qualification documents received 11/30/2020.

Authorized Consultant:  Liskow & Lewis

| NAME | TITLE | EXPIR. DATE |
|---|---|---|
| John Dobbs | Chief Financial Officer and Assistant Secretary | |
| Charles Rougeau | President and Chief Executive Officer | |
| David Wiley | Vice President and Secretary | |

RESOLVED, that each officer of the Company (including the President and Chief Executive Officer; Chief Financial Officer and Assistant Secretary; and Vice President and Secretary) is hereby (acting alone) empowered on behalf of the Company, among other things, in any and all matters to Federal lands or minerals or other rights under the supervision of Federal authority, to agree upon terms of and to execute and deliver any instrument or agreement pertaining to oil and gas leases, rights of use and easements, pipeline rights-of-way, including any qualification or qualification update, application, representation, bid, lease, plan, bond or other financial security instrument, assignment, relinquishment, designation of operator forms, designation of applicant forms, abandonment, and any other paper, including the issuing or revoking of Powers of Attorneys, as the same may be amended or supplemented from time to time.

THIS LIMITED LIABILITY COMPANY IS COMPRISED OF THE FOLLOWING:

1.  Forward Path Energy LLC - Sole Member

TERM:  Dissolution, Liquidation and Termination of business stipulated in Article V of the Limited Liability Agreement.

## Plaquemines Parish Recording Page

Kim Turlich-Vaughan
Clerk of Court
PO Box 40
Belle Chasse, LA 70037
(504) 934-6610

**Received From :**
Attn: JANICE THOMAS
PORTER HEDGES LLP
1000 N MAIN ST 36TH FL
HOUSTON, TX 77002

**First VENDOR**
SANARE ENERGY PARTNERS LLC

**First VENDEE**
GOMEX FINANCE LLC

Index Type :   CONVEYANCE                    File Number : 2022-00003649

Type of Document : MORTGAGE

                                             Book :  1452    Page :  713

Recording Pages :        61

### Recorded Information

I hereby certify that the attached document was filed for registry and recorded in the Clerk of Court's office for Plaquemines Parish, Louisiana.

On (Recorded Date) : 09/15/2022

At (Recorded Time) : 11:16:22AM

_[signature]_
Deputy Clerk

Doc ID - 006666670061

| Additional Index Recordings | | | |
|---|---|---|---|
| Index Type | Book | Page | File # |
| MTG | 820 | 272 | 2022-000003649 |

Unofficial Copy Official of Marilyn Burgess District Clerk

Return To :   Attn: JANICE THOMAS

**EXHIBIT 5**

Do not Detach this Recording Page from Original Document

LOUISIANA

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Attn: Ms. Janice Thomas

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON,
YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING
INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN
THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR
DRIVER'S LICENSE NUMBER.**

**ACT OF MORTGAGE, SECURITY AGREEMENT, FIXTURE FILING, FINANCING
STATEMENT AND ASSIGNMENT OF PRODUCTION AND REVENUES**

from

**SANARE ENERGY PARTNERS, LLC**
(Organizational No. 6332425)
(Mortgagor and Debtor)

to

**GOMEX FINANCE, LLC**, as Collateral Agent
(Mortgagee and Secured Party)

FOR PURPOSES OF FILING THIS INSTRUMENT AS A FINANCING STATEMENT, THE
ADDRESS OF MORTGAGOR/DEBTOR IS 777 NORTH ELDRIDGE PARKWAY, SUITE
300, HOUSTON, TEXAS 77079; THE MAILING ADDRESS OF MORTGAGEE/SECURED
PARTY IS GOMEX FINANCE LLC, C/O JAVELIN GLOBAL COMMODITIES, 4625
LINDELL BOULEVARD, SUITE 231, ST. LOUIS, MISSOURI 63108.

THIS INSTRUMENT CONTAINS AFTER-ACQUIRED PROPERTY PROVISIONS, AND
COVERS FUTURE ADVANCES AND PROCEEDS. INTERESTS IN OIL, GAS, MINERALS
AND OTHER AS-EXTRACTED COLLATERAL OR IN ACCOUNTS RESULTING FROM
THE SALE THEREOF, WHICH ARE INCLUDED IN THE MORTGAGED PROPERTY,
WILL BE FINANCED AT WELLHEADS LOCATED ON THE LANDS, LEASES OR
LANDS ASSOCIATED WITH PIPELINES DESCRIBED IN EXHIBIT A-1 AND EXHIBIT A-
2 HERETO.

13368042v.3

PERSONAL/MOVABLE PROPERTY AND FIXTURES CONSTITUTING A PORTION OF THE MORTGAGED PROPERTY MAY BE OR MAY IN THE FUTURE BECOME AFFIXED TO THE LANDS OR LANDS ASSOCIATED WITH PIPELINES DESCRIBED IN EXHIBIT A-1 AND EXHIBIT A-2 HERETO.

THIS INSTRUMENT IS, AMONG OTHER THINGS, A FINANCING STATEMENT UNDER THE UNIFORM COMMERCIAL CODE COVERING AS-EXTRACTED COLLATERAL THAT IS RELATED TO, AND GOODS WHICH ARE, OR ARE TO BECOME FIXTURES ON, THE REAL/IMMOVABLE PROPERTY HEREIN DESCRIBED.  THIS FINANCING STATEMENT MAY BE FILED, AMONG OTHER PLACES, IN THE UNIFORM COMMERCIAL CODE RECORDS.  A CARBON, PHOTOGRAPHIC, OR OTHER REPRODUCTION OF THIS INSTRUMENT IS SUFFICIENT AS A FINANCING STATEMENT.   MORTGAGOR   HAS   AN   INTEREST   OF   RECORD   IN   THE REAL/IMMOVABLE PROPERTY CONCERNED, WHICH INTEREST IS DESCRIBED IN EXHIBIT A-1 AND EXHIBIT A-2 HERETO (OR THE DOCUMENTS REFERENCED THEREIN).

*********************************

This instrument was prepared by Anders Gibson, PORTER HEDGES LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002.

ATTENTION OF RECORDING OFFICER: This instrument is a mortgage of both real/immovable and personal/movable property and is, among other things, a Security Agreement and Financing Statement under the Uniform Commercial Code. This instrument creates a lien on rights in or relating to, among other things, lands and oil and gas interests of Mortgagor which are described, or referred to, in the documents described in Exhibit A-1 and Exhibit A-2 hereto.

2

| | |
|---|---|
| ACT OF MORTGAGE, SECURITY AGREEMENT, FIXTURE FILING, FINANCING STATEMENT AND ASSIGNMENT OF PRODUCTION AND REVENUES | UNITED STATES OF AMERICA |
| FROM | STATE OF TEXAS |
| SANARE ENERGY PARTNERS, LLC | COUNTY OF HARRIS |
| IN FAVOR OF | |
| GOMEX FINANCE LLC | |

* * * * * * * * * * * * * * * * * * * * * * * *

**BE IT KNOWN**, that on the 2nd day of September, 2022,

**BEFORE ME**, the undersigned Notary Public duly commissioned and qualified in and for the State and county/parish set forth above, and in the presence of the undersigned competent witnesses, personally came and appeared:

**SANARE ENERGY PARTNERS, LLC**, a Delaware limited liability company, (Organizational No. 6392425), with its principal office located at 777 North Eldridge Parkway, Suite 300, Houston, Texas 77079, and the mailing address for which is 777 North Eldridge Parkway, Suite 300, Houston, Texas 77079 represented herein by Brian Macmillan, its Senior Vice President - Land duly authorized by Written Consent of the Sole Member of Sanare Energy Partners, LLC of said limited liability company, an original or certified copy of which resolutions are attached hereto as Annex I (hereinafter referred to as "Mortgagor").

who declared as follows:

This Act of Mortgage, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production and Revenues (as amended, restated, supplemented or otherwise modified from time to time, the "Mortgage") is entered into effective as of September 6, 2022 (the "Effective Date") by Mortgagor and **Gomex Finance LLC**, a Delaware limited liability company, in its capacity as Collateral Agent (in such capacity under this Mortgage, "Mortgagee"), for the benefit of the Secured Creditors, as defined below.

**RECITALS**

1

A.   Greyhound Energy LLC, a Delaware limited liability company, as borrower ("Borrower"), Secured Party, as Administrative Agent, Collateral Agent and a lender, and the other lenders party thereto from time to time ("Lenders") have entered into that certain Term Loan Agreement dated as of the Effective Date (as amended, restated, supplemented or otherwise modified from time to time, the "Term Loan Agreement") and, in connection with the Term Loan Agreement, Borrower and certain of its Affiliates and the Lenders and Secured Party have entered into other Loan Documents, as defined in the Term Loan Agreement.

B.   Borrower and **JAVELIN GOMEX TRADING LLC**, a Delaware limited liability company (the "Marketing Agent"), have entered into that certain Omnibus Agreement dated as of the Effective Date (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Omnibus Agreement"), and, in connection therewith, Borrower and Marketing Agent have entered or may enter into, from time to time, certain other Marketing Documents (as defined in the Omnibus Agreement) (together with the Omnibus Agreement, collectively, herein the "Marketing Documents"), and Marketing Agent, as a "Hedge Counterparty", will also enter into, in order to provide certain hedging activities to Borrower under, certain Hedge Agreements (as defined in the Omnibus Agreement) dated as of the Effective Date.

C.   Secured Party, as Collateral Agent and Administrative Agent, Marketing Agent and Borrower have entered into that certain Intercreditor Agreement dated the Effective Date (the "Intercreditor Agreement"). The documents referred to in Recitals A, B and C above are referred to herein as the "Secured Indebtedness Documents", and the parties hereto acknowledge that copies of all of such Secured Indebtedness Documents have been provided to Mortgagor.

D.   Gomex Finance LLC, in its capacity as Collateral Agent and Administrative Agent, the Lenders, the Marketing Agent and any Hedge Counterparty are collectively referred to in this Mortgage as the "Secured Creditors."

E.   Each Secured Creditor has conditioned its obligations under the Secured Indebtedness Documents, as applicable, upon, among other things, the execution and delivery of this Mortgage by Mortgagor, and Mortgagor has agreed to enter into this Mortgage.

## ARTICLE I

### GRANT OF LIENS AND SECURITY INTERESTS IN MORTGAGED PROPERTY

Section 1.01   Certain Defined Terms.   As used in this Mortgage, the terms defined above shall have the meanings set forth above and the following terms shall have the following meanings (unless otherwise indicated, such meanings to be equally applicable to both the singular and plural forms of the terms defined):

The following terms will have the meaning set forth in the Term Loan Agreement, so long as the Term Loan Agreement has not been terminated, and after such termination will have the meaning set forth in the Omnibus Agreement: "Business Day," "Collateral Agent," "Debt," "Debtor Relief Laws," "Default," "Environmental Law," "Event of Default," "Final Payment Date," "GAAP," "Governmental Authority," "Hazardous Substances," "Hedge Agreement,"

2

"Hedge Counterparty," "Lien," "Loan Party," "Maximum Rate," "Properties" and "Subsidiary". Notwithstanding the foregoing, Mortgagor and Mortgagee acknowledge that Mortgagee is not a party to either the Term Loan Agreement or the Omnibus Agreement, but, nevertheless, each such Person does hereby adopt the defined terms noted above.

For purposes of this Mortgage:

"Material Adverse Change" means a material adverse change in, or material adverse effect on, (a) the business, assets, operations, Property, or condition (financial or otherwise) of Mortgagor, (b) the ability of Mortgagor to perform any of its obligations under this Mortgage, (c) the validity or enforceability of this Mortgage or (d) the rights and remedies of, or benefits available to Mortgagee under this Mortgage.

"Permitted Liens" means:

(a)     Liens granted under this Mortgage;

(b)     Liens in favor of landlords or lessors under operating leases or capital lease; *provided that* the debt secured by such Liens (i) is secured only by the Property leased under such operating leases or capital leases and not any other Property of Mortgagor and (ii) is not increased in amount;

(c)     purchase money Liens or purchase money security interests upon or in any equipment or other property acquired or held by Mortgagor prior to or at the time of, or within 90 days after, the Mortgagor's acquisition of such equipment or other property; provided, that, the debt secured by such Liens (i) was incurred solely for the purpose of financing the acquisition of such equipment or other property, and does not exceed the aggregate purchase price of such equipment or other property plus reasonable costs and expense incurred in furtherance thereof, (ii) is secured only by such equipment or other property and not by any other assets of Mortgagor, and (iii) is not increased in amount;

(d)     Liens for taxes not overdue by more than sixty (60) days or that (provided foreclosure, sale, or other similar proceedings shall not have been initiated) are being contested in good faith by appropriate proceedings; *provided that* such reserves as may be required by GAAP shall have been made therefor; *provided further* that even if such reserves are made and any such Liens relate to any Mortgaged Property, such Liens could not be expected to materially impair the use of, or proceeds derived from, such Mortgaged Property;

(e)     (i) Liens in favor of vendors, carriers, warehousemen, repairmen, mechanics, workmen, materialmen, suppliers, laborers, construction, or similar Liens arising by operation of law in the ordinary course of business in respect of obligations that are not overdue by more than sixty (60) days or that are being contested in good faith by appropriate proceedings in an aggregate amount not to exceed $250,000; *provided that* such reserve as may be required by GAAP shall have been made therefor; *provided further* that even if such reserves are made and any such Liens relate to any Mortgaged Property, such Liens could not be expected to materially impair the use of, or proceeds derived from, such Property; *provided* that any such Liens could not be expected to materially impair the use of, or proceeds derived from, any Mortgaged Property;

3

Unofficial Copy Office of Harris County District Clerk

(f)      Liens to operators and non-operators under joint operating agreements, unitization and pooling agreements and related orders arising in the ordinary course of the business of Mortgagor to secure amounts owing, which amounts are not overdue by more than sixty (60) days or are being contested in good faith by appropriate proceedings; *provided that* such reserve as may be required by GAAP shall have been made therefor, *provided further* that even if such reserves are made and any such Liens relate to any Mortgaged Property, such Liens could not be expected to materially impair the use of, or proceeds derived from, such Mortgaged Property;

(g)      royalties, overriding royalties, net profits interests, production payments, reversionary interests, calls on production, preferential purchase rights and other burdens on or deductions from the proceeds of production, that do not secure debt for borrowed money and that are taken into account in computing the Net Revenue Interests and Working Interests of Mortgagor warranted in this Mortgage;

(h)      Liens arising in the ordinary course of business out of pledges or deposits under workers' compensation laws, unemployment insurance, old age pensions or other social security or retirement benefits, or similar legislation or to secure public or statutory obligations of Mortgagor;

(i)      easements, rights-of-way, restrictions, and other similar encumbrances, and minor defects in the chain of title that are customarily accepted in the oil and gas financing industry, including in respect of surface operations or for pipelines or power lines, none of which materially interfere with the ordinary conduct of the business of Mortgagor or materially detract from the value or use of the Property to which they apply;

(j)      rights reserved to or vested in any Governmental Authority to control or regulate any Property of Mortgagor, or to use such Property; *provided that*, such rights (a) are not presently expected to materially impair the use of such Property for the purpose for which it is held by Mortgagor and (b) are not presently expected to materially diminish the value of such Property; and

(k)      Liens on cash or securities pledged to secure performance of bids, tenders, performance bonds, surety and appeals bonds, letters of credit, or regulatory compliance or other obligations of a like nature incurred in the ordinary course of business.

*provided, that* Liens described in clauses (b) through (k) above shall not constitute Permitted Liens upon the initiation of any foreclosure or judicial proceedings with regard to the Property encumbered by such Liens and; *provided further*, no intention to subordinate the first priority Lien granted in favor of Mortgagee is hereby implied or expressed or is to be inferred by the permitted existence of such Permitted Liens.

Section 1.02    Grant of Liens and Security Interests.  On the Effective Date, Mortgagor, for valuable consideration, the receipt of which is hereby acknowledged and to secure the full and timely payment of the Secured Indebtedness by Borrower (whether at the stated maturity, by acceleration or otherwise) and the full and timely performance and discharge of the Obligations, Mortgagor has granted, bargained, sold, conveyed, mortgaged, pledged, transferred, and assigned, and set over and by these presents does hereby GRANT, BARGAIN, SELL,

<div align="center">4</div>

CONVEY, MORTGAGE, PLEDGE, TRANSFER, ASSIGN AND SET OVER unto Mortgagee the real, personal and mixed property, rights, titles, interests and estates described in Section 1.03 below (collectively, the "Mortgaged Property").

Section 1.03   Mortgaged Property.

(a)   Oil and Gas Properties.

(i)   Lands; Subject Interests; Oil and Gas Leases.   All of Mortgagor's rights, titles, interests and estates in and to those certain oil, gas and mineral leases, mineral interests, mineral servitudes, royalty interests, overriding royalty interests, production payments, net profits interests, fee interests, carried interests and reversionary interests, including, without limitation, such of the foregoing described on Exhibit A-1 attached hereto and made a part hereof or in, on or under any lands described or referred to, or referred to in the documents described in Exhibit A-1 (collectively, the "Lands"), whether such rights, titles, interests or estates or such Lands are correctly described therein or not (collectively, "Subject Interests"). The term "oil, gas and mineral leases" as used in this instrument and in Exhibit A-1 includes, in addition to oil, gas and mineral leases, oil and gas leases, oil, gas and sulphur leases, other mineral leases, co-lessee's agreements and extensions, amendments, ratifications and other modifications and subleases (collectively, "Oil and Gas Leases").

(ii)   Units.   All of Mortgagor's rights, titles, interests and estates in and to drilling, spacing, proration or production units, as created by the terms of any unitization, communitization and pooling agreements or orders, and all properties, property rights and estates created thereby which include, belong or appertain to the Subject Interests, including, without limitation, all such units formed voluntarily or pursuant to any Applicable Law relating to any of the Subject Interests (collectively, "Units"). As used herein, the term "Applicable Law" means all applicable statutes, laws, ordinances, rules, regulations, orders, judgments, writs, injunctions, or decrees of any state, commonwealth, nation, territory, possession, county, township, parish, municipality, or Tribunal. The term "Tribunal" means any court or governmental department, commission, board, bureau, agency, or instrumentality of the United States or of any state, commonwealth, nation, territory, possession, county, parish, or municipality, whether now or hereafter existing.

(iii)   Hydrocarbons; As-Extracted Collateral.   All of Mortgagor's rights, titles, interests in all oil, gas, coal seam gas, coalbed methane, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, and all other liquid or gaseous hydrocarbons produced or to be produced in conjunction therewith from a well bore and all products, by-products, and other substances derived therefrom or the processing thereof, and all other minerals and substances produced in conjunction with such substances, including, but not limited to, sulfur, geothermal steam, water, carbon dioxide, helium, any and all minerals, ores, or substances of value and the products and proceeds therefrom and all as-extracted collateral (as defined in the Uniform Commercial Code as enacted, amended and in effect in the State of Louisiana, the "UCC") now or hereafter accruing to,

5

Unofficial Copy of the Office of Business LLC

attributable to or produced from the Subject Interests and the Units or to which Mortgagor now or hereafter may be entitled (collectively, "Hydrocarbons").

(iv)     Wells; Fixtures and Personal Property. All of Mortgagor's rights, titles, interests and estates in and to all oil and gas wells, disposal and injection wells (collectively, "Wells"), platforms, rigs, improvements and fixtures, machinery and other equipment, inventory and articles of personal/movable property of any kind or character (excluding vehicles, equipment or other personal/movable property which may be taken to the premises for the drilling of a Well or for other similar temporary uses and are not owned by Mortgagor), in each case appurtenant to, or used or held for use for the production of Hydrocarbons from the Subject Interests and Units, and any of the foregoing, wherever located, including, without limitation, connection apparatus and flow lines from Wells to tanks, gathering lines, trunk lines, lateral lines, flow lines, compressor, dehydration and pumping equipment, pumping plants, gas plants, processing plants, pumps, dehydration units, separators, heater treaters, valves, gauges, meters, derricks, rig substructures, buildings, tanks, reservoirs, tubing, rods, liquid extractors, engines, boilers, tools, appliances, cables, wires, tubular goods, machinery, supplies and any and all other equipment, inventory and articles of personal/movable property of any kind or character appurtenant to, or used or held for use for the production of Hydrocarbons, or used on or about the Lands for operations, together with all improvements or products, accessions, attachments and other additions to, tools, parts and equipment used in connection with, and substitutes and replacements for, all or any part of the foregoing (collectively, "Personal Property" and to the extent any property described in this Section 1.03(a)(iv) or in Section 1.03(b)(iv) below is affixed to the Lands, collectively, "Fixtures").

(v)     Subject Contracts. All of Mortgagor's rights, titles, interests and estates (including, without limitation, all rights to receive payments) in and to all easements, permits, licenses, rights-of-way, surface leases, franchises, servitudes, division orders, transfer orders and other agreements relating or pertaining to purchasing, exchanging, exploring for, developing, operating, treating, processing, storing, marketing or transporting Hydrocarbons under or by virtue of any contract relating in any way to all or any part of the Mortgaged Property otherwise described herein, including, without limitation, farmout contracts, farmin contracts, operating or joint operating agreements, trade letter agreements and all agreements creating rights-of-way for ingress and egress to and from the Subject Interests and Units (collectively, "Subject Contracts"), and all rights, titles and interests in and to all surface fees and fee estates described in Exhibit A-1, and all compressor sites, settling ponds, equipment or pipe yards, office sites, office buildings and all property and Fixtures affixed thereon, whether such are fee simple estates, leasehold estates or otherwise.

(vi)     Accounts. All of Mortgagor's rights, titles and interests in all accounts (including, without limitation, all open accounts receivable and accounts receivable arising under or pursuant to any Subject Contracts, all seismic data, geological data and interpretations of any of the foregoing (but excluding such data licensed by Mortgagor where such licenses prohibit or restrict encumbrance, pledge or assignment), general intangibles, chattel paper, documents, instruments, cash and noncash proceeds and other

6

Unofficial Document from Westlaw/Bloomberg

rights arising from the voluntary or involuntary sale or other disposition, collections, insurance proceeds payable, proceeds payable, or claims against any other person or entity related to the Mortgaged Property (collectively, "Accounts").

(vii)   Other Minerals.   All sulphur, lignite, coal, uranium, thorium, iron, geothermal steam, water, carbon dioxide, helium and all other minerals, ores or substances of value (whether similar to the foregoing or not), and the products and proceeds therefrom now owned or hereafter acquired by Mortgagor, including, without limitation, all gas resulting from the in-situ combustion of coal or lignite now or hereafter accruing to, attributable to or produced from the Subject Interests or to which Mortgagor now or hereafter may be entitled as a result of or by virtue of Mortgagor's ownership of the Subject Interests (collectively, "Other Minerals").

(b)   Pipelines.

(i)   Pipelines; Gathering Systems.   All of Mortgagor's rights, titles and interests in and to all pipelines and gathering systems for the gathering, transmission, or distribution of Hydrocarbons, including, without limitation, those pipelines described on Exhibit A-2 which is attached hereto and made a part hereof, and any interests in real/immovable property relating thereto (collectively, "Pipelines").

(ii)   Lands Associated with Pipelines.   All of Mortgagor's rights, titles and interests, in and to all tracts and parcels of real/immovable property described or referred to in Exhibit A-2 attached hereto, or the description of which is incorporated in Exhibit A-2 by reference to any other instrument or document associated with the Pipelines (collectively, the "Lands Associated with Pipelines").

(iii)   Rights-of-Way and Franchises.   All of Mortgagor's rights, titles and interests, by Mortgagor in and to all leases, leaseholds, easements, rights-of-way, licenses, franchises, privileges, permits, ordinances, grants, rights, consents, servitudes, surface leases or rights, amendatory grants and interest in land for the installation, maintenance and operation of the Pipelines or the assets associated with the Pipelines including, without limitation, the foregoing described in Exhibit A-2, or by the documents described in Exhibit A-2 (collectively, "Rights-of-Way and Franchises").

(iv)   Other Pipeline Assets.   All other assets of Mortgagor now or hereafter situated on any of the Lands Associated with Pipelines or related to the Rights-of-Way and Franchises, including without limitation, fixtures, improvements, equipment, surface or subsurface machinery, facilities, supplies, replacement parts, vehicles of every description, process control computer systems and equipment or other property of any kind or nature and, including, without limitation, buildings, structures, machinery, gas processing plants, stations, substations, pumps, pumping stations, meter houses, metering stations, regulator houses, ponds, tanks, scrapers and scraper traps, fittings, valves, connections, cathodic or electrical protection by-passes, regulators, drips, meters, pumping units, storage or tankage facilities, engines, pipes, gates, telephone and telegraph lines, electric power lines, poles, wires, casings, radio towers, mechanical equipment, electrical equipment, machine shops and other equipment, used or useful in

7

connection therewith; together with all of Mortgagor's Hydrocarbons, and other inventory fuels, carbon, chemicals, electric energy, and other consumable materials or products manufactured, processed, generated, produced, transmitted, stored (whether above or below ground) or purchased by Mortgagor for sale, exchange, distribution, consumption or transmission by Mortgagor (collectively, "Pipeline Assets").

(c)   General.

(i)   Other Appurtenances, Etc.   All rights, titles and interests to tenements, hereditaments, appurtenances, profits and properties in any way related, affixed or incidental to, or used or useful in connection with, all or any part of the property and interests described in this Section 1.03, including, without limitation, all reversions, remainders, carried interests, tolls, rents, revenues, issues, proceeds, earnings, income, products, profits, deposits, easements, permits, licenses, servitudes, surface leases, Rights-of-Way and Franchises related thereto.

(ii)   All Other Property.   All other interests of every kind and character whether real or personal/movable property, which Mortgagor now owns or hereafter acquires in and to the types of property and interests described in Sections 1.03(a), 1.03(b) and 1.03(c)(i) and which is used or useful in connection with the Mortgaged Property and the proceeds and products of all of the foregoing.

(iii)   Additional Interests.   In the event that the Mortgagor acquires additional undivided interests in some or all of the Mortgaged Property, this Mortgage will automatically encumber such additions or increases to Mortgagor's interest in the Mortgaged Property without need of further act or document.   Further, in the event Mortgagor becomes the owner of an interest in any part of the Subject Interests, Lands or Lands Associated with Pipelines, including those described either in Exhibit A-1 or Exhibit A-2 or the documents described in Exhibit A-1 or Exhibit A-2 or otherwise subject to or covered by the Mortgaged Property, this Mortgage will automatically encumber such ownership interest of Mortgagor without need of further act or document.

(iv)   Excluded Structures.   Notwithstanding any provision in this Mortgage to the contrary, in no event is any Building (as defined in the applicable Flood Insurance Regulation) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulation) included in the definition of "Fixtures" and no Building or Manufactured (Mobile) Home (collectively, "Excluded Structures") is hereby encumbered by this Mortgage.   As used herein, "Flood Insurance Regulations" shall mean (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, et seq.), as the same may be amended or recodified from time to time, and (d) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

Section 1.04   Additional Grant and Agreements.   For the avoidance of doubt and to further secure the full and complete payment and performance of the Secured Indebtedness,

8

Unofficial Copy Maryland District Court

(defined below), Mortgagor, as debtor, hereby grants to Mortgagee and Mortgagee's successors in title and assigns, as secured party, a first and prior Lien and security interest in and to the following types and items of property and interests now owned or hereafter acquired by Mortgagor: (a) all present and future Personal Property, Subject Contracts and Accounts; (b) all present and future Subject Interests, Hydrocarbons and Other Minerals  (including all as-extracted collateral), as defined in and subject to the UCC, and for which the creation and perfection of a security interest or lien therein is governed by the provisions of the UCC; (c) all present and future other Mortgaged Property described in Section 1.03 consisting of Accounts, contract rights, general intangibles, chattel paper, documents, instruments, inventory, equipment, fixtures and other goods and articles of personal property of any kind or character defined in and subject to the UCC; (d) all present and future increases, profits, combinations, reclassifications, improvements and products of, accessions, attachments and other additions to, tools, parts and equipment used in connection with, and substitutes and replacements for, all or any part of the Mortgaged Property described in this or any other clause of this paragraph; (e) all present and future Accounts, contract rights, general intangibles, chattel paper, documents, instruments, cash and noncash proceeds and other rights arising from or by virtue of, or from the voluntary or involuntary sale or other disposition of, or collections with respect to, or insurance proceeds payable with respect to, or proceeds payable by virtue of warranty or other claims against manufacturers of, or claims against any other person or entity with respect to, all or any part of the Hydrocarbons, the Other Minerals or the Mortgaged Property described in this Article I; and (f) all present and future security for the payment to Mortgagor of any of the Mortgaged Property described in this Article I and goods which gave or will give rise to any of such Mortgaged Property or are evidenced, identified, or represented therein or thereby.

For the same consideration, Mortgagor hereby grants to Mortgagee and Mortgagee's successors and assigns a first and prior security interest in and to any and all rights of Mortgagor to Liens and security interests securing payment of proceeds from the sale of production of Hydrocarbons from the Mortgaged Property, including, but not limited to, those Liens and security interests provided for in the UCC (and any successor statute thereto or any similar statute in any state where the Mortgaged Property is located).

TO HAVE AND TO HOLD all and singular the Mortgaged Property and all other property which, by the terms hereof, has or may hereafter become subject to the Lien of this Mortgage, together with all rights, hereditaments and appurtenances in anywise belonging to the Mortgagee or assigns forever.  Any additional right, title, interest or estates, whether real, personal or mixed and whether Mortgagor now owns or may hereafter acquire in law or in equity or become entitled to in all assets of the types described above shall inure to the benefit of and be covered by this Mortgage and constitute "Mortgaged Property," the same as if expressly described and conveyed herein. The inclusion of certain specific types and items of property and interests of any Mortgaged Property is not intended in any way to limit the effect of the more general descriptions.  Mortgagor hereby binds itself, its successors and assigns, to warrant and forever defend all and singular the above described property, rights, and interests constituting the Mortgaged Property to the Mortgagee and to his assigns forever, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

9

## ARTICLE II

### SECURED INDEBTEDNESS

Section 2.01   Secured Indebtedness Documents.   This Mortgage is made to secure and enforce the payment and performance of the following indebtedness, obligations and liabilities (collectively, "Secured Indebtedness"):

(a)   All Obligations of Borrower or any other Loan Party under, as defined in, or arising pursuant to the terms of the Term Loan Agreement, including any Obligations owing to any Hedge Counterparty pursuant to any Hedge Agreement as such terms are defined in the Term Loan Agreement.

(b)   All Obligations of Borrower or any Designated Subsidiary under, as defined in, or arising pursuant to the terms of the Omnibus Agreement, including the other Marketing Documents.

(c)   All Secured Hedge Agreement Obligations of Borrower or any Designated Subsidiary under, as defined in, or arising pursuant to the terms of the Omnibus Agreement owing to any Hedge Counterparty pursuant to any Hedge Agreement.

(d)   All indebtedness under those certain promissory notes evidencing Borrower's indebtedness to Mortgagee and other Lenders under the Term Loan Agreement up to the aggregate principal face amount of $30,000,000 (whether one or more, and all replacements, substitutions, amendments or restatements, the "Note").

(e)   Payment of any sums which may be advanced or paid by Mortgagee under the terms hereof on account of Mortgagor's failure to comply with the covenants of Mortgagor contained herein; and all other indebtedness of Borrower arising pursuant to the provisions of this Mortgage or other Secured Indebtedness Documents.

(f)   All interest (including, without limitation, interest accruing at any post-default rate and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, whether a claim for post-filing or post-petition interest is allowed in such proceeding) in respect of the Term Loan Agreement and the Note.

(g)   All obligations and fees (including the Obligations, as defined in the Term Loan Agreement and the Omnibus Agreement) of Borrower or any other Loan Party and/or Designated Subsidiary owing to any Secured Creditor under any Secured Indebtedness Document).

(h)   All obligations of any Loan Party owed to Mortgagee for the benefit of the Secured Creditors arising pursuant to the terms of any Guaranty, if any, executed from time to time by a Loan Party in connection with this Mortgage and any other Secured Indebtedness Documents (as the same may be amended, restated, supplemented or otherwise modified from time to time, collectively, the "Guaranties").

10

13586942v5

(i)     All renewals, extensions, replacements and modifications of indebtedness described, referred to or mentioned in paragraphs (a) through (h) above, and all substitutions therefor, in whole or in part.

(j)     All premium, reimbursement obligations, fees, indemnities, costs and expenses including, without limitation, all costs, fees and disbursements of counsel, as provided herein and in the other Secured Indebtedness Documents.

(k)     Any obligations in respect of fees or expenses of Secured Creditors that accrue after the filing of any proceeding under any Debtor Relief Law regardless of whether allowed or allowable in whole or in part as a claim in such proceeding.

(l)     All other Total Obligations, as defined in the Intercreditor Agreement, that are not covered in parts (a) through (k), above.

Section 2.02   Present and Future.  The word "Secured Indebtedness" wherever used in this Mortgage will refer to all present and future indebtedness, debts, obligations and liabilities described or referred to in this Mortgage and will encompass all renewals, extensions, replacements, substitutions and modifications of Secured Indebtedness.

Section 2.03   Maximum Indebtedness.   The maximum amount of the Secured Indebtedness that may be outstanding at any time and from time to time that this Mortgage secures, including, without limitation, as a mortgage and as an assignment of production and revenue, is FIVE HUNDRED MILLION DOLLARS ($500,000,000) plus, interest paid in kind, to the extent permitted by applicable law, collection costs, sums advanced for the payment of taxes, assessments, maintenance and repair charges, insurance premiums and any other costs incurred to protect the security encumbered hereby or the lien hereof, expenses incurred by the Mortgagee by reason of any default by the Mortgagor under the terms hereof, together with interest thereon, all of which amount shall be secured hereby.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES

Mortgagor represents and warrants on the date of this Mortgage as follows:

Section 3.01   Existence.  Mortgagor is (a) a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware and (b) in good standing and qualified and licensed to do business as a foreign Business Entity in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business require such qualification or license (including Louisiana).

Section 3.02   No Conflicts or Consents.  The execution, delivery, and performance by Mortgagor of this Mortgage and the consummation of the transactions contemplated hereby (a) are within the governing power of the Governing Body of Mortgagor, (b) have been duly authorized by all necessary governing action of the Governing Body, (c) do not contravene (i) the Governing Agreements of Mortgagor, or (ii) any law binding on or affecting Mortgagor and (d) will not result in or require the creation or imposition of any Lien prohibited by this

11

Mortgage or require any payment to be made under any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which the Mortgagor or its property is subject.

Section 3.03    Enforceable Obligations.  This Mortgage, when executed and delivered by Mortgagor will be the legal, valid and binding obligation of Mortgagor, enforceable against Mortgagor in accordance with its terms, except as such enforcement may be limited by Debtor Relief Laws.

Section 3.04    Litigation.  Mortgagor represents that there is no litigation involving Mortgaged Property other than as set forth in Section 4.07 of the Term Loan Agreement and Section 4.07 of the Omnibus Agreement.  As of the date hereof, the Mortgagor has neither received any notice of nor has any knowledge of any disputes regarding boundary lines, location, encroachments or possession of any portions of the Mortgaged Property and has no knowledge of any state of facts that may exist which could give rise to any such claims whether or not recorded, other than any dispute or state of facts, which could have a material adverse effect on the value or use of the Mortgaged Property.

Section 3.05    Title.  Until the Final Termination Date has occurred, Mortgagor is the lawful owner of the Mortgaged Property and has the good right and authority to grant, convey, pledge, transfer, mortgage and assign the Mortgaged Property.  The Mortgaged Property is free of any and all Liens, except Permitted Liens.

Section 3.06    Oil and Gas Leases in Effect; Rentals Paid.  All of the Oil and Gas Leases constituting all or part of the Mortgaged Property are in full force and effect.  All covenants, express or implied, in respect thereof of any Oil and Gas Leases, or of any assignment thereof, which may affect the validity of any of the Oil and Gas Leases, have been performed.  All rentals and royalties due and payable in accordance with the terms of the Oil and Gas Leases comprising a part of the Subject Interests have been duly paid or provided for.

Section 3.07    Revenue and Cost Bearing Interest.  Mortgagor's ownership of the Subject Interests and the undivided interests therein as specified on attached Exhibit A-1 will, after giving full effect to all Permitted Liens, afford Mortgagor not less than those Net Revenue Interests in the production from or allocated to such Subject Interests as specified on attached Exhibit A-1 and will cause Mortgagor to bear not more than that portion of the Working Interest costs of drilling, developing and operating the Subject Interests as specified on Exhibit A-1, unless there is a proportionate increase in Mortgagor's Net Revenue Interest in such property.

Section 3.08    Power to Create Lien.  Until the Final Termination Date has occurred, Mortgagor has full power and lawful authority to bargain, grant, sell, mortgage, assign, transfer, convey, pledge and hypothecate and grant a Lien in all of the Mortgaged Property all in the manner and form herein provided and without obtaining the waiver, consent or approval of any lessor, sublessor, Governmental Authority or other party except to the extent the approval or consent of the State of Louisiana or the Department of the Interior, United States of America is required by Applicable Law to the transfer, deed or assignment of an interest in the Mortgaged Property.  Mortgagor is not party to any agreement or arrangement, or subject to any known order, judgment, writ or decree, which restricts or purports to restrict its ability to grant Liens to Mortgagee on or in respect of the Mortgaged Property to secure the Secured Indebtedness.

12

1560894265

Section 3.09   Taxes.  All (a) Property Taxes, (b) Severance Taxes, (c) ad valorem taxes, (d) conservation taxes and (e) any other taxes of any kind, excluding only income taxes and franchise taxes, imposed on Mortgagor in connection with or as a result of its ownership of interests in the Mortgaged Property have been paid. The term "Property Taxes" means taxes imposed annually on Mortgagor which are based on or measured by the estimated value (at the time such taxes are assessed) of any Hydrocarbons situated within the Mortgaged Property as calculated by the governing authority where located. The term "Severance Taxes" means taxes imposed at the time Hydrocarbons are produced from a Well which are based on or measured by the amount or value of such production.

Section 3.10   Operation of Mortgaged Property.  The Mortgaged Property has been maintained, operated and developed in a good and workmanlike manner according to practices and procedures that are standard in the oil and gas industry (or, in connection with underground gravity drainage activities, that are standard in the underground gravity drainage industry) and in conformity in all material respects with all Applicable Law of all duly constituted authorities having jurisdiction and in conformity in all material respects with the provisions of all Oil and Gas Leases or Subject Contracts.  Specifically, (i) no Mortgaged Property is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (ii) none of the Wells comprising a part of the Mortgaged Property or Units are deviated from the vertical more than the maximum permitted by Applicable Law, and such Wells are, in fact, bottomed under and are producing from, and the Well bores are wholly within, the Mortgaged Property or Units.

Section 3.11   Environmental Laws.  Mortgagor (a) is and has been in material compliance with all Environmental Laws and all permits, requests and notifications relating to health, safety or the environment applicable to Mortgagor or any of its properties, assets, operations and businesses; (b) where applicable, has obtained or caused to be obtained and adhered to and currently possesses all necessary permits and other approvals necessary to store, dispose of and otherwise handle Hazardous Substances and to operate its properties, assets and businesses; (c) where applicable, will report or cause to be reported, to the extent required by all Applicable Law, all sites owned and/or operated by Mortgagor where any Hazardous Substances are released, treated, stored or disposed of and (d) has not used, stored, or released any Hazardous Substances in excess of amounts allowed by Environmental Laws.  There is no location on any property currently or previously owned or operated by Mortgagor where Hazardous Substances have entered or are likely to enter into the soil or groundwater or such property, other than immaterial releases of oil or natural gas in the ordinary course of business, none of which (i) either individually or in the aggregate has had or may be expected to result in a Material Adverse Change in Mortgagor's business or (ii) has violated or reasonably may be expected to violate any Environmental Laws. There is no on-site or off-site location to which Mortgagor has released or transported Hazardous Substances or arranged for the transportation or disposal of Hazardous Substances, which is or is likely to be the subject of any federal, state, local or foreign enforcement action or any investigation which could lead to any claims against any such entity for any clean-up cost, remedial work, damage to natural resources, common law or legal liability, including, but not limited to, claims under the Comprehensive Environmental Response Compensation and Liability Act, (as amended, "CERCLA").

13

Unofficial Image - Managed Copy

Section 3.12   Pipelines and Pipeline Assets.   Mortgagor has constructed, operated, maintains and repairs the Pipelines and Pipeline Assets, if any, in conformity in all material respects with all Applicable Law of all regulatory authorities having jurisdiction.

Section 3.13   No Intent to Limit.   Any fractions or percentages specified on attached Exhibit A-1 in referring to Mortgagor's interests are solely for the purposes of the warranties made by Mortgagor above and will in no manner limit the quantum of interest with respect to any Subject Interests, Unit or Well identified on Exhibit A-1.  If any of the Lands or Lands Associated with Pipelines or other instrument mentioned on Exhibit A-1 and Exhibit A-2 are incorrectly described, then nevertheless this Mortgage will cover all Mortgagor's interest in such Lands, Lands Associated with Pipelines and other instrument as to all of the lands covered thereby, unless limited by express words to the contrary on Exhibit A-1 and Exhibit A-2.

Section 3.14   No Unusual Agreements.   All agreements and all material provisions in agreements applicable to Mortgagor's Working Interest and Net Revenue Interest in the Mortgaged Property are of the type generally found in the oil and gas industry and the gathering and transmission industry, as applicable, and do not individually or in the aggregate contain any material provisions not generally found in the oil and gas industry and the gathering and transmission industry, as applicable.

Section 3.15   Suspense of Proceeds.   All proceeds from the sale of Hydrocarbons from Mortgagor's Working Interest or Net Revenue Interest in the Mortgaged Property are being received by Mortgagor in a timely manner and are not being held in suspense for any reason.

Section 3.16   Insurance.   Mortgagor has obtained and will maintain, for as long as the Final Termination Date has not occurred, insurance coverage of the types required hereunder. Mortgagor has not received from any insurer a notice of termination or non-renewal regarding such insurance policies.

Section 3.17   No Material Adverse Change.   No Material Adverse Change has occurred as of the date hereof.

Section 3.18   Priority.   Subject to Permitted Liens, the Lien created by this Mortgage has or will have first ranking priority, and such Lien is not subject to any prior ranking or pari passu ranking Lien.

Section 3.19   Excluded Structures.   Mortgagor does not own any interest in any Excluded Structure for which the loss of such interest could reasonably be expected to result in a Material Adverse Change.

<div style="text-align:center">

**ARTICLE IV**

COVENANTS OF MORTGAGOR

</div>

Mortgagor, for itself and its successors and permitted assigns, covenants and agrees as follows:

Section 4.01   [Reserved].

<div style="text-align:center">14</div>

4858842-5

Unofficial Copy Office of Marilyn Burgess District Clerk

Section 4.02   Defend Title.   Mortgagor will not create or suffer to be created or permit to exist any Lien, senior to, junior to, or on parity with, the Lien of this Mortgage upon the Mortgaged Property or any part thereof, except Permitted Liens.   Except for the Permitted Liens, Mortgagor will warrant and defend title to the Mortgaged Property against the claims and demands of all other persons and will maintain and preserve the Lien created hereby so long as any of the Secured Indebtedness remains unpaid (other than contingent obligations not yet accrued and payable).   Except for the Permitted Liens, if an adverse claim is made against or a cloud develops upon the title to any part of the Mortgaged Property, Mortgagor agrees, upon the occurrence and during the continuance of a Default or an Event of Default, it will immediately defend against such adverse claim or take appropriate action to remove such cloud which would cause title to the Mortgaged Property not to be good and defensible title at Mortgagor's sole cost and expense, and Mortgagor further agrees that Mortgagee may take such other action as Mortgagee reasonably deems advisable to protect and preserve its interests in the Mortgaged Property, and in such event MORTGAGOR WILL FOREVER INDEMNIFY, PROTECT, DEFEND, AND HOLD HARMLESS EACH SECURED CREDITOR MORTGAGEE, THEIR RESPECTIVE AFFILIATES, MEMBERS, MANAGERS, SHAREHOLDERS, OWNERS, DIRECTORS, PARTNERS, OFFICERS, EMPLOYEES, REPRESENTATIVES, ADVISORS, ATTORNEYS AND AGENTS (COLLECTIVELY, THE "INDEMNIFIED PARTIES") AGAINST ANY AND ALL ACTIONS, SUITS, LOSSES, CLAIMS, DAMAGES, LIABILITIES, COSTS, ATTORNEYS' FEES AND OTHER EXPENSES OF WHATEVER KIND OR NATURE, JOINT OR SEVERAL, WHICH IT MAY INCUR IN DEFENDING AGAINST ANY SUCH ADVERSE CLAIM OR TAKING ACTION TO REMOVE ANY SUCH CLOUD.

Section 4.03   Correct Defects.   Upon the earlier of the Mortgagor becoming aware and the request of Mortgagee, Mortgagor will promptly correct any defect which may be discovered after the execution and delivery of this Mortgage or in the description of the Mortgaged Property, and will execute, acknowledge, and deliver such division orders, transfer orders and other assurances and instruments as will, in the opinion of Mortgagee, be necessary or proper to convey and assign to the Mortgagee all of the Mortgaged Property herein conveyed or assigned, or intended to be so.

Section 4.04   Pooling.   Except as required by Applicable Law, Mortgagor will not, without the prior written consent of Mortgagee, which consent will not be unreasonably withheld, voluntarily pool or unitize all or any part of the Mortgaged Property where the pooling or unitization would result in the diminution of Mortgagor's Net Revenue Interest in production from the Mortgaged Property included in such Unit.   Immediately after the formation of any Unit in accordance herewith, Mortgagor will furnish to Mortgagee a confirmed copy of the pooling agreement, declaration of pooling, or other instrument creating the Unit.   The interest of Mortgagor included in any Unit attributable to the Mortgaged Property or any part thereof will become a part of the Mortgaged Property and will be subject to the Liens hereof.   If any proceedings of any governmental body which could result in pooling or unitizing all or any part of the Mortgaged Property are commenced, Mortgagor will give immediate written notice thereof to Mortgagee.

Section 4.05   Maintenance and Operation of Mortgaged Property.

15

(a)     Mortgagor will, from time to time, pay or cause to be paid before they become delinquent and payable, all taxes, assessments and governmental charges lawfully levied or assessed upon the Mortgaged Property or any part thereof, or arising from any of the rents, issues, revenues, profits and other income from the Mortgaged Property, or related to the production of Hydrocarbons or the operation and development thereof; provided, that the foregoing covenant will be suspended so long as the amount, applicability or validity of any such charges is being diligently contested in good faith by appropriate proceedings and if Mortgagor will have set up reserves therefor which are adequate under GAAP.

(b)     Mortgagor will promptly pay and discharge before delinquent, or cause to be promptly paid or discharged before delinquent, all rentals, delay rentals, royalties and indebtedness accruing under, and in all material respects perform or cause to be performed each and every act, matter or thing required by Subject Contracts or affecting Mortgagor's interests or rights in the Mortgaged Property, and will do or cause to be done all things necessary to keep unimpaired Mortgagor's rights with respect thereto and prevent any forfeiture thereof or default thereunder. Mortgagor will operate or cause to be operated the Mortgaged Property in a careful and efficient manner in accordance with the prudent operator standard and in compliance in all material respects with all applicable contracts and agreements and in compliance with all Applicable Laws of the jurisdiction in which the Mortgaged Property is situated or deemed situated (including, without limitation, all Applicable Laws reflecting the development and operations of the Mortgaged Property and the production and sale of Hydrocarbons therefrom). Mortgagor will do or cause to be done such development work as may be reasonably necessary to the prudent and economical operation of the Mortgaged Property in accordance with the prudent operator standard.

(c)     Mortgagor will promptly pay any tax levied or assessed against any part of the Secured Indebtedness, or against this Mortgage, or against Mortgagee with respect to said Secured Indebtedness or this Mortgage (excluding, however, any income tax payable by Mortgagee).

(d)     Mortgagor will perform or cause to be performed, each and all covenants, agreements, terms, conditions and limitations imposed upon Mortgagor or its predecessors in interest and expressly contained in any assignment or other form of conveyance, related to any part of the Mortgaged Property.

Section 4.06   Operation by Third Parties.   To the extent that all or portions of the Mortgaged Property may be comprised of interests in the Subject Interests which are other than Working Interests or which may be operated by a party or parties other than Mortgagor, Mortgagor's covenants set forth in as expressed in Section 4.05 are modified to require that Mortgagor use its best efforts to obtain compliance with such covenants by the Working Interest owners or the operator or operators of such Subject Interests.

Section 4.07   Insurance; Taxes.   Mortgagor will obtain and maintain for as long as the Final Termination Date has not occurred, insurance, with financially sound and reputable insurance companies satisfactory to Mortgagee.  For the avoidance of doubt, Mortgagor shall procure and maintain or shall cause to be procured and maintained continuously in effect policies of insurance in form and amounts and issued by financially sound and reputable companies,

16

associations, or organizations satisfactory to Mortgagee, covering Mortgagor and covering such casualties, risks, perils, liabilities and other hazards as are customarily carried by businesses similarly situated in the offshore oil and gas exploration and production business, all such insurance to be in amounts and from insurers reasonably acceptable to the Mortgagee. All policies of insurance shall either have a lender's loss payable endorsement (which may be a blanket endorsement) for the benefit of the Mortgagee, as loss payee, in form reasonably satisfactory to Mortgagee or shall provide by endorsement (including by blanket endorsement) that Mortgagee is an additional insured (except with respect to workers compensation insurance and employer's liability insurance), as applicable. Mortgagor shall be required to furnish Mortgagee with certificates of insurance and copies of such endorsements, in each case, evidencing such required insurance, and if requested by Mortgagee copies of such policies of insurance. All policies of insurance shall set forth the coverage, the limits of liability, the name of the carrier, the policy number, and the period of coverage and shall contain an agreement of the insurer waiving all rights of setoff, counterclaim or deductions and a waiver of subrogation against Mortgagor. All such policies shall contain a provision that such policies will not be cancelled, allowed to lapse without renewal, surrendered or amended (which provision shall include any reduction in the scope or limits of coverage) without at least 30 days' prior written notice to Mortgagee and, in the case of non-payment of premium, without at least 10 days' prior written notice to Mortgagee. In the event that, notwithstanding the "lender's loss payable endorsement" requirement of this Section 4.07, the proceeds of any insurance policy described above are paid to Mortgagor, except as permitted under this Section 4.07, Mortgagor shall deliver, or cause to be delivered, such proceeds to Mortgagee immediately upon receipt. Furthermore, except during the continuance of an Event of Default, (i) the proceeds of any insurance policy shall be paid directly to Mortgagor to repair or replace the damaged or destroyed Property covered by such policy, *provided that* Mortgagor shall contract for the repair or replacement of such Property within 90 days (or such longer period of time agreed to by Mortgagee in its sole and absolute discretion) from the receipt of such proceeds and (ii) the remaining amount of such proceeds and any amount of proceeds that were paid to Mortgagor under clause (i) above and not contracted and/or used toward the repair or replacement of such Property within such time period required under such clause (i), shall be paid directly to Mortgagee to be applied in a manner that is in Mortgagee's sole and absolute discretion. Mortgagor shall keep Mortgagee reasonably informed at all times regarding the receipt of such insurance proceeds and the application thereof when such receipts exceed $250,000 or as may be requested by Mortgagee. However, after the occurrence and during the continuance of an Event of Default, all proceeds of insurance, including any casualty insurance proceeds, property insurance proceeds, proceeds from actions, and any other proceeds, shall be paid directly to Mortgagee to be applied in a manner that is in Mortgagee's sole and absolute discretion. Finally, in the event that any insurance proceeds are paid to Mortgagor in violation of this Section 4.07, Mortgagor shall hold the proceeds in trust for Mortgagee, segregate the proceeds from the other funds of Mortgagor, and promptly pay the proceeds to Mortgagee with any necessary endorsement.

Section 4.08   Labor; Materials.   The Mortgagor will (a) promptly pay or cause to be paid before delinquent all bills for labor and materials incurred in the operation of the Mortgaged Property, except any that is being contested in good faith and as to which satisfactory accruals have been provided; (b) promptly pay its share of all costs and expenses incurred under any joint operating agreement affecting the Mortgaged Property or any portion thereof; (c)

17

Unofficial Copy Only Do Not Rely

furnish Mortgagee, as and when requested, full information as to the status of any joint account maintained with others under any such operating agreement; (d) not take any action to incur any liability or Lien thereunder; and (e) not enter into any new operating agreement or amendment of existing operating agreement affecting the Mortgaged Property that would diminish or alter Mortgagor's Net Revenue Interest therein, all without the prior written consent of Mortgagee.

Section 4.09   Books and Records; Inspections.  Mortgagor shall keep and maintain in all material respects proper, complete and consistent books and records regarding Mortgagor's operations, affairs and financial condition.  At any reasonable time and from time to time, upon reasonable notice, Mortgagor shall permit the Mortgagee and any Lender (coordinated with the Mortgagee) or any agents or representatives thereof, at the sole cost, risk and expense of the Mortgagor to examine and make copies of and abstracts from the records and books of account of, and visit and inspect at their reasonable discretion the Properties of, Mortgagor.

Section 4.10   Legal Proceedings; Notices.  Mortgagor will promptly notify Mortgagee, in writing, of the commencement of any legal proceedings affecting any part of the Mortgaged Property, and will take such action as may be necessary to preserve its and Mortgagee's rights affected by any legal proceedings affecting any part of the Mortgaged Property. If Mortgagor fails or refuses to take any such action, Mortgagee may at its election take such action on behalf and in the name of Mortgagor and at Mortgagor's cost and expense.  Mortgagor will promptly provide Mortgagee copies of any notice of violation or any other material notices received from BOEM or any other Governmental Authority and will also provide a written summary to Mortgagee of Mortgagor's position regarding any such notices and its intended plan to satisfactorily address any such violations or matters.

Section 4.11   Existence.  Mortgagor will maintain its limited liability company existence.

Section 4.12   Releases of Mortgaged Property; Waivers.  Subject to the terms of the other Secured Indebtedness Documents, Mortgagee at all times will have the right to release any part of the Mortgaged Property now or hereafter subject to the Lien of this Mortgage, any part of the proceeds of production or other income herein or hereafter assigned or pledged, or any other security it now has or may hereafter acquire securing the Secured Indebtedness, without releasing any other part of the Mortgaged Property, proceeds or income, and without affecting the Liens hereof as to the part or parts thereof not so released, or the right to receive future proceeds and income.

Section 4.13   Legal and Other Expenses.  Mortgagor agrees to pay (but without duplication) to Mortgagee for the benefit of the Secured Creditors: (a) all reasonable and documented advances, charges, costs and expenses (including, without limitation, attorneys' fees and expenses) incurred by Mortgagee: (i) in connection with the transaction which gives rise to this Mortgage, (ii) in connection with all customary costs and expenses incurred by Mortgagee for legal, accounting, engineering or geological services, and (iii) in connection with confirming, perfecting and preserving the security interest created under this Mortgage; and (b) all documented advances, charges, costs and expenses (including, without limitation, attorneys' fees and expenses) incurred by Mortgagee: (iv) in connection with protecting Mortgagee against any claims or interests of any Person against the Mortgaged Property, (v) in connection with the

18

Mortgagee satisfying any failure by Mortgagor to comply with any covenant hereunder and (vi) in connection with exercising any right, power or remedy conferred by this Mortgage or by law or in equity (including, without limitation, reasonable attorneys' fees and legal expenses incurred by Mortgagee in the collection of instruments deposited with or purchased by Mortgagee and in connection with the operation, maintenance or foreclosure of any or all of the Mortgaged Property).  The obligations of Mortgagor hereunder will survive the non-assumption of this Mortgage in a case commenced under Debtor Relief Laws, the State of Louisiana or any other jurisdiction and will be binding upon Mortgagor, or a trustee, receiver, custodian or liquidator of Mortgagor or appointed in any such case.

Section 4.14  Disposition.  Without the prior written consent of Mortgagee, Mortgagor will not sell, assign, lease, transfer, otherwise dispose of, or mortgage, pledge or otherwise encumber all or any portion of the Mortgaged Property, nor will Mortgagor mortgage, pledge or otherwise encumber the Mortgaged Property or any part thereof, regardless of whether the Lien is senior, pari passu, coordinate, junior, inferior or subordinate to the Lien created hereby, except for Permitted Liens.

Section 4.15  Letter in Lieu of Transfer Orders; Prohibitions Ineffective.  Following an Event of Default as informed by the Mortgagee or Borrower, Mortgagor authorizes Mortgagee to deliver letters in lieu of transfer orders or other notices to any third parties owing or which may in the future owe to Mortgagor monies or accounts arising in connection with any of the following matters:  (a) any Hydrocarbons, including as-extracted collateral, produced from the Mortgaged Property, (b) any Subject Contracts or other contracts relating to the Mortgaged Property; or (c) the operation of or production from any part of the Mortgaged Property.  The letters in lieu of transfer orders or other notices will advise the third parties that all of the monies or accounts described above have been assigned to Mortgagee, and if required by Mortgagee, will also require and direct that future payments thereof, including amounts then owing and unpaid, be paid directly to an account designated by Mortgagee.

Section 4.16  Prohibitions Ineffective.  Any (a) Lien, (b) unitization, pooling, or communization (except as required by Applicable Law) or (c) other action or instrument in violation of the prohibitions contained in this Article IV will be of no force or effect against Mortgagee.

Section 4.17  Environmental Laws.

(a)     Mortgagor will comply at all times and in all material respects with all Environmental Laws.  Mortgagor will, in all material respects, comply with any and all Applicable Law (i) related to any natural or environmental resource or media located on, above, within, in the vicinity of, related to or affected by the Mortgaged Property, or (ii) required for the performance or conduct of its operations.

(b)     Mortgagor will neither conduct nor permit the conduct (and Mortgagor represents and warrants that, to the best of its knowledge (after due and careful inquiry), there has not been conducted) on the Mortgaged Properties (or on any other lands or properties in the vicinity thereof) of any activity or operation which is in violation of any Environmental Law, including but not limited to, CERCLA and the Clean Water Act (33 U.S.C.A. §1251, et seq.).  Mortgagor

19

Unofficial Copy of McKinney/Harris County District Clerk

agrees that it will not permit any Hazardous Substance, as defined in Section 101(14) of CERCLA to be deposited, stored, disposed of, placed or otherwise come to be located on the lands covered and affected by the Mortgaged Property (or on any other lands or properties in the vicinity thereof), except those used in daily operations in compliance with Applicable Laws.

(c)     TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW, MORTGAGOR AGREES TO FOREVER PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL LOSS, COST, EXPENSE OR LIABILITY OF ANY KIND OR NATURE, JOINT OR SEVERAL, (INCLUDING ATTORNEYS' FEES AND COURT COSTS) INCURRED BY ANY INDEMNIFIED PARTY IN CONNECTION WITH OR OTHERWISE ARISING OUT OF ANY AND ALL CLAIMS OR PROCEEDINGS (WHETHER BROUGHT BY A PRIVATE PARTY, GOVERNMENTAL AUTHORITY OR OTHERWISE) FOR BODILY INJURY, PROPERTY DAMAGE, ABATEMENT, REMEDIATION, ENVIRONMENTAL DAMAGE OR IMPAIRMENT OR ANY OTHER INJURY OR DAMAGE RESULTING FROM OR RELATING TO ANY HAZARDOUS SUBSTANCES OR CONTAMINATED MATERIAL LOCATED UPON, MIGRATING INTO, FROM OR THROUGH OR OTHERWISE RELATING TO THE MORTGAGED PROPERTY (WHETHER OR NOT THE RELEASE OF SUCH MATERIALS WAS CAUSED BY MORTGAGOR, A TENANT OR SUBTENANT OF MORTGAGOR, A PRIOR OWNER, A TENANT OR SUBTENANT OF ANY PRIOR OWNER OR ANY OTHER PARTY AND WHETHER OR NOT THE ALLEGED LIABILITY IS ATTRIBUTABLE TO THE HANDLING, STORAGE, GENERATION, TRANSPORTATION OR DISPOSAL OF SUCH SUBSTANCE OR THE MERE PRESENCE OF THE SUBSTANCE ON THE MORTGAGED PROPERTY), WHICH ANY INDEMNIFIED PARTY MAY INCUR DUE TO THE EXTENSION OF THE SECURED INDEBTEDNESS, THE EXERCISE OF ANY OF ITS RIGHTS UNDER THIS MORTGAGE, OR OTHERWISE.   THE FOREGOING INDEMNIFICATION WILL APPLY WHETHER SUCH LOSSES, COSTS, EXPENSES AND LIABILITIES ARE IN ANY WAY OR TO ANY EXTENT CAUSED, IN WHOLE OR IN PART, BY ANY NEGLIGENT ACT OR OMISSION OF ANY KIND BY INDEMNIFIED PARTIES PROVIDED ONLY THAT NO PERSON WILL BE ENTITLED UNDER THIS SECTION 4.17 TO RECEIVE INDEMNIFICATION FOR THAT PORTION, IF ANY, OF ANY LOSSES, COSTS, EXPENSES AND LIABILITIES WHICH ARE CAUSED BY SUCH PERSON'S, OR SUCH PERSON'S AGENTS', EMPLOYEES', OFFICERS', DIRECTORS', PARTNERS', OR ADVISORS', GROSS NEGLIGENCE, FRAUD, OR WILLFUL MISCONDUCT. FOR THE PURPOSES OF THE INDEMNITY CONTAINED IN THIS SECTION 4.17, HAZARDOUS SUBSTANCES OR CONTAMINATED MATERIAL INCLUDE BUT ARE NOT LIMITED TO ASBESTOS AND THOSE SUBSTANCES WITHIN THE SCOPE OF ALL ENVIRONMENTAL LAWS, INCLUDING THE RESOURCE CONSERVATION AND RECOVERY ACT, CERCLA AND THE SUPERFUND AMENDMENT AND REAUTHORIZATION ACT OF 1986.   THE PROVISIONS OF THIS SECTION 4.17 WILL SURVIVE ANY FORECLOSURE OF THE LIENS CREATED BY THIS MORTGAGE, CONVEYANCE IN LIEU OF FORECLOSURE AND THE REPAYMENT OF THE SECURED INDEBTEDNESS AND THE DISCHARGE AND RELEASE OF THIS MORTGAGE.



28

Section 4.18   Amendments to Oil and Gas Leases.   Except as required by Applicable Law, Mortgagor will not enter into any amendments to, request waivers under, or will not terminate or allow to be terminated, the Oil and Gas Leases or Subject Contracts that have a material adverse change on Mortgagee, or its Liens, rights or remedies hereunder or under the other Secured Indebtedness Documents.

Section 4.19   Access to Seismic and Geophysical Data.   Mortgagor will provide Mortgagee and its respective engineering consultants with access to all engineering, seismic, geological and geophysical data, studies and evaluations which Mortgagor or any of its affiliates possess or to which any of them has access.   Mortgagee will, upon reasonable notice to Mortgagor, have access to these records during Mortgagor's regular business hours; *provided that*, to the extent the information to be made available to Mortgagee under this section is subject to a confidentiality agreement, Mortgagee may require Mortgagee to execute and deliver to it a mutually acceptable confidentiality agreement prior to being allowed access to the confidential information.

## ARTICLE V

### DEFEASANCE, EVENTS OF DEFAULT, FORECLOSURE AND OTHER REMEDIES

Section 5.01   Defeasance.   If the Final Termination Date has occurred, then, and in that case only, this Mortgage will be released by Mortgagee in due course at the cost of Mortgagor or Borrower. If the Interim Termination Date has occurred, Mortgagee will partially release this Mortgage, as to the applicable Mortgaged Property.   "Interim Termination Date" means the date on which BOEM Approvals have been obtained by Borrower with regard to any specific portion of the Mortgaged Property described on Exhibit A attached hereto. "BOEM" means the U.S. Bureau of Ocean Energy Management.   "BOEM Approvals" means any and all approvals, permits, licenses, certifications and other grants of authority required to be provided by BOEM in order for Mortgagee to transfer to Borrower legal and beneficial title to any of the Mortgaged Properties described on Exhibit A attached hereto consisting of High Island A-571, Main Pass 64 and 65 and South Marsh Island 41 and related rights or way, surface rights and pipelines, pursuant to the two certain Assignments and Bills of Sale dated effective December 31, 2021 from Mortgagor to Borrower, and for BOEM to recognize Borrower as the legal and valid record owner of all the right, title and interests in such Mortgaged Properties.   Otherwise this Mortgage will remain and continue in full force and effect.   "Final Termination Date" means the date on which BOEM Approvals for all of the Mortgaged Properties have been obtained by Borrower and becomes the legal and valid record owner of all of the Mortgaged Properties described on Exhibit A.   Any partial release that is provided hereunder by Mortgagee shall not otherwise affect, release or impair any of the liens, security interests and other rights of Mortgagee with regard to all other remaining Mortgaged Property.

Section 5.02   Remedies.

(a)   Upon the occurrence of an Event of Default which is continuing, the whole of the principal of the Secured Indebtedness remaining unpaid, together with all interest and fees accrued thereon, may, at the option of Mortgagee, without notice (including, but not limited to,

21

Unofficial Copy

1336888575

notice of intention to accelerate maturity and notice of acceleration of maturity) or demand, which are, to the full extent permitted by Applicable Law, waived by Mortgagor, be declared immediately due and payable; *provided that* such acceleration may occur automatically, as provided in the Secured Indebtedness Documents, without any action by Mortgagee; and thereupon, or at any time thereafter while the Secured Indebtedness or any part thereof remains unpaid, Mortgagee shall enforce this Mortgage.

(b)     If the Secured Indebtedness shall become due and payable and shall not be promptly paid at maturity or earlier as a result of an Event of Default, the Mortgage may be foreclosed as to the Mortgaged Property or any portion thereof in any manner permitted by Applicable Law, and Mortgagee shall have the right and power to proceed by suit or suits for specific performance of any covenant or agreement herein contained or in aid of the execution of any power herein granted or for any foreclosure hereunder or for the sale of the Mortgaged Property under the judgment or decree of any court or courts of competent jurisdiction, or for the appointment of a receiver pending any foreclosure hereunder or the sale of the Mortgaged Property under the order of a court or courts of competent jurisdiction or under executory or other legal process, or for the enforcement of any other appropriate remedy.

(c)     Upon the occurrence of an Event of Default which is continuing, Mortgagee will be entitled to all of the rights, powers and remedies afforded a secured party by the UCC with reference to all of the Mortgaged Property consisting of personal and movable property described in Sections 1.02, 1.03 and 1.04 above in which Mortgagee has been granted a Lien hereby, or Mortgagee may proceed as to the real property, fixtures and personal and movable property constituting part of the Mortgaged Property. Without limiting the generality of the foregoing, Mortgagee may exercise the right to take possession of all fixtures and personal and movable property constituting a part of the Mortgaged Property, and for this purpose Mortgagee may enter upon any premises on which any or all of such fixtures and personal and movable property are situated and take possession of and operate such fixtures and personal and movable property (or any portion thereof) or remove it therefrom. Mortgagee may require Mortgagor to assemble such fixtures and personal and movable property and make it available to Mortgagee at a place to be designated by Mortgagee which is reasonably convenient to all parties. Unless such fixtures or personal and movable property are perishable or threaten to decline speedily in value or is of a type customarily sold on a recognized market, Mortgagee will give Mortgagor notice in accordance with Applicable Law of the time and place of any public sale or of the time after which any private sale or other disposition of such fixtures and personal and movable property is to be made. Mortgagee agrees to provide notice by first-class mail, postage prepaid, to Mortgagor at Mortgagor's address set forth in Section 7.20, at least five (5) days before the time of the sale or disposition.

(d)     Every right, power and remedy specifically herein given to Mortgagee will be cumulative and in addition to every other right, power and remedy now or hereafter existing in equity or pursuant to Applicable Law (including specifically those granted by the UCC in effect and applicable to the Mortgaged Property or any portion thereof) each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time and so often and in such order as may be deemed expedient by Mortgagee, and the exercise, or the beginning of the exercise, of any such right, power or remedy will not be deemed a waiver of the right to exercise, at the same time or thereafter any other right, power or remedy.

22

No delay or omission by Mortgagee in the exercise of any right, power or remedy will impair any such right, power or remedy or operate as a waiver thereof or of any other right, power or remedy then or thereafter existing.

(e)     The proceeds of any sale made under or by virtue of this Section 5.02, together with any other sums which then may be held by the Mortgagee under this Mortgage, whether under the provisions of this Section or otherwise, shall be applied in any manner as may be determined by Mortgagee, and subject to terms of Secured Indebtedness Documents.  Mortgagee may bid for and acquire the Mortgaged Property or any part thereof at any sale made under or by virtue of this Section 5.02 and, in lieu of paying cash therefor, may make settlement for the purchase price by crediting against the purchase price the unpaid amounts (whether or not then due) owing to Mortgagee in respect of the Secured Indebtedness, after deducting from the sales price the expense of the sale and the reasonable costs of the action or proceedings and any other sums that Mortgagee is authorized to deduct under this Mortgage.  Mortgagee may adjourn from time to time any sale by it to be made under or by virtue hereof by announcement at the time and place appointed for such sale or for such adjourned sale or sales, and, Mortgagee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned, and, furthermore, if the Mortgaged Property is comprised of more than one parcel of land, the Mortgagee may take any of the actions authorized by this Section 5.02 in respect of any number of individual parcels.

Section 5.03   Rights of Mortgagee With Respect to Fixtures.  To the extent permitted by Louisiana law, Mortgagee may elect to treat Fixtures constituting a part of the Mortgaged Property as either real/immovable property collateral or personal/movable property collateral and proceed to exercise such rights as apply to such type of collateral.

Section 5.04   Possession of the Mortgaged Property.  It will not be necessary for Mortgagee to have physically present or constructively in its possession at any sale held by Mortgagee or by any court, receiver or public officer any or all of the Mortgaged Property, and Mortgagee will deliver to the purchaser at such sale on the date of sale the Mortgaged Property purchased by such purchasers at such sale, and if it becomes impossible or impracticable for any of such purchasers to take actual delivery of the Mortgaged Property, then the title and right of possession to the Mortgaged Property will pass to the purchaser at such sale as completely as if the same had been actually present and delivered.

Section 5.05   Effect of Sale.  Any sale or sales of the Mortgaged Property by virtue of judicial proceedings will operate to divest all right, title, interest, claim and demand whatsoever either at law or in equity, of Mortgagor, in and to the premises and the property sold, and will be a perpetual bar, both at law and in equity, against Mortgagor, and Mortgagor's successors or permitted assigns, and against any and all persons claiming or who will thereafter claim all or any of the property sold from, through or under Mortgagor, or Mortgagor's successors or permitted assigns.  Nevertheless, Mortgagor, if reasonably requested by Mortgagee to do so, will join in the execution and delivery of all proper conveyances, assignments and transfers of the properties so sold.

23

Unofficial Copy © Copyright August 5, 2019

Section 5.06   Application of Proceeds.   The Mortgagee is authorized to receive the proceeds of said sale or sales and apply the same in accordance with the terms of the other Secured Indebtedness Documents.

Section 5.07   Evidence.   It is agreed that in any deed or deeds given by any Mortgagee any and all statements of fact or other recitals therein made as to the identity of Mortgagee, or as to the default in the payments thereof or any part thereof, or as to the breach of any covenants herein contained, or as to the request to sell, notice of sale, time, place, terms and manner of sale, and receipt, application, and distribution of the money realized therefrom, and, without being limited by the foregoing, as to any other additional act or thing having been done by Mortgagee, will be taken by all courts of law and equity as prima facie evidence that the statements or recitals state facts and are without further question to be so accepted; and Mortgagor does hereby ratify and confirm any and all acts that the Mortgagee may lawfully do in the premises by virtue of the terms and conditions of this Mortgage.

Section 5.08   Judicial Proceedings.   Mortgagee may, at its election, proceed by suit or suits, at law or in equity, to enforce the payment of the Secured Indebtedness in accordance with the terms hereof and of the other Secured Indebtedness Documents, and to foreclose the Lien of this Mortgage as against all or any portion of the Mortgaged Property and to have such property sold under the judgment or decree of a court of competent jurisdiction.

Section 5.09   Purchaser.   The parties agree and acknowledge that Mortgagee may be a purchaser of the Mortgaged Property, or of any part thereof, at any sale thereof, or upon any other foreclosure of the Lien hereof, or otherwise; and Mortgagee so purchasing will, upon any such purchase, acquire good title to the Mortgaged Property so purchased, free of the Lien of this Mortgage and free of all rights of redemption in Mortgagor.

Section 5.10   Confession of Judgment and Executory Process.   For purposes of foreclosure under Louisiana executory process procedures, the Mortgagor hereby acknowledges the Secured Indebtedness and confesses judgment in favor of Mortgagee for the full amount of the Secured Indebtedness. Mortgagor further agrees that the Mortgagee may cause all or any part of the Mortgaged Property to be seized and sold by executory process, the Mortgagor waiving the benefit of all Applicable Laws or parts of Applicable Laws relative to the appraisement of property seized and sold under executory process or other legal process, and consenting that all or any part of the Mortgaged Property may be sold without appraisement, either in its entirety or in lots and parcels, as the Mortgagee may determine, to the highest bidder for cash (except that the Mortgagee may credit bid) or on such terms as the plaintiff in such proceedings may direct. Mortgagor hereby waives (i) the benefit of appraisement provided for in articles 2332, 2336, 2723, and 2724 of the Louisiana Code of Civil procedure and all other Applicable Laws conferring the same; (ii) the demand and delay, if any, as provided in article 2721 of the Louisiana Code of Civil Procedure; (iii) the notice of seizure provided for in articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (iv) the three (3) days delay provided for in articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (v) the benefit of the other provisions of Louisiana Code of Civil Procedure Articles 2331, 2722 and 2723, not specifically mentioned above, and all other Applicable Laws providing rights of notice, demand, appraisement, or delay. Mortgagor expressly authorizes and agrees that Mortgagee shall have the right to appoint a keeper of such Mortgaged Property pursuant to the terms and provisions of La.

24

R.S. 9:5131 et seq. and La. R.S. 9:5136 et seq., which keeper may be the Mortgagee, any agent or employee thereof, or any other person, firm, corporation, or other business entity. To the extent permitted by Applicable Law, compensation for the services of the keeper is hereby fixed at five percent (5%) of the amount due or sued for or claimed or sought to be protected, preserved, or enforced in the proceeding for the recognition or enforcement of this Mortgage and shall be secured by the Liens, privileges, and security interests of this Mortgage.

Section 5.11   Authentic Act.   Any and all declarations of facts made by authentic act before a notary public in the presence of two witnesses by a person declaring that such facts lie within his or its knowledge, shall constitute authentic evidence of such facts for the purpose of executory process. Mortgagor specifically agrees that such an affidavit by a representative of Mortgagee as to the existence, amount, terms and maturity of the Secured Indebtedness and of a default thereunder shall constitute authentic evidence of such facts for the purpose of executory process.

Section 5.12   Appraisement; Deficiency.   To the full extent Mortgagor may do so, Mortgagor agrees that Mortgagor will not at any time insist upon, plead, claim or take the benefit or advantage of any Applicable Law providing for any appraisement, valuation, stay, extension or redemption, and Mortgagor, for Mortgagor and Mortgagor's successors and permitted assigns, and for any and all persons ever claiming any interest in the Mortgaged Property, to the extent permitted by Applicable Law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, notice of intention to mature or declare due the whole of the Secured Indebtedness, notice of election to mature or declare due the whole of the Secured Indebtedness and all rights to a marshaling of the assets of Mortgagor, including the Mortgaged Property, or to a sale in inverse order of alienation in the event of foreclosure of the Liens hereby created. Mortgagor will not have or assert any right under any Applicable Law pertaining to the marshaling of assets, sale in inverse order of alienation, or other matters whatever to defeat, reduce or affect the right of Mortgagee under the terms of this Mortgage to a sale of the Mortgaged Property for the collection of the Secured Indebtedness without any prior or different resort for collection, or the right of Mortgagee under the terms of this Mortgage to the payment of such indebtedness out of the proceeds of sale of the Mortgaged Property in preference to every other claimant whatever. If any Applicable Law referred to in this Section 5.12 and now in force, of which Mortgagor or Mortgagor's successors and permitted assigns and such other persons claiming any interest in the Mortgaged Property might take advantage despite this Section 5.12, will hereafter be repealed or cease to be in force, such Applicable Law will not thereafter be deemed to preclude the application of this Section 5.12.

(a)   To the extent permitted by Applicable Law, Mortgagor agrees that Mortgagee will be entitled to seek a deficiency judgment from Mortgagor and any other party obligated on the Secured Indebtedness equal to the difference between the amount owing on the Secured Indebtedness and the amount for which the Mortgaged Property was sold pursuant to a judicial or non-judicial foreclosure sale;

(b)   Mortgagor expressly recognizes that this Section will, to the extent permitted by Applicable Law, constitute a waiver of any potential rights which would otherwise permit Mortgagor and other persons against whom recovery of deficiencies is sought or guarantors independently (even absent the initiation of deficiency proceedings against them) to present

25

competent evidence of the fair market value of the Mortgaged Property as of the date of foreclosure and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than fair market value;

(c)     Mortgagor further recognizes and agrees that this waiver will, to the extent permitted by Applicable Law, create an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Mortgaged Property for purposes of calculating deficiencies owed by Mortgagor, other mortgagors on the Secured Indebtedness, guarantors, and others against whom recovery of a deficiency is sought;

(d)     Alternatively, in the event this waiver is determined by a court of competent jurisdiction to be unenforceable, the following will be the basis for the finder of fact's determination of the fair market value of the Mortgaged Property as of the date of the foreclosure sale in proceedings governed by Applicable Law:

(i)     The Mortgaged Property will be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Mortgaged Property will be repaired or improved in any manner before a resale of the Mortgaged Property after foreclosure;

(ii)     The valuation will be based upon an assumption that the foreclosure purchaser desires a prompt resale of the Mortgaged Property for cash promptly (but no later than twelve months) following the foreclosure sale;

(iii)     All reasonable closing costs customarily borne by the seller in a commercial real estate transaction should be deducted from the gross fair market value of the Mortgaged Property, including, without limitation, commercially reasonable brokerage commissions, title insurance (without endorsement), a survey of the Mortgaged Property, tax prorations, reasonable attorney's fees, and reasonable marketing costs;

(iv)     The gross fair market value of the Mortgaged Property will be further discounted to account for any estimated holding costs associated with maintaining the Mortgaged Property pending sale, including, without limitation, operational and utilities expenses, reasonable property management fees (for property similar to the Mortgaged Property), taxes and assessments (to the extent not accounted for in (d)(iii) above), and other reasonable maintenance expenses; and

(v)     Any expert opinion testimony given or considered in connection with a determination of the fair market value of the Mortgaged Property must be given by persons having at least five years' experience in appraising property similar to the Mortgaged Property and who have conducted and prepared a complete written appraisal of the Mortgaged Property taking into consideration the factors set forth above.

Section 5.13   Operation of the Mortgaged Property by Mortgagee.  Upon the occurrence and during the continuance of an Event of Default, Mortgagee (or any person designated by Mortgagee) will have the right and power, but will not be obligated, to enter upon and take possession of any of Mortgagor's interest in the Mortgaged Property, and to exclude Mortgagor, and Mortgagor's agents, employees or representatives, wholly therefrom, and to hold, use,

26

Unofficial Copy Office of Harris County District Clerk

administer, manage and operate the same to the extent that Mortgagor will be at the time entitled and in its place and stead. Mortgagee (or any person designated by Mortgagee) may operate the same without any liability to Mortgagor in connection with such operations, except to use ordinary care in the operation of such properties, and Mortgagee (or any person designated by Mortgagee) will have the right to collect, receive and receipt for all Hydrocarbons produced and sold from said properties, to make reasonable and necessary repairs, purchase machinery and equipment, and conduct such work-over or other operations that a reasonably prudent operator would make, purchase or conduct to maintain the Mortgaged Property. When and if the expenses of such operation and development (including costs of unsuccessful work-over or other operations or additional Wells) have been paid and the indebtedness paid, said properties will, if there has been no sale or foreclosure, be returned to Mortgagor. All costs, expenses and liabilities of every character incurred by Mortgagee in administering, managing, operating and controlling the Mortgaged Property will constitute a demand obligation (which obligation Mortgagor hereby expressly promises to pay) owing by Mortgagor to Mortgagee and will bear interest from date of expenditure until paid at a rate set forth in the Secured Indebtedness Documents, all of which will constitute a portion of the Secured Indebtedness and will be secured by this Mortgage and all other Security Instruments, as defined in Term Loan Agreement, and the Omnibus Agreement.

Section 5.14   Power of Attorney and Agent to Mortgagee.   Mortgagor does hereby designate Mortgagee as the agent and attorney in fact of Mortgagor to act in the name, place, and stead of Mortgagor in the exercise of each and every remedy set forth herein, including rights to Liens on the Mortgaged Property, and in conducting any and all operations and taking any and all action reasonably necessary to do so, recognizing such agency in favor of Mortgagee to be coupled with the interests of Mortgagee under this Mortgage and, thus, irrevocable so long as this Mortgage is in force and effect. Without limiting the generality of the foregoing, Mortgagor shall have the right:

(a)   to notify account debtors of the obligors on the accounts, the general intangibles and the related rights to make and deliver payment to Mortgagee;

(b)   to demand, sue for, collect, receive and give acquittance for any and all funds due or to become due under such accounts, general intangibles and related rights and otherwise deal with proceeds;

(c)   to receive, take, endorse, assign and deliver any and all checks, notes, drafts, documents and other negotiable and non-negotiable instruments and chattel paper taken or received by Mortgagee in connection therewith;

(d)   to sell, assign, transfer, make any agreement in respect of, or otherwise deal with or exercise rights in respect of, any Mortgaged Property or the goods or services that have given rise thereto, and to novate and assign and assume any contract relating to the Mortgaged Property, in each case, as fully and completely as though the Mortgagee were the absolute owner thereof for all purposes;

22

Unofficial Copy Certificate of Harris County Brandon Davis District

(e)    to receive payment of and receipt for any and all monies, claims and other amounts due and to become due at any time in respect of or arising out of any Mortgaged Property;

(f)    to settle, compromise, compound, prosecute or defend any action or proceeding with respect thereto at any court, arbitration or other forum for the purposes of collecting any of the Mortgaged Property and enforcing any other right in respect thereof;

(g)    to sell, transfer, assign or otherwise deal in or with the same or the proceeds or avails thereof or the relative goods, as fully and effectively as if Mortgagee were the absolute owner thereof;

(h)    to direct any parties liable for any payment in connection with any of the Mortgaged Property to make payment of any and all monies due and to become due thereunder directly to the Mortgagee or as the Mortgagee shall direct;

(i)    to execute and deliver all assignments, conveyances, statements, financing statements, renewal financing statements, security and pledge agreements, affidavits, notices and other agreements, instruments and documents in order to perfect and maintain the security interests and Liens granted in this Mortgage and in order to fully consummate all of the transactions contemplated therein;

(j)    to institute any foreclosure proceedings that the Mortgagee may reasonably deem appropriate;

(k)    to extend the time of payment of any or all thereof and to grant waivers and make any allowance or other adjustment with reference thereto; and

(l)    to do and perform all such other acts and things as the Mortgagee may reasonably deem appropriate or convenient in connection with the Mortgaged Property;

provided, however, that Mortgagee shall be under no obligation or duty to exercise any of the powers hereby conferred upon it and shall be without liability for any act or failure to act in connection with the collection of, or the preservation of any rights under, any Mortgaged Property.

This power of attorney is a power coupled with an interest and shall be irrevocable until the Final Payment Date.

Section 5.15    Mortgagee May Act.    If Mortgagor fails to comply with any of the covenants or obligations of Mortgagor hereunder, and upon the occurrence and continuance of a Default or an Event of Default, then Mortgagee may perform the same for the account and at the expense of Mortgagor but will not be obligated so to do, and any and all expenses incurred or paid in so doing will be payable by Borrower to Mortgagee, with interest at the rate set forth in the Secured Indebtedness Documents, from the date when same was so incurred or paid, and the amount thereof will be payable on demand and will be secured by and under this Mortgage, and the amount and nature of such expense and the time when paid will be presumptively established by the affidavit of Mortgagee or any officer or agent thereof, or by the affidavit of any

28

Unofficial office of Teneshia Hudspeth, Harris County District Clerk

Mortgagee acting hereunder; except that the exercise of the privileges granted in this Section 5.15 will not be considered or constitute a waiver of the right of Mortgagee upon the occurrence and during the continuance of an Event of Default hereunder to declare the Secured Indebtedness at once due and payable but will be cumulative of such right and all other rights herein given.

## ARTICLE VI

### ASSIGNMENT OF PRODUCTION AND REVENUES
#### (this "Assignment")

Section 6.01   Production.   In addition to the conveyance to the Mortgagee herein made, Mortgagor does hereby transfer, assign, deliver and convey unto Mortgagee all Hydrocarbons saved or sold from the Mortgaged Property and attributable to the interest of Mortgagor herein subsequent to 7:00 A.M. on the 1st day of the month in which this Mortgage is executed, together with the proceeds of any sale thereof ("Hydrocarbon Proceeds"); Mortgagor hereby directs any purchaser now or hereafter taking any production from the Mortgaged Property to pay to Mortgagee such Hydrocarbon Proceeds and to continue to make payments directly to Mortgagee until notified in writing by Mortgagee to discontinue; and the purchaser of any such production will have no duty or obligation to inquire into the right of Mortgagee to receive the same, what application is made thereof, or as to any other matter; and the payment made to Mortgagee will be binding and conclusive as between such purchaser and Mortgagor. Mortgagor further agrees to perform all such acts, and to execute all such further assignments, transfers and division orders, and other instruments as may be required or desired by Mortgagee or any other party to have such Hydrocarbon Proceeds so paid to Mortgagee.

Section 6.02   Revenues.   In addition to the conveyance to the Mortgagee herein made, Mortgagor does hereby transfer, assign, deliver and convey unto Mortgagee, all the income, revenues, rents, issues, profits and proceeds arising from the Pipelines relating to the Mortgaged Property whether due, payable or accruing (collectively, the "Revenues") under any and all present and future contracts or other agreements relating to the transmission or storage of the Hydrocarbons or the ownership of all or any portion of the Mortgaged Property. Mortgagor hereby directs any payor to pay to Mortgagee such Revenues derived from such contracts and agreements, and to continue to make payments directly to Mortgagee until notified in writing by Mortgagee to discontinue the same; and the payor will have no duty or obligation to inquire into the right of Mortgagee to receive the same, what application is made thereof, or as to any other matter; and the payment made to Mortgagee will be binding and conclusive as between such payor and Mortgagor. Mortgagor agrees to perform all such acts, and to execute all such further assignments, transfers and other instruments as may be required or desired by the Mortgagee or any party in order to have said Revenues so paid to the Mortgagee.

Section 6.03   General.   Mortgagee is fully authorized to (i) receive and receipt for said Revenues and Hydrocarbon Proceeds; (ii) to endorse and cash any and all checks and drafts payable to the order of Mortgagor or Mortgagee for the account of Mortgagor received from or in connection with said Revenues and Hydrocarbon Proceeds and apply the proceeds thereof to the payment of the Secured Indebtedness, when received, regardless of the maturity of any of the Secured Indebtedness, or any installment thereof, and (iii) execute any instrument in the name of Mortgagor to facilitate any of the foregoing.  Mortgagee will never be liable for any delay,

29

neglect, or failure to effect collection of any Revenues and Hydrocarbon Proceeds or to take any other action in connection therewith or hereunder; but will have the right, at its election, in the name of Mortgagor or otherwise, to prosecute and defend any and all actions or legal proceedings deemed advisable by Mortgagee in order to collect such funds and to protect the interests of Mortgagee and/or Mortgagor, with all costs, expenses and attorney's fees incurred in connection therewith being paid by Mortgagor.

Section 6.04   INDEMNIFICATION.  UNLESS MORTGAGEE HAS CLAIMED OR IS CLAIMING, FOR ITS BENEFIT REVENUES AND HYDROCARBON PROCEEDS BELONGING TO THIRD PARTIES AND NOT ATTRIBUTABLE TO THE MORTGAGED PROPERTY, MORTGAGOR HEREBY AGREES TO FOREVER INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS THE INDEMNIFIED PARTIES AGAINST ALL CLAIMS, ACTIONS, LIABILITIES, JUDGMENTS, COSTS, CHARGES AND ATTORNEYS' FEES MADE AGAINST OR INCURRED BY IT, OF ANY KIND OR NATURE, JOINT OR SEVERAL, BASED ON AN ASSERTION THAT THEY RECEIVED REVENUES OR HYDROCARBON PROCEEDS CLAIMED BY THIRD PERSONS EITHER BEFORE OR AFTER THE PAYMENT IN FULL OF THE SECURED INDEBTEDNESS.   THE INDEMNIFIED PARTIES WILL HAVE THE RIGHT TO DEFEND AGAINST ANY SUCH CLAIMS, ACTIONS AND JUDGMENTS, EMPLOYING THEIR ATTORNEYS THEREFOR, AND IF THEY ARE NOT FURNISHED WITH REASONABLE INDEMNITY, THEY WILL HAVE THE RIGHT TO COMPROMISE AND ADJUST ANY SUCH CLAIMS, ACTIONS AND JUDGMENTS.   MORTGAGOR AGREES TO INDEMNIFY AND PAY TO INDEMNIFIED PARTIES ANY AND ALL SUCH CLAIMS, JUDGMENTS, COSTS, CHARGES AND ATTORNEYS' FEES AS MAY BE PAID IN ANY JUDGMENT, RELEASE OR DISCHARGE THEREOF OR AS MAY BE ADJUDGED AGAINST MORTGAGEE. MORTGAGOR HEREBY APPOINTS MORTGAGEE AS ITS ATTORNEY-IN-FACT TO PURSUE ANY AND ALL RIGHTS OF MORTGAGOR TO LIENS ON THE MORTGAGED PROPERTY.  MORTGAGOR HEREBY FURTHER TRANSFERS AND ASSIGNS TO MORTGAGEE ANY AND ALL SUCH LIENS OR SIMILAR INTERESTS OF MORTGAGOR ATTRIBUTABLE TO ITS INTEREST IN THE MORTGAGED PROPERTY AND REVENUES AND HYDROCARBON PROCEEDS PURSUANT TO APPLICABLE LAW.  THE POWER OF ATTORNEY GRANTED TO MORTGAGEE IN THIS SECTION 6.04, BEING COUPLED WITH AN INTEREST, WILL BE IRREVOCABLE SO LONG AS ALL OR ANY PART OF THE SECURED INDEBTEDNESS REMAINS UNPAID.  NOTWITHSTANDING THE FOREGOING, MORTGAGOR WILL HAVE NO OBLIGATION TO INDEMNIFY INDEMNIFIED PARTIES FOR ANY CLAIMS, ACTIONS, LIABILITIES, JUDGMENTS, COSTS, CHARGES AND ATTORNEYS' FEES ARISING OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT SUCH INDEMNIFIED PARTIES AS DETERMINED BY A NON-APPEALABLE ORDER OF A COURT OF COMPETENT JURISDICTION.

Section 6.05   Failure of Payments.  If any purchaser or other party taking the production from the Mortgaged Property or owing payment to Mortgagor fails to make prompt payment to Mortgagee in accordance with this Assignment, Mortgagee will, if permitted by Applicable Law, have the right at Mortgagor's expense to demand a change of connection or other form of

38

transmission and to designate another purchaser or other party with whom a new connection or other form of transmission may be made, without any liability on the part of Mortgagee in making such selection, so long as ordinary care is used in the making thereof, and failure of Mortgagor to consent to and promptly effect such change of connection or other form of transmission will constitute an Event of Default hereunder.

Section 6.06   Receiving Holding Monies.   Mortgagee authorizes and empowers Mortgagee to receive, hold and collect all sums of money paid to Mortgagee in accordance with this Assignment, and to apply the same as hereinafter provided, all without any liability or responsibility on the part of Mortgagee, save and except as to good faith in so receiving and applying such sums, subject to the terms of the Intercreditor Agreement.   All payments provided for in this Assignment will be paid promptly to Mortgagee, and any provisions contained in any Secured Indebtedness Documents evidencing the Secured Indebtedness or any part thereof to the contrary notwithstanding, Mortgagee may apply the same or so much thereof as it elects to the payment of the Secured Indebtedness, application to be made in such manner as it may elect, regardless of whether the application so made will exceed the payments of principal and interest then due as provided in the Loan Documents evidencing the Secured Indebtedness, but in no event in excess of the total Secured Indebtedness outstanding.   After such application has been so made by Mortgagee in accordance with the Secured Indebtedness Documents, the balance of any such payment or payments remaining will be paid to Mortgagor.   Mortgagee agrees to give Mortgagor written notice simultaneously with its notice to the purchaser that such payments are to be paid to Mortgagee in accordance with the terms of this Article VI.

Section 6.07   Payments Under Assignment.  The parties agree that if payments provided for by this Assignment are less than the sum or sums then due on the Secured Indebtedness, such sum or sums then due will nevertheless be paid by Mortgagor in accordance with the provisions of the Secured Indebtedness Documents and other instrument or instruments evidencing the Secured Indebtedness, and neither this Assignment nor any provisions hereof will in any manner be construed to affect the terms and provisions of such Secured Indebtedness Documents or other instrument or instruments evidencing the Secured Indebtedness.   Likewise, the parties agree that neither this Assignment nor any provisions hereof will in any manner be construed to affect the Lien, rights, title and remedies herein granted securing the Secured Indebtedness or Borrower's liability therefor.   The rights under this Assignment are cumulative of all other rights, remedies, and powers granted under this Mortgage, and are cumulative of any other security which Mortgagee now holds or may hereafter hold to secure the payment of the Secured Indebtedness.

Section 6.08   Remittance of Monies.  If Mortgagor receives any of the proceeds which under the terms hereof should have been remitted to Mortgagee, Mortgagor will immediately remit same in full to Mortgagee and until such time, the Mortgagor shall hold such proceeds on trust for the Mortgagee.

Section 6.09   [Reserved].

Section 6.10   Unconditional Effectiveness.   Mortgagor hereby acknowledges that this Assignment is intended to be presently, unconditionally and immediately effective.   Furthermore, Mortgagor agrees that Mortgagee is not required to assert any affirmative act, including the institution of any legal proceedings, to enforce this Assignment.

31

Unofficial Copy Official Record

Section 6.11    [Reserved].

## ARTICLE VII

### MISCELLANEOUS

Section 7.01    Renewals, Amendments and Other Security.  Renewals and extensions of the Secured Indebtedness may be given at any time and amendments may be made to the Mortgage in accordance with the terms hereof and the other Secured Indebtedness Documents, and the Mortgagee may take or may hold other security for the Secured Indebtedness without notice to or consent of Mortgagor. The Mortgagee may resort first to such other security or any part thereof or first to the security herein given or any part thereof, or from time to time to either or both, even to the partial or complete abandonment of either security, and such action will not be a waiver of any rights conferred by this Mortgage, which will continue as a first Lien upon the Mortgaged Property not expressly released until all Secured Indebtedness secured hereby is fully paid.

Section 7.02    Amendments and Supplements.  It is contemplated by the parties hereto that from time to time additional interests and properties may or will be added to the interests and properties in Exhibit A-1 and Exhibit A-2 attached hereto by means of supplements or amendments identifying this Mortgage and describing such interests and properties to be so added and included, and upon the execution of any such supplements or amendments, the Lien, rights, titles and interests created herein will immediately attach to and be effective as of the date of such supplements and amendments in respect to any such interests and properties so described, and the same being included in the term "Mortgaged Property," as used herein. This Mortgage, and any provisions hereof, may be modified or amended only by an agreement in writing signed by Mortgagor and Mortgagee.

Section 7.03    No Waiver.  Mortgagee's failure or delay in filing or giving any notice as to this Mortgage, or exercising any right, remedy or option to declare the maturity of the principal debt, or any other sums hereby secured, or the payment by Mortgagee of any taxes, Lien, charges or assessments, will not operate as a waiver of any rights to exercise such right or option or to declare any such maturity as to any past or subsequent violations of any of such covenants or stipulations, and will not waive or prejudice any right or Lien hereunder. Mortgagee's failure to exercise any rights, remedies or options hereunder will not constitute a waiver or prejudice the exercise of other rights or remedies existing hereunder.

Section 7.04    Liability for Deficiency.  Neither the acceptance of this Mortgage by Mortgagee nor any action taken pursuant hereto will be construed as relieving any party liable for the Secured Indebtedness from any liability or deficiency thereon.  The execution and delivery of this Mortgage will not in any manner affect any other security for the Secured Indebtedness, nor will any security taken hereafter as security for the Secured Indebtedness impair or affect this Mortgage.

Section 7.05    [Reserved].

32

1358884945

Section 7.06   Subrogation.  The Secured Indebtedness will conclusively be presumed to have been entered into in reliance upon this Mortgage.  All dealings between Mortgagor and Mortgagee, whether or not resulting in the creation of the Secured Indebtedness, will be conclusively presumed to have been had or consummated in reliance upon this Mortgage.  Until the Secured Indebtedness is paid and discharged in full, Mortgagor will have no right to subrogation or to enforce any remedy or participate in any Mortgaged Property or security whatsoever now or hereafter held by Mortgagee.

Section 7.07   Assignment; Covenants Running with the Land.  Without the prior written consent of Mortgagee, Mortgagor may not assign any rights, duties or obligations hereunder.  In the event of an assignment or pledge of all or part of the Secured Indebtedness by Mortgagee in accordance with the terms of the Secured Indebtedness Documents, the assignee will be entitled to all the rights, privileges and remedies granted in this Mortgage to Mortgagee.  The covenants and agreements set forth in this Mortgage by or on behalf of Mortgagor will bind Mortgagor and Mortgagor's successors or permitted assigns and all persons who become bound as a mortgagor to this Mortgage and will inure to the benefit of Mortgagee and its successors and assigns.  The covenants and agreements set forth in this Mortgage shall constitute covenants running with the land and shall inure to the benefit of Mortgagee and its successors and permitted assigns.  To the fullest extent permitted by law, Mortgagor hereby releases the Mortgagee, its respective successors and assigns and its respective officers, attorneys, employees and agents, from any liability for any act or omission or any error of judgment or mistake of fact or of law relating to this Mortgage or the Mortgaged Property, except for any liability arising from the gross negligence or willful misconduct of such party.

Section 7.08   No Termination.  Subject to the occurrence of the Final Termination Date, this Mortgage, including the grant of Liens hereunder and all of Mortgagee's rights, powers and remedies in connection with this Mortgage, will remain in full force and effect regardless of whether the liability of any other obligor may have ceased, or irrespective of the validity or enforceability of any other instrument executed in connection with the Secured Indebtedness, and notwithstanding the reorganization, incapacity or bankruptcy of any obligor, or the reorganization or bankruptcy of Mortgagor or any other event or proceeding affecting Mortgagor or any obligor.

Section 7.09   Further Assurances.  If and to the extent that Mortgagee determines that any further actions, notices or agreements are or hereafter become necessary under Applicable Law to create, vest, perfect or continue the Liens and other rights of Mortgagee described in this Mortgage, Mortgagor, at its own cost and expense, agrees to promptly take such actions and to execute and deliver such notices or agreements to Mortgagee.

Section 7.10   Successors and Assigns.  The terms used to designate any of the parties herein will be deemed to include the heirs, successors, assigns, trustees and legal representatives of such parties, and the term "Mortgagee" will also include any lawful owner, holder or pledgee of any Secured Indebtedness.  Whenever the context requires, reference herein made to the single number will include the plural and the plural will likewise include the singular.  Words denoting sex will be construed to include the masculine, feminine, and neuter when such construction is appropriate, and specific enumeration will not exclude the general, but will be construed as cumulative.

33

Unofficial Copy Office of Harris County Clerk

Section 7.11   Articles, Etc.  This Mortgage, for convenience only, has been divided into Articles, Sections and paragraphs, and the rights, powers, privileges, duties and other legal relations of Mortgagor and Mortgagee will be determined from this Mortgage as an entirety and without regard to the aforesaid division into Articles, Sections and paragraphs and without regard to headings prefixed to such Articles.

Section 7.12   Multiple Counterparts.   This Mortgage may be executed in multiple counterparts.  For recording purposes, various counterparts have been executed and there may be attached to each such counterpart an Exhibit A-1 and Exhibit A-2 containing only the description of the Mortgaged Property, or portions thereof, which relates to the county/parish or state in which the particular counterpart is to be recorded.  A complete, original counterpart of this Mortgage with a complete Exhibit A-1 and Exhibit A-2 may be obtained from Mortgagee.  Each of the counterparts hereof so executed will for all purposes be deemed to be an original, and all such counterparts will together constitute but one and the same Mortgage.

Section 7.13   Benefits of the Term Loan Agreement.   In connection with its execution and acting hereunder, Mortgagee is entitled, in addition to its other rights, to all rights, privileges, protections, immunities, benefits and indemnities provided to it as Administrative Agent under the Term Loan Agreement.

Section 7.14   Reserved].

Section 7.15   Unenforceable or Inapplicable Provisions.   If any provision of this Mortgage or in any other Secured Indebtedness Documents is invalid, illegal or unenforceable in any jurisdiction, the other provisions hereof or of any other Loan Document will remain in full force and effect in such jurisdiction, and the remaining provisions hereof will be liberally construed in favor of the Mortgagee in order to effectuate the provisions hereof, and the invalidity of any provision hereof in any jurisdiction will not affect the validity or enforceability of any such provision in any other jurisdiction.  Any reference herein contained to statute or law of a state in which no part of the Mortgaged Property is situated will be deemed inapplicable to, and not used in, the interpretation hereof.

Section 7.16   Effectiveness as Financing Statements.   This Mortgage covers goods which are or are to become fixtures on the real property described herein, and this Mortgage shall be effective as a financing statement filed as a fixture filing with respect to all Fixtures included within the Mortgaged Property. This Mortgage shall also be effective as a financing statement covering as-extracted collateral, minerals and other substances of value which may be extracted from the earth (including, without limitation, natural oil and crude gas), and Accounts related thereto, which will be financed at the wellhead or minehead of the Wells or mines located on the Lands and Leases. This Mortgage is to be filed for record in the mortgage records of each parish where any part of the Mortgaged Properties is situated or which lies shoreward of any Mortgaged Properties (i.e., to the extent any of the Mortgaged Properties lie offshore within the projected seaward extension of the relevant county/parish boundaries), and may also be filed in the offices of the Bureau of Land Management or the Bureau of Ocean Energy Management, Regulation and Enforcement, OCS Gulf of Mexico Region, New Orleans, Louisiana or in any relevant state agency (or any successor agencies). This Mortgage shall also be effective as a financing statement covering any other Mortgaged Property and may be filed in any other

34

Unofficial Copy - Northern District of Texas

appropriate filing or recording office, including, but not limited to, with the clerk of any parish for filing in the central registry of the State of Louisiana. The mailing address of Mortgagor is 777 North Eldridge Parkway, Suite 300 Houston, Texas 77079, and the address of Mortgagee from which information concerning the security interests hereunder may be obtained is the address of Mortgagee set forth in Section 7.20 of this Mortgage.

Section 7.17   Instrument as an Assignment, Etc.; Grant to Mortgagee.   This Mortgage will be deemed to be and may be enforced from time to time as an assignment, chattel mortgage, contract, deed of trust, financing statement, real estate mortgage, pledge, or security agreement, and from time to time as any one or more thereof, and to the extent that any particular jurisdiction wherein a portion of the Mortgaged Property is situated does not recognize or permit Mortgagor to grant, bargain, sell, warrant, mortgage, pledge, assign, transfer, or convey Mortgagor's rights, titles, and interests to the Mortgagee for the benefit of Mortgagee in the manner herein adopted, then, with respect to the Mortgaged Property located in such jurisdiction, Mortgagor does hereby grant, bargain, sell, warrant, mortgage, pledge, assign, transfer, and convey unto Mortgagee, with power of sale (if permitted by Applicable Law), the Mortgaged Property to secure the Secured Indebtedness and the obligations of Mortgagor contained herein and the references herein to the rights and powers of or rights and powers granted by Mortgagor to the Mortgagee will be deemed to be rights and powers of or rights and powers granted by Mortgagor to Mortgagee.

Section 7.18   Governing Law.   **THE SUBSTANTIVE LAWS OF THE STATE OF LOUISIANA (AND WHERE APPLICABLE, THE UNITED STATES OF AMERICA) SHALL GOVERN THE VALIDITY, CONSTRUCTION, ENFORCEMENT AND INTERPRETATION OF THIS MORTGAGE, UNLESS THE LAWS OF ANOTHER STATE SHALL MANDATORILY APPLY.**

Section 7.19   WAIVER OF JURY TRIAL; CLASS ACTION; RELIANCE; DAMAGES.

(a)   JURY TRIAL WAIVER.   AS PERMITTED BY APPLICABLE LAW, MORTGAGOR WAIVES ITS RESPECTIVE RIGHTS TO A TRIAL BEFORE A JURY IN CONNECTION WITH ANY CLAIM, DISPUTE, OR CONTROVERSY THAT ARISES WITH RESPECT TO THIS MORTGAGE OR ANY OTHER AGREEMENT OR BUSINESS RELATIONSHIP WHETHER OR NOT RELATED TO THE SUBJECT MATTER OF THIS MORTGAGE (ALL OF THE FOREGOING, A "DISPUTE"), AND DISPUTES SHALL BE RESOLVED BY A JUDGE SITTING WITHOUT A JURY.

(b)   CLASS ACTION.   AS PERMITTED BY APPLICABLE LAW, MORTGAGOR WAIVES THE RIGHT TO LITIGATE IN COURT OR AN ARBITRATION PROCEEDING ANY DISPUTE AS A CLASS ACTION, EITHER AS A MEMBER OF A CLASS OR AS A REPRESENTATIVE, OR TO ACT AS A PRIVATE ATTORNEY GENERAL.

(c)   RELIANCE.   Each party (i) certifies that no one has represented to such party that the other party would not seek to enforce jury waiver in the event of suit, and (ii) acknowledges that it and the other party have been induced to enter into this Mortgage by, among other things, the mutual waivers, agreements, and certifications in this section.

35

(d)     DAMAGES. MORTGAGOR, ADMINISTRATIVE AGENT, COLLATERAL AGENT, EACH LENDER AND EACH HEDGE COUNTERPARTY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH ACTION AGAINST ANOTHER PARTY, ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.

(e)     PARTY.  As used in Section 7.19, "party" and "PARTY" includes each of Mortgagor, the Administrative Agent, the Collateral Agent and each Lender, in each capacity set forth in this Mortgage and the other Loan Documents.

Section 7.20    Notices. Any record, notice, demand or document which either party is required or may desire to give hereunder will be in writing and will or may, as the case may be, be given in the same manner as notice is given under the Secured Indebtedness Documents as follows:

If to Mortgagee:

Gomex Finance LLC
c/o Javelin Global Commodities
4625 Lindell Boulevard, Suite 231
St. Louis, Missouri 63108
Attention:  Peter Bradley, Spencer Sloan, Michael Foster, Peter Prischard, Jennifer Binkin
Email: peter.bradley@javelincommodities.com;
spencer.sloan@javelincommodities.com;
michael.foster@javelincommodities.com
peter.prichard@javelincommodities.com
jennifer.binkin@javelincommodities.com

*with a copy to:*

Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Attention:  Anders Gibson
Email: agibson@porterhedges.com

If to Mortgagor:

Sanare Energy Partners, LLC
777 North Eldridge Parkway, Suite 300
Houston, Texas 77079
Attention:  Brian Macmilian
Email: bmac@sanarepartners.com

36

Section 7.21   Paraph.   Mortgagor acknowledges that no Note or other obligation has been presented to the undersigned Notary Public to be paraphed for identification herewith.

Section 7.22   Drafting of Mortgage.   Mortgagor declares that it has contributed to the drafting of this Mortgage or has had the opportunity to have it reviewed by its counsel before signing it and agrees that it has been purposefully drawn and correctly reflects its understanding of the transaction that it contemplates.

Section 7.23   Prior or Oral Agreements.   **THIS MORTGAGE REFLECTS THE FINAL AGREEMENT OF THE PARTIES WITH RESPECT TO THE MATTERS SET OUT HEREIN AND MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENT OF THE UNDERSIGNED.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

Section 7.24   Reserved].

Section 7.25   Reserved].

Section 7.26   Acceptance of Mortgage.   In accordance with the provisions of the Louisiana Civil Code Article 3289, Mortgagee's acceptance of this Mortgage is not required to be evidenced by a signature on this Mortgage.

(Signature and Acknowledgment pages follow.)

**THUS DONE AND PASSED** on the date set forth above, but effective as of the Effective Date, in the presence of the undersigned witnesses who hereunto sign their names with the Mortgagor and Notary, respectively, after due reading of the whole.

WITNESSES:                                    MORTGAGOR/DEBTOR:

SANARE ENERGY PARTNERS, LLC

By: _____
Brian Macmillan
Senior Vice President – Land

_____
John Dobbs
Printed Name

_____
Richard Coleman
Printed Name

_____
NOTARY PUBLIC
Printed Name: Marisela Chavez
My Commission Expires: 7-22-2024
Notary Identification #: 126598305

NOTARY PUBLIC, STATE OF TEXAS

Signature Page to Act of Mortgage

Unofficial Copy Office of Teneshia Hudspeth Burgess District Clerk

ANNEX I
TO
Act of Mortgage, Security Agreement, Fixture Filing,
Financing Statement and Assignment of Production and Revenues
from SANARE ENERGY PARTNERS, LLC
in favor of GOMEX FINANCE LLC, as Collateral Agent

CERTIFICATE OF COMPANY RESOLUTIONS

I, the undersigned, hereby certify that I am the Senior Vice President – Land of Sanare Energy Partners, LLC, a Delaware limited liability company ("Company"), whose address for notices is 777 North Eldridge Parkway, Suite 300, Houston, Texas 77079.

I further certify that attached hereto is a true and correct copy of written consent of Sole Member of the Company in accordance with applicable law and the articles of formation and the limited liability company agreement of the Company and that nothing in such written consent of the Sole Member has been rescinded, revoked, modified, or amended in any respect, and that each provision of such written consent of the Sole Member is in full force and effect on the date hereof.

IN WITNESS WHEREOF, I hereunto subscribe my name on the 6th day of September, 2022.

By: _____
Brian Macmillan
Senior Vice President – Land

## WRITTEN CONSENT OF THE SOLE MEMBER OF
## SANARE ENERGY PARTNERS, LLC

WHEREAS, Sanare Energy Partners, LLC (the "Company") is a successful producer of oil and gas in the Gulf of Mexico; and

WHEREAS, the Company has recently assigned to Greyhound Energy LLC ("Greyhound") several oil and gas leases covering promising drill sites within the Gulf of Mexico and Greyhound requires additional financing to expand its operations therein;

WHEREAS, such assignment of certain oil and gas leases by the Company to Greyhound remains subject to regulatory approval by the Bureau of Ocean Energy Management (the "BOEM") with respect to certain of the leases; and

WHEREAS, Gomex Finance LLC (the "Lender") has agreed to provide a credit facility of up to $30,000,000 (the "Greyhound Term Loan") to Greyhound pursuant to that certain Term Loan Agreement (the "Greyhound Term Loan Agreement") by and among Greyhound, as borrower, Lender and Gomex Finance LLC, as administrative agent and as collateral agent, for the purpose of expanding Greyhound's drilling and exploration operations in the Gulf of Mexico; and

WHEREAS, in conjunction with the Greyhound Term Loan by Lender, the Company has agreed to designate Lender's affiliate, Javelin Gomex Trading LLC (the "Marketing Agent"), as its marketing agent pursuant to that certain Sanare Marketing Agreement (defined below) for the sale of oil and gas produced in the Gulf of Mexico with respect to those certain Sanare Marketing Documents (defined below); and

WHEREAS, the Company desires to enter into a Hedge Agreement with Marketing Agent, including, without limitation, an ISDA Master Agreement and schedule thereto with respect to hedging activity from time to time (collectively, together with any and all transactions and confirmation with respect thereto, the "Sanare Hedge Agreement");

WHEREAS, in conjunction with the Greyhound Term Loan by Lender, the Company has agreed to subordinate certain rights pursuant to the terms and conditions of that certain Subordination Agreement (the "Subordination Agreement") by and among the Company, Lender, Greyhound, Kewa Financial, Inc., and Forward Path Energy LLC; and

WHEREAS, the sole Member of the Company believes it is in the best interest of the Company to take all steps necessary and appropriate to consummate the Greyhound Term Loan Agreement, Sanare Marketing Agreement and the other Sanare Marketing Documents, the Sanare Hedge Agreement, and any other relevant or related agreements related to the foregoing.

NOW, THEREFORE, let it be:

1.   **Authority to Grant Security Interests and Mortgages.**

**RESOLVED**, that Brian Macmillan, the Senior Vice President – Land of the Company, is hereby authorized on behalf of the Company, acting alone, to

mortgage, pledge, grant and assign a security interest in, hypothecate or otherwise encumber any and all property, rights and interests of the Company, whether real or personal, tangible or intangible, now owned or hereafter acquired, as security for the payment and performance of any and all indebtedness and other obligations of the Company to the Lender, the Marketing Agent and their affiliates, and to execute and deliver any mortgage, act of mortgage, deed of trust, security agreement, collateral assignment, security instrument, pledge agreement, assignment, deposit account control agreement, financing statement or other instrument, and any amendment or supplement thereof, required by Lender, as applicable, to effect such encumbrance, in such form and containing such terms and conditions as he shall approve as being advisable and proper and in the best interests of the Company (the execution thereof to constitute conclusive evidence of such approval).

2. **Authority to Enter into Sanare Marketing Agreement and Sanare Marketing Documents.**

**RESOLVED**, that Brian Macmillian, the Senior Vice President – Land of the Company, is hereby authorized on behalf of the Company, acting alone, to enter into, execute and deliver and affix the seal of the Company to any agreement, arrangement, or understanding with Marketing Agent for the sale of oil and gas products produced by the Company, including execution and delivery of that certain Marketing Agreement between the Company and the Marketing Agent (the "Sanare Marketing Agreement"), Master Crude Oil Purchase and Sale Agreement, Master Netting Agreement, NAESB Base Contract for Sale and Purchase of Natural Gas including the Special Provisions attached thereto, in each case between the Company and the Marketing Agent (the foregoing agreements together with the Sanare Marketing Agreement and any and all other documents and agreements related thereto, collectively, the "Sanare Marketing Documents"), and any intercreditor agreement, in each case, in such form and containing such terms and conditions as such Manager shall approve as being advisable and proper and in the best interests of the Company (the execution thereof to constitute conclusive evidence of such approval).

3. **Authority to Enter into Sanare Hedging Agreement.**

**RESOLVED**, that Brian Macmillian, the Senior Vice President – Land of the Company, is hereby authorized on behalf of the Company, acting alone, to enter into, execute and deliver and affix the seal of the Company to the Sanare Hedge Agreement, all under such terms and conditions which such Manager may agree in his discretion, in such form and containing such terms and conditions as he shall approve as being advisable and proper and in the best interests of the Company (the execution thereof to constitute conclusive evidence of such approval).

**RESOLVED**, that the Company shall and is authorized to enter into, execute, deliver and perform its obligations under the Sanare Hedge Agreement, together

Unofficial Copy of Montgomery District Clerk

with any and all transactions and confirmations entered into with respect thereto from time to time.

4.  **Authority to Enter into Subordination Agreement.**

**RESOLVED**, that Brian Macmillan, the Senior Vice President – Land of the Company, is hereby authorized on behalf of the Company, acting alone, to enter into, execute and deliver and affix the seal of the Company to the Subordination Agreement, in such form and containing such terms and conditions as such Manager shall approve as being advisable and proper and in the best interests of the Company (the execution thereof to constitute conclusive evidence of such approval).

5.  **Additional Authority; Ratification of Prior Actions.**

**RESOLVED**, that Brian Macmillan, the Senior Vice President – Land of the Company, is hereby further authorized to take any and all such other actions as may be necessary to carry out the intent and purposes of the foregoing resolutions, and that any and all actions taken by Brian Macmillan, the Senior Vice President – Land of the Company to carry out these resolutions prior to their adoption are hereby ratified and confirmed by, and adopted as the actions of, the sole Member of the Company.

6.  **Continuing Authority; Certification.**

**RESOLVED**, that these resolutions shall constitute a continuing authority to Brian Macmillan, the Senior Vice President – Land of the Company, to act on behalf of the Company, and the powers and authority granted herein shall continue until revoked by the Company, and formal written notice of such revocation shall have been given to the Lender and/or the Marketing Agent, as applicable.  These resolutions do not supersede similar prior resolutions given to the Lender, the Marketing Agent or any entity related to or affiliated therewith.

**RESOLVED FURTHER**, that Brian Macmillan, the Senior Vice President – Land of the Company, is hereby authorized to certify the foregoing resolutions to the Lender and the Marketing Agent and that the provisions thereof are in conformity with the Certificate of Formation, as amended and restated, and the Limited Liability Company Agreement, as amended and restated, of the Company.

**IN WITNESS WHEREOF,** the undersigned Managers have duly executed this Written Consent of the Sole Member of the Company as of September 6 , 2022.

Stockbridge Natural Resources, LLC, Sole Member

By: David Wiley
Title: Manager

Unofficial Copy Office of Marilyn Burgess District Clerk

## EXHIBIT A

This Exhibit A consists of Exhibit A-1 and Exhibit A-2

Exhibit A



**EXHIBIT A-1**

**OIL AND GAS WELLS**

| Block | Lease # | Well | API# | WI | NRI |
|---|---|---|---|---|---|
| High Island Block A-573 | | | | | |
| | High Island A-573 | OCS-G 2391 | A005 ST1 | 42-709-40499-01 | 79.16% | 65.7937900% |
| | High Island A-573 | OCS-G 2391 | A018 | 42-709-41036-00 | 79.16% | 65.7937900% |
| | High Island A-573 | OCS-G 2391 | A001 BP1 | 42-709-40271-00 | 79.16% | 65.7937900% |
| | High Island A-573 | OCS-G 2391 | A015 | 42-709-40985-00 | 79.16% | 65.7937900% |
| | High Island A-573 | OCS-G 2391 | A011 BP1 | 42-709-40868-00 | 79.16% | 65.7937900% |
| | High Island A-573 | OCS-G 2391 | A016 ST2 | 42-709-40081-02 | 79.16% | 65.7937900% |
| | High Island A-573 | OCS-G 2391 | A019 ST3 | 42-709-41042-03 | 79.16% | 65.7937900% |
| | High Island A-573 | OCS-G 2391 | A030 | 42-709-41125-00 | 79.16% | 65.7937900% |
| | High Island A-573 | OCS-G 2391 | A006 | 42-709-40555-00 | 79.16% | 65.7937900% |
| | High Island A-573 | OCS-G 2391 | A008 | 42-709-40434-00 | 79.16% | 65.7937900% |
| | | | | | | |
| Main Pass 64-68 | | | | | |
| | Main Pass 64 | OCS-G 4909 | B022 ST1 | 17-725-40814-01 | 100.000% | 75.4166400% |
| | Main Pass 68 | OCS-G 4909 | B11 | 17-725-40329-00 | 100.000% | 75.4166600% |
| | Main Pass 68 | OCS-G 4909 | B01 ST2 | 17-725-40317-02 | 100.000% | 75.4166600% |
| | Main Pass 64 | OCS-G 4909 | B015 | 17-725-40446-00 | 100.000% | 75.4166600% |
| | Main Pass 68 | OCS-G 4909 | B10 ST3 | 17-725-40328-01 | 100.000% | 75.4166600% |
| | Main Pass 64 | OCS-G 4909 | B07 | 17-725-40322-00 | 100.000% | 75.4166600% |
| | Main Pass 64 | OCS-G 4909 | B03 | 17-725-40308-00 | 100.000% | 74.0155400% |
| | Main Pass 64 | OCS-G 4909 | B04 | 17-725-40312-00 | 100.000% | 74.0155400% |
| | Main Pass 64 | OCS-G 4909 | B06 | 17-725-40123-00 | 100.000% | 74.0155400% |
| | Main Pass 64 | OCS-G 4909 | B13 | 17-725-40360-00 | 100.000% | 74.0155400% |
| | Main Pass 68 | OCS-G 4909 | B01 ST2 | 17-725-40344-00 | 100.000% | 74.0155400% |

Unofficial Copy Office of Nathan Burgess District Clerk

Unofficial Copy Office of Marilyn Burgess District Clerk

| Block | Lease # | Wells | API# | WI | NRI |
|---|---|---|---|---|---|
| Main Pass 64 | OCS-G 4909 | 017 ST3 | 17-725-40465-01 | 100.0000% | 74.015540% |
| Main Pass 64 | OCS-G 4909 | 018 Sand | 17-725-40527-00 | 100.0000% | 74.015540% |
| Main Pass 64 | OCS-G 4909 | 019 | 17-725-40370-00 | 100.0000% | 74.015540% |
| Main Pass 64 | OCS-G 4909 | 020 | 17-725-40353-00 | 100.0000% | 74.015540% |
| Main Pass 64 | OCS-G 4909 | 020 | 17-725-40351-00 | 100.0000% | 74.015540% |
| Main Pass 64 | OCS-G 4909 | 021 | 17-725-40564-00 | 100.0000% | 25.614640% |
| Main Pass 64 | OCS-G 4909 | H025 Steel | 17-725-40812-00 | 100.0000% | 74.015540% |
| Main Pass 64 | OCS-G 4909 | 002 | 17-725-40362-00 | 100.0000% | 74.015540% |
| Main Pass 64 | OCS-G 4909 | 0019 | 17-725-40560-00 | 100.0000% | 74.015540% |
| Main Pass 65 | OCS-G 5692 | A002 | 17-725-40553-00 | 100.0000% | 74.015540% |
| Main Pass 65 | OCS-G 5692 | A005 | 17-725-40554-00 | 100.0000% | 74.015540% |
| Main Pass 65 | OCS-G 5692 | A003 | 17-725-40556-00 | 100.0000% | 74.015540% |
| Main Pass 65 | OCS-G 5692 | A006 ST1 | 17-725-40806-01 | 100.0000% | 74.015540% |
| Main Pass 65 | OCS-G 5692 | A004 | 17-725-40565-00 | 100.0000% | 74.015540% |
| South Marsh Island 43 | | | | | |
| South Marsh Island 43 | OCS-G 1192 | A009 | 17-707-40849-00 | 100.0000% | 81.833330% |
| South Marsh Island 43 | OCS-G 1192 | A008 | 17-707-40822-00 | 100.0000% | 81.833330% |
| South Marsh Island 43 | OCS-G 1192 | CA015 | 17-707-40802-00 | 100.0000% | 81.833330% |
| South Marsh Island 43 | OCS-G 1192 | CA013 ST1 | 17-707-40876-01 | 100.0000% | 81.833330% |
| South Marsh Island 43 | OCS-G 1192 | CA043 | 14-707-40877-00 | 100.0000% | 81.833330% |

EXHIBIT A-1

OIL AND GAS LEASES

| Area | Block | Lease No. | Lease Date | Lessor | Original Lessee | Land/Depth Description | Ownership Rights |
|------|-------|-----------|------------|--------|-----------------|------------------------|------------------|
| Main Pass | 68 | OCS-G 8982 | 12-1-1986 | United States | Diamond Exploration Corporation | Entire Block | Record Title |
| | | | | | | Portion of Block 68, Main Pass Area, INSOFAR AND ONLY INSOFAR AS the lease covers the South Half (S/2) of the Block, below the stratigraphic equivalent of 11,980 feet subsea as seen on the electric log on the OCS-G 6964 Well #20 | Operating Rights |
| Main Pass | 68 | OCS-G 9882 | 7-1-1988 | United States | Total Petroleum | Entire Block | Record Title |
| High Island | A-573 | OCS-G 7282 | 8-1-1985 | United States | Texas Pacific Oil Company, Inc. El Paso Natural Gas Company CNG Producing Company | Entire Block | Record Title |
| | | | | | | S/2 SE/4, SE/4, E/2 SE/4, E/2 NW/4 SE/4, and S/2 SW/4 SE/4 of Block A 573, High Island Area, South Addition, Official Leasing Map, Texas Map No. 7B, INSOFAR AND ONLY INSOFAR AS it the Cibb Alt Sand Reservoir, defined as that productive zone occurring within the interval 12,519 feet TVD and 13,828 feet TVD, electric log | Operating Rights |

Unofficial Copy Office of Marilyn Burgess District Clerk

| Area | Block | Lease No. | Lease Date | Lessor | Original Lessee | Lease/Map Description | Operating Rights |
|------|-------|-----------|------------|--------|-----------------|----------------------|------------------|
| South Marsh | 41 | OCS-G 1192 | 6-1-1962 | United States | Continental Oil Company | Block 41 South Marsh Island Area, as shown on official leasing map La. No. 3A, Outer Continental Shelf Leasing Map, Louisiana Offshore Operations | Record Title |
| | | | | | | E/2 of Block 41, South Marsh Island Area, limited in depths from 13,500' TVD down to a depth of 50,000' TVD | Operating Rights |
| | | | | | | W/2 of Block 41, South Marsh Island Area, limited in depths from 15,000' TVD down to a depth of 50,000' TVD | Operating Rights |

Unofficial Copy Office of Marilyn Burgess District Clerk

EXHIBIT A-2

PIPELINES, LANDS ASSOCIATED WITH PIPELINES AND RIGHTS OF WAY AND FRANCHISES



| Area/Block | Right-of-Way Number | Pipeline Segment | Description |
|---|---|---|---|
| HI A-573 | OCS-G 04356 | 5933 | Pipeline Right-of-way (ROW) OCS-G 04356 is a 200-foot wide and approximately 7.27 miles (38,364 feet) long corridor associated with the 20-inch Pipeline Segment No. (PSN) 5933. The purpose of the pipeline ROW OCS-04356 is to maintain and operate PSN 5933 and to transport gas originating at Platform A in Block A573, through Blocks A568, A547, and A547, terminating at a 30-inch SSTI in Block A566, all in the High Island Area, South Addition. |

Unofficial Copy Office of Marilyn Burgess District Clerk



EXHIBIT A-4

PIPELINES, LANDS ASSOCIATED WITH PIPELINES AND RIGHTS-OF-WAY AND FRANCHISES

A 12-3/4 inch pipeline, 6.39 miles in length, transport oil from a Sub Sea Tie-In (SSTI) in Block 55, to the Federal/State Boundary in Block 55, all located in Main Pass Area, and all related pipelines, valves, cathodic protection equipment, pig launchers and receivers, metering facilities, equipment, other fixtures and personal property (Segment No. 4892).

A 4 1/2-inch pipeline, 3.60 miles in length, transporting oil from Platform A in Block 65, through Block 56, to Platform PIG-TRAP in Block 55, all located in Main Pass Area and all related pipelines, valves, cathodic protection equipment, pig launchers and receivers, metering facilities, equipment, other fixtures and personal property (Segment No. 7294).

A 4 1/2-inch pipeline, 0.012 miles in length transporting oil from Platform PIG-TRAP in Block 55 to a subsea tie-in in Block 55, all located in Main Pass Area and all related pipelines, valves, cathodic protection equipment, pig launchers and receivers, metering facilities, equipment, other fixtures and personal property (Segment No. 1196).

A 4 1/2-inch pipeline, 3.60 miles in length, transporting oil from Platform A in Block 65, through Block 56, to Platform PIG-TRAP in Block 55, all located in Main Pass Area, and all related pipelines, valves, cathodic protection equipment, pig launchers and receivers, metering facilities, equipment, other fixtures and personal property (Segment No. 6818), formerly Segment No. 7306).

A 3 1/2-inch pipeline, 1.09 miles in length, transporting gas supply from the Federal/State boundary in Block 68 to Platform A in Block 64, all located in Main Pass Area, and all related pipelines, valves, cathodic protection equipment, pig launchers and receivers, metering facilities, equipment, other fixtures and personal property (Segment No. 16199).

A 3 1/2-inch pipeline located in Plaquemines Parish, Louisiana, transporting natural gas from Main Pass Area Block 68, Platform "C" in Block 64 SSTI, and all related pipelines, valves, cathodic protection equipment, pig launchers and receivers, metering facilities, equipment, other fixtures and personal property.





**EXHIBIT A-2**

**SUBJECT CONTRACTS**

<u>Main Pass Blocks 64 and 65</u>

Conveyance of Overriding Royalty Interest by and between Sanare Energy Partners, LLC, as Grantor, and The First National Bank of Central Texas, as Grantee, dated effective April 16, 2020.

Conveyance of Overriding Royalty Interest by and between Sanare Energy Partners, LLC, as Grantor, and The First National Bank of Central Texas, as Grantee, dated effective April 16, 2020.

Lease, dated May 15, 2013, by and among Harvest Blocks Pipeline LLC, Medco Energi US LLC, and Northstar Offshore Group, LLC.

Shell Trading (US) Company STUSCO Contract, Amendment 1, Reference No. CXC01.P0001 Amendment 0001, dated effective July 1, 2018, by and between Shell Trading (US) Company and Medco Energi US LLC.

Master Agreement, dated May 15, 2013, by and among Harvest Blocks Pipeline LLC, Medco Energi US LLC, and Northstar Offshore Group, LLC.

Master Crude Petroleum Agreement dated August 29, 2019 between Shell Trading (US) Company and Sanare Energy Partners. Amendment dated 12-3-2020, 3-3-2023.

Base Contract for Sale and Purchase of Natural Gas dated August 1, 2017 dated between Sanare Energy Partners, LLC and Southwest Energy LP.

Notice of Lease with Option to Purchase Leased Property and Other Property, dated May 15, 2013, by and among Harvest Blocks Pipeline LLC, Medco Energi US LLC, and Northstar Offshore Group, LLC.

Asset Sale and Purchase Agreement, dated May 15, 2013, by and between Chevron Pipe Line Company and Medco Energi US LLC and Northstar Offshore Group, LLC.

Bill of Sale, dated August 14, 2013, by and between Chevron Pipe Line Company and Medco Energi US LLC and Northstar Offshore Group, LLC.

Unit Operating Agreement, 7500' Sand Unit, Blocks 64 and 65, Main Pass Area, Offshore Plaquemines Parish, Louisiana, Contract No. 7543900004, dated effective April 1, 2008, by and between Medco Energi US LLC and Lord Petroleum LLC.

3571603354



First Amended and Restated Offshore Operating Agreement, by and between Marlin Energy US L.L.C. and Lend Petroleum LLC, dated effective April 1, 2009, covering Main Pass Area, Block 64, Main Pass Area, Block 65, and 7320' Sand Unit, Main Pass Area, Blocks 64 and 65.

Ratification of Unit Operating Agreement, by and between Marlin Energy US LLC and Lend Petroleum LLC, Main Pass Area, Block 64, Main Pass Area, Block 65, and 7320' Sand Unit, Main Pass Area, Blocks 64 and 65, Contract No. 754298004.

First Amendment to and Ratification of First Amended and Restated Offshore Operating Agreement, dated effective May 17, 2011, by and between Marlin Energy US LLC and Marlin GOM L.L.L.C.

Option Farm-Out Agreement, dated effective September 18, 1991, by and among Howell Petroleum Corporation, Oil Acquisitions, Inc. and Global Marine Oil & Gas Company, covering the South Half of Main Pass Block 64, OCS-G 4909.

Amendment of Option Farm-Out Agreement, dated effective November 11, 1992, by and between Howell Petroleum Corporation and Global Marine Oil & Gas Company, covering the South Half of Main Pass Block 64, OCS-G 4909 Well #20.

Letter Agreement, dated July 25, 1994, by and among Challenger Minerals Inc. (successor in interest to Global Marine Oil & Gas Company), Howell Petroleum Corporation, Chevron USA, Chevron International Corporation, and Texaco Exploration and Production Inc., regarding Main Pass Block 64, OCS-G 4909, Well #20.

Transition Agreement dated February 11, 2022, between Sanare Energy Partners, LLC and Greyhound Energy LLC.

Master Services Agreement dated March 26, 2022 between Sanare Energy Partners, LLC and SBB Energy Services, LLC, as contractor.

**High Island Block A-571**

Offshore Operating Agreement dated February 23, 1924 by and between GNG Producing Company, Texas Pacific Oil Company, Inc., El Paso Natural Gas Company and American Petrofina Company of Texas covering all of Block A-571 High Island Area, South Addition, as amended.

Lateral Line Operating Agreement, 12-1-12 between Enterprise GTM Offshore Operating Co. LLC, Black Elk Energy Offshore Operations, Fieldwood Energy LLC.

Reserve Commitment Agreement effective December 1, 2009 between High Island Offshore System and Black Elk Energy Offshore Operations, LLC.

Interruptible Transportation Agreement between High Island Offshore System and Black Elk Energy Offshore Operations, LLC dated December 1, 2009.

Unofficial Copy Office of Marilyn Burgess District Clerk

Amendment to Reserve Commitment Agreement effective April 1, 2020 between High Island Offshore System and Black Elk Energy Offshore Operations, LLC.

Assignment and Bill of Sale between Sanare Energy Partners and Rosefield Operating Company effective February 1, 2023.

Oil Gathering and Reserve Dedication between Sanare Energy Partners, LLC and Rosefield Operating Company, LLC effective February 1, 2023.

Letter Agreement dated November 6th 2020 between Sanare Energy Partners, LLC and Rosefield Pipeline Company.

Conveyance of Overriding Royalty Interest by and between Sanare Energy Partners, LLC, as Grantor, and The First National Bank of Central Texas, as Grantee, dated effective April 16, 2020.

Assignment of Term Overriding Royalty Interest by and between Sanare Energy Partners, LLC, as Grantor, and KEWA Capital LLC, as Grantee, dated effective July 1, 2020.

Master Crude Petroleum Agreement dated August 28, 2019 between Shell Trading (US) Company and Sanare Energy Partners. Amendments dated 11-1-2020, 3-1-2021.

Base Contract for Sale and Purchase of Natural Gas dated August 1, 2017 dated between Sanare Energy Partners, LLC and Southwest Energy LP.

High Island Pipeline System (HIPS) Operating and Administrative Management Agreement dated effective June 1, 2009 by and between Owners of High Island Pipeline System (HIPS)

High Island Pipeline System (HIPS) Owners Agreement dated effective June 1, 2009 by and between Owners of High Island Pipeline System (HIPS)

High Island Pipeline System (HIPS) Operating Agreement dated effective March 25, 2002

Operating Agreement High Island Lateral Line A-571 dated 3-24-82, between Michigan-Wisconsin Pipe Line Co., Northern Natural Gas Co., Consolidated Gas Supply

Agreement to Succeed Feather Operating Company as Operator of HIPS Pipeline System dated May 10, 2021.

Amendment to Operating Agreement dated effective February 1, 1989 by and between CNG Producing Company, Sun Operating Limited Partnership et al., Meridian Oil Production, Inc., El Paso Natural Gas Company and Fina Oil and Chemical Company

Amendment to Operating Agreement dated effective March 1, 1986 by and between CNG Producing Company, Sun Exploration and Production, Meridian Oil Production, Inc., El Paso Natural Gas Company and Fina Oil and Chemical Company

Amendment to Operating Agreement dated effective July 28, 1975 by and between CNG Producing Company, Texas Pacific Oil Company, Inc., El Paso Natural Gas Company, and American Petroleum Company of Texas

Offshore Operating Agreement dated effective February 13, 1974 by and between CNG Producing Company, El Paso Natural Gas Company, and American Petroleum Company of Texas

Ratification and Adoption Agreement, 11-1-02 between Offshore Energy, LLC, Dauberts Operating Co. LLC, Dominion E&P Inc.

Texas Offshore Exploration Agreement (TEX'S Group), 10-31-73 between Signal Oil & Gas, Texas Pacific Oil Co., CNG, El Paso Natural Gas Co.

Master Services Agreement dated March 14, 2022 between Sanare Energy Partners, LLC and SBB Energy Services, LLC, as contractor

**South Marsh Island Block 41**

Conveyance of Overriding Royalty Interest by and between Sanare Energy Partners, LLC, as Grantor, and The First National Bank of Central Texas, as Grantee, dated effective April 16, 2020

Base Contract for Sale and Purchase of Natural Gas dated August 1, 2012 dated between Sanare Energy Partners, LLC and Southwest Energy LP

Master Crude Petroleum Agreement dated August 28, 2019 between Shell Trading (US) Company and Sanare Energy Partners. Amendments dated 11-1-2020, 3-1-2021

Assignment of Gas Processing Agreement dated effective January 12, 1998 by and between Shell Western E&P Inc. and Tejas Holdings, LLC

Production Handling Agreement dated effective September 1, 2004 by and between Hunt Petroleum (AEC), Inc. and Devon Energy Production Company

Operating Agreement dated effective June 1, 2003 by and between Hunt Petroleum (AEC), Inc. LLOG Exploration Offshore, Inc. and Devon Energy Production Company

Farmout Agreement dated effective January 15, 2003 between Apache Corporation and Hunt Petroleum (AEC), Inc. amended on June 30, 2003 and October 19, 2004

Joint Area Agreement with Operating Agreement Attached dated effective July 1, 2005 by and between Hunt Petroleum (AEC), Inc., LLOG Exploration Offshore, Inc. and Devon Energy Production Company, LP

First Amendment to Joint Area Agreement dated effective October 1, 2005 by and between LLOG Exploration Offshore, Inc., Hunt Petroleum (AEC), Inc. et al, Apache Corporation, Devon and Nippon

Unofficial Copy Office of Marilyn Burgess District Clerk

Stipulation and Amendment to the Operating Agreement (attached to the Joint Area Agreement) dated effective November 14, 2005 by and between Devon and Nippon

Letter Agreement regarding PSA dated March 1, 2006 between Nippon Oil Exploration USA Limited and Hunt Petroleum (AEC), Inc.

Letter Amending PSA dated July 21, 2008 between Nippon Oil Exploration USA Limited and Hunt Petroleum (AEC), Inc.

Agreement for Sharing Fairfield Industries 3D Prestack Depth Migration dated December 19, 2007 between Hunt Petroleum (AEC), Inc. Nippon Oil Exploration USA Limited

Production Handling Agreement dated December 1, 2007 between Hunt Petroleum (AEC), Inc. Nippon Oil Exploration USA Limited

Ratification and Amendment of PSA dated April 1, 2008 between Hunt Petroleum (AEC), Inc. Nippon Oil Exploration USA Limited

Master Services Agreement dated March 16, 2021 between Sonace Energy Partners, LLC and SBS Energy Services, LLC, as contractor.

## EXHIBIT A-1
## TO MORTGAGE

### Oil and Gas Properties

This Exhibit A-1 contains this Preamble and the specific description of the "Oil and Gas Leases" comprising a portion of the "Mortgaged Property", as those terms are defined in the Act of Mortgage, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production and Revenues (the "Mortgage") to which this Exhibit A-1 is attached.

Divisions. This Exhibit A-1 may be composed of several divisions and subdivisions at least one for each state and county or parish in each state in which any part of the Mortgaged Property is located (or deemed located) in more than one county or parish, the division hereof containing the description of such oil, gas and mineral lease will generally include the relevant portion of each of the counties in which any part of such oil, gas and mineral lease is located. Counties or parishes containing portions of such multi-county or multi-parish leases may therefore be covered by more than one division of this Exhibit A-1. Each subdivision is in turn composed of further subdivisions—each one covering one or more of the oil, gas and mineral leases included among the Mortgaged Property.

Definitions. For all purposes of the Mortgage and this Exhibit A-1 unless the context otherwise requires, the hereinafter-identified terms have the following meanings:

"After Payout" or "APO" specifies the Net Revenue Interest and the Working Interest of Mortgagor after the occurrence of a particular event, such as payout of certain costs with respect to a Well or Wells, as described in an Oil and Gas Lease, assignment or assignments thereof, or one or more of the agreements to which the affected property is subject as shown in this Exhibit A-1.

"Before Payout" or "BPO" specifies the Net Revenue Interest and the Working Interest of Mortgagor before the occurrence of a particular event, such as payout of certain costs with respect to a Well or Wells, as described in an Oil and Gas Lease, assignment or assignments thereof, or one or more of the agreements to which the affected property is subject as shown in this Exhibit A-1.

"Net Revenue Interest" or "NRI" means (i) with respect to a Unit for which a Net Revenue Interest is stated, that interest in the applicable Hydrocarbons (as defined in the Mortgage) produced, saved and sold from such unitized area which is afforded to Mortgagor by virtue of its ownership of the Oil and Gas Leases included in whole or in part in such area after deducting all burdens against the production therefrom, and (ii) with respect to a Well for which a Net Revenue Interest is stated, that interest in the applicable Hydrocarbons produced, saved and sold from the Well which is afforded to Mortgagor by virtue of its ownership of the Oil and Gas Lease on which such Well is located after deducting all burdens against the production therefrom.

"Working Interest" or "WI" means the property interest which entitles the owner thereof to explore and develop certain land for oil and gas production purposes,

Exhibit A, Page 1

whether under an oil and gas lease or unit, a compulsory pooling order or otherwise.  And, (i) with respect to a Unit for which a Working Interest is stated, Mortgagor's share of the costs of operations conducted thereon, and (ii) with respect to a Well for which a Working Interest is stated, Mortgagor's share of costs of the operation thereof.

Exhibit A, Page 2

**EXHIBIT A-2**

**TO MORTGAGE**

**Pipelines**

All rights, titles and interests of Mortgagor in all existing and future pipelines, gathering systems and other transportation assets, and all assets, equipment, rights and interests related thereto (i) located on the Mortgaged Property described on Exhibit A-1 and (ii) located on the Lands Associated with Pipelines and Rights of Way and Franchises described on the following pages.

Exhibit A-2